

FILED
APR 1 2 2019
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

**UNITED STATES DISTRICT COURT**
FOR THE NORTHERN DISTRICT OF ILLINOIS

LEONARD A. SZPLETT, an individual,

PLAINTIFF,

vs.

KENCO LOGISTIC SERVICES, LLC, a TENNESSEE LIMITED LIABILITY COMPANY, MARS, INC., The HARTFORD, DAVID JABALEY, MARIO LOPEZ, TAMMI FOWLER, PAULA HISE, TRACE SPIER, ROBERT COFFEY, TODD MOORE, JAY ELLIOTT, DAVID CAINES, MICHAEL MANZELLO, DAVID CRAWLEY, and KELVIN WALSH

DEFENDANTS.

1:19-cv-02500
Judge: Gary Feinerman
Magistrate Judge: Young B. Kim

**NOW COMES PLAINTIFF, LEONARD A. SZPLETT** (hereafter "SZPLETT") and

hereby brings his complaint against defendants KENCO LOGISTIC SERVICES, LLC, a

TENNESSEE LIMITED LIABILITY COMPANY, MARS, INC., The HARTFORD,

DAVID JABALEY, MARIO LOPEZ, TAMMI FOWLER, PAULA HISE, TRACE

SPIER, ROBERT COFFEY, TODD MOORE, JAY ELLIOTT, DAVID

CAINES, MICHAEL MANZELLO, DAVID CRAWLEY, and KELVIN WALSH

and alleges as follows:

## I.
## NATURE OF THE ACTION

2.             The action is brought to remedy the violations of Szplett civil rights and to

redress the unlawful and discriminatory employment practices of KENCO LOGISTIC

SERVICES, LLC, a TENNESSEE LIMITED LIABILITY COMPANY, MARS, INC., The

HARTFORD, DAVID JABALEY, MARIO LOPEZ, TAMMI FOWLER, PAULA

HISE, TRACE SPIER, ROBERT COFFEY, TODD MOORE, JAY ELLIOTT,

DAVID CAINES, MICHAEL MANZELLO, DAVID CRAWLEY, and KELVIN

WALSH. This action arises out of the conduct of MARS and KENCO's employees and its

employment practices of race discrimination as defined by 42 U.S.C. § 1981 and

Federal Civil RICO, 18 U.S.C. §1962(c) & (d).

**II.**

**JURISDICTION**

3. This in part, an action authorized and instituted pursuant to the Civil Rights Act of 1866, as amended by the Civil Rights Act of 1991, 42 U.S.C. §1981; 42 U.S.C. 1981 A, 42 U.S.C. §1988 Illinois common law and Federal Civil RICO, 18 U.S.C. §1962(c) & (d).

4. The jurisdiction of this court is predicated upon 28 U.S.C. §§1331 and 1343, to redress the unlawful deprivation of Plaintiff's rights secured, guaranteed and protected by federal law. The Court also has jurisdiction pursuant to 28 U.S.C. 2 §§2201 and 2202 relating to declaratory judgments. This Court may also exercise pendent jurisdiction over Plaintiff's state law claims arising from a common nucleus of operative facts pursuant to 28 U.S.C. 1367.

## III.
## VENUE

Venue is proper in the United States District Court for the Northern District of Illinois, Eastern Division pursuant to28 U.S.C. §1331 and 28 U.S.C. §1391Section 1981 claims, arising under 42 U.S.C. § 1981,wherein Defendants KENCO and Mars regularly conduct business.

## IV.
## THE PARTIES
### PLAINTIFF

5. SZPLETT is a citizen of the United States and is a Caucasian male and at all relevant times herein; he has resided in Illinois, in the County of Kankakee and was an employee of MARS and KENCO within the meaning of the Civil Rights Act of 1866, as amended by the Civil Rights Act of 1991, 42 U.S.C. §1981and applicable case law.

6. SZPLETT was employed with MARS and KENCO and its predecessor, whom at all times acted as agents of Mars, Inc., since 1999 through various 3rd party management companies; beginning with 4T's Management Company and then with KENCO since April 2013.

**DEFENDANT**

7. At all relevant times herein, Defendant KENCO was a 3rd party Logistics management servicing agent for Defendant Mars, Incorporated employing over 3000+ employees nationwide and is a Tennessee and Virginia Limited Liability Company with offices in Bolingbrook, Romeoville and Joliet Illinois. Defendant Kenco does business as Kenco Logistics.

8. KENCO maintained an office in Manteno, Illinois and currently maintains offices in Bolingbrook, Romeoville, and Joliet Illinois, and conducts business within the State of Illinois. Defendant KENCO'S primary place of business is in Chattanooga, Tennessee and is an employer within the meaning of Civil Rights Act of 1866, as amended by the Civil Rights Act of 1991, 42 U.S.C. §1981.

9. MARS, Incorporated currently maintains several offices in Chicago, Burr Ridge, Joliet and Manteno, Illinois. Defendant MARS, Inc. employs over 3000+primary place of business is in Mclean, Virginia and is an employer within the meaning of Civil Rights Act of 1866, as amended by the Civil Rights Act of 1991, 42 U.S.C. §1981.

10. Robert Coffey was the Regional Distribution Manager for the Mars Manteno facility in Manteno, IL. At all relevant times Coffey resided in Chicago IL and was an employee of Mars, Inc. during the relevant times.

11. Todd Moore was the Senior Manager of Logistics for the Mars, Inc. Moore managed Robert Coffey, who managed the Mars Manteno facility, among other duties as a Mars, Inc. employee. During the relevant times Moore resided in Tennessee.

12. Paula Hise was the Vice President of Operations for Kenco Logistics and Vice President of Kenco Group Health and Personal Care during the relevant times and resided in Tennessee.

13. Trace Spier was the Vice President of Operations for Kenco Logistics and Vice President of Kenco Group Fast Moving Consumer Goods during the relevant times and resided in Tennessee.

14. Dwight Crawley was the Chief Financial Officer of the Kenco Group during the relevant times and resided in Tennessee.

15. David Caines was the President of Kenco Logistics who reported to Shelia Crane President of the Kenco Group and the Chief Operating Officer of the Kenco Group during the relevant times and resided in Tennessee.

16. Tammi Fowler was the Senior Manager of Employee Relations for the Kenco Group during the relevant times and resided in Tennessee.

17. Jay Elliott was the Vice President of Legal for the Kenco Group during the relevant times and resided in Tennessee.

18.    David Jabaley was the Director of Operations for Kenco Logistics and the interim General Manager of the Mars Manteno facility. During the relevant times Jabaley resided in Illinois and Tennessee.

19.    Kelvin Walsh was the General Manager of the Mars Manteno facility during the relevant times and resided in Evanston, IL.

20.    Mike Manzello was the Operations Manager of the Mars Manteno facility during the relevant times and resided in Illinois.

21.    Mario Lopez was the Operations Manager of the Mars Manteno facility during the relevant times and resided in Illinois.

22.    Hartford was the 3rd party administrator for the Kenco Group servicing agent for Defendant Kenco's, health and disability benefits, employing over 3000+ employees nationwide and is a Hartford, Connecticut company with offices in Chicago, IL.

## V.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

23. No administrative prerequisites are required before a plaintiff files a complaint pursuant to the Civil Rights Act of 1866, as amended by the Civil Rights Act of 1991, 42 U.S.C. §1981.

## VI.

## FACTUAL ALLEGATIONS

24. At all relevant times, Defendants KENCO and MARS, Inc., employed in excess of fifteen (15) employees for at least twenty (20) calendar weeks in 2013, 2014 and 2015.

25. At all relevant times, all matters regarding compensation, terms, conditions, rights and privileges of SZPLETT'S employment were governed and controlled by Defendant(s) MARS, KENCO, The HARTFORD, DAVID JABALEY, MARIO LOPEZ, TAMMI FOWLER, PAULA HISE, TRACE SPIER, ROBERT COFFEY, TODD MOORE, JAY ELLIOTT, DAVID CAINES, MICHAEL MANZELLO, DAVID CRAWLEY, and KELVIN WALSH

26. At all relevant times SZPLETT possessed the skills, experience and qualifications necessary to work in his employment position and adequately, competently and completely performed all of the functions, duties and responsibilities of his employment with Defendant KENCO.

27.   KENCO was acting as the agent of Mars and in its conduct and actions as alleged herein.   Kenco and its agents were acting in a capacity within the scope of its authority, or, if said conduct was outside the scope of its authority, said conduct was known; authorized and ratified by Mars, Inc.

28.   MARS, Inc., and 4T's management through ingenuity and family alliance collaborated, championed, and implemented the vertical startup of the MARS Manteno facility.

29.   The MARS Manteno facility is a dedicated co-pack, warehouse and distribution center for Mars, Inc.

30.   The MARS Manteno facility has been in operation since 1999.

31.   The MARS Manteno facility was managed by 4T's from 1999 until 2013.

32.   The Mars-Manteno facility, since its inception in 1999, has been a fully functional facility comprised of a General Manager, Operations Manager, Accounting and Human Resource Department, supervisors, and workers.

33.   MARS, Inc. specifically provided on a daily basis:

      a.   On site Regional District Manager.

      b.   Morning meetings regarding the daily "Plan."

      c.    Fulfillment orders are generated by Mars, Inc. through the warehouse Management System "WMS" using Systems Applications and Products in Data Processing "SAP" software for the intake and distribution of the billion pounds or more of candy annually at the Mars Manteno facility.

      d.    Mars, Inc. warehouse quality manual.

      e.    Labor Management of the Mars Manteno facility.

      f.    Cross-functional collaboration between departments.

34.    MARS, Inc. routinely and regularly provided incentives to the Mars Manteno employees.

35.    MARS, Inc. issued a Request for Proposal (RFP) in late 2012 or early 2013 to bid on the upcoming management vacancy at the MARS Manteno warehouse and distribution facility in Manteno, IL.

36.    MARS, Inc. had a Co-Pack Operation in house at the Mars Manteno Facility run by Jacobson Logistics Company.

37.    Kenco Logistics responded to the RFP issued by MARS, Inc.

38.    MARS, Inc. identified and retained the management services of Kenco Logistics in early 2013.

39.    On or about February 15, 2013, 4T's notified the Mars Manteno employees in writing that the owner was retiring and; that another

distributor would be taking over the MARS account and; that it was expected that most employees would be hired to essentially perform the same work, and that technically the plant was being closing under 4T's management. Exhibit 1

40. Kenco Logistics replaced the services of 4T's Management.

41. Kenco Logistics is a 3rd party logistics company that manages warehouse and distribution centers for other companies.

42. Kenco Logistics stated to the on or about November 2014 in case number 2014CF0475, and subsequently again in case number 2014CF2858, 2014CF2992, 2014CF3057, 2014CF3161, 2015CF0310, 2015CF0811, 2015CF1145, 2015CF0342, 2015CF0990, 2015CF1315, 2015CA1464, 2014CF3162, 2015CF0003, 2015CF0006, 2015CF0515, 2015CF0516, 2051CF0699, 2015CA1054, 2015CA1590 and others that "Kenco is a third-party logistics company ("3PL") that operates and manages warehouses and order fulfillment operations for other companies."

43. On April 21, 2013, Kenco began managing such a warehouse in Manteno, Illinois for Mars, Inc.

44. Kenco Logistics is a privately held company in the state of Tennessee.

45. Kenco Logistics corporate structure, operating structure and legal structuring is not synonymous with any other company.

46. Kenco Logistics is part of the Kenco Group.

47. Kenco Group's CEO at the relevant times were Jane Kennedy Greene and Gerald Perritt.

48. Kenco Group's President at the relevant time was Shelia Crane.

49. Kenco Logistics was hired to manage the Mars, Inc. Manteno facility in Manteno, IL.

50. Mars, Inc. is a privately held company in the state of Virginia.

51. Mars, Inc. paid Kenco Logistics a management fee to manage the Mars Manteno facility according to their signed agreement. Exhibit 2

52. Mars, Inc. passed thru their costs through Kenco Logistics with the exception of the direct pays of the lease, the taxes, fire protection, insurance, management fee, rack expense/amortization, and material handling fee.

53. Specifically, Mars, Inc. passed through Kenco Logistics the salaries of all the employees (temporary and part & full time employees), as well as, any invoices of the Mars Manteno facility.

54. This function performed was synonymous to that of the services provided by ADP, LLC.

55. Mars, Inc. managed Kenco Logistics.

56. Mars Manteno was a part of the network of Mars distribution centers.

57. Mars Manteno was the Midwest distribution center:

a. Mars Manteno serviced twelve (12) Midwestern states and Canada

b. Mars Manteno had been the number one (1) distribution center in the network

58. Mars Manteno was infrastructurally similarly situated to the other four (4) distribution centers in the network in organization. For example each distribution center had, but was not limited to having a:

a. General Manager

b. Operations Manager

c. Accounting/Human Resources

d. Truck Builders

e. Warehouse workers

59. Organizationally the Mars Manteno General Manager answered to and conferred with the onsite Regional Distribution Manager herein "RDM" of Mars, Inc., as a matter of the course of ordinary business operations.

60. *Black's Law Dictionary* defines "employee" as "a person in the service of another under any contract of hire, express or implied, oral or written,

where the employer has the power or right to control and direct the employee in the material details of how the work is to be performed.

61. Mars, Inc. provided and stipulated such terms and conditions of employment, to Kenco Logistics, just as it did to the other employees of Mars Manteno facility.

Mars also ensured compliance to the "mandates" of Mars outlined in the Mars US Warehouse Quality Manual and public policy, including but not limited to FSMA (Food safety and Modernization Act, 2002 Bioterrorism Act, CFR Title 21, and any other applicable public policy. Compliance was verified through internal and external 3rd party audits.

For example, Mars conducted various internal audits prior to Kenco taking over the management of the facility. There were 3rd party external audits conducted by customers such as: Walmart, Costco and others, such as the Herrington Group for compliance. Exhibit 3

62. Mars, Inc. required Kenco Logistics to which Kenco Logistics agreed to be compliant with Public Policy, such as, Title VII, 21 U.S.C. Chapter 27-FSMAamong other codified statutes and laws of the land, just as it would with any employee. Exhibit 2

63. Specifically, Mars, Inc. provided Kenco Logistics with company policies, procedures, manuals and the like, as it would with any employee. In addition, Mars, Inc. provided the necessary tools to perform

the assigned job functions, such as but not limited to: Leasing the facility, the equipment (warehouse and office), the computers, and the software. Mars maintained the facility and repaired the equipment used by Kenco.

64.     Specifically, Mars, Inc. provided to Kenco Logistics, just as it had its former management company on a regular and ongoing basis, a comprehensive standard to safeguard the Quality and Food Safety of its products in the outbound pipeline. The documents were developed in conjunction with the Global Quality and Food Safety standards of the Codex Alimentarius-Food and Agriculture Organization of the United Nations herein after "FAO" and the World Health Organization herein after "WHO"-21CFR Chapter I Subchapter B part 130 Subchapter A.

Additionally, Defendant Mars, Inc. is very familiar with these standards, as Mars, Inc. is a Board Member of the International Life Sciences Institute herein after "ILSI" who enjoys a close relationship with regulatory bodies including the WHO/FAO.

The ILSI's mission is to resolve pending issues relative to food regulations and the international trade of food, using relevant scientific data.

65. Specifically, Mars, Inc. set the performance management standards and goals for Kenco Logistics, just as it would with any employee.

66. Kenco Logistics because of its multifunctional and multilayers of management types can be characterized as a "Super Manager."

67. Specifically, Mars, Inc. provided it's "Super Manager" Kenco Logistics with ongoing guidance, support, resources and management continually.

68. Specifically, Mars, Inc. provided this support, guidance and management to its "Super Manager" Kenco logistics and the Mars Manteno Facility, by way of an in-house Regional Distribution Manager (RDM).

69. Kenco Logistics, it's "Super Manager" conferred with Mars, Inc. on a regular ongoing basis regarding its goals and directives. Kenco also reported the results of the goals and directives to Mars to maintain conformity to such goals and directives.

Additionally, Kenco reported incidents that occurred at the Mars Manteno facility to Mars. Exhibit 4

Mars Specifically, instructed Kenco to report incidents to Mars and receive directives before taking any actions, particularly those incidents that could damage the "goodwill/reputation" of Mars. Exhibit 5

70.    Just as any manager would, Kenco Logistics a type of "Super Manager" dovetailed their management styles to synergize the mandates of it employer, Mars, Inc. and public policy to meet the performance management goals set by Mars, Inc.

71.    Public policy drives industry standards that drive company policy. Specifically, in this case the Food, Drug and Cosmetic Act (FD&C Act), Food Safety and Modernization Act (FSMA), the 2002 Bioterrorism Act and other Acts, as well as, The Center for Disease Control (CDC), Food Safety and Inspection Service (FSIS), (WHO), Codex Alimentarius Commission (CAC), FAO and other organizations, shape and form the various recognized Global Food Safety Initiative (GFSI) benchmarks; which include but are not limited to: FSSC 2200, ISO2200, BRC, IFS, SQF and other food safety standards.

72.    Defendant Mars and its agents are governed by the ISO22000 standard. This standard is derived from the Codex Alimentarius-21CFR130.6

73.    Specifically, Kenco Logistics was assigned the task of implementing a written Quality Management System based upon the current non-documented procedures and protocols being performed at the Mars Manteno facility. This standard was based upon ISO, the International Standard of Organization.

74. Kenco Logistics Quality Management System is based on ISO, The International Standard of Organization; the specific ISO standard is 9001:2008.

75. Specifically, Kenco Logistics implemented a written Quality Management System at the Mars Manteno Facility-Exhibit 6-CP.BP.4.2.1001.

76. Mars, Inc. and Kenco logistics are both certified to the Global Food Safety Initiative standard and or benchmark-21CFR Chapter I Subchapter M. Exhibit 7

77. Yearly external audits are required to remain compliant to the Quality Management System along with internal audits. 21 CFR 117 Subchapter G.

78. Furthermore, the federal government under the 2001 Bioterrorism Act and the 2011 Food Safety Modernization Act, requires all august body participants along the food supply chain to be complaint with these statutes 21CFR Chapter I Subpart B pt 117 Sub Part F & G; Essentially from farm to fork.

79. Kenco Logistics publicly purports to "ensure all requirements are documented according to the ISO-9001:2008 structure and are incorporated into the sites' standard operating procedures. Through regular internal audits and program development, Kenco's quality team

provides support and industry expertise in FDA, OSHA, EPA, DEA, DOT, and numerous other compliance agencies."

80. Specifically, the system implemented at the Mars Manteno facility was to be a standardization of all policies, procedures, mandates and the like. This included, but was not limited to job analysis, job descriptions and the corresponding operating procedures for each job. These and all-encompassing documents were authored, vetted and catalogued in a library according to ISO.4.2.3.001. Exhibit 8

81. Quality Management systems under the FSMA, including but not limited to this Mars Manteno Quality Management System, mandate that all documents are to be catalogued, controlled, maintained, and stored amongst other requirements. These requirements are codified at 21CFR Chapter I Subchapter B pt. 117 Subchapter F pt.121 Subchapter; Subchapter A pt. 1 Subchapter J Authority

82. Kenco Logistics developed an Appendix A for the Mars Manteno facility that catalogued the corresponding standardized documents for the Mars Manteno Facility. This included but was not limited to Job descriptions, Standard Operating Procedures, policies, and forms. Exhibit 10

83. Kenco Logistics also maintained an Appendix F, a higher matrix of Appendix A, top tier documents, that catalogued the corresponding standardized documents for the Kenco Logistics as a whole, inclusive of the Manteno Facility, as well as, other managed facilities. This included but was not limited to Job functions by titles, Standard Operating Procedures, policies, forms and the like. Exhibit 11

84. The documents itemized in Appendix A for the site superseded those documents in Appendix F because they were customized to the specific employer's and site requirements.

85. Defendant Mars required Defendant Kenco to turn over the library these Appendices.

86. To ensure proper dissemination and training, each policy and or procedure are to be signed off by each employee and a record (log) retained of such. Exhibit 13

87. No deviation from any policy and procedure is to occur without following the procedure of the exception procedure and an approval of such on any level according to CP.BP.4.2.1001. Exhibit 14

88. In an email President, David Caines, of the Kenco Group during the relevant time referred to the employees of the Mars Manteno site specifically as Mars, Inc. employees. Exhibit 15

89. The "Super Manager's" role was to manage and enforce the directives and mandates of Mars, Inc. at the Mars Manteno facility that was owned, leased and operated by Mars, Inc. since the Mars, Inc. Manteno inception in 1999.

90. Civil Rights Act of 1866, as amended by the Civil Rights Act herein "CRA" of 1991, 42 U.S.C. §1981 provides that it is unlawful to be harassed, fired or otherwise discriminated against because of a person's race.

91. Section 101 of CRA 1991 was codified as the recently amended 42 U.S.C. § 1981, which, together with the former § 1981, states in pertinent part:

> (a) Statement of equal rights
> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts ....
> (b) Definition
> For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.
> (c) Protection against impairment
> The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

92. The Civil Rights Act of 1866, as amended by the Civil Rights Act of 1991, 42 U.S.C. §1981 is at bottom line an enterprise liability

scheme. It is structured to hold employing entities—and individuals—accountable for race based discrimination within the organization.

93. The Mars-Manteno facility, since its inception in 1999, has been a fully functional facility comprised of a General Manager, Operations Manager, Accounting and Human Resource Department, supervisors, and workers.

94. Kenco, Mars, Inc., "Super Manager" provided back office support to the accounting and human resource department where Szplett worked. Exhibit 9

95. The implementation of Kenco management styles included but were not limited to: Kenco Quality Management System (KQMS), an ISO 9001:2008 based system, operational excellence and continuous improvement based upon Lean and Six Sigma principles.

96. The specific back office support provided by Kenco entailed the passing on of invoices/bills of the Mars Manteno facility to Mars, Inc. after they were receipted, reconciled and by the Mars Manteno facility Accounting Department, to which Plaintiff oversaw with this counterpart Edith McCurry.

97. In addition to the invoice pass through to Mars, Inc., Kenco also passed through the Mars Manteno payroll by issuing the payroll checks, after the payroll had been processed, verified and submitted by the Mars

Manteno Accounting Department for the five (5) different payrolls that comprised the Mars Manteno Facility to Kenco's payroll department.

98. The additional specific back office support provided by Kenco was the recruitment and hiring of salaried personnel for the Mars Manteno facility and other Human Resource support. Exhibit 16

99. While the Mars Manteno facility's HR recruited, hired, and onboarded hourly employees. Mars Manteno on site HR also performed performance management for all employees, including performance appraisals, promotions, discipline and terminations; handled employee relation issues; received employee complaints of all kinds; administered employee benefits; complied with federal and state employment laws; among other functions and tasks.

100. The KQMS was designed to standardize the facility to bring compliance to 21CFR110, Food Safety and Modernization Act, 2002 Bioterrorism Act, and any other applicable Global Food Safety Initiative (**GFSI**) benchmarked schemes; in addition to, streamlining business process, increasing efficiency, profitability, transparency and accountability.

101. The claims of disparate treatment and impact by SZPLETT and others were reported to Kenco corporate and its officers: Senior Manager Employee Relations -Tammi Fowler, Paula Hise- V.P. of Operations, David Jabaley-

Director of Operations, Dan Dey-Director of Risk Management and Trace Spier- V.P. of Operations, and onsite management  Kelvin Walsh-General Manager, Mike Manzello Operations Manager, Mario Lopez-General Manager, and other corporate persons by email, phone, fax, and in-person on numerous occasions.

102.  Additionally, Robert Coffey, on site Regional Distribution Manager and Todd Moore his superior were aware of the discrimination claims being made by employees.

103.  Coffey reported directly to Moore.

104.  Both Coffey and Moore were aware and weighed in on personnel management hiring's, disciplines and terminations.  Group Exhibit 17

105.  For example, Coffey was aware of the circumstances of Tom White's immediate resignation, after the then GM, Kelvin Walsh, admonished and punished White for not treating employees like "assholes."  Exhibit 18

106.  The majority of the employee's White supervised at the time Walsh admonished him for not treating the employees like "assholes" were African American.

107.  Coffey made personnel change announcements regarding the Mars Manteno employees.  Exhibit 19

108. Coffey even directed that William Schwerin be brought back after he had been terminated. Schwerin was the Quality/Facility Engineer for the Mars Manteno facility.

109. Mars at all times had the opportunity to participate in all employment matters at the Mars Manteno facility; including the formal charges of discrimination filed by the employees of the Mars Manteno facility. Exhibit 17

110. At all times, Kelvin Walsh, ("Walsh"), a Caucasian, American male, held the position of General Manager. Walsh was in a position of authority to undertake tangible employment decisions and/or control the terms and conditions of SZPLETT'S employment with Defendant KENCO.

111. At all relevant times, Walsh, acting on behalf of Kenco, the managing agent for Mars, Inc. directed and approved all operational activities, including but not limited to: hiring, firing, pay, scheduling, performance management, workflow and the like. Walsh reported to Paula Hise, V. P. of Operations for Kenco Logistics and Robert Coffey Regional Distribution manager for the Mars Manteno facility.

112. At all times relevant, Mike Manzello, ("Manzello"), a Caucasian male held the position of Operations Manager reporting to Walsh. Manzello was in a position of authority to undertake or recommend tangible

employment decisions and/or control the terms and conditions of SZPLETT'S employment with KENCO and MARS.

113. At all relevant times, Manzello managed operational activities relative to the receipt and distribution of inventory for Mars, Inc., including but not limited to: hiring, firing, pay, scheduling, performance management, workflow and other tasks.

114. At all times, David Jabaley, ("Jabaley"), a Caucasian, American male, held the position of Director of Operations at Kenco Logistics, a part of the Kenco Group. Jabaley was in a position of authority to undertake tangible employment decisions and/or control the terms and conditions of SZPLETT'S employment with Defendant KENCO.

115. At all relevant times, Jabaley, acting on behalf of Kenco Corporate, the managing agent for Mars, Inc. directed and approved all operational activities, including but not limited to: hiring, firing, pay, scheduling, performance management, workflow and the like.

116. At all times, Mario Lopez, ("Lopez"), a Caucasian, American male, held the position of General Manager at the Mars, Inc. Manteno facility. Lopez was in a position of authority to undertake tangible employment decisions and/or control the terms and conditions of SZPLETT'S employment with Defendant KENCO.

117. At all relevant times, Lopez, acting on behalf of Kenco, the managing agent for Mars, Inc. directed and approved all operational activities, including but not limited to: hiring, firing, pay, scheduling, performance management, workflow and the like.

118. At all times, Tammi Fowler, ("Fowler"), a Caucasian, American female, held the position of Senior Employee Manager at the Kenco Corporate. Fowler was in a position of authority to undertake tangible employment decisions and/or control the terms and conditions of SZPLETT'S employment with Defendants.

119. At all relevant times, Fowler, acting on behalf of Kenco the managing agent for Mars, Inc. directed and approved all operational activities, including but not limited to: hiring, firing, pay, scheduling, performance management, workflow and the like.

120. At all times, Paula Hise, ("Hise"), a Caucasian, American female, held the position of V.P. of Operations for Kenco Logistics. Hise was in a position of authority to undertake tangible employment decisions and/or control the terms and conditions of SZPLETT'S employment with Defendants.

121. At all relevant times, Hise, acting on behalf of Kenco the managing agent for Mars, Inc. managed and approved all operational activities,

including but not limited to: hiring, firing, pay, scheduling, performance management, workflow and other tasks.

122. At all times, Trace Spier, ("Spier"), a Caucasian, American male, held the position of V.P. of Operations for Kenco Logistics. Hise was in a position of authority to undertake tangible employment decisions and/or control the terms and conditions of SZPLETT'S employment with Defendants.

123. At all relevant times, Spier, acting on behalf of Kenco the managing agent for Mars, Inc. directed and approved all operational activities, including but not limited to: hiring, pay, scheduling, performance management, workflow and other tasks.

124. At all times, Robert Coffey, ("Coffey"), a Caucasian, American male, held the position of Regional Distribution Manager for MARS, Inc. Coffey was in a position of authority to undertake tangible employment decisions and/or control the terms and conditions of SZPLETT'S employment with Defendants.

125. At all relevant times, Coffey, acting on behalf of Mars, Inc. directed and approved all operational activities, including but not limited to: hiring, firing, pay, scheduling, performance management, workflow and other tasks.

126. At all times, Todd Moore, ("Moore"), a Caucasian, American male, held the position of Senior Manager of Logistics for MARS, Inc. Moore was in a position of authority to undertake tangible employment decisions and/or control the terms and conditions of SZPLETT'S employment with Defendants.

127. At all relevant times, Moore, acting on behalf of Mars, Inc. directed and approved all operational activities, including but not limited to: hiring, firing, pay, scheduling, performance management, workflow and other tasks.

128. At all times relevant, Jay Elliott, ("Elliott"), a Caucasian male, held the position of V. P. of Legal reporting to Shelia Crane, President of Kenco. Elliott was in a position of authority to undertake or recommend tangible employment decisions and/or control the terms and conditions of SZPLETT'S employment relationship with KENCO.

129. At relevant times, Elliott coordinated/managed and participate in legal proceedings and litigation on behalf of Defendants.

130. SZPLETT was employed with predecessors of KENCO on or about July 9, 2001 as the HR/Accounting Manager, for a 3rd party management company whom at all times acted as agents of Mars, Inc., beginning with 4T's Management Company and then with KENCO on April 21, 2013.

131. On April 3, 2013, SZPLETT was offered continued employment at the Mars Manteno facility by Paula Hise V.P. of Operations for Kenco.

132. Hise extended this explicit offer of employment to Plaintiff in writing, just as all offers were made to the employees of the Mars Manteno facility. Exhibit 20

133. The offer required Plaintiff to sign and return a copy of the letter as acceptance of the offer. Exhibit 21

134. SZPLETT asserts that this offer letter constituted a legitimate contractual relationship between Defendants Kenco and Mars.

135. SZPLETT further contends that "[Plaintiff's] promise to work for Defendants Kenco and Mars was consideration exchanged for their promise to pay him.

136. Thus, the party's actions created a contractual relationship; a "contract."

137. SZPLETT also asserts that this contractual agreement created a fiduciary obligation between Defendants Kenco and Mars and SZPLETT.

138. SZPLETT was responsible for the HR and Accounting department that oversaw employee relations, hiring, terminations, performance management, onboarding, benefits, payroll and other duties and tasks, along with his counterpart, Edith McCurry.

139. McCurry was equally qualified as SZPLETT.

140. Szplett and McCurry performed similar duties along with common core tasks. Both Szplett and McCurry had performed these same duties since 2001.

141. McCurry was not afforded the same fringe benefits, terms and conditions of employment as SZPLETT.

142. McCurry complained to management.

143. Thereafter, McCurry became the target of discrimination.

144. The discriminatory treatment of McCurry eventually affected SZPLETT as it denied him of the proper administrative support to properly and effectively operate the HR and Accounting Department efficiently.

145. Szplett was very familiar with the policies and procedures of Defendants Kenco and Mars.

146. Szplett was very familiar with Human Resource policies, procedures and practices.

147. Szplett performed Human Resources duties and tasks as a part of his daily job function.

148. Szplett was designated as the manager over HR and accounting.

149. SZPLETT was never disciplined for work performance or any other impropriety, or company infraction.

150. African-Americans employees, who complained to SZPLETT or McCurry and Management about actions of disparate and disparaging treatment and impact, were terminated; usually within a relatively short time to give rise to a retaliatory motive.

151. SZPLETT conveyed the sentiments of disparaged employee to management.

152. Thereafter, SZPLETT became the target of disparate and disparaging treatment and impact.

153. From 2001 through 2015 African-Americans and those who opposed the disparate and disparaging treatment of African-Americans, including SZPLETT, were subject to harsher scrutiny, discipline, harassment, humiliation, intimidation, retaliation, unequal terms and conditions of employment, disparate pay, defamation, retribution, and termination amongst other things creating racial animus and a hostile work environment.

154. African-Americans had also been mischaracterized, misclassified, and underpaid.

155. For example, Defendants have mischaracterized Edith McCurry as a clerk that only performed rudimentary or basic clerical functions such as typing and filing.

156.    Plaintiff contends that Defendants assertions of McCurry were not true.

157.    Beginning in 2001 SZPLETT was paid more for performing the same job functions and activities along the same exact lines of business, as Edith McCurry, African-American.

158.    SZPLETT and McCurry possessed the same identical credentials.

159.    SZPLETT and McCurry equally divided the duties of the HR and Accounting Departments.

160.    SZPLETT asserts that racial discrimination and biases flourished and were deeply embedded in the KENCO and Mars Manteno culture. It was open, active and unabashed.

161.    SZPLETT also asserts that the harassment, abuse and discrimination were encouraged by KENCO and MARS management's open endorsement and refusal to stop or deter this oppressive behaviour.

162.    SZPLETT also alleges that necessary to the existence of the KENCO and Mars Manteno racially discriminatory culture was the expectation that white employees would in complicity work together to marginalize, harass, denigrate, subordinate, punish and exclude black employees.

163. SZPLETT also alleges that white employees, including plaintiff, who do not disparage or minimize black employees have been adversely affected by the racially hostile environment at the Mars Manteno facility.

164. SZPLETT also asserts that the right of persons in the protected class, including himself, right to work in an environment free of racial discrimination that he and other protected class persons including blacks have been aggrieved in some of the following ways:

a. By a working environment heavily charged with racial discrimination, resulting largely from the rampant racial harassment, unequal terms and conditions of employment, uneven discipline, pay disparities, publicly staged psychological demoralizing and humiliating chastisements and punishes, reminiscent of slavery and Reconstruction era;
b. By a working environment which expects complicity with white racial dominance and subordination of blacks, and punishes resistance or refusal to contribute to such discrimination;
c. By being subjected to and observing racially hostile treatment and stereotypes and;

       d. By KENCO and MARS management's awareness of; participation in and/or lack of response to the hostile working conditions.

165. SZPLETT'S also alleges that as a result of his failure to act in complicity with management's race-based stereotypes regarding African Americans and his unwillingness to cooperate with other Caucasian employees to marginalize, subordinate, minimize, exclude or disparage African American employees, he suffered adversely in the following ways:

a. That he suffered reverse discrimination.

b. The terms and conditions of his employment changed in that:1) his workload increased, due to the lack of administrative support and; 2) his job title and function were being used in an unlawful way to help Defendants obstruct justice and violate the protected rights of African Americans or those who opposed such;

c. The loss of job title and duties; demotion from HR Manager; Exhibit 22

d. Being falsely accused of being responsible for the charges of discrimination that were being filed against Defendants; Exhibit 22

e. Being noted as having failing leadership; Exhibit 22

f. Being subject to false statements made under oath by Defendants;
   Exhibit 22

   a. For example, Defendant Elliott stated in defendant Kenco's
      position statement that Szplett's was never the HR Manager.

   b. Additionally, that Szplett's job duties did not change after
      Varvel was hired.

g. Being defamed by telling third parties false and materially
   misleading information that directly affected SZPLETT'S
   professional and personal standing permanently; Exhibit 22

   a. That Szplett was responsible for the charges of
      discrimination being filed because of his failing leadership.

h. Being unjustly denied benefits such as disability and
   unemployment through fraudulent and deceptive measures;

i. Being denied compensation through unlawful measures of
   extortion. Specifically, Szplett was coerced into a quid pro quo
   of forcing him to waive his claims including but not limited to:
   Title VII, Civil Rights Act of 1866, as amended by the Civil
   Rights Act of 1991, 42 U.S.C. §1981 and other statutorily
   protected claims and to assist Defendants in HR matters and
   litigation in return to receive his compensation and severance
   pay; Exhibit 23

j. Being denied the opportunity to apply and to continue working at the Mars Manteno facility; Exhibit 25

k. Being subjected to intentional infliction of emotional distress in that plaintiff:

a. Has witnessed a number of persons in the protected class suffer public ridicule; humiliation; unjust adverse employment decisions of uneven discipline, economic sanctions, demotions, and terminations amongst other treatment; loss of professional standing, and dignity;

b. Has witnessed at least two (2) people lose their lives because of the racially motivated expectation of complicity to racial dominance and subordination of blacks (Don Stonchus and Scott Marksteiner);

c. Has watched defendant psychologically terrorize a number of persons in the protected class by making public examples of them;

d. Has watched a number of persons in the protected class be treated with a recklessly with blatant disregard of their livelihood and well-being;

i. For example, refusing to return Morris Tyson, a (ten) 10-year tenured, African American employee back to

work and leaving him on indefinite leave without pay while making accommodations of Mark Baker, non-African American, and employee for less than six (6) months. Who was returned to a position that Morris Tyson could perform and was qualified to perform; or suspending African American employees such as Nathan Doss, Morris Tyson and Mardy Ringo for extended periods of time without pay and without following company policy as it relates to investigations and discipline; or terminating African American employees unjustly such as Jacque Morrison, Vernon Henry and Mary Madison after raising issues of discrimination and other safety issues.

e. Has watched Defendants withhold due benefits and compensation in favor of whites over blacks who were either not qualified or not entitled to various fringe benefits;

f. Has been subjected to a loss of professional and personal standing;

g. Has been held accountable or deemed responsible by Defendant for the charges of discrimination being filed;

h. Has been fraught with guilt, shame and anguish relative to witnessing the racially motivated disparaging and disparate treatment and impact imposed upon African Americans and those who opposed such discrimination;

i. Has been deprived of benefits and compensation needed to support Plaintiff and his family while out on disability due to the work related stress of having been subjected to a hostile work environment charged with racial animus; Exhibit 23

j. Has with anguish contemplated what the loss of job and income was to other co-workers who had been victimized by the racially motivated adverse actions of Defendants;

k. Has suffered mental and physical anguish, stress and duress as a direct result of Defendants actions;

l. Has suffered a seared conscious from the blatant and reckless racial discrimination that stemmed from the hostile work environment created by Defendants;

m. Has watched his wife suffer undue physical anguish, stress and duress as a result of Defendants actions;

n. Was subject to a constructive discharge relative to the hostile work environment, when Plaintiff had to take a medical leave

of absence due to the unbearable and unreasonable working conditions at the Mars Manteno facility;

o. Was subject to not being able to properly retire and receive the accolades and benefits associated with retirement and;

p. Was subject to being extorted in order to receive his severance pay after having his compensation and other benefits withheld amongst other things.

l. Being subject to and a subject of a number of civil conspiracies that include, but are not limited to:

a. Being mischaracterized as other than the HR Manager to aid and abet Defendants in avoiding liability and culpability in various lawful charges and suits of discrimination and;

b. Being the victim of an elaborate scheme designed by executive level management to employ Jay Elliott, as VP of Legal to provide false and misleading information that would obstruct justice and its administration.

166. In 2012, under the direction of Kelvin Walsh's management leadership, the Mars Manteno facility became a pervasively heightened animus and hostile work environment, precipitating a shooting inside the Mars Manteno warehouse. Exhibit 26

167. From 2012 on this animus and hostile work environment caused SZPLETT and others at the Mars Manteno facility to be in constant fear of their safety, lives and well-being.

168. Under the same management direction later in 2012, Defendant's newly promoted General Manger, Kelvin Walsh's, open disdain and dislike of African-Americans and those who opposed the disparate and disparaging treatment of African-Americans became more pronounced when one of Walsh's first acts as General Manger was terminating Don Stonchus, a Supervisor, without a valid or lawful reason.

169. Stonchus a former supervisor of the Mars Manteno facility, upon realizing Walsh's apathy and abhorrence for African-Americans, began opposing the disparate and disparaging treatment of African-Americans.

170. Stonchus was discharged by Walsh because of his opposition to Walsh's discrimination against African Americans.

171. Upon information and belief, Stonchus fell into a deep depression after his termination; Stonchus committed suicide.

172. In about March or April of 2013, Kelvin Walsh collaborated with the incoming management company, Kenco, to memorialize

pay rates and equivalent job functions from the 4T's conversion to Kenco.

173. SZPLETT and his counterpart McCurry were trained in May of 2013 according to Defendant Kenco's Human Resources policies, procedures, and protocols at Defendant, Kenco's, corporate office in Chattanooga, TN, by Tammi Fowler and others (Exhibit 27). Fowler was to support the site Human Resources persons in employee issues at the sites. Fowler was never to handle the employee issues with exclusivity. Exhibit 27-A

174. Both SZPLETT and McCurry had accountability to Defendant, Kenco's, corporate HR, specifically Tammi Fowler.

175. Defendant's policies and procedures and the like were governed by a Quality Management ISO based System, specifically the Kenco Quality Management System (KQMS). Exhibit 6

176. Defendant Kenco had corporate policies, procedures, protocols, forms and the like that were spelled out in Appendix F. Exhibit 11

177. Facilities managed by Defendant, Kenco, had site specific policies, procedures, protocols, forms and the like.

178. Mars Manteno site was to have site specific policies, procedures, protocols, forms and the like.

179. These site policies procedures, protocols, forms and the like would be contained in Appendix A. Exhibit 10

180. Appendix A is equivalent to Appendix F on a site level.

181. According to company policy, employees were to be trained on all applicable policies, procedures, protocols, forms and the like.

182. According to company policy a record and/or log of this training was to be kept. Exhibit 13

183. According to company policy employees who were trained on policies, procedures, protocols, forms were to sign off on that training.

184. According to company policy a record of employee's signature and acknowledgment of the policies, procedures, protocols, forms and the like were to be maintained.

185. The policies, procedures, protocols, forms and the like were to be developed, implemented and maintained by the Quality Engineer/Coordinator.

186. On July 8, 2013, after 5:00 p.m., Walsh called Szplett into his office and stated that he wanted to have a meeting.

187. Walsh did not give any particulars of the meeting or what it entailed. Present at the meeting was Walsh, Mary Madison and Plaintiff.

188. Walsh began speaking to Madison in a very derogatory, condescending and accusatory manner about situations that did not exist.

189. Madison was ultimately given a Performance Improvement Plan.

190. Such a plan had never existed at the Mars Manteno facility, nor had any person been given such a plan.

191. This alleged Performance Improvement Plan was on a plain piece of paper. It was not on company stationery or conforming to other official company correspondence.

192. Walsh had not spoken to SZPLETT prior to giving this plan to Madison.

193. The allegations made by Walsh were unfounded and were rebuffed by Madison by written documentation that refuted the contrived allegations.

194. Walsh told Madison that she was giving him a headache.

195. Additionally, no one had made any adverse reports to Szplett's or his counterpart regarding Madison.

196. Madison was given ten (10) days after receipt of the "PIP" Performance Improvement Plan dated July 8, 2013 and that was acknowledge by Madison on July 9, 2013 to respond to the "PIP".

197. Upon signing the plan on July 9, 2013, Madison indicated that she did not agree.

198. Madison emailed Walsh, Hise, and Szplett on or about July 22, 2013 in response to the "PIP" stating again that she had been treated differently and not afforded the same opportunities as Tim McGrath of Service Master.

199. Madison was not afforded the thirty (30) days stated on the plan to improve after the submitted response.

200. Madison was terminated on August 9, 2013.

201. Defendant did not follow its own requirements.

202. Walsh referred to Madison as an "educated nigger bitch" in addition to using other racially motivated derogatory statements and epithets towards her.

203. Madison's "PIP" did not correlate with any corresponding site or corporate policy. Exhibit 10 & 11

204. Madison's "PIP" did not correlate with the Defendant's documentation policy or procedure. Exhibit 6

205. Defendants violated their own policies, procedures, protocols and the like.

206.   SZPLETT'S counterpart Edith McCurry was interviewed by Karen
Smith the then outside counsel for defendant Kenco regarding the charges
of discrimination and whistleblowing filed by Madison. Exhibit 29

207.   McCurry reported to Smith that Madison had made complaints to
not only her, but to Paula Hise, Len Szplett's and others about the
disparaging and disparate treatment and impact directed toward her by
Defendant's General Manager, Kelvin Walsh.

208.   McCurry also reported to Szplett and at Madison's fact-finding
conference that she had witnessed this treatment of Madison and
outlined the discriminatory treatment to which McCurry had been
subjected.

209.   Despite Madison reporting the incidents of discrimination, no
action was taken by Defendant to further investigate Madison's claims or
to confer with Szplett's or McCurry.

210.   Defendant had a policy which required it to conduct an investigation
into Madison's allegations. Exhibit 30

211.   Defendant failed to follow its own company policy.

212.   Defendant allowed Walsh to initiate, disseminate and execute the
adverse actions against Madison, without any investigation or
intervention.

213. Defendant's Counsel, Karen Smith, reported to the Illinois Department of Human Rights case no. 2014CF0475 cross-files with the EEOC that McCurry was only a clerk and was therefore unable to intake such information on behalf of the company and that SZPLETT was the HR Manager. Exhibit 31

214. Defendants and Defendants' counsel were fully aware of McCurry's role and position as HR Administrator, as it was posted on Defendant Kenco's website that McCurry was the HR Administrator for the Mars Manteno site. Exhibit 32

215. Defendants and Defendant's Counsel, Karen Smith, intentionally, willfully, and maliciously defamed, marginalized, and mischaracterized McCurry and McCurry's job functions to the Illinois Department of Human Rights and EEOC to continue to intentionally perpetuate the racially motivated conspiracy against Madison's protected rights, obstruct justice, and impede the administration of justice, to avoid culpability and liability.

216. Despite McCurry's statements to Smith, Smith willfully and intentionally represented to the Illinois Department of Human Rights and EEOC that Madison instructed McCurry not to take any action about the complaints waged against Defendant Kenco. Exhibit 31

217. Immediately after speaking with Smith, McCurry began being ostracized, marginalized, harassed and retaliated against by Defendant.

218. For example, McCurry was excluded from the witness list concerning the charges Madison filed.

219. Madison requested that McCurry be present during the Fact Finding Conference for the charges filed at the Illinois Department of Human Rights and EEOC. Exhibit 33

220. McCurry affirmed during the Fact Finding Conference that Madison had reported the matter and that McCurry knew how she felt because of how McCurry had been treated as an African American while working at the Mars Manteno facility.

221. Defendants went on to say in the Madison Fact Finding Conference that there was a hotline number that could have been used to report employment issues.

222. This was a misrepresentation, as there was no hotline number during the relevant time.

223. McCurry began being overburden with "other" tasks that were assigned to her outside the scope of her job function and was routinely given impossible deadlines by senior management.

224. Defendant began capriciously changing the shifts of the employees, without notification to SZPLETT or McCurry.

225. Defendant ran a seven (7) day a week, multiple daily overlapping shift operation.

226. Defendant's actions caused and created chaos, payroll errors, impossible deadlines, intentional stress and hostile employees.

227. The Defendants intentionally and willfully minimized and marginalized McCurry's job status, title, tasks and duties from and HR Administrator to a HR Clerk to relieve themselves of culpability and obstruct justice for the actions of Mars-Kenco and its agents in the creation and sustainment of a hostile working environment charged with racial animus that fostered hate crimes, threats, disparate and disparaging impact and treatment to those who oppose such treatment.

228. Immediately, after the Fact-Finding Conference SZPLETT was aggressively retaliated against, harassed, and further marginalized by defendant.

229. Within days, under Defendant's General Manger, Kelvin Walsh's, direction Valerie Lillie pressured SZPLETT to agree to change McCurry's job description/title from HR Administrator to clerk.

230. The effect of this change meant that McCurry would report directly to Walsh instead if Szplett.

231. Plaintiff alleges that this change would have been an adverse employment decision towards Plaintiff; as it would have further altered Szplett's administrative support in operating his department and that;

232. Walsh would have terminated her employment resulting from this change, just as he had done Madison and others.

233. No one else had been subject to having their job description/title changed; despite continuing to perform the same duties.

234. SZPLETT opposed such change in McCurry job description/title.

235. Walsh did not have the professional, educational, or experiential acumen to manage or oversee McCurry and the work she performed, as Walsh only had a high school diploma and no experience in HR or accounting.

236. Walsh did not meet defendant's criteria for being the General Manager.

237. As a result of McCurry again being subjected to additional daily tasks, greater workloads and impossible deadlines by Kelvin Walsh and others, affected the terms and conditions of Plaintiff's employment. These actions denied Plaintiff and McCurry the proper administrative support necessary to operate the HR and Accounting department efficiently.

238. In August of 2013, Morris Tyson began requesting to return back to work from an injury.

239. Tyson's repeated requests to return to work were ignored by Defendant's General Manager, Kelvin Walsh.

240. Defendant's General Manager ignored Tyson's calls to him and messages given to him by Plaintiff and McCurry regarding Tyson's request to return to work.

241. Defendant's General Manager, Kelvin Walsh finally informed Tyson that he could not return to work unless he was a 100% without restrictions.

242. The Americans with Disability Act requires that employees be given reasonable accommodations.

243. Reasonable accommodations were available.

244. Tyson had over ten (10) years of employment at the MARS Manteno facility as a spotter.

245. Conversely, during the same time Defendant's General Manager, Kelvin Walsh returned to work a recent hire, Mark Baker, of less than six (6) months to an accommodated position of a window clerk.

246. Baker was Caucasian.

247. Baker's requests to return to work were not ignored by Defendant as was such request by Tyson to return to work.

248. Baker was returned as a Window Clerk (Shipping and Receiving).

249. Baker had to be trained as a Window Clerk (Shipping and Receiving).

250. The Window Clerk position was a position that Tyson had extensive experience performing; Tyson had performed the position in years prior and he could have performed it without any training.

251. There was a legitimate business need for Spotter's.

252. A position that Tyson could have been performed without accommodation.

253. Other modified work was available and had been made available to other non-black employees instead of Tyson.

254. Other non-blacks had not been ignored by defendant, such as Harold Bell.

255. Harold Bell was reasonably accommodated after having permanent doctor's restrictions.

256. Bell was returned to work in a sanitation position.

257. Plaintiff had worked to get Tyson placed on an unpaid leave of absence to protect his employment status while trying to return to work. Exhibit 35

258. In December of 2013, an issue arose in which Walsh was questioned about Nathan Doss's pay disparity.

259. Walsh informed SZPLETT and McCurry by email that Tammi Fowler, Senior Manager of Employee Relations had approved Doss's incremental pay raise.

260. Fowler is a certified member of The Society of Human Resources herein "SHRM."

261. Fowler asserts on her LinkedIn page that:

> Her responsibilities include management of the Employee Relations function for the five Kenco Companies; providing interpretation and advice to HR Managers and Site Managers on employment law, organization policy and overall employee relations issues; conducting investigations related to claims of harassment or discrimination and recommending steps for resolution; reviewing termination requests and providing management with appropriate action plans; and educating Managers regarding the spirit and intent of laws, regulations and company policies. Exhibit 37

262. Fowler could have prevented the racially motivated discriminatory treatment upon Doss and others, as she was the Senior Employee Relations Manager who touts her ability to provide interpretation and advice to HR Managers and Site Managers on employment law, organization policy and overall employee relations issues. Fowler was to offer support to the sites. Exhibit 27-A

263. Fowler could have also used SHRM as a resource. Its membership has privileges that afford resources necessary to address virtually any Human Resource issue and/or matter or legal counsel.

264. No other non-black external or internal Lead Associate immediately preceding or proceeding Doss was subjected to such adverse terms and conditions of employment.

265. This was against Defendant's compensation policy.

266. Defendant hired an external candidate, Stephanie Dumas, who did not meet defendant's requirements for the Lead Associate Position. Exhibit 38

267. This was against defendant's policy.

268. Furthermore, Dumas was given a premium shift, i.e. first (1st) shift, Monday - Friday.

269. Shortly after McCurry's attempted change title, SZPLETT'S counterpart, McCurry was informed to no longer take action in employee related matters but forward them to Fowler.

270. Defendant in an attempt to further its scheme to cover up claims of discrimination in April of 2014 issued the second "PIP" at the Mars Manteno facility to Tom White.

271. White opposed the contrived scheme and resigned immediately.

272. White had been employed at the Mars Manteno Facility, since its inception in 1999, for almost 15 years.

273. White was the first (1st) shift supervisor and immediate past Operations Manager.

274. Plaintiff asserts that White was demoted from Operations Manager by Walsh because of his failure to act in in complicity with management's race-based stereotypes regarding African Americans and his

unwillingness to work with other Caucasian employees to discriminate against African American employees.

275. White indicated upon his written exit interview that you don't have to treat people like "assholes" to get them to do what is needed. Exhibit 18

276. White also indicated the work environment was discriminatory. Exhibit 18

277. On or about June 4, 2014, Walsh was terminated. Exhibit 39

278. Defendant KENCO through its VP of Operations, Paula Hise, openly praised and lauded Walsh as a valued employee and friend and characterized his separation from defendant as a great loss. Exhibit 40

279. Hise made these statements about Walsh despite defendant being in possession of firsthand knowledge and evidence of Walsh's violation of company and public policy regarding discriminatory treatment in the workplace. This constituted another form of harassment, and racial animus by Defendant KENCO.

280. Walsh was offered a severance.

281. Walsh severance was the equivalent of his salary almost nine (9) thousand dollars a month for better than three (3) months.

282. Other employees who were, African American, allegedly terminated for performance, such as Madison were not given a severance.

283. On or about Mid-August 2014, SZPLETT and McCurry began receiving emails sent from corporate saying that McCurry isn't getting payroll in on time.

284. The constraints were caused by faulty time clock and the whimsical changes in shifts without prior notification. Payroll was also due within 2.5 hours of the last shift ending. Persons worked mandatory overtime past the close of payroll. There were five (5) separate payrolls with different processes. There were also employee issues, complaints and inquisitions about incorrect pay amongst a host of other things that contributed to payroll not being timely.

285. Bobby Isles from corporate payroll instructed Szplett and McCurry that the time be estimated or guessed as to what time the employees would finish and record the time as such.

   a.   Effectively shorting the employee of their wages

   b.   Falsifying official records

286. SZPLETT and McCurry complained, protested and refused to do such.

287.   Defendant continued to impose ever changing and more stringent and impossible deadlines.

288.   Defendant intentionally used the impossible deadlines for payroll to harass and inflict emotional and physical stress on Plaintiff and McCurry.

289.   Defendant also intentionally used this impossible deadline in retaliation for SZPLETT and McCurry for having engaged in protected activity.

290.   Defendant intentionally contrived this scheme to effectively make this an impossible deadline to use as lawful and non-discriminatory reason to eventually terminate SZPLETT and McCurry.

291.   Specifically, Manzello reported on September 2, 2014, the day he was terminated, that Defendants were also looking for ways to terminate SZPLETT and McCurry's employment with the company as well.

292.   Manzello also reported that someone from the company had come in his office and taken paperwork out of his office that could be of aid to Doss, as well as, other employees.

293.   Sometime in September of 2014, SZPLETT and McCurry were called into a meeting.  McCurry was accused by David Jabaley, Mario Lopez, and Tammi Fowler of making unauthorized payments to an employee, Dana Woods, African American.

294. Mario Lopez stated that making unauthorized payments was stealing from the company.

295. Fowler indicated that the best punishment for employees was "hitting them in the pocket."

296. There was no written policy on when an employee's vacation pay could and could not be disseminated.

297. Defendant often used this economic and psychological sanction to harass, intimidate, and retaliate against employees by not paying them for weeks at a time and holding their monies (vacation time) in abeyance.

298. Hourly employees were paid weekly.

299. As a company benefit, employees were afforded the benefit of being able to have their Paid Time Off herein "PTO" paid out to them upon request.

    a. Woods was suspended for making a comment about an incident that he saw on the national news in a conversation with another employee. Bushey, a white female supervisor, said she felt threatened by the conversation.

        i. Non-black, African Americans, who made similar comments, or comments that violated persons protected rights were not punished, reprimanded, or suspended such as Pete Monstwillo or Karl Meyers.

ii. Woods was not afforded an opportunity for
progressive discipline; he was not counseled,
warned or given a verbal write up.

iii. Woods punishment was more severe and
harsher than other non-African Americans.

iv. Peter Monstwillo, non-black, made racial slurs,
epithets and threats to Vernon Henry in February of
2014 in front of a number of employees."Calling him
a "nigger" amongst other epithets."

v. Monstwillo was not punished; but was hired as
permanent employee.

vi. Subsequently, Pete Monstwillo attempted to kill
Vernon Henry with a Forklift on October 8, 2014;
He was not punished nor terminated.

300. Suspending Woods was a psychological tool routinely used to
subjugate and oppress African-Americans.

301. SZPLETT intervened and took responsibility for paying Woods to
avoid any adverse employment action against McCurry.

302. In April of 2015, Plaintiff became aware that he too had begun to
be mischaracterized. Defendant Kenco stated in its position statement

dated March 27, 2015 that SZPLETT'S was only the office manager, inferring that he was not the HR Manager. Exhibit 41

303.  In May of 2015, SZPLETT filed claims for wages and other unlawful actions against him by Defendants with the DOL, IDHR and EEOC.

304.  In late August of 2015, SZPLETT learned that Defendants had hired Lori Varvel as the HR Manager because of all the charges of discrimination filed against them due to SZPLETT'S alleged failing leadership.

305.  SZPLETT'S had not been apprised that he would or had been replaced.

306.  SZPLETT asserts that he was demoted in retaliation for his association with African Americans and for his opposition to discriminatory treatment of African Americans and others who opposed such unlawful actions by the Defendant.

307.  SZPLETT'S also asserts that this demotion was an adverse employment decision and that his professional and personal standing suffered as a result of this adverse employment action.

308.  SZPLETT also asserts that he was harassed and defamed by Defendants in that Defendants denied him administrative support, created impossible deadlines, increased workloads and

reported false and misleading information regarding Szplett's leadership and job performance.

309. The harassment and discrimination followed the complaint to corporate and HR within such a period of time as to raise an inference of retaliatory motivation.

310. The position was not posted as required by company policy; Job Posting Procedure CP.HR. 6.2.2.011. Exhibit 42

311. After Mars approved the position, Defendants advertised the position in September of 2014.

312. Varvel had less experience than SZPLETT and McCurry.

313. Varvel was paid more than SZPLETT.

314. As a part of Defendant's evidence, it presented to the IDHR/EEOC in charge no.# 2015CA1804/21BA50670 that Varvel was a HR Generalist. Exhibit 43

315. A HR Generalist and a HR Manager are not the same.

316. Varvel did not meet the qualifications set forth by Defendant to be the HR Manager.

317. Defendant also represented to the IDHR and EEOC that Szplett had no change in responsibilities. Exhibit 22

318. SZPLETT asserts that Defendants have taken inconsistent positions regarding SZPLETT and what his role and title were at the Mars Manteno facility.

319. Defendants have stated in other matters that SZPLETT was not the HR Manager.

320. Defendants' changed their position in its motion for summary judgment in McCurry v Kenco et al. 16 -CV-2273 Docket #113 stating that Szplett was the HR Manager.

321. Defendants have represented that SZPLETT'S was the HR Manager In the following matters:

a. Madison v. Kenco et al.-2014CF0475 cross-filed with the EEOC, OSHA—DOL 2016-FDA-04

b. McCurry v. Kenco et al.-16-cv-2273, 18-3206

322. Defendants have consistently stated in Madison since 2013 to date that plaintiff was the HR Manager. Exhibit 31

323. In the matter of McCurry v. Kenco et al., case no. 18-3206 Defendants have as recently as February 2019 reaffirmed in its Appellee brief to the 7th Circuit appeals court that Szplett was the HR Manager.

324. Plaintiff is in privity to the matters immediately listed above.

325. Plaintiff asserts that Defendants should be estopped from changing its position again regarding SZPLETT and his position as HR Manager.

326.    Plaintiff contends that Defendants should be estopped pursuant to the doctrines of Res Judicata, Collateral Estoppel, and Judicial Estoppel, as these matters have been previously litigated and decided on its merits.

327.    Plaintiff asserts that Defendants committed fraud on the administration of justice by providing misleading and fraudulent information to the IDHR and EEOC about plaintiff and used the mail to further its schemes.

328.    SZPLETT has been subjected to the misuse, abuse and misapplication of company policy for intimidation, harassment, bullying, retaliation, threats to personal standing and other adverse employment decisions because SZPLETT opposed discriminatory treatment of African Americans by defendant.

330.    Similarly situated non- African American employees were not treated in this manner.

331.    For example, Marci DeRosier and Anthony Marquez and others, who had not engaged in protected activity, are currently still employed by Mars and its current management scheme.

332.    Similarly situated male non-black, African American employees were not treated in this manner.

333.   The harassment and discrimination followed the complaint to corporate and HR within such a period of time as to raise an inference of retaliatory motivation.

334.   On or about August 2013 to 2014SZPLETT involuntarily conspired, aided and abetted the company against the rights of certain African American employees, such as Morris Tyson, by denying them of reasonable accommodations for no apparent reason other than they were African American.

335.   SZPLETT also involuntarily conspired, aided and abetted the company in violation of other employees' rights, such as Mary Madison, Jacque Morrison, Nathan Doss, Vernon Henry, and Scott Marksteiner, Edith McCurry among others, in relation to wrongful termination, uneven and harsher discipline, disparate pay and other adverse and post adverse employment decisions.

336.   Defendant contrived a racially motivated scheme to eradicate and control the claims of discrimination made by African Americans and those who opposed disparate and disparaging treatment and impact.

337.   Defendant instituted an anonymous hotline whereby employees could allegedly report employment matters without fear of retribution.

338.   Defendants also mislead employees into believing that matters would be addressed according to company policy.

339. Defendant's hotline was not anonymous and the information was directly given to Tammi Fowler.

340. Tammi Fowler would then call the employees manager and reveal the employees identity.

341. Fowler's actions caused irreparable harm to the employees, as they were subjected to harsher scrutiny, discipline and various other measures.

342. Defendant also conspired and contrived additional schemes to eradicate the complaints of African-Americans by letting them believe that if they reported the incident to Plaintiff, the onsite HR, that:

a. An unbiased investigation would be undertaken;

b. There issues would be addressed according to company and public policy;

c. That the employees' rights would be protected;

d. That investigation would be documented;

343. Plaintiff asserts that Defendants breached their fiduciary obligation to its employees.

344. From March 27, 2015 to date, SZPLETT has been mischaracterized and defamed by the defendant and defendant's counsel as other than an HR Manager for the sole purpose to relieve the company of any culpability and liability for unconscionable acts of employment discrimination that

violate employee's rights, including SZPLETT'S own, and other persons/employee's rights who opposed the discriminatory treatment of them by defendant.

345. SZPLETT was defamed on more than several occasions in various matters by Defendant in the proceedings at the Illinois Department of Human Rights and the EEOC.

346. From on or about July of 2013-to date, defendant engaged SZPLETT in an involuntarily conspiracy to aid and abet the company in violation of African American employees, as well as, those who opposed such disparate treatment to not be treated differently, disparagingly, or biasly regarding their fundamental protected rights of: 1) not being paid disparately or differently than those non-blacks performing the same duties and tasks; 2) subjection to unfavorable shift changes; 3) abuse of authority; 4) adverse changes terms and conditions of employment; 5) other fringe benefits offered to non-blacks, such as but not limited to access to overtime; 6) being free from a hostile work environment; 7) harassment; 8) nepotism; 9) favoritism; 10) racism;11) being subjugated to harsher and more strenuous work assignments created a hostile and racially animus charged work environment.

347. Defendant KENCO intentionally and willfully interfered with the job duties and obligations of SZPLETT as the HR Manager as a

result of his opposition to Defendants discriminatory conduct directed toward African Americans and other employees that supported them.

348.   Defendant's actions were rooted in racial animus.

349.   Defendant KENCO intentionally and willfully interfered with SZPLETT'S obligation as the HR Manger to oppose their impeding and obstruction of justice to governmental regulatory agencies, such as but not limited to OSHA, EEOC and the Department of Human Rights by mischaracterizing the circumstances and events surrounding the complaints before the various agencies.

350.   Defendant intentionally and willfully spoiled direct evidence submitted from investigations, complaints and the like gathered by SZPLETT, McCurry and others that could be used to support the position of employees/claimants.  Exhibit 45

351.   Defendant KENCO and its agents, Fowler, Walsh, Jabaley, Lopez, Manzello, and others, publicly humiliated, degraded, belittled, intimidated and reprimanded employees, especially African American's and those who oppose disparate and disparaging treatment.  Such as Nathan Doss, Scott Marksteiner, Mardy Ringo and others.

352.   Defendants' actions were racially motivated and inspired.

353. Defendants' continued to negligently employ workers who denigrated African-American employees, by displaying openly bigoted and racist conduct toward African American employees.

354. Defendant Kenco and its agents, routinely, made intentional and willful adverse decision to continue to subject African Americans, and those who opposed discriminatory conduct, including SZPLETT regarding their terms and conditions of employment and their employment. Additionally, Defendants contrived plans of harassment and intimidation in retaliation of waging internal and external complaints of, nepotism, favoritism, racism, discrimination, intimidation, hostile work environment, harassment, coercion, harder work assignments, less pay, humiliation, harsher scrutiny and discipline than non-blacks and those who did not oppose such treatment.

355. Defendant Kenco and its agents intentionally and willfully mischaracterized incidents and events with the intent to incite divisive, chaotic and racially tense relationships amongst employees and management.

356. Defendant Kenco and its agents intentionally and willfully propagated misleading, unethical, and fraudulent company policies, protocols, procedures, and practices that were negative,

adverse to, and retaliatory towards the employees, especially, African Americans, and those who opposed discriminatory treatment of African Americans.

357. Defendants again breached their fiduciary obligation to its employees by the following actions:

a.    Defendant Kenco fraudulently propagated a confidential employee hotline to report various employment issues.

    i.    Defendant KENCO intentionally and willfully induced and mislead employees into using a non-confidential employee hotline.

    ii.    The ill-gotten information was given to Fowler, who in turn gave it to Defendant KENCO's managers and/or supervisors.

    iii.    Allegedly confidential information reported was used by Defendant KENCO and its agents to harass, intimidate, and retaliate against complaining employees.

    iv.    Such actions fostered and maintained a hostile work environment charge with racial animus

b.    Defendant KENCO falsely propagated that it would follow company and public policy as it relates to employment matters.

    i.    Defendant KENCO intentionally and willfully failed to investigate reported employment matters.

    ii.   Defendant KENCO intentionally and willfully failed to fairly and unbiasedly investigate reported employment matters and concerns.

    iii.  Defendant KENCO intentionally and willfully failed to fairly and unbiasedly consider all relevant information and facts before implementing adverse employment decisions.

    iv.  Defendant KENCO intentionally and willfully failed to implement and deploy corrective and preventive actions under company and public policy.

c.    Defendant KENCO intentionally and willfully failed to fairly and unbiasedly administer the same criterion for the compensation management of non-blacks and blacks.

d.    Defendant KENCO intentionally and willfully failed to fairly and unbiasedly administer company and public policy as it relates to the employment life cycle of an employee.

e.    Defendant KENCO intentionally and willfully failed to fairly and unbiasedly administer the same criterion for the hiring of non-blacks and blacks.

1. Unqualified non-blacks were hired over qualified blacks.

a. External non-black candidates were hired over qualified internal black employees.

2. Non-blacks with criminal backgrounds were hired while blacks with similar or less criminal offenses were not hired.

3. Non-black employees were not vetted as required by company and public policy.

a. Defendant KENCO intentionally and willfully failed to fairly and unbiasedly administer the same criterion used for the terms and conditions of employment as it relates to non-blacks and blacks in the following areas:

1. Giving premium shift assignments
2. 40 hour work weeks
3. Granting of overtime
4. Making Shift changes/or cancellations
5. Training
6. Providing the opportunity for job growth and advancement
7. Job assignments

8. Discipline
9. Scrutiny and oversight
10. Recruitment
11. Onboarding of employees
12. Compensation Management
13. Statutory Compliance to the Food Drug and Cosmetic Act as amended by the Food Safety and Modernization Act.

358. Mars also breached their fiduciary obligation to the employees of the Mars Manteno facility by failing to ensure that its manager did not breach the fiduciary obligations of both Kenco and Mars and failing to stop its manager from engaging in unlawful employment practices.

359. Mars also intentionally failed to follow the policies that it had implemented at the Mars Manteno facility through Defendant Kenco.

360. Defendant intentionally and willfully submitted false, misleading and fraudulent information that subjected employees to continual retaliation and harassment through denial of entitled benefits; such as, but not limited to: unemployment, disability, and Paid Time Off.

361. Defendant intentionally and willfully submitted false, misleading and fraudulent information to regulatory and public policy agencies; such as, but not limited to Illinois Department of

Human Rights, Illinois Department of Labor, Illinois Department of Employment Security, Department of Labor-OSHA, EEOC, FDA and others.

362. Defendant intentionally, willfully, maliciously and recklessly depicted each and every African-American or those who opposed discriminatory treatment of African-Americans as either an offender of public and company policies, procedures, protocols or as being obtrusive, inept, low capacity, low functioning, violent, aggressive, incompetent, unteachable, and confrontational.

363. Defendants allowed its non-black employees and management to make racial slurs, epithets, threats, and stereotypes directed towards to African Americans such statements as “Niggers”, “Black Bitch”, “Black Ass” and other derogatory and demeaning slurs and epithets at the Mars Manteno facility without reprisal.

364. For example, Defendants allowed Pete Monstwillo to make racial threats, slurs and epithets to Vernon Henry and allowed Monstwillo to attempt to kill Henry with a forklift. This was not the first occasion that Monstwillo had assaulted Henry.

365. Coffey often corresponded directly with the employees of the Mars Manteno facility. Exhibit 46

366. Defendant did not follow its own policies, procedures, and protocols as it relates to its zero tolerance policy of work place violence and other policies.

367. Defendant terminated Henry for allegedly violating a cell phone policy and for allegedly posting a picture on face book.

368. Defendant did not have a social media policy.

369. Defendant did not have a cell phone policy. Specifically, Defendant admitted to not having a cell phone policy to OSHA in the matter of Kenco Logistics OSHA no. 985037 re: Jacque Morrison.

370. Defendant exercised its policies in a manner that disparately impacted black employees.

371. Defendant did not administer policies, procedures, "Opportunities For Improvement" and punishments equitably between non-African Americans and African-Americans.

372. Defendant subjected African-Americans to harsher scrutiny, punishment and adverse actions than non-African-Americans.

373. Defendant failed to even punish non-African Americans for more egregious and or life threatening documented occurrences, as in the case of Morris Tyson.

374. Defendant never spoke with Henry before terminating him to ascertain his side of the story before making that adverse employment decision. Exhibit 47

375. Defendant had no evidence to connect Henry to picture being taken or posted on social media.

376. Defendant fired Henry while he was out on a Family Medical Leave of absence (FMLA).

377. Tammi Fowler ratified the decision to fire Henry even though she knew he was on medical leave. Exhibit 48

378. Defendant destroyed or failed to produce to the IDHR and the EEOC the doctor's note faxed to Plaintiff by Henry on or about October 13, 2014 that Plaintiff gave to management and placed in Henry's personnel file. Exhibit 45

379. Defendant failed to punish Pete Monstwillo immediately after he attacked and tried to kill Vernon Henry with a forklift.

380. Tammi Fowler stated that Monstwillo was horse playing when he tried to hit Henry with a moving 9,000 pound vehicle (forklift) while jeering the blades at Henry. Exhibit 49

381. Defendant materially altered the personnel file of Plaintiff and other employees who have filed claims of discrimination against defendant. Exhibit 50

    a.     Defendant has not maintained personnel files according to company policy.

    b.     Personnel files given to Plaintiff and other employees who requested their personnel file, as well as, those files presented to the IDHR and EEOC by defendant do not mirror the files that SZPLETT and McCurry oversaw at the Mars Manteno facility.

    c.     Defendant removed documents from these personnel files.

382. Plaintiff also believes that defendant also intentionally and willfully interfered with his right to enjoy his protected rights of a fair due process of law.

383. Plaintiff also alleges and believes that Defendant committed obstruction by deception in that:

    a.     Defendant knowingly and willingly engaged in misleading conduct by altering Plaintiff's personnel file and supplying misleading witnesses; information and documentation to hinder the administration of justice at the Illinois Department of Human Rights, Illinois Department of Labor, and EEOC for the anticipated impending judicial proceedings that would make SZPLETT whole.

384. Plaintiff also alleges and believes that defendant committed obstruction by destruction of evidence.

    a.    Defendant knowingly and willingly engaged in unlawful conduct by altering Plaintiff's personnel file to impede the administration of justice at the Illinois Department of Human Rights, Illinois Department of Labor and EEOC, as well as, the anticipated impending judicial proceedings that would make SZPLETT whole.

385. Plaintiff also alleges that Defendant committed perjury.

    a.    Defendant knowingly and willingly and contrary to oath engaged in unlawful conduct by deliberately supplying misleading witnesses, witnesses without firsthand information, false statements, verifications, position statements and documentation as material facts to impede the administration of justice at the Illinois Department of Human Rights and Employment Security and EEOC, as well as, the pending administrative proceedings under oath, as well as, verification, and certification that would make SZPLETT whole.

386. Plaintiff also alleges and believes that defendant intentionally committed obstruction of an administrative proceeding.

   **a.** Defendant knowingly and willingly engaged in unlawful conduct by altering Plaintiff's personnel file, supplying misleading witnesses such as: Elliott and Varvel, information and documentation, including, but not limited: the verified response and position statements, as well as, company policies, procedures to impede the administration of justice at the Illinois Department of Human Rights and EEOC, as well as, the anticipated impending judicial proceedings that would make SZPLETT whole.

For example:

In Defendant's verified response and position statements to the IDHR and EEOC it stated that:

a. In November of 2014, Jay Elliott was hired. The hiring of Elliott required several executive level management of Kenco according to defendant Kenco's policy. Exhibit 21(Exempt hiring policy- CP-HR-1002) Plaintiff asserts that Elliott's hiring also included other persons herein referred to as the "Kenco Co-Conspirators" engaged in the contrived scheme to hire Jay Elliott as Vice President of Legal.

b.Plaintiff contends this scheme was contrived to avoid culpability and liability of the company and its employer Mars, Inc.

c. The true names and capacities of the Defendants named herein as "Kenco Co-Conspirators" are unknown to Plaintiff, who therefore sues them under these fictitious names.

387. Plaintiff will amend this complaint to add their true names and capacities when they become known.

388. The Plaintiff then alleges that all of the Defendants (presumably including the "Kenco Co-Conspirators" Defendants) were the agents and principals of all of the other Defendants and were acting in the course and scope of their authority when they hired Jay Elliott.

389. According to Kenco Company Exempt Hiring Policy CP-HR-1002:

> **Executive Management** — perform approval authority duties for job openings and responsible for nominating candidates for Vice President levels and above.
>
> **CFO** — performs approval authority duties as described in this procedure
>
> **Kenco Management Services (KMS) — Director of Recruiting and Development** — performs approval authority duties throughout the exempt hiring process and responsible for the overall implementation and enforcement of this policy for the company.
>
> **KMS — Human Resources (HR) Recruiting Assistant** — performs duties outlined in this procedure to assure sites are notified of exempt

job openings and that the exempt hiring process is followed through
successful placement of a candidate.

**KMS — Human Resources Employee Relations (ER) Administrative Assistant** — enters all exempt level background investigations into the company approved vendor's system.
VP level and above positions will not be posted through the internal process. Those positions will be filled through nominations by VPs or above to be submitted to the Group President and CFO for final approval.

Posting Process

a. The Hiring Manager will complete form *CP-HR-6.2.2.013-1 Exempt Job Posting Requisition Form,* obtain the required signatures, and submit the completed form along with a current job description to the HR Recruiting Assistant.
Postings for both replacement and newly created positions must be approved by the Hiring Manager's immediate Supervisor/Manager, the Director or VP of Operations, and the CFO.

i. All exempt job postings will be posted by the 2ndbusiness day after the HR Recruiting Assistant receives the required documents.
For example: Job posting requests received by 5:00 p.m. on Monday will be posted by 5:00 p.m. on Wednesday of the same week; Job posting requests received by 5:00 p.m. on Wednesday will be posted by 5:00 p.m. on Friday of the same week.

Pending successful completion of the background check (external candidates only, except in Canada), the Hiring Manager will complete *CP-HR-1002-4 Offer Letter Summary Form* and send it to the HR Recruiting Assistant.

Pending successful completion of the background check (except in Canada), the HR Recruiting Assistant Prepares the Offer Letter and emails to the Hiring Manager including the *Relocation Expense Repayment Agreement* (if applicable). The Hiring Manager will sign and extend the finalized Offer Letter to the selected candidate.
Upon receipt of the signed Offer Letter and Relocation Expense Repayment Agreement, the HR Recruiting Assistant will obtain the final approval of the Director of Recruiting and Development.
The HR Recruiting Assistant will forward the signed Offer Letter to the appropriate KMS-HR Payroll Supervisor via a flagged email.
All new employees must complete their part of the new hire paperwork through the HRIS Onboarding Program before end of business on their first day of work with Kenco.

a. In Canada, all new hire paperwork must be completed by end of business on the first day of work.

All employer-related new hire paperwork must be completed by the Site HR Administrator through the HRIS Onboarding Program within the first three (3) days of employment.

390. Plaintiff also alleges that Defendant committed a conspiracy to obstruct and commit fraud against the court.

a.          Elliott was the attorney of record at the Illinois

Department of Human Rights and EEOC representing

Defendant Kenco.

b.   Defendant was informed with every filed charge that the charges were cross filed with the IDHR and EEOC. Exhibit 52

c. Defendant was informed of the EEOC's recordkeeping and reporting requirements. Exhibit 53

d.  Defendant was also informed of the participation requirements for participating in a Fact Finding Conference. Exhibit 54

e.  Defendant knew that there were no onsite personnel with first-hand knowledge.

f.  Defendant knew and stated it had no one to gather its information from onsite.

  Specifically, Elliott stated to the IDHR/EEOC investigator that instances that occurred prior to the hiring of Varvel that he had as much knowledge as Varvel would have.

For example:

a. Defendant knowingly and willingly characterized its Vice President of Legal as an individual who had firsthand knowledge of the material facts and/or matters relating to SZPLETT and others by allowing him to be a participant in the Fact Finding Conferences at the Illinois Department of Human Rights and EEOC investigation. Exhibit 55

b.    Defendant knew that it had an admitted history to the court of a pattern and practice of discriminatory treatment and impact towards African Americans; specifically Jay Elliott informed the court of such in Brown vs. Kenco. See {Case # 3:10-CV-668 in the Eastern Division of Virginia Richmond Division}.

c.    Defendant knew that it had in excess of 30 discrimination charges filed against defendant at the Mars Manteno Facility.

d.    Defendant knew that if it was found liable for these and other infractions, it would be a breach of its contract with MARS, Inc. and damage Mars, Inc. reputation.

e.    Defendant knew that the charges were true.

f.    Defendant knew that it had violated a number or public policies.

g.    Defendant crafted and implemented a plan to employ Jay Elliott as an employee of Defendant.

h.    As a matter or ordinary course of business defendant Kenco and Elliott discussed Elliott's employment expectations, goals among other topics.

i.    Defendant and Elliott agreed upon terms and conditions of Elliott's employment, including wages, benefits, goals, bonuses and other fringe benefits.

j. Defendant and Elliott knew that Elliott's employment would circumvent Illinois Department of Human Rights and EEOC guidelines because Elliott was now an employee who would be able to speak on Defendants behalf.

k. Defendant knew it would impede the exhaustive remedy process to the administration of justice.

l. Defendant knew Elliott was a licensed and practicing attorney in the state of Tennessee.

m. Defendant knew that it had retained Elliott as outside counsel in other employment related matters. See {Case # 3:10-CV-668 in the Eastern Division of Virginia Richmond Division}

n. Defendant had a well-established relationship with Elliott, Karen Smith and Miller & Martin PLLC. {Case # 3:10-CV-668 in the Eastern Division of Virginia Richmond Division}

o. Defendant knew Elliott was not hired until after the incidents occurred relative to SZPLETT and others.

p. Defendant knew that Elliott was not physically situated at the Mars Manteno facility.

r. Defendant knew that Jay Elliott and others such as Tammi Fowler, Senior Manager of Employee Relations, were in Chattanooga, Tennessee and could not have been a party to the incidents in question.

s.     Plaintiff asserts that Defendants contemplated that it could conspire with its employees and not be subject to conspiracy.

t.     Defendant knew that as an attorney, Elliott would not be allowed to be an active participant in the Illinois Department of Human Rights and EEOC investigations.

u.     Defendant knew that it had terminated some of the people that had committed some of the discriminatory acts, such as Walsh and Manzello.

v.     Defendant knew that it did not have supporting witnesses to incidents.

w.     Defendant reported to Illinois Department of Human Rights and EEOC that it no longer had its witnesses.

y.     Defendant knew that incidents with SZPLETT and others had been contrived.

z.     Defendant knew that it had excluded its onsite Human Resource Personnel from formal investigations and disciplinary matters.

aa.     Defendant knew it had usurped its onsite Human Resource Personnel from performing their charged duties at the Mars Manteno facility.

bb.     Defendant knew that the onsite Human Resource Personnel had reported the discriminatory treatment of African-Americans and those

who opposed such treatment to management and Kenco's Corporate office and that it was discussed with Mars, Inc.

cc.    Defendant knew that the onsite Human Resource Personnel had opposed the discriminatory treatment of African-Americans and those who opposed such treatment.

dd.    Defendant knew that it had misrepresented the onsite Human Resource Personnel role in the reporting of the discriminatory treatment of African-Americans and those who opposed such treatment to the Illinois Department of Human Rights and EEOC.

ee.    Defendant knew that it had deviated from its organizational structure at the Mars Manteno Facility.

ff.    Defendant knew that Elliott had no firsthand knowledge of the events which he testified to and about during the proceedings as the IDHR and EEOC.

gg.    Defendants knew that "they" had not taken any steps to correct the hostile work environment charged with racial animus that affected SZPLETT's and others.

hh.    Defendants knew that it did not follow its own policies and procedures.

ii. Defendant knew that the Illinois Department of Human Rights and EEOC would assume that Elliott and others were employees of Defendant during the relevant period of times to which he testified.

jj. Defendant knew that employing Elliott would give Elliott a legitimate reason to be a defense witness to Defendants' administrative proceedings.

kk. Defendant knew that the Illinois Department of Human Rights and EEOC would rely on the information provided by Elliott to make an administrative determination.

ll. Defendant knew that Elliott would have an unfair advantage over Plaintiff and others, as an expert in law and subject matter expert in employment Law.

mm. Defendants knew that Elliott would be able to mitigate any statements of fact made by claimants because of his expertise and knowledge.

nn. Defendants knew that Elliott would be able to use his expert knowledge to aid and abet Defendant in the violation of Henry and others protected rights by deception; conspiracy; manipulation of material facts to Defendant's advantage by presenting materially false and misleading documentation and statements to the Illinois Department of Human Rights and EEOC, impede and obstruct the administration of justice, commit fraud on the court, and perjury.

oo. Defendants knew it was evading the law and circumventing justice.

pp. Defendants knew that evading the law and circumventing justice at the IDHR and EEOC was a precursor to the obstruction of pending federal court proceedings.

qq. Defendants knew its behaviour's toward the employees of the Mars Manteno, as well as, the administration of justice were/are unlawful, disingenuous, and contrived.

rr. Defendants knew that assault was a criminal offense and punishable as such.

ss. Defendants Kenco, Coffey and Moore knew that it aided and abetted the violators of company and public policy that included but was not limited to Walsh, Manzello, Lopez and other Kenco Corporate employees, such Fowler, Jabaley, Hise, Spier and others.

tt. Defendants knew that they had discriminated against SZPLETT.

uu. Defendants knew it minimalized its actions.

vv. Defendants' counted on prevailing at the IDHR and EEOC. Defendants also used this defeat to deter further action or to ward off further investigations into Defendants systemic decimation.

ww. Defendants knew that this victory for them would cause irreparable harm to SZPLETT and others.

xx. Defendant knew that providing misleading, deceptive, disingenuous statements and documents would inhibit SZPLETT and others ability to prevail in their claims of discrimination.

i. Defendant knew it hired Varvel against and in violation of its own policies.

ii. Defendant knew that it intentionally created a hostile work environment charged with racial animus for SZPLETT and others.

iii. Defendant knew it had retaliated against SZPLETT by demoting him and altering his terms and conditions of employment.

yy. Defendant Kenco and its agents --Paula Hise, David Jabaley, Trace Spier and other executive level C-Suite employees, such as David Crawley-the CFO and the President -David Caines during the relative times conspired with Mars Manteno employees, such as, but not limited to: Kelvin Walsh, Mike Manzello, Mario Lopez, Stacey Bushey, Todd Moore and Robert Coffey to violate Plaintiff's civil rights (a violation of 18 U.S.C. 1985), obstruct justice (a violation of 18 U.S.C. 1803) avoid culpability.

391. Plaintiff also alleges that defendant committed obstruction by interstate travel and mail.

a. Defendants traveled between Illinois and Tennessee in furtherance of their schemes.

For example, specifically, in September of 2014 Trace Spier and Todd Moore agreed to meet in Illinois offsite of the Mars Manteno facility regarding the facility and its leadership.

From the meeting between Spier and Moore a plan was devised on how to address the issues at the Mars Manteno facility. Exhibit 57

Plaintiff asserts that the devised plan included hiring a replacement for Plaintiff, that would perform his HR duties and functions. Exhibit 58

Plaintiff also asserts that Fowler traveled to Illinois in furtherance of Defendants scheme to avoid liability and culpability for when Defendants hired Varvel as the HR Manager.

Plaintiff also asserts that Hise also traveled to Illinois in furtherance of Defendants schemes, when Hise met with Coffey, Moore and Steve Sheldon regarding the Mars Manteno warehouse and its leadership. Exhibit 59

b. Defendant knowingly and willingly used the United States Mail to further its scheme of fraud by 1) mailing

Plaintiff's altered personnel file;2) supplying misleading information and documentation to impede the administration of justice at the Illinois Department of Human Rights and EEOC, as well as, the pending administrative proceedings that would make SZPLETT whole.

For example:

1.  Mailing to the IDHR and EEOC non-effectuated and irrelevant policies.

2.  Mailing to the IDHR and EEOC verified responses and positions statements under oath and/or perjury that contained deceptive, fraudulent, misleading and disingenuous information that reference policies and procedures that were not relevant to SZPLETT to commit fraud against the administration of justice and SZPLETT.

392. Elliott, as an officer of the court and subject matter expert, and Defendants agents knew better.

393. Plaintiff also believes that his rights were deprived under 42 U.S.C. §1983.

394.    Upon information and belief Plaintiff believes that the Illinois Department of Human Rights, "herein after" the "Department" and its investigators acted in concert with Defendants to engage in a course of action that would deprive the plaintiff of his constitutional rights.

395.    The Illinois Department of Human Rights allowed Jay Elliott to be the attorney for the Defendant and to act as a witness in SZPLETT'S, McCurry's, Tyson's, Doss' and other complainant's cases before it.

396.    The "Department" states in correspondence relative to participation in the Fact Finding Conference that attorneys will not be allowed to engage on behalf of any party.

397.    The "Department" further states in such correspondence that a failure to participate in the proceedings can constitute a default.

398.    Defendant admitted to the "Department" on numerous occasions that it had no witnesses, as it lost its contract and no longer had access to its former employees. Exhibit 56

399.    Plaintiff and others contend that there had to be a concerted meeting of the minds between Defendant and the "Department" to allow defendant to operate outside the authority granted to the "Department" by law.

400.   Jay Elliott was hired by the defendant after the relevant time of the unlawful events of SZPLETT that led up to his demotion and other complainant's charges before the "Department."

401.   Jay Elliott filed an appearance on behalf of Kenco dated October 1, 2015 at The Illinois Department of Human Rights.

402.   Jay Elliott and Lori Varvel attended and participated as witnesses in the SZPLETT Fact Finding Conference.

403.   SZPLETT'S legal counsel raised the issue of Elliott's and Varvel's participation as witnesses as it related to the allegations outside their scope of employment.

404.   Plaintiff's attorney or attorney representative was not allowed to participate in the Fact Finding Conference.

405.   Plaintiff asserts that this was not the first time that this issue had been raised with the Illinois Department of Human Rights relative to Jay Elliott's employment relationship with the defendant.

406.   At the same time, the Illinois Department of Human Rights, Investigator was also presented with other documentation from other witnesses LinkedIn pages confirming either their employment dates and or their physical location.

407.   The Illinois Department of Human Rights allowed others such as Lori Varvel to be witnesses on behalf of the Defendant without having

firsthand knowledge of the facts of SZPLETT and other complainant's charges before the department.

408. The Illinois Department of Human Rights had been made apprised of similar and/or the same instances of either persons being used as witnesses by defendant that had no information and/or firsthand knowledge or who were not employed by Defendant during the relevant times of the occurrences complained of by Plaintiff.

409. A reasonable person could conclude that there was an issue with Defendants, considering that more than 20% of the workforce filed complaints; resulting in more than thirty (30) charges.

410. Racial slurs, epithets, degrading and demeaning remarks were made about SZPLETT and others by Mars Manteno upper management and Kenco Logistics Tammi Fowler, Dan Dey, David Jabaley and others. Such as that they should just pay those "niggers" off.

411. Kenco logistics lost its contractual agreement with Mars, Inc. around January 21, 2015 and was subject to the WARN ACT. Kenco violated the WARN Act by not timely and properly notifying Plaintiff of the mass lay off to meet the required 60 timeframe because of Plaintiff's protected activity.

412. Plaintiff asserts that Defendant Kenco logistics failed to notify him of the process to secure employment through the new management

company, as it had with the other employees who had not engaged in protected activity.

413. Kenco intentionally and willfully interfered with SZPLETT'S ability to procure benefits and the terms and conditions of the WARN ACT by not timely and properly notifying him of the mass lay off to meet the required 60 day timeframe.

414. Plaintiff asserts this failure to notify plaintiff was due to plaintiff's association with African Americans and his opposition to the discriminatory of African Americans.

415. Plaintiff further asserts that this failure to notify him was intentional, as to prevent him from being in a position to have access to information that could or would be damaging to Defendants. Since plaintiff was not willing to act in complicity with management's race-based stereotypes regarding African Americans and his unwillingness to work with other Caucasian employees to discriminate against African American employees.

416. Defendants intentionally and willfully interfered with Plaintiff's business relationships and opportunities. Defendants failed to notify Plaintiff of the process to secure employment through the new company continue employment at the Mars Manteno facility, as it had with the other employees who had not associated with African Americans or

opposed the discriminatory treatment of such persons, such as: Marci DeRosier, Anthony Marquez and others.

418. Defendants intentionally and willfully conspired to harass, retaliate and interfere with plaintiff's benefits and compensation by not paying him for the month of March as it had other employees who had not engaged in protected activity, such as Russell Shippits or Anthony

419. Defendants intentionally and willfully conspired to harass, retaliate and interfere with plaintiff's benefits and compensation by providing his physician with a false and inaccurate job description that was used to terminate Plaintiff's benefits because of his association and opposition to the disparate and disparaging treatment of African Americans.

DISPARATE TREATMENT

(INTENTIONAL DISCRIMINATION)

Based on association and in reverse discrimination for opposition to disparate treatment on protected class persons

1. Szplett was treated differently than other employees at the Mars Manteno facility, such as Marci DeRosier or William Scherwin, or Anthony Marquez, or Mike Manzello, or Kelvin Walsh who were not in a protected class.

2. Szplett was treated differently for opposing the disparate treatment and impact by the actions of such malfeasors as: Kelvin Walsh, Mike Manzello, Tammi Fowler, Mario Lopez, David Jabaley, Robert Coffey, Todd Moore and others towards African Americans, whistleblowers, and others who opposed such disparate treatment of protected class persons.

3. Szplett also asserts that he was treated differently for his association with African Americans, whistleblowers, and others who opposed such disparate treatment of protected class persons.

4. Beginning in April of 2014, Szplett was ostracized from meetings and a number of various routine job duties and tasks that

he had regularly performed as the HR and Accounting Manager, after his opposition to the disparate treatment and impact of African Americans, whistleblowers, and others who opposed such disparate treatment of protected class persons.

5.    Szplett was also marginalized, harassed, demoted, defamed, retaliated against, subjected to hostile and racially charged work environment, received a reduction of job duties, denied benefits, defrauded out of compensation, defrauded out of disability benefits, compensated inequitably  and deprived of a proper retirement amongst actions.

6.    Examples of adverse actions were:

    a.    Szplett's being forced to work third (3rd) shift for a week; demoted from the position of HR Manager. Defendant Kenco admitted that its decision to hire Varvel as the HR Manager was because of Szplett's failing leadership that led to all the complaints of discrimination.

    b.    Szplett was instructed to forward all informal and formal complaints to Tammi Fowler at Corporate or her assistant, Michelle Hisey who was a HR Generalist.

c.    Szplett was defrauded out of disability benefits when Defendants provided Szplett's physician with an intentionally false and misleading job description.

d.    Defendants refused to compensate Szplett for the compensation for the month of March 2015 as it had all other employees.

e.    Intentionally withholding Szplett's unemployment by making false and misleading statements to the Illinois Department of Employment Securities that Szplett was a paid employee through March of 2015.

f.    Conspiring and attempting to extort Szplett into helping Defendants' defend HR matters in exchange for his severance pay and his March 2015 salary.

g.    Denying March's compensation to Szplett that other employees received who were not involved or knowledgeable about the impending and ongoing HR matters involving Defendants and others.

7.    Szplett asserts that at all times Defendants had a fiduciary obligation to him and that the named Defendants controlled the

terms and conditions of his employment, including hiring, firing, promotion and discipline.

8. Szplett asserts that there was no other lawful reason for Defendants to make and execute adverse employment decisions towards him except that it was their deliberate, willful and intentional discrimination against him in retaliation for his opposition to the disparate treatment and impact of protected class persons and his failure to act in complicity with the white racial dominance and subordination of African Americans and those who opposed this treatment.

**Harassment**

Based on association and in reverse discrimination for opposition to disparate treatment and impact on protected class persons

9. Plaintiffs incorporate by reference all the preceding paragraphs of this Complaint as if fully set forth herein.

Plaintiffs incorporate by reference all the preceding paragraphs of this Complaint as if fully set forth herein.

10. Szplett's was subjected to more than a "campaign of petty harassment."

11. Szplett was harassed when he was isolated and ostracized from performing his duties as the HR Manager.

12. Additionally, Szplett's was often asked to meetings regarding African American employees, whereby he had no knowledge or input of what was to occur and where management had already contrived illegitimate pretextual reasons for adverse employment decisions to be imposed upon these persons, without investigation and against company policy.

13. Plaintiff asserts that his presence was to give an appearance and feel of legitimacy for the actions being taken against protected class persons.

14. Szplett asserts that he was expected to act in complicity with the white racial dominance and subordination of African Americans.

15. Failure to act in white racial dominance and subordination of African American employees resulted in retaliatory actions of harassment and adverse employment decisions.

16. Szplett was also harassed when he was continually subjected to critical, unwanted and unwarranted remarks, insults

and stereotypes about African Americans and other protected class persons.

17.      For example, Kelvin Walsh the then GM referred to the African American Quality Engineer, Mary Madison, as an educated "Nigger Bitch" immediately after he insisted that Szplett accompany him to walk her out after terminating her without cause.

18.      The accusations were patently false and were based on a fictitious non-existent policy.

19.      As a result of Madison raising various safety and health issues relative to improper fire and ammonia evacuations; 2) pest infestations of rodents, birds and bats; 3) adulteration and contamination of raw materials for processing of packaged foods and packaged foods from pest infestation; 4) along with issues of falsification documents and records that are auditable under the Food Drug and Cosmetic Act as amended by The Food Safety and Modernization Act, The Bioterrorism Act of 2002 and other Presidential Directives.

20.      Madison also raised issues of racial discrimination.

21.     Additionally, there were a number of other racially derogatory statements, slurs, and epithets made that were made by Walsh and others to repulsive for Plaintiff to pen or repeat. Other examples are:

22.     Amongst numerous comments made by Mike Manzello who often made racial epithets, jokes, slurs and stereotypical comments about African Americans such as an employee, Nathan Doss.

23.     Nathan Doss was from the Southside of Chicago and because of this he was being associated with and alleged to have gang affiliations and ties with known reputed gang members, such as Larry Hoover.

24.     Manzello also went on to comment on how Mexicans handle their women in gesturing that they raise the back of their hand as to strike them.

25.     Manzello also talked about how black men handle their women by calling them derogatory names such as bitches, whores and so on as well as, referencing movies that highlight degrading and derogatory behavior towards black women from men.

26. For example, Manzello referenced the movie Anchorman 2-enacting scenes from the movie that illustrate his point of how black men treated their women.

27. Also Tammi Fowler, Senior Manager of Employee relations suggested that she knew that an African American employee, Nathan Doss ("Black ass") smoked "weed" everyday.

28. These comments came soon after Doss had raised a number of issues of disparate pay and other instances and forms of discriminatory treatment, Fowler made these and other derogatory comments.

29. Moreover, Fowler and Dan Dey questioned Manzello for over three (3) hours as to why Doss had been promoted to lead.

30. Fowler along with the then GM was responsible for Doss being paid disparately.

31. No other employee was subjected to not being paid the prevailing rate upon hiring.

32. In June of 2014, Paula Hise the Vice President of Operations spoke to each shift at the facility regarding Walsh's separation.

33. Hise intimated how good of person Walsh was, that he was a friend, that he would be missed and that she was sure he would land on his feet.

34. Hise in fact had been aware since at least June of 2013 that Walsh had been the ongoing subject and center of a number of internal and external formal complaints of discrimination.

35. Hise in her official capacity of an executive officer of the company openly and unabashedly praised and condoned the malfeasant and unlawful behaviours of Walsh ultimately continuing to foster the already animus and racially charged work environment.

36. Hise publicly acclaimed her support for Walsh and his beahviours; even to the detriment of those she addressed who had filed various informal and formal complaints.

37. Robert Coffey, the onsite Regional Distribution Manager for Mars, Inc. was aware that Hise came to the facility and addressed the employees regarding Walsh's.

38. Additionally, Robert Coffey had been noted saying this how our southern brothers and sisters handle things.

39. Plaintiff also asserts that this was Robert Coffey's and Mars' position regarding Walsh and his behaviours, as Coffey nor any other Mars' management rebutted or refuted the sentiments proclaimed by Hise.

40. Nor had Coffey or any other Mars management addressed, mediated or remediated any of the numerous complaints made by employees at the Mars or the racially charged hostile work environment that existed at the Mars Manteno facility.

41. Szplett asserts that Defendants are liable because of their gross negligence in failing to follow company and public policy in addressing, mediating or remediating any of the numerous complaints made by employees at the Mars Manteno facility or the racially charged hostile work environment that existed at the Mars Manteno facility.

42. Szplett was harassed in retaliation for his opposition to discrimination and his association with African Americans when he was forced to work third (3rd) shift allegedly to have a management presence.

43. Defendants suggest in their verified response that Szplett was invited to work the third (3rd) shift.

44.     However, Plaintiff contends that it was not an invitation, but a directive used to retaliate against Plaintiff.

45.     Szplett's alleges that this reason was pretextual, as employees working off shifts did not have access to plaintiff's office to even know that plaintiff was working.

46.     More specifically, after 5:00 p.m. employees did not have access to the office area where Szplett was located; therefore, employees could not access Szplett nor even know that he was onsite.

47.     Additionally, there was no communication sent to employees informing them Szplett would be available.

48.     More specifically, it was common practice for third (3rd) shift employees to address any issues immediately after the end of their shift, when the office was open.

49.     Other managers such as Marci DeRosier, Mike Manzello, Bill Schwerin and Anthony Marquez, who also only worked first (1st) shift were not required to and did not work third (3rd) shift.

50.     Szplett also asserts that this directive to work third (3rd) shift came after Szplett had raised issues about the pay disparity of the African American Spotters.

51. Plaintiff also contends that the expectation to act in complicity with management's race-based stereotypes regarding African Americans and to work with other Caucasian employees to marginalize, subordinate, minimize, exclude or disparage African American employees he was a form of Quid Pro Quo in order to not be subject to adverse employment decisions, harassment and retaliation.

52. Szplett's was also subject to another Quid Pro Quo when defendant attempted to extort Plaintiff into obstructing justice and aiding and abetting Defendant into obstructing justice.

53. More specifically, Defendant required Plaintiff to agree to help Defendant defend itself against lawful cases of discrimination, retaliation, harassment and whistleblowing against Defendants in exchange for his severance pay and compensation for the month of March 2015.

54. Other employees who were not involved in protected activity or who did not have firsthand knowledge relative to the allegations or matters before agencies, tribunals or courts were paid their compensation and severance pay.

55.     Specifically, during the week of February 26, 2015, Szplett's received an undated letter in the mail from defendant Kenco, regarding Szplett's March compensation, vacation pay, benefits and severance pay along with the terms and conditions to Szplett receiving these monies.

56.     Additionally, Szplett was informed in this same communication that he was entitled to this severance as a result of not applying to continue working at the Mars Manteno facility.

57.     Plaintiff asserts that he was never informed of the particulars on how to continue his employment at the Mars Manteno facility.

58.     Plaintiff also contends that this failure to inform him of how to apply for continued employment was contrived and done to harass and retaliate against plaintiff for his protected activities.

59.     Plaintiff also contends that Defendants' failure to inform him of how to apply for continued employment, coupled with the refusal to pay plaintiff his March 2015 wages, the denial of Plaintiff's disability benefits based upon falsified and misleading information submitted to Szplett's doctor, and denying Plaintiff's unemployment along with attempting to extort plaintiff into

agreeing to aid and abet Defendants in obstructing justice in order to receive his severance pay was part of a contrived scheme to economically and psychologically harass and punitively punish Plaintiff for his association with African Americans and in opposition to disparate treatment and impact of protected class persons.

60. This economic and psychological tacit and tool of withholding an employee's compensation was often wielded as a two-edged sword used to terrorize and extort protected classes persons into conforming to the "servant –master relationship" and abandoning any ideas of revolting by not pursuing their rightful claims of discrimination in order to retain their employment.

61. More specifically, in early September of 2014, in a meeting with plaintiff, Edith McCurry-HR Administrator, Mario Lopez-then GM and Tammi Fowler-Senior Manager of Employee Relations and Plaintiff regarding McCurry paying an employee Dana Woods (African American) his paid time off while being suspended.

62. Woods' suspension was for discussing and commenting on a news story in which Stacey Bushy (Caucasian female) over

head Woods speaking with another co-worker regarding the incident.

63.     Fowler stated that paying Woods his paid time off defeated the purpose of suspending him.

64.     Fowler stated that "hitting them in the pocket" would get their attention.

65.     Lopez also indicated that McCurry had stolen from the company by paying Woods.

66.     Fowler and Lopez were making a number of accusations, innuendos and statements regarding McCurry's professional standing, her ethics, her fiduciary obligations and the lawfulness of her actions in paying Woods.

67.     By this time Plaintiff realized that this had become a contrived high tech scheme to adversely affect McCurry's employment.

68.     Plaintiff intervened and took responsibility for McCurry paying Woods his earned paid time off.

69.     Plaintiff sensed that Fowler and Lopez were expecting that Plaintiff would act in complicity to cooperate and work together

with them to marginalize, subordinate, exclude and penalize African American employees.

70.     Plaintiff asserts that this was the expectation as this was not the first time plaintiff had been placed in such a position.

71.     The first time Plaintiff was placed in that position was after an African American employee, Mary Madison, filed charges of discrimination and whistleblowing against various Defendants. 2014CF0475 cross-filed with the EEOC.

72.     McCurry was interviewed regarding the matter by defendant Kenco's outside counsel.

73.     It was indicated that the internal report of discrimination was reported to McCurry.

74.     McCurry affirmed that she had received this report of discrimination along with the fact that she too had been discriminated against.

75.     Defendant Kenco's counsel never spoke with Szplett about this matter.

76.     Additionally, no one else spoke to Szplett about this matter.

77. Plaintiff was listed as a witness in Defendant's position statement to the IDHR and EEOC.

78. Plaintiff was also cited as the HR Manager in the same position statement.

79. Plaintiff was instructed to go the fact finding conference on Defendants' behalf.

80. It was never discussed with plaintiff what he was expected to do and say.

81. However, Plaintiff asserts that it was the expectation to act in complicity with management's race-based stereotypes regarding African Americans and his unwillingness to work with other Caucasian employees to marginalize, subordinate, minimize, exclude or disparage African American employees he was subject to adverse employment decisions.

82. After the fact finding conference, Walsh, Fowler and defendant's counsel Karen Smith made a number of disparaging, intimidating and derogatory remarks about the complainant who was African American in the presence of McCurry.

83. Defendants assumed that because plaintiff was an older Caucasian male that would plaintiff would work together with other

Caucasian employees to marginalize, subordinate, exclude and penalize African American employees.

84. The working environment that was somewhat once manageable had now morphed into an open, active and unashamed animus and racially charged working environment.

85. The harassment, abuse and discrimination were encouraged and expected by various levels of management from the General Manager to the senior and executive level management of Kenco and Mars to act in complicity with the white racial dominance and subordination of African Americans and those who opposed this treatment.

a. For example, Tom White was written up through contrivance for failing to treat African Americans like "assholes." Tom White opposed such discriminatory treatment and constructively resigned effective immediately.

86. Caucasian employees who do not disparage or minimize African American employees have been and continue to be adversely affected by hostile work environment at the Mars Manteno facility. For example, in addition to plaintiff, this included

Scott Marksteiner 2015CA1054 and 2015CA1650 (cross-filed with EEOC), Anastasia Sandness 2015CF0006 and 2015CF1655 (cross-filed with EEOC) and Don Stanchues.

87. Resistance and failure to comply with such discrimination resulted in punishment. i.e. harassment, retaliation, demotion, public humiliation, defamation, failure to promote, termination, blackballing, economic and psychological sanctions, differing terms and conditions of employment, uneven discipline and other adverse actions.

**Retaliation**

Based on association and in reverse discrimination for opposition to disparate treatment and impact on protected class persons

88. Plaintiffs incorporate by reference all the preceding paragraphs of this Complaint as if fully set forth herein.

89. In retaliation for Szplett's failure to act in complicity with management's race-based stereotypes regarding African Americans and his unwillingness to work with other Caucasian employees to marginalize, subordinate, minimize, exclude or disparage African

American employees he was subject to adverse employment decisions.

90.     Specifically, when Plaintiff and other Caucasian employees voiced their opposition to the Mars Manteno racist policies and practices or demonstrate their support of African American employees they were routinely retaliated against and have suffered extreme mental, physical and economic harms.

91.     For example, Szplett's was retaliated against when he was forced to work third (3rd) shift allegedly to have a management presence.

92.     Szplett's alleges that this reason was pretextual, as employees working off shifts did not have access to plaintiff's office to even know that plaintiff was working.

93.     Additionally, there was no communication sent to employees informing them Szplett's would be available.

94.     Other managers such as Marci DeRosier, Mike Manzello, Bill Schwerin and Anthony Marquez, who also only worked first (1st) shift were not required to and did not work third (3rd) shift.

95.     The terms and conditions of Plaintiff's employment were altered when Plaintiff had to work third (3rd) shift.

96. In Plaintiff's fourteen years of employment, Plaintiff had never been mandated to work third (3rd) shift.

97. Other examples of retaliation include, Mario Lopez stating in his interrogatory response in case 16 cv 2273 that it was Lopez and Tammi Fowler who decided to hire Varvel as the HR Manager.

98. Fowler stated in her interrogatories in 16 cv 2273 that she recommended that a HR Manager be hired.

99. Admittedly, Fowler was at the center of the contrivance to hire a HR Manager.

100. Additionally, Defendant Kenco provided as evidence to the IDHR/EEOC in charge no. 2015CA1804/21BA50670, specifically Exhibit L, the job posting for the HR Manager's position with a posting date of September 25, 2014.

101. The September 25, 2014 posting was a couple of weeks after Plaintiff refused to act with complicity against McCurry for paying Dana Woods his earned paid time off while on suspension for having a discussion and making a comment on a newsworthy incident that upset a Caucasian woman.

102. Plaintiff asserts that the Woods alleged matter was not investigated by HR as there was no one on site to do an investigation except Szplett and McCurry to which neither of them performed such an investigation.

103. Additionally, there were no investigative notes presented or placed in Woods file.

104. Defendants had a habitual habit of failing to follow its own policies relative investigations, discipline and other matters.

105. Plaintiff also contends that Defendants hired Varvel to further its active, open and unashamed discriminatory culture and further its various schemes of obstruction of justice and to continue to violate the protected rights of African Americans and those who do not conform to the race-based stereotypes or disparaging's of African American employees.

106. Plaintiff also asserts that Varvel was hired because of all of the charges of discrimination filed against them.

107. Defendants have contended that Szplett's was never the HR Manager.

108. Plaintiff contends that he was demoted from the HR Manager's position.

109. Contrarily, Defendants contended that Szplett's was the HR Manger in its motion for summary judgment in 16 cv 2273- Docket #113 pg.7 and even had it listed as an undisputed fact.

110. Plaintiff contends that Defendants have misrepresented who plaintiff was and his role at different stages to keep up with its current litigation.

111. The inconsistent representations of Plaintiff by Defendants have been used to obstruction justice and its administration.

112. Defendants should be estopped according to the doctrines of Res Judiciata, Collateral and Judicial Estoppel from changing its position on Szplett's position as HR Manager.

113. Plaintiff also contends that he was not given the opportunity or apprised of the process to apply to continue to work at the Mars Manteno facility in retaliation of Szplett's failure to act in complicity with management's race-based stereotypes regarding African Americans and his unwillingness to work with other Caucasian employees to marginalize, subordinate, minimize, exclude or disparage African American employees.

114. Plaintiff also asserts that he was not paid in March of 2015 in retaliation and in keeping with their moto of "hitting them in the pocket" for his failure to act with complicity in regards to fostering a work environment white racial dominance, racial animus, hostility and subordination of African Americans.

115. Plaintiff also asserts that he was discharged through the elaborate contrived retaliatory scheme not give Plaintiff the opportunity to apply to continue to work at the Mars Manteno facility.

116. Plaintiff contends that Defendants also denied his unemployment in retaliation and in keeping with their moto of "hitting them in the pocket" for his failure to act with complicity in regards to fostering a work environment white racial dominance, racial animus, hostility and subordination of African Americans.

117. Plaintiff also contends that Defendants also cut off and denied plaintiff's disability.

118. Plaintiff's disability was denied based upon fraudulent and deceptive information to his physicians.

119. Plaintiff also asserts that this is a part of an elaborate contrived scheme to force Plaintiff to accept the terms and

conditions of helping Defendants obstruct justice by aiding and abetting Defendants in defending against HR matters.

120. Plaintiff also asserts that Plaintiff was also required to waive any claims that Plaintiff may have had as a requisite to receiving Plaintiffs severance.

121. Plaintiff contends that these retaliatory actions individually and collectively were done to extort Plaintiff's cooperation to aid and abet Defendants in the continued violation of protected persons rights, in the obstruction of justice and to avoid being liable and culpable for violating these rights.

**PRETEXT**

Based on association and in reverse discrimination for opposition to disparate treatment and impact on protected class persons

122. Szplett's was harassed and retaliated against when he was forced to work third (3rd) shift allegedly to have a management presence.

123. Szplett's alleges that this reason was pretextual, as employees working off shifts did not have access to plaintiff's office to even know that plaintiff was working.

124.    Additionally, there was no communication sent to employees informing them Szplett's would be available.

125.    It was common practice for third (3rd) shift employees to address any issues immediately after the end of their shift, when the office was open.

126.    Other managers such as Marci DeRosier, Mike Manzello, Bill Schwerin and Anthony Marquez, who also only worked first (1st) shift were not required to and did not work third (3rd) shift.

127.    Szplett also asserts that the reason Plaintiff was not compensated for March of 2015 and not given his severance was pretextual.

128.    Defendant Kenco asserted that Szplett did not work and was not entitled to his March 2015 compensation.

129.    This was in contradiction to the communication received in the mail by Szplett.

130.    No other person with firsthand knowledge of the HR matters was not given their severance pay or March 2015 compensation or subjected to such terms and conditions.

131.    Szplett also asserts that Defendants rationale and reasons regarding Plaintiff's job duties, title, compensation and

performance were pretextual, as Defendants have stated to various agencies, tribunals and courts that Szplett's was the HR Manager.

132. Defendants in other instances have stated that Szplett's job duties were not reduced and that the position had not existed previously or that Szplett had never been the HR Manager.

133. Szplett also asserts that Varvel performed less duties and tasks than Szplett.

134. Szplett also contends that the reason that Defendants proffered for paying Varvel more that Szplett was pretextual.

135. Szplett also contends that it is actual job performance and content —not job titles, classifications or descriptions of the work performed that defines what a job entails.

136. Szplett also asserts that he had more than twice as much experience than Varvel in human resource management and more than four (4) times as much working experience in HR.

137. Szplett further asserts that there were no new duties, tasks and responsibilities derived, added or adduced that had not previously existed and have not previously been performed by Szplett and his counterpart McCurry.

138. Plaintiff also contends that employee issues had existed since his employment at the Mars Manteno facility.

139. Additionally, Defendants asserted that it was Szplett's fault and failing leadership that caused all of the discrimination charges to be filed

140. Defendants have also stated that for performance reasons Szplett was given a negative performance review.

141. Szplett's vehemently contends that it was not his fault or failing leadership that led to the discrimination charges being filed, but it was his failure to act in complicity with management's race-based stereotypes regarding African Americans and his unwillingness to work with other Caucasian employees to marginalize, subordinate, minimize, exclude or disparage African American employees that he was subject to adverse employment decisions.

142. Szplett's also asserts that he has never been given a negative performance review.

143. Specifically Defendants did not produce such a performance review to the IDHR/EEOC nor did Defendant Kenco

produce one when Plaintiff requested his personnel file relative to the Illinois Personnel Review Act.

144. Szplett's asserts that Defendants have intentionally taken inconsistent positions with regards to Szplett's job title and duties.

145. Plaintiff asserts that an employer's reason for an adverse employment action is without factual basis that is evidence suggestive that an employer might be lying about its true motivation.

OBSTRUCTION OF JUSTICE IN VIOLATION of 18 USC 1503, 1505& 1512(b), (c) & (f), 1621

Based on association and in reverse discrimination for opposition to disparate treatment and impact on protected class persons

146. Plaintiffs incorporate by reference all the preceding paragraphs of this Complaint as if fully set forth herein.

147. Defendants have intentionally taken inconsistent positions at various tribunals to avoid liability and culpability relative to claims of discrimination.

148. Defendants actions were deliberate and an obstruction to justice and its administration.

149. Defendants have provided half-truths, misleading and patently false evidence regarding Plaintiff to various governmental agencies.

150. Plaintiff also asserts that conflicting accounts about employment actions "constitutes further evidence as to the honesty of Defendants' belief in imposing an adverse employment decision"-Pretext.

151. Defendants utilized the mail to further its schemes violating protected class employees civil and constitutional rights, deceit, fraud, extortion and obstruction of justice.

152. Plaintiff asserts that Defendant Kenco's hiring Jay Elliott as the VP of legal was a conspiracy to corruptly impede and obstruct the administration of justice.

153. The hiring of Elliott in this case required approval of the VP or higher, the CFO and the COO according to Defendants hiring policy referenced in the matter of Henry V. Kenco et al. 1:15-cv-10961.

154. Additionally, by sheer definition the hiring of an individual requires a consensus and a common goal in exchange for consideration; essentially a conspiracy.

155.    Specifically, an outlined agreement of mutual understood expectations to be fulfilled on the parts of perspective employee and employer for a sum of money as consideration for the fulfillment of these mutually agreed objectives, goals and tasks.

156.    Jay Elliott being the counsel of record participated in Plaintiff's fact finding conference as a witness-providing misleading and patently false information and written documentation.

157.    Varvel also participated in plaintiff's fact finding conference and she too did not have any firsthand information and she too could not affirmatively attest to anything that occurred relative to Plaintiff's allegations, as a vast number of these instances occurred prior to Varvel's hiring.

158.    Pointedly, a number of these things occurred prior to both Elliott and Varvel's hiring.

159.    Plaintiff asserts and concurs with Elliott when Elliott stated to the IDHR/EEOC investigator that instances that occurred prior to the hiring of Varvel that he had as much knowledge as Varvel would have.

160.    Plaintiff asserts that neither Varvel nor Elliott had any legitimate firsthand admissible knowledge to provide.

161. Plaintiff has not only witnessed Elliott on behalf of Defendants corruptly influence, obstruct, and impede the administration justice in Plaintiff's matters, but Plaintiff has also witnessed Elliott and Varvel on behalf of Defendants further their schemes to influence, obstruct, or impede, the due administration of justice of other litigants such as Vernon Henry, Edith McCurry, and others.

162. Szplett's also contends that Elliott had sufficient enough business relationships with his client that generated a "financial motive" for him to conspire with the defendant to intentionally obstruct, impede, delay and thwart the administration of justice relative to Plaintiff and other litigants. In re: Henry v Kenco et al., McCurry s Kenco et al., Doss v. Kenco et al., and others.

163. This is evidenced by Defendants contrived schemes of intentionally taking inconsistent positions with agencies, tribunals and courts relative in avoiding liability and culpability relative to claims of discrimination, retaliation, harassment and other unlawful violations of public policy.

164.     Defendant Kenco has contended that Mars did not have anything to do with the employment decisions or operations at the Mars Manteno facility.

165.     Szplett's asserts that this simply not true. All operational decisions, including labor management Mars participated in or dictated. All costs were passed on to Mars, including legal fees.

166.     For example, Todd Moore agreed that there was a desperate need for a HR Manager. Moore, Coffey and others also approved and funded on behalf of Mars the hiring of Lori Varvel.

167.     Mars also routinely discussed employees of the Mars Manteno facility.

168.     Mars drove the workplace in every aspect, as it was Mars facility, their product, their network, their vendors, and their customers.

DEFAMATION OF CHARACTER

169.     Defendants reported false and misleading information to the IDHR/EEOC regarding Plaintiff's performance that was damaging to plaintiff's professional standing and career.

170. Specifically, Defendants stated that it was Szplett's failing leadership that led to all the charges of discrimination filed against them.

171. Szplett's had been employed at the Mars Manteno facility since 2001 and had not ever received a negative performance rating or disciplinary action.

172. At all times Szplett's met respondents legitimate employment expectations.

173. Defendants have never produced the alleged negative performance review.

**NEGLIGENCE**

Based on association and in reverse discrimination for opposition to disparate treatment and impact on protected class persons

174. Plaintiffs incorporate by reference all the preceding paragraphs of this Complaint as if fully set forth herein.

175. Defendants are negligent for failing to comply with public policies such as the Food Drug and Cosmetic Act as amended by the Food Safety and Modernization Act, Presidential Directives and the Bioterrorism Act of 2002, Title VII, The Civil Rights Act of 1964

as amended in 1991, OSH Act and other statutes and codified standards.

176. Defendants are also negligent for failing to comply with company policies relative to harassment, violence, discrimination, investigations, and its quality management systems (which is equivalent to the FDA's Qsit-21CFR 8.20)

177. Defendants established a duty of care and fiduciary obligation when it extended a written offer of employment to Plaintiff that Plaintiff was required to sign and return to accept Defendants offer.

178. Defendants were negligent in their intentional and willful discrimination of Plaintiff and other Caucasians that refused to act complicitly individually and collectively to disparage, marginalize, subordinate, minimize and exclude African Americans.

179. Defendants were negligent in their intentional and willful discrimination of African Americans.

180. Defendants were negligent in their hiring and retention of employees who also fostered the hostile work environment and aided and abetted Defendants in their malfeasance.

181. This would include Kelvin Walsh, Mike Manzello, Tammi Fowler, David Jabaley, Jay Elliott, Mario Lopez, Karl Meyers, Trace Spier, Paula Hise and Pete Monstwillo amongst others.

**Breach of Fiduciary duty**

182. Defendants had a duty of care to Plaintiff and other protected class persons to which they breached and failed to adhere.

183. Plaintiff asserts that Defendants Kenco and Mars created a fiduciary duty to Plaintiff and other employees when it required its employees to sign its offer letter according to Defendants policy CP.HR. 1002 as a term and condition of employment.

184. In addition, public policies such as the Food Drug and Cosmetic Act as amended by the Food Safety and Modernization Act, Presidential Directives and the Bioterrorism Act of 2002, Title VII, The Civil Rights Act of 1964 as amended in 1991 and other statutes and codified standards also created this duty of care.

185. For example, Plaintiff and others are to be free from a racially hostile work environment.

186. While Pete Monstwillo was still a temporary employee he began engaging in racially motivated threats, white racial dominance and subordination of African Americans.

187. Despite Walsh and Manzello, the senior management, at the facility being aware of Monstwillo's very open, active and unashamed discriminatory proclivity he was hired as a full time employee, given premium shifts, greater access to overtime and better fringe benefits than African Americans such as Vernon Henry.

188. Specifically, Pete Monstwillo made a number of racially motivated threats, his repeated threats culminated in an attempt to kill an African –American employee (Vernon Henry) with a forklift. Even after he attempted to kill him with the forklift, he continued to call the facility and threaten Henry. The authorities were not called.

189. Within a day or so of this incident, Henry was discharged on a contrived cell phone policy violation that did not exist.

190. Specifically, it was alleged that Henry posted a picture to Facebook, to which Defendants were not able to produce on or from Henry's Facebook.

191.    Henry had previously filed formal charges of
discrimination in July 2014 regarding Monstwillo racially motivated
threats that had been received in the mail by Plaintiff and
forwarded to corporate and senior management.

192.    In furtherance of its scheme, Lopez and others
terminated the persons in the photo that Henry allegedly took to
legitimize Henry being terminated who was not in the picture nor
did they have any evidence linking Henry to having took this
picture, even if it was on Henrys Facebook page.

193.    The persons terminated were also minorities-African
American and Hispanic.  Plaintiff asserts they were collateral
damage.

194.    Henry was unevenly and more harshly disciplined than
Monstwillo even though Monstwillo's known actions were far more
egregious than Henry's contrived allegations.

195.    Plaintiff affirmed for corporate, specifically Dan Dey, that
there was not a cell phone policy for the facility.

196.    Defendant admitted to OSHA that it did not have a cell
phone policy or proof of such policy in the matter of Kenco Logistics
OSHA No. 985037.

197. Each policy at the facility accompanied a signature as proof that an employee had been presented with the corresponding policy.

198. There was no policy log for Henry or any other employee regarding cell phone use.

199. More specifically, Tammi Fowler stated that Monstwillo was just horse playing.

200. Fowler offered more harsh rhetoric about Henry's alleged indiscretion.

201. Plaintiff and others also had a right to safe working environment as well.

202. There were numerous health and safety violations[1] ranging from: the spread of human feces, vermin infestation of various kinds including bats, birds and mice and exhaust fan failure to mediate ammonia spills amongst other potential public health safety issues and crises.

[1] These health and safety violations affected every employee, their families and the surrounding community potentially transmitting germs, viruses, and diseases to others from being exposed to human fecal matter or being exposed to 9,500 pounds of ammonia. Additionally, Mars, Inc. consumers across the globe could have been affected by food products contaminated by vermin or their feces.

## CONSPIRACY TO COMMIT BREACH OF FIDUCIARY DUTY

203. Defendants in an effort to conceal the truth conspired to obstruct justice and avoid culpability and liability about: 1) the racially charged hostile work environment; 2) the pervasive and rampant discrimination; 3) the adverse employment decisions toward Plaintiff and others and; 4) the blatant breach in their duty of care by: intentionally failing to uphold their fiduciary obligation of failing to investigate claims of discrimination, collusion, disparity of pay, uneven discipline, and retaliation amongst other issues raised.

204. Fowler recommended hiring a HR Manager.

205. All of the discrimination claims were deemed frivolous by David Jabaley Director of Operations, in our budget meeting in October of 2014.

206. Spier added a $100,000.00 to the budget to defend these frivolous claims of discrimination.

207. After the $100,000.00 increase in the budget to defend these claims, Defendant Kenco hired Jay Elliott[2] as its in house counsel.

[2] The hiring of Jay Elliott according to Defendant Kenco's policy required the recommendation of the VP or higher and the approval of the CFO and President of the company. Docket # 117 page 60 n. 25 &Docket #82-13.

208. Elliott's hiring was a contrived scheme to further Defendants schemes to breach Defendants' fiduciary obligations to comply with public and company policy with regard to Plaintiff and others.

209. Additionally, Defendants intentionally interfered and obstructed the administration of justice through strategically hiring Elliott as an employee to participate in the administrative processes.

210. The administrative process at the IDHR and EEOC is a requisite of Title VII claims.

211. Defendants, specifically Elliott, provided inaccurate, prejudicial and misleading accounts of information, testimony and documentation[3] to undermine the integrity of the process of incidents that occurred, even prior to his employment.

212. Plaintiff was on disability for work related stress prior to Elliot being hired.

213. Plaintiff went on short disability on or about October 27, 2014.

[3]By way of U.S. mail.

214. Elliott was hired in November of 2014 and was not at the Mars Manteno facility, but in Chattanooga, TN.

215. Elliott also indicated that he lacked access to employees.

216. Consequently, it can be easily inferred and asserted that Elliott was not able to conduct an investigation regarding these matters, as he lacked access to employees.

217. It can also easily be inferred that any information that Elliott provided or submitted to various agencies, tribunals and courts relative to Plaintiff and other litigants was contrived, capricious and inaccurate.

218. David Caines, David Crawley, Trace Spier, Paula Hise, Tammi Fowler, David Jabaley and others participated in these conspiracies that retaliated against and harassed Plaintiff for his non-complicity to white racial dominance and black subordination.

219. Plaintiff also asserts that these persons conspiratory actions also obstructed justice and its administration.

220. Plaintiff also asserts that these conspiratory actions were in violation of U.S.S. 1985.

221. Elliott became Defendants' proxy during the requisite investigation stage to influence, prejudice and obstruct justice.

222.    Additionally, it can be asserted that Defendants, including Elliott, had financial motives because of their respective financial interests in the company to protect the interest of the company (Kenco) and its client Mars.

223.    Defendants awarded employees performance bonuses.

## TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

Based on association and in reverse discrimination for opposition to disparate treatment and impact on protected class persons

224.    Plaintiffs incorporate by reference all the preceding paragraphs of this Complaint as if fully set forth herein.

225.    Plaintiff contends that he was not given the opportunity or apprised of the process to apply to continue to work at the Mars Manteno facility with the new management company.

226.    Defendants indicated that information would be provided to Plaintiff for Plaintiff to apply for continued employment.

227.    Szplett contends this interference was in retaliation of Szplett's failure to act in complicity with management's race-based stereotypes regarding African Americans and his unwillingness to

work with other Caucasian employees to marginalize, subordinate, minimize, exclude or disparage African American employees.

228. Plaintiff also asserts that his discharge was also a result of this interference executed through the elaborate contrived retaliatory scheme not give Plaintiff the opportunity to apply to continue to work at the Mars Manteno facility.

INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Based on association and in reverse discrimination for opposition to disparate treatment and impact on protected class persons

229. Plaintiffs incorporate by reference all the preceding paragraphs of this Complaint as if fully set forth herein.

230. Defendants were aware that Plaintiff was out on disability due to work related stress.

231. Defendants intentionally inflicted emotional distress upon Plaintiff and Plaintiff's family, when it intentionally failed to compensate Szplett as it had other employees for the month of March in 2015.

232. Defendants intentionally inflicted emotional distress upon plaintiff and Plaintiff's family, when it intentionally denied Plaintiff disability and unemployment benefits beginning in

February of 2015, while Plaintiff was out on disability due to the work related stress of the hostile work environment.

233.    Defendants intentionally inflicted emotional distress upon Plaintiff and Plaintiff's family, when it intentionally did not apprise plaintiff on how to continue his employment at the Mars Manteno facility as it had other employees.

234.    Defendants intentionally inflicted emotional distress upon Plaintiff and Plaintiff's family, when Defendants orchestrated a Quid Pro Quo to extort Plaintiff into obstructing justice by aiding and abetting Defendants in defending against the HR claims in litigation in exchange for Plaintiff's severance pay.

235.    Szplett had not been compensated since January of 2015.

236.    Defendants intentionally inflicted emotional distress upon Plaintiff and Plaintiff's family, when it intentionally demoted Plaintiff.

237.    This demotion occurred less than three weeks after plaintiff was on disability for work related stress.

238. Defendants had been conspiring and furthering its schemes prior to the hiring of Lori Varvel and Szplett's actual demotion in November 2014.

239. Plaintiff did not become aware that he had been demoted until on or about April 8, 2015, after being apprised of being mischaracterized by Defendant as other than the HR Manager.

## Hostile Work Environment

Based on association and in reverse discrimination for opposition to disparate treatment and impact on protected class persons

240. Plaintiffs incorporate by reference all the preceding paragraphs of this Complaint as if fully set forth herein.

241. Additionally, this was a hostile work environment charged with racial animus fostered and led by top level and executive management.

242. Necessary to the Kenco and Mars Manteno racially discriminatory culture was the expectation that Caucasians will work together to marginalize, subordinate, disparage, and exclude African Americans.

243. For example, this was evidenced when Defendants offered Plaintiff as a witness relative to wrongful termination of an African American Quality Engineer, Mary Madison, who brought charges of discrimination and retaliation.

244. Defendants' outside counsel nor any of the management at any time questioned or spoke with Plaintiff regarding the matter prior to offering Plaintiff as witness to the IDHR and EEOC or prior to the fact-finding conference that Plaintiff was instructed to attend on the Respondent's part.

245. However, Defendants counsel spoke with Edith McCurry who affirmed that Madison had reported claims of racial discrimination amongst other claims. McCurry also told how she too had been discriminated against. McCurry was left off Defendants witness list.

246. Plaintiff asserts that management assumed that Plaintiff would uphold this deep rooted racially discriminate culture through the expectation of complicity of whites working together to marginalize, subordinate, harass, berate and publicly humiliate African Americans with white racial dominance, subordination.

247.    Defendants such as Walsh and Manzello would make public spectacles out of African American employees by publicly chastising, disciplining, berating, humiliating, or making some derogatory comment.

248.    For example, Nathan Doss was accused of smelling like weed. It was his day off, Manzello and others forced Doss to swipe in or be terminated.

249.    Doss was written up for having a work time accident and sent for a drug test.--Doss did not have a work time accident.

250.    Due to the fact that he was African American Doss was stereotyped to have been a person who smoked "weed."

251.    They were certain that he would fail his test. They halted vacations of other employees in anticipation that he would fail and they would have to cover his shift as a lead.

252.    Doss did not fail the test. Upon him being called back to return to work, Walsh publicly humiliated and berated him and continued to cancel his shift that he was to lead.

253.    Doss had raised issues of being disparately paid as a lead. Doss was promoted without receiving the prevailing wage for the position.

254. Walsh and Fowler decided to incrementally pay Doss for performing the job as a lead.

255. No other employee in the history had been subject to incremental pay.

256. Additionally, other leads were hired externally immediately preceding and proceeding his promotion.

257. These persons were non-African Americans (Stephanie Dumas and John Steele) and they were paid at the prevailing wage.

258. This management scheme intentionally superimposed different terms and conditions upon African Americans and Caucasian employees who did not conform to race based stereotypes regarding interactions with African American employees or those Caucasian employees who did not disparage or minimize or marginalize or subordinate or exclude African American employees.

259. Other examples: Mario Lopez, the then General Manager told Mardy Ringo in September of 2014 an employee of the Mars Manteno facility , who was a Spotter, that he would fire him he said that he was being racially discriminated against.

260. Ringo and others were tenured Spotter's who were being paid less than newly hired non-white Spotters and even non-white

persons who did not meet the employers or the Department of Transportation requirements of holding a commercial driver's license.

261.     David Jabaley, Director of Operations, stated "why don't they just write his black ass a check" referring to Nathan Doss.

262.     Paula Hise, V.P. of Operations addressed the three (3) shifts of the facility telling the employees that Kelvin Walsh was a good friend and he would be missed.-- All the while knowing, that complaints had been made to corporate and that Walsh had been named in numerous and formal informal charges of racial discrimination.

263.     Hise a VP of the company condoned and promoted the hostile work environment charged with racial animus as an acceptable culture of the company.

264.     Hise, Jabaley, Fowler, Walsh and others have established through their actions a direct causal link of its corporate culture and the intentional deprivation of statutorily protected rights.

265.     Plaintiff asserts that defendant Kenco has an admitted history of disciplining African-Americans more harshly than non-African Americans.

266. Plaintiff also contends that in the matter of *Brown V. Kenco*, Karen Smith and Jay Elliott were the counsel for defendant Kenco. Smith is the attorney who interviewed McCurry relative to the Madison charges in November of 2013. Smith excluded McCurry from the respondent's witness list. Smith included Plaintiff as the HR representative and referenced Szplett's as the HR Manager.

267. Plaintiff also contends that Pete Monstwillo was an employee of the Mars Manteno warehouse and that Monstwillo was subject to the same policies as Plaintiff and others at the Mars Manteno facility.

268. Plaintiff also contends that Monstwillo was not punished or held accountable with regard to public policy or the policies of defendant Kenco or Mars relative to basic employment policies, harassment, violence and safety; nor was Monstwillo punitively or economically sanctioned for making numerous racially motivated threats, his repeated threats and an attempt to kill an African – American employee (Vernon Henry) with a forklift amongst other unlawful actions.

269. Monstwillo was not punished for these racially motivated acts. However, several days later while Henry was off on medical leave from being attacked by Monstwillo, Henry was fired, while on FMLA.

270. Plaintiff personally received Henry's doctors' note that was placed in his personnel file.

271. Management was aware that Henry was out on medical leave when he was terminated for contrived and pretextual reasons.

272. Tammi Fowler alleged along with others that Henry violated its cell phone policy and that Monstwillo was just horse-playing[4]. There was no cell phone policy.

273. Monstwillo's consequences for violating company and public policy, while a temporary employee, was being hired as a fulltime permanent employee of the Mars Manteno facility.

274. Plaintiff asserts that the prohibition on violence is unequivocal and that it was Defendants' duty to refrain from hiring Monstwillo.

275. Defendants were negligent in the hiring and retention[5] of Monstwillo as an employee, as his actions were foreseeable based

[4] Monstwillo called repeatedly threatening to kill Henry, after attempting to kill him with the forklift. This was especially unnerving considering there had been a shooting recently at the facility.

upon immediate past behaviour that he was and continued to be a contributor of hostile and a racially animus work environment.

276. Throughout Monstwillo's employment at the Mars Manteno facility he cleaved to the ideology of white racial dominance and subordination of African Americans by often boasting to African American employees that he could get them fired; that he had supremacy over African-Americans (stating that Henry should look in the mirror, as he was "nigger") and that management was his friend amongst other rants.

277. Monstwillo's friends in management were a part of the same management scheme that subjected Szplett to being ostracized from meetings, denial of proper administrative support by increasing workloads and adding additional duties outside of HR and accounting to Szplett's counterpart McCurry along with whimsical and ever changing and shorter deadlines that created chaos and stress within the daily workflow of both Szplett's and his counterpart McCurry.

278. Additionally, certain white employees repeatedly told racially derogatory jokes and slurs, as well as, making racially

[5] Plaintiff asserts this also holds true for Kelvin Walsh, Tammi Fowler, Mike Manzello, David Jabaley and others who were not disciplined for unlawful acts reported.

motivated epithets and stereotypical terms such as; "niggers,""nigger bitches,""educated nigger," "black asses."

279. This would include Kelvin Walsh, Mike Manzello, David Jabaley, Tammi Fowler and others.

280. Not only would Walsh make such remarks he even encouraged other Caucasian management to do the same and treat the employees like "assholes."

281. When Walsh was met with resistance to his ideology he punished the resistors.

282. Specifically, Walsh contrived performance issues relative to Tom White and presented them to him in the form of a write-up. White further resisted and immediately resigned.

283. White referenced in his written exit interview that the workplace was discriminatory and management pressured lower management and other whites to act in complicity with white racial dominance.

**Civil Conspiracy**

Based on association and in reverse discrimination for opposition to disparate treatment and impact on protected class persons

284. Plaintiffs incorporate by reference all the preceding paragraphs of this Complaint as if fully set forth herein.

285. Defendants engaged in a number of civil conspiracies to violate Plaintiff's protected rights.

286. The Defendants in an effort to conceal the truth about the racially charged hostile work environment, the pervasive and rampant discrimination, the adverse employment decisions toward Plaintiff and others engaged in numerous civil conspiracies.

a. For example Defendants: 1) hired Jay Elliott as in house legal counsel; 2) manipulated, contrived and applied policies that either did not exist or that were created to accommodate the current issue(s) at hand; 3) provided patently false and misleading information and or documentation to agencies, tribunals and courts that blatantly went against their own policies; 4) breached their duty of care by failing to uphold their fiduciary obligation to follow company and public policy; 5) aided and abetted malfeasors that fostered and condoned such disparaging acts against African Americans and other protected class persons; 6) intentionally failed to

investigate claims of discrimination, collusion, disparity

of pay, uneven discipline, retaliation, amongst other

issues raised and; 7) provided misleading and patently

false information and documentation that supported

whatever non-discriminatory reason that was asserted to

avoid culpability, liability and obstruct justice.

b. Hired Lori Varvel as the HR Manager.

286.    Plaintiff also asserts that he was subjected to a

conspiracy to extort him out of his protected rights, his wages,

benefits and compensation.

287.    Plaintiff also asserts the conspiracy to extort Plaintiff

would also defraud other litigants out of their civil and

constitutional rights by either having Plaintiff perjure himself by

either telling half-truths or making materially false statements or

committing fraud by omission to help Defendants defend or

overcome lawful litigation unlawfully.

288.    Essentially Plaintiff would be obstructing and impeding

justice.

289.    Plaintiff also contends that Defendants attempted to extort him into aiding and abetting Defendants in obstructing justice.

290.    Plaintiff contends that this obstruction would continue to violate the other protected class person's civil and constitutional rights.

291.    Defendants in furtherance of its scheme contrived a plan to place Plaintiff in a precarious economic situation to coerce him to obstruct justice in order to receive his severance pay.

292.    Defendants gave Plaintiff's physician a contrived and inaccurate job description for Plaintiff's physician to make an evaluation.

293.    Predicated on those duties and the responses, the Hartford, the administrator for defendant Kenco's self-insured disability plan deduced that Plaintiff was able to return to work.

294.    On February 26, 2015, Plaintiff received certified mail from defendant Kenco indicating that the contract had been terminated sooner than the expected date of March 29, 2015.

295.    Additionally, it stated that since Szplett had not applied to continue to work at the Mars Manteno facility that he was

entitled to receive severance by signing the release within forty five (45) days of the date of receipt.

296.     The most notable of the terms and conditions were that Plaintiff had to waive any claims that he may have had against defendant and that he had to help Defendants defend itself against HR matters in order to receive his severance pay.

297.     Szplett's applied for unemployment a benefit due him.

298.     Szplett was denied because Defendant asserted that Szplett was still an employee until March 29, 2015 and was not entitled to his unemployment benefits.

299.     Plaintiff asserts that Defendants: 1) defrauded him out of his disability benefits; 2) intentionally failed to inform him of how to apply to continue his employment and ; 3) refused to pay Szplett as it had the other employees who were not continuing their employment at the Mars Manteno facility.

300.     Plaintiff asserts that defendants contrived a perfect scenario to deprive Plaintiff out of his benefits, wages and compensation to coerce Plaintiff into being extorted into waiving his rights and defrauding others out of their rights by aiding and

abetting defendants in obstructing justice and violating other protected class person's civil and constitutional rights.

301. The scheme was to get Szplett into helping defendants' defend HR matters in exchange for his severance pay.

302. Szplett was never paid his March compensation or his disability benefits.

303. Plaintiff contends this was a deprivation and adverse employment action that gives rise to liability.

304. Additionally, Szplett asserts that Defendants have kept Szplett's wages unjustly and for their undue enrichment and in punishment for Szplett failure to act in complicity with management's race-based stereotypes regarding African Americans and his unwillingness to work with other Caucasian employees to marginalize, subordinate, minimize, exclude or disparage African American employees.

305. Plaintiff also asserts that defendants have violated 18 USC 1962 in regards to 18 USC 1503 and 18 U.S.C. 1985. Defendants have used the mail to further its conspired schemes to impede and obstruct the administration of justice and to extort

plaintiff out of his protected rights, his wages, compensation and benefits, as well as, to defraud other protected class persons out of their civil and constitutional rights.

**Fraudulent concealment**

306.    Additionally, Szplett asserts that Defendants conspired to fraudulently conceal from Plaintiff that Defendants had harmed him when Plaintiff was demoted from the HR Manager's position.

307.    At no time did Defendants tell Plaintiff that Plaintiff would be replaced.

308.    At no time did Defendants tell Plaintiff that he had been replaced while he was on sick leave.

309.    Specifically, within three (3) weeks of Szplett's being on disability he was replaced.

310.    Szplett contends that Defendants had been furthering its scheme by conspiring to replace Szplett's.

311.    Szplett contends that Defendants had been actively looking and recruiting for his replacement since September of 2014.

312.    Plaintiff also asserts that Defendants had not made him aware of any performance issues that would dictate or necessitate such a change.

313.    Plaintiff also asserts that the first time he became aware

of an issue with his performance was in August of 2015, when

Defendants indicated that it was his failing leadership that led to

Defendants deciding to hire Varvel as the HR Manager.

314.    Szplett's also contends that numerous Defendants and

other malfeasors wanted Szplett to actively assist with the expected

complicity to the white racial dominance and subornation of African

Americans.

315.    Szplett's asserts that his failure to conform to this overt

racism prompted the change in the Manteno HR department.

316.    Additionally, it was not until the middle of April of 2015

that Plaintiff learned that Defendants began to mischaracterize him

as other than the HR/Accounting Manager in the matter of Edith

McCurry.


## ADVERSE ACTIONS

Based on association and in reverse discrimination for opposition to
disparate treatment and impact on protected class persons

317.    Plaintiffs incorporate by reference all the preceding

paragraphs of this Complaint as if fully set forth herein.

318.    Plaintiff contends that he had been working for Defendants at the Mars Manteno facility for so many years without incident, Defendants' abrupt and cryptic adverse employment decision supports the drawing of an inference that Defendants were motivated by some impermissible reason.

319.    Plaintiff asserts that he was subjected to a reduction of duties.

320.    Plaintiff asserts that he was subjected to a demotion.

321.    Plaintiff asserts that he was subjected to a title change.

322.    Plaintiff asserts that he was subjected to extortion.

323.    Plaintiff asserts that he was subjected to being defrauded out of his benefits. i.e. unemployment and disability.

324.    Plaintiff asserts that he was subjected to the equivalent of wage theft, as he was not compensated as other employees were at the Mars Manteno facility who had not engaged in protective activity.

325.    Plaintiff asserts that he was subjected to being depraved of an opportunity to apply for and continue work at the Mars Manteno facility.

326. Plaintiff asserts that he was subjected to being evicted from his office and reassigned to a cubicle in the back of the office away from co-workers and management.

327. Plaintiff asserts that he was subjected to harassment, retaliation, disparate treatment, different terms and conditions of employment, and a hostile work environment amongst other things.

328. Plaintiff asserts that he was subjected to damage to his professional standing and defamation of his character.

329. Plaintiff asserts that he was subjected to a temporary constructive discharge, when he was forced to take medical leave of absence due to the intolerable and hostile working conditions at the Mars Manteno facility.

330. Plaintiff asserts that he was not equally paid as Varvel for performing the job duties and tasks of the HR Manager.

331. Plaintiff also asserts that he had more job duties and tasks than Varvel consisting of accounting and other ancillary tasks.

## AIDING AND ABETTING

Based on association and in reverse discrimination for opposition to disparate treatment and impact on protected class persons

332.    Plaintiffs incorporate by reference all the preceding paragraphs of this Complaint as if fully set forth herein.

333.    Mars, Inc., Robert Coffey, Todd Moore, Paula Hise, Trace Spier, COO, CFO, CEO/President and others aided and abetted malfeasors such as Kelvin Walsh, Mike Manzello, David Jabaley, Mario Lopez, Tammi Fowler, Jay Elliott, Lori Varvel and others in obstructing justice and its administration.

334.    Mars, Inc., Robert Coffey, Todd Moore and others aided and abetted malfeasors such as Kelvin Walsh, Mike Manzello, David Jabaley, Mario Lopez, Tammi Fowler, Pete Monstwillo and others to intentionally discriminate against protected class person, including Plaintiff, to include African Americans and those that either associated with African Americans or who opposed disparaging or refused to disparage African Americans.

335.    Furthermore, Mars, Inc., Robert Coffey, Todd Moore and others aided and abetted malfeasors such as Kelvin Walsh, Mike

Manzello, David Jabaley, Mario Lopez, Tammi Fowler, Pete Monstwillo and others in their gross negligence of allowing persons to in intentionally discriminate against protected class person, including Plaintiff, to include African Americans and those that either associated with African Americans or who opposed disparaging or refused to disparage African Americans.

336.    Specifically, Mars, Inc., Robert Coffey, Todd Moore and others refused to stop the gross negligence and intentional discrimination of protected class persons, including Plaintiff and others such as African Americans and those that either associated with African Americans or who opposed disparaging or refused to disparage African Americans.

337.    More specifically, Robert Coffey was on site and should have known or been aware of the intentional discrimination, the uneven discipline of protected class persons and the hostile work environment.

338.    Coffey reported to Moore, who also had input and control over the Mars Manteno facility and in turn Moore reported to others such as Steve Sheldon.

339.    Additionally, Plaintiff asserts that it is an employee's right to have a safe working environment free from racial animus and hostility and that Mars, Inc. Robert Coffey, Todd Moore and others did nothing to stop this intentional, pervasive and systematic discrimination.

340.    Mars, Inc., Robert Coffey, Todd Moore and others aided and abetted malfeasors such as Kelvin Walsh, Mike Manzello, David Jabaley, Mario Lopez, Tammi Fowler, Pete Monstwillo and others in violating the constitutionally protected rights of protected class persons, including Plaintiff, as well as, African Americans and those that either associated with African Americans or who opposed disparaging or refused to disparage African Americans.

341.    More specifically, Mars, Inc., Robert Coffey, Todd Moore and others furthered the malfeasors conspired and intentional schemes of discrimination by giving approval and funding to execute the hiring of Lori Varvel to cover-up the intentional discrimination along with weighing in on various schemes that would defraud employees out their various protected rights.

342.    Specifically, Mars, Inc., Robert Coffey, Todd Moore and others did not conduct any investigation to unearth the issues or to

address them. Nor did they follow their policies or public policy relative to employment.

343. Mars, Inc., Robert Coffey, Todd Moore and others aided and abetted malfeasors such as Kelvin Walsh, Mike Manzello, David Jabaley, Mario Lopez, Tammi Fowler, Pete Monstwillo and others to intentionally obstructed and impeded justice and its administration relative to protected class person, including Plaintiff, to include African Americans and those that either associated with African Americans or who opposed disparaging or refused to disparage African Americans.

344. More specifically, Mars, Inc., Robert Coffey, Todd Moore and others furthered the malfeasors conspired and intentional schemes of obstruction by giving approval and funding necessary to execute the hiring of Lori Varvel to cover-up the intentional discrimination along with weighing in on various schemes that would obstruction the administration of justice of the various protected rights of protected class employees.

345. Mars, Inc., Robert Coffey, Todd Moore and others aided and abetted malfeasors such as Kelvin Walsh, Mike Manzello, David Jabaley, Mario Lopez, Tammi Fowler, Pete Monstwillo and others to

intentionally make materially false misrepresentations in violation of 18 U.S.C. § 1001 to governmental agencies and tribunals in an effort to further obstruct and imped justice and its administration relative to Plaintiff and other protected class persons.

346.     Defendants either acquiesce, made patently false or misleading statements, half-truths or omissions.

347.     Mars, Inc., Robert Coffey, Todd Moore and others aided and abetted and conspired with malfeasors such as Kelvin Walsh, Mike Manzello, David Jabaley, Mario Lopez, Tammi Fowler, Pete Monstwillo and others in breaching its duty of care owed to the employees of the Mars Manteno facility.

348.     The duty of care to the employees was established through Defendants Kenco and Mars requiring as a term and condition of employment according to policy CP.HR. 1002, for employees to sign and return the Defendants offer letter. The offer letter was extended by Defendant Kenco's Vice President on behalf of Defendants Kenco and Mars. The offer letter was countersigned by Defendants Director of Employee Relations, Eddy Register.

349.     Additionally, such public policies as the Food Drug and Cosmetic Act as amended by the Food Safety and Modernization

Act, Presidential Directives and the Bioterrorism Act of 2002, Title VII, The Civil Rights Act of 1964 as amended in 1991 and other statutes and codified standards also created and added to Defendants duty of care.

**THE ESTOPPELS**

350. In the case of Szplett Kenco/Mars in 2015CA3083 and 21BA51536 and IDOL Wage Claim No.-15-001523, herein "Szplett Matters" in Defendants verified and position statements to the IDHR/EEOC, and IDOL Defendants contended that Szplett was not the HR Manager.

351. Defendants also contended throughout his matters at the administrative level that Leonard Szplett was either the Office or Accounting Manager for the Mars Manteno facility.

352. More specifically, Defendants have previously asserted that they have never had an HR Manager's position before and the position that Varvel assumed was newly created with different duties.

353.     Defendants made omissions, misrepresentations and half-truths to the IDHR/EEOC, and IDOL to support their current position within its current litigation.

354.     Plaintiff asserts that this was a violation of 18 U.S.C. § 1001 and 18 U.S.C. § 1503.

355.     Szplett contends that the Defendants should be estopped pursuant to the doctrines of Res Judicata, Collateral and Judicial Estoppel.

356.     Plaintiff asserts that the doctrine of res judicata applies when there is: (1) a final judgment on the merits, (2) identity of the cause of action in both an earlier and later suit, and (3) identity of parties or in privity in the matters.

357.     Plaintiff asserts that Defendants have received the benefit on several occasions from several government agencies and tribunals for asserting the contention that Plaintiff was the HR Manager.

358.     For example, Edith McCurry filed several charges of discrimination with the IDHR and EEOC that were culminated and concluded in the district court in case 16-cv-2273 Docket 125.

359.    In the case of McCurry V. Kenco/Mars in 2015CA1804/21BA50670 and 2015CA2495/21BA51135 and in 16-CV-2273, herein "McCurry," Defendants contended inconsistent positions throughout the matter relative to Szplett's and his job title and functions.

360.    Plaintiff asserts that initially in this matter Defendants stated that he was the Office Manager in their position statement to the IDHR and EEOC dated March 27, 2015.

361.    Plaintiff asserts that this contention of Defendants in response to McCurry's charges is what alerted him that there was a potential issue relative to plaintiff being mischaracterization of not being the HR Manager.

362.    Plaintiff contends that in Defendants' motion for summary judgment in the McCurry matter 16-cv-2273 Defendants contrarily asserted that Szplett's was the HR Manager and enumerated that as an undisputed fact.

363.    The District court in its ruling acknowledged that Szplett was the HR Manager.

364. Plaintiff asserts that Defendants have recently asserted this same contention to the seventh circuit in its Appellee Brief in McCurry vs. Kenco et al. 18-3206 filed on February 22, 2019.

365. More specifically, Defendants have asserted that they have not been inconsistent in their positions relative to Szplett.

366. Plaintiff asserts that Defendants have intentionally taken inconsistent positions relative to avoiding liability and culpability relative to claims of discrimination and other actionable causes of action.

367. Plaintiff asserts that Defendants actions were deliberate and an obstruction to justice and its administration.

368. Plaintiff asserts that because this matter had a final judgment on the merits and; the identity of the cause of action in both the earlier and later suit shares the common nucleus of operative facts asserted and; that SZPLETT and McCurry are the same and in privity in the matters makes the doctrine of Res Judicata applicable.

369. Plaintiff also asserts that in the matter of Mary Madison v. Kenco et al. 2016-FDA-04. Defendants contended to the Department of Labor's administrative law judge in its two (2)

motions for summary decision in August of 2017 that Szplett was the HR Manager. The matter was decided on November 22, 2017.

370.     Plaintiff also asserts that Defendants had also made this same contention in its position statement in Madison's IDHR charge no. 2014CF0475 cross-filed with the EEOC and to OSHA in 2013.

371.     Plaintiff also asserts that collateral estoppel is applicable, as collateral estoppel "refers to the effect of a judgment in foreclosing litigation in a subsequent action of an issue of law or fact that has been actually litigated and decided."

372.     Plaintiff contends that this doctrine holds true in this matter from both the Madison and McCurry matters.

373.     Plaintiff asserts that there are a common nucleus of operative facts asserted in Defendants summary decision/judgment motions in the matters of Madison and McCurry of claims of discrimination, retaliation and that Szplett was the HR Manager.

374.     Plaintiff assert that Defendants should be judicially estopped as it has now changed its theory in other matters of Madison and McCurry before the Department of Labor and the district and appellate courts relative to that of Szplett's being the HR Manager.

375.    Plaintiff also asserts that Defendants intentionally attempted to support its contention that HR Manager's position filled by Varvel was newly created and that he was just a manager, who was not the HR Manager.

376.    Varvel was an HR Generalist according to Defendants evidence to the IDHR and EEOC.

377.    HR Generalist and HR Managers are not the same.

378.    Fowler's assistant was an HR Generalist.

379.    Plaintiff asserts that this contention of Defendants regarding Varvel was a pretext.

380.    Plaintiff asserts that the doctrine of judicial estoppel protects the integrity of the judicial process

381.    Plaintiff also asserts that this doctrine prohibits parties from deliberately changing positions according to the exigencies of the moment.

382.    Plaintiff vehemently asserts Varvel's hiring was a pretext, as it is apparent that Defendants were intentionally and willfully inconsistent in the reasons it offered for hiring Varvel in this matter versus the reasons given in other matters.

383.    Plaintiff asserts that Defendants conveniently used Szplett's title as HR Manager when it would benefit them in the matters of Madison, McCurry and others.

384.    Plaintiff assert that Defendants intentionally evaded at the administrative level of this matter the fact that Szplett's was the HR Manager to cover up the true temporal proximity between Szplett's and others protected activity and the adverse employment decisions that SZPLETT'S and others were subjected to.

## QUID PRO QUO

Based on association and in reverse discrimination for opposition to disparate treatment and impact on protected class persons

385.    Plaintiffs incorporate by reference all the preceding paragraphs of this Complaint as if fully set forth herein.

386. Necessary to the Kenco and Mars Manteno racially discriminatory culture was the expectation that Caucasians will work together to marginalize, subordinate, disparage, and exclude African Americans.

387.    Failure of Caucasians to adhere to working together to marginalize, subordinate, disparage, and exclude African Americans

would result in adverse employment actions such as: write-ups, constructive discharge(s), disciplinary actions of suspension and or demotion.

388.    For example, Tom White was written up through contrivance for failing to treat African Americans like "assholes." Tom White opposed such discriminatory treatment and constructively resigned effective immediately.

389.    White indicated that the working environment was discriminatory.

390.    Scot Marksteiner was demoted, suspended and eventually terminated for his failure to act in complicity with other Caucasians to work together to marginalize, subordinate, disparage, and exclude African Americans.

391.    Plaintiff was also was ostracized from meetings and a number of various routine job duties and tasks that he had regularly performed as the HR and Accounting Manager along with reducing his administrative support.

392.    Plaintiff was also mandated to work 3rd shift and eventually demoted from the HR Manager's position for failing to meet the unlawful illegitimate expectations that Caucasians will

work in complicity to marginalize, subordinate, disparage, and
exclude African Americans.

393.    Plaintiff asserts that failure to act in complicity with
Caucasians to marginalize, subordinate, disparage, and exclude
African Americans altered the terms and conditions of his and other
employees at the Mars Manteno facility.

394.    Additionally, Szplett's was subject to another form of
Quid Pro Quo from Defendant when it required plaintiff to agree to
help Defendant defend lawful charges of discrimination, retaliation,
harassment and whistleblowing  and its lawsuits against
Defendants in exchange for his severance pay and compensation for
the month of March 2015.

395.    Specifically, during the week of February 26, 2015,
Szplett's received an undated letter in the mail from Defendant
Kenco, regarding Szplett's severance pay and the terms and
conditions to Szplett's receiving his severance pay.

396.    Additionally, Szplett's was informed in this same
communication that he was entitled to this severance as a result of
not applying to continue working at the Mars Manteno facility.

397. Plaintiff asserts that he was never informed of the particulars on how to continue his employment at the Mars Manteno facility.

398. Plaintiff also contends that this failure to inform him of how to apply for continued employment was contrived to coerce Plaintiff into being placed in a situation where it would be easy to extort Plaintiff into aiding and abetting Defendants into obstructing justice for Plaintiff and others by economically depriving him of monies and benefits due him.

399. More specifically, Defendants scheme entailed not paying Szplett since January of 2015. Szplett had been not been paid in over a month, when Defendants attempted to extort Plaintiff into obstructing justice and; under this contrived scheme it would be more than a month before Szplett could receive his unemployment.

400. Plaintiff asserts that this was done to extort Plaintiff into obstructing justice by aiding and abetting Defendants in violating the constitutional rights of protected class persons.

401. Plaintiff asserts that this was done to extort Plaintiff into obstructing justice by aiding and abetting Defendants in the

obstruction of justice and its administration to avoid liability and culpability.

402. Plaintiff asserts that this was done to harass and retaliate against plaintiff for his association with African Americans and his protected activities that opposed discrimination in the work place.

RICO

(Federal Civil RICO, 18 U.S.C. §1962(c) & (d))

Defendants Kenco Logistics, The Kenco Group, Trace Spier, Paula Hise, Mars Inc., David Jabaley, Eddy Register, Tammi Fowler, David Crawley, and President, Todd Moore, Robert Coffey, Steve Sheldon and Other Unknown Persons

403. Plaintiffs incorporate by reference all the preceding paragraphs of this Complaint as if fully set forth herein.

404. Defendants violated RICO and Plaintiff was injured as a result.

405. Each Defendant is a "person" capable of holding legal or beneficial interest in property within the meaning of 18 U.S.C. § 1961(3).

406. Each Defendant violated 18 U.S.C. § 1962(c) & (d) by the acts described in the prior paragraphs, and as further described below.

407.    The Enterprise, Defendants Kenco Logistics, Mars, Inc, Jabaley, Tammi Fowler, Mario Lopez,......, together with (1) the Kenco Group, (2) one or more former officers and former directors of Kenco, (3) employees, officers and directors of the Kenco Group-controlled companies (including David Caines, Sandra Kennedy, Trace Spier, Paula Hise, Eddy Register, David Jabaley, David Crawley), and (4) Mars, Inc, together with (1) one or more former officers and former directors of Mars, Inc. (3) employees, officers and directors of the Mars, Inc. including Robert Coffey, Todd Moore, Steve Sheldon and others form an association-in-fact for the common and continuing purpose described herein and constitute an enterprise within the meaning of 18 U.S.C. § 1961(4) engaged in the conduct of their affairs through a continuing pattern of racketeering activity.

408.    The members of the enterprise functioned as a continuing unit with an ascertainable structure separate and distinct from that of the conduct of the pattern of racketeering activity. There may also be other members of the enterprise who are unknown at this time.

409.     Alternatively, the Kenco Group companies each constitute a separate enterprise within the meaning of 18 U.S.C. § 1961(4).

410.     Alternatively, the Kenco Group-controlled companies together constitute an enterprise within the meaning of 18 U.S.C. § 1961(4).

411.     Alternatively, the Mars, Inc companies each constitute a separate enterprise within the meaning of 18 U.S.C. § 1961(4).

412.     Alternatively, the Mars, Inc.-controlled companies together constitute an enterprise within the meaning of 18 U.S.C. § 1961(4)

413.     Each enterprise has engaged in, and their activities have affected, interstate commerce.

414.     Pattern of Racketeering Activity. Defendants, each of whom are persons associated with, or employed by, the enterprise, did knowingly, willfully and unlawfully conduct or participate, directly or indirectly, in the affairs of the enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(1), 1961(5), and 1962(c).

415. The racketeering activity was made possible by Defendants' regular and repeated use of the facilities and services of the enterprise. Defendants had the specific intent to engage in the substantive RICO violation alleged herein.

416. Predicate acts of racketeering activity are acts which violate the provisions of the U.S. Code enumerated in 18 U.S.C. § 1961(1)(A) & (B), as more specifically alleged below. Defendants each committed at least two such acts or else aided and abetted such acts.

417. The acts of racketeering were not isolated, but rather the acts of Defendants were related in that they had the same or similar purpose and result, participants, victim(s) and method of commission. Further, the acts of racketeering by Defendants have been continuous.

418. There was repeated conduct during a period of time beginning in approximately 2013 and continuing to the present, and there is a continued threat of repetition of such conduct.

419. The association-in-fact enterprise and the alternative enterprises, as alleged herein, were not limited to the predicate acts and extended beyond the racketeering activity. Rather, they

existed separate and apart from the pattern of racketeering activity for the legitimate business purpose Defendants.

420. Plaintiff asserts that Defendants have had and do have legitimate business plans outside of the pattern of racketeering activity.

421. Plaintiff specifically alleges that Defendants participated in the operation and management of the association-in-fact enterprise and the alternative enterprises by overseeing and coordinating the commission of multiple acts of racketeering as described below.

422. Predicate Act: Use of Mails and Wires to Defraud Plaintiff through extortion in Violation of 18 U.S.C. §§ 1341 and 1343. Defendants committed acts constituting violations under 18 U.S.C. §§ 1341 and 1343 in that they conspired to devise and devised a scheme or artifice to defraud money through extortion from Plaintiff in a quid pro quo scheme by means of false or fraudulent pretenses, representations, and promises.

423. For the purpose of executing their scheme or artifice, Defendants caused delivery of various documents and things by

the U.S. mails or by private or commercial interstate carriers, or received such there from.

424.    Defendants also transmitted or caused to be transmitted by means of wire communications in various writings, signs and signals that furthered Defendants schemes.

425.    The acts of Defendants set forth above were done with knowledge that the use of the mails or wires would follow in the ordinary course of business, or that such use could have been foreseen, even if not actually intended.

426.    These acts were done with an intentional reckless disregard for Plaintiff and others.

427.    Defendants knew that its specific intent was to advance Defendants' scheme or artifice to obstruct justice to avoid culpability and liability for the violation of Plaintiff and others federally protected rights under Title VII, USC 1981 and other federally protected rights.

428.    Defendants carried out their scheme in different states and could not have done so unless they used the U.S. mails or private or commercial interstate carriers or interstate wires.

429. In furtherance of their scheme alleged herein, Defendants Kenco, The Kenco Group, Spier, Hise, Jabaley, Lopez, Register, CFO, COO, CEO, President of Kenco Group, Mars, Inc., Coffey, Moore, Sheldon and others communicated among themselves and with Plaintiff in furtherance of the scheme to defraud and extort Plaintiff, as well as, obstruct justice and its administration to avoid culpability and liability in the violation of Plaintiff and others federally protected rights..

430.     These communications were typically transmitted by wire (i.e., electronically) and/or through the United States mails or private or commercial carriers. Defendants also transmitted or caused an undated letter regarding Plaintiff's severance, compensation and unemployment benefits received by Plaintiff during the week of February 26, 2015 through the U.S. mail.

431.     Furthermore, Plaintiff asserts that communications took place with Defendants and unknown officers and directors of Kenco and Mars during the course of the termination of Kenco Logistics as the 3rd party manager for MARS, Inc. in 2015 to carry out this transition.

432.     Specifically, Defendants used wire and/or U.S. mail or private or commercial carriers to coerce and extort Plaintiff out of his compensation, severance and unemployment benefit for the purpose of continuing their fraudulent scheme to obstruct justice to avoid liability and culpability for engaging in the violation of employees federally protected rights under Title VII, USC 1981 and other federally protected rights.

433.     More specifically, Defendant Mars, Inc., its officers, directors and employees caused the January 2015 termination letter to be disseminated by U.S. mail or private or commercial carriers.

434.     Correspondence took place between Mars and Kenco regarding the transition.

435.     Specifically, Judy Craig discussed notifying the employees of transition by email with Mars.

436.     Specifically, in early February Plaintiff was notified by mail by Mario Lopez that Kenco had lost its contract.

437.     Specifically, in February of 2015, Plaintiff was notified by Eddy Register that he had failed to apply for continued employment.  Plaintiff was told that he was entitled

to his salary for March, his severance and unemployment after March's compensation was exhausted; {in exchange} if he agreed to waive his rights to pursue claims against Defendant(s). Plaintiff was also to help Defendants defend against HR related matters and litigation.

438.    Essentially, Defendants conspired to coerce Plaintiff into being extorted out of his protected rights and to obstruct justice and its administration for Plaintiff and other former and then current employees of the Mars Manteno facility in a quid pro quo for his salary, his severance and his unemployment through the U.S. Mail.

439.    Plaintiff was given forty-five (45) days after receiving this offer through the U.S. Mail to accept this offer.

440.    Within those forty-five (45) days, on or about April 15, 2015 Plaintiff became aware that Defendants were attempting to obstruct justice and its administration, when Plaintiff began being mischaracterized as other than the HR manager to avoid culpability and liability in the matter of Edith McCurry IDHR and EEOC charge no. 2015CA1804/21BA50670.

441.    More specifically, on April 1, 2015, the IDHR and EEOC received a communication from Defendant Kenco in charge no. 2015CA1804/21BA50670 indicating that Szplett was not the HR Manager.

442.    It was at this point that Plaintiff had a suspicion that Defendants were engaging in some impermissible or unlawful acts.

443.    Plaintiff realized that once again Defendants expected Plaintiff to act in complicity to expectation that Caucasians would work together to purport white racial dominance and the subornation of African Americans through disparagement, marginalization, minimization and exclusion.

444.    Plaintiff's then and current legal counsel contacted Defendant Kenco regarding Plaintiff's March compensation.

445.    Defendant Kenco stated by email that Szplett was not entitled to the March compensation because he did not work.

446.    No other employee who received March's compensation worked.

447.     Shortly thereafter in May of 2015, Plaintiff filed charges at the IDHR, EEOC and the Illinois Department of Labor herein after "IDOL."

448.     In late August of 2015, Plaintiff learned from Defendants position statement that according to Defendant Kenco, Szplett was the reason for all of the discrimination charges being filed.

449.     Szplett also learned in the same position statement that Defendants hired Lori Varvel because of all of the charges of discrimination that were being filed.

450.     This statement was sent to the IDHR and EEOC by Defendants through the U.S. Mail.

451.     This was the first time that Defendants had communicated to Szplett's that he had been relieved of his job duties and tasks as the HR Manager, as Szplett had been out on a constructive medical discharge due to the hostile work environment.

452.     Defendants were aware that Plaintiff was out on medical leave due to work related stress.

453.     Plaintiff asserts that at a minimum Defendants communicated this information amongst themselves by email.

454.     Plaintiff asserts that Defendants used wire and/or U.S. Mail or private or commercial carrier to submit its position and verified statements and supporting documentation and evidence in charge no. 2015CA1804/21BA50670 in furtherance of their scheme to obstruct justice and its administration.

455.     Plaintiff also asserts that Defendants obstruction of justice and its administration was to avoid liability and culpability through providing misleading and fraudulent half-truths that would continue to violate Plaintiff's and others federally protected rights.

456.     Defendants' quid pro quo scheme to extort Plaintiff also caused Plaintiff to be defrauded out of his benefits and thousands of dollars.

457.     Defendants shared objective was to avoid culpability and liability of Title VII, §1981 and other federally protected claims by obstructing justice and its administration through contrivance.

458.     Defendants committed acts constituting violations under 18 U.S.C. §1952 in having devised or intended to devise a scheme or artifice to obstruct justice and its administration.

459.     Defendants committed acts constituting violations under 18 U.S.C. §1952 in that having devised or intended to devise a scheme or artifice to defraud and extort plaintiff out of his benefits, compensation, severance and protected rights in a quid pro quo exchange to force Plaintiff to aid and abet Defendants in obstructing justice and its administration.

460.     Specifically, in September of 2014 Trace Spier and Todd Moore agreed to meet.

461.     Both individuals traveled to Illinois to meet offsite regarding the Mars Manteno site and its leadership.

462.     From the meeting between Spier and Moore a plan was devised on how to address the issues at the Mars Manteno facility.

463.     Plaintiff asserts that the plan included hiring a replacement for Plaintiff to perform his HR duties and functions.

464.     Plaintiff asserts that in furtherance of this scheme Defendants used electronic mail, telephone and internet to comprise and finalize its plans to hire a HR Manager.

465.     Plaintiff contends that defendants used the internet to advance its scheme when it advertised the position of HR Manager in September of 2014.

466.     Plaintiff contends that when Defendants advertised the position of HR Manager, Szplett was holding the position of HR Manager.

467.     Plaintiff also contends that by email Todd Moore and Robert Coffey of Mars, Inc. approved the cost of hiring the HR Manager.

468.     Plaintiff asserts that Todd Moore was located in Chattanooga, TN and Robert Coffey was located in Manteno, IL.

469.     Plaintiff also asserts that Defendants scheme could not have been furthered without U.S. mails or private or commercial interstate carriers or interstate wires.

470.     These acts were done intentionally and knowingly with the specific intent to advance Defendants' scheme or artifice to obstruct justice and its administration to avoid culpability and

liability for the violation(s) of the federally protected rights of the former and then current employees of the Mars Manteno facility.

471.     Specifically, Defendants obstructed justice to deprive former and then current employees, including Plaintiff, out of their constitutional right of due process.

472.     Tammi Fowler recommended hiring a HR Manager.

473.     Fowler traveled from Chattanooga, TN to Illinois to interview candidates in furtherance of Defendants scheme or artifice to obstruct justice.

474.     This was not the only instance that Fowler had traveled to Illinois from Tennessee in order to promote, manage and facilitate the continuation of Defendants schemes.

475.     Plaintiff also contends that others such as David Jabaley, Paula Hise, Trace Spier and others have traveled to Illinois in furtherance of Defendants scheme or artifice to obstruct justice.

476.     Mario Lopez, the then General Manager and Tammi Fowler decided to hire Lori Varvel.

477.     Lori Varvel was hired, according to Defendants, as the HR Manager because of Szplett's failing leadership and because of all the charges of discrimination filed against them.

478.     Plaintiff also asserts that Jay Elliott was also hired as the VP of Legal in furtherance of Defendants scheme and artifice to obstruct justice.

479.     Elliott had been Defendant Kenco's outside legal counsel from the firm of Miller & Martin in Chattanooga, TN.

480.     Plaintiff asserts that Trace Spier stated in late September of 2014 that an additional $100,000.00 would be added to the budget to defend the claims of discrimination.

481.     Jabaley stated that the claims of discrimination were frivolous, but still needed to be defended.

482.     Budgets were approved by Mars, Inc.

In previous years, Mars previously paid the legal bills incurred at the Mars Manteno facility.

483.     Todd Moore, Robert Coffey and others approved the budget for the Mars Manteno facility.

484.     Mars ultimately paid the line items on the approved budget, after it was passed through the management company.

485.    Plaintiff asserts that this included legal fees.

486.    Plaintiff asserts that Elliott's hiring was a result of the budgeted monies to defend the alleged "frivolous" claims of discrimination.

487.    According to Defendant Kenco's policy CP.HR.01002 the hiring of a VP required the authorization of the CFO and President of the Group.

488.    Elliott was hired in November of 2014.

489.    These acts were done intentionally and knowingly with the specific intent to advance Defendants' scheme or artifice.

490.    Varvel and Elliott participated in Fact Finding Conferences held on behalf of the IDHR and EEOC for Plaintiff and other former and then current employees at the Mars Manteno facility.

491.    Kenco and Elliott were made aware that an attorney could not participate in the Fact Finding Conference by the IDHR and EEOC.

492.    Nonetheless, Elliott participated in Plaintiff's Fact Finding conference by phone, as he had with other employees, without having any firsthand knowledge.

493.     Specifically, Elliott admitted in an email to the IDHR
and EEOC investigator that he did not have access to
employees at the Mars Manteno facility, as they had lost the
contract.

494.     Specifically, Elliott admitted in email(s) in March and
October of 2014 that Varvel did not know any more than he
did, as she was hired after the incidents that occurred in this
matter of Vernon Henry in October of 2014, to which Plaintiff
witnessed and participated in.

495.     Plaintiff asserts that Elliott's participation violated
the IDHR and EEOC rules regarding attorney participation.

496.     Plaintiff also asserts that the statements made by
Elliott were not made with firsthand knowledge nor made upon
a reasonable investigation.

497.     Plaintiff also asserts that because Elliott did not have
access to the employees as he stated he could not have
conducted an investigation.

498.     Furthermore, Defendants failed to adhere to their
policies to conduct investigations as required by company and
public policy.

499. Plaintiff contends that Elliott was the attorney of record for Defendants in the IDHR and EEOC proceedings.

500. Szplett also contends that Elliott was an officer of the court at the relevant time.

501. Plaintiff also contends that since Elliott had no firsthand knowledge, no access to employees, and no investigations had taken place the statements made by Elliott were patently false and misleading.

502. Szplett also contends that Elliott's participation was contrived to impede, thwart and obstruct justice and its administration in Plaintiff's and others matters.

503. Szplett also contends that Elliott's participation was also in furtherance of Defendants' scheme or artifice.

504. Szplett also contends that Varvel had no firsthand knowledge and that any statements made were patently false and misleading.

505. Szplett also contends that Varvel's hiring was contrived and that Defendants used Varvel to further its schemes and artifices of obstruction of justice and its administration, when

Varvel participated in Plaintiff's and others proceedings at the
IDHR and EEOC.

506. These acts were done intentionally and knowingly with
the specific intent to advance Defendants' scheme or artifice.

507. Defendants' shared objective was to obstruct justice and
its administration to avoid culpability and liability.

508. Szplett also contends that the directors, executive
officers and other employees of the Mars Manteno facility,
Mars, Inc., Kenco Logistics and The Kenco Group conspired to
and obstructed justice and its administration when hired
Elliott and Varvel.

509. Szplett contends that these persons included: Lori
Varvel, Mario Lopez, Robert Coffey, Todd Moore, Steve Sheldon,
Paula Hise, Trace Spier, CFO, COO, CEO, President, David
Jabaley, Eddy Register, Tammi Fowler and other unknown
persons at this time.

510. Szplett also contends that Kelvin Walsh and Mike
Manzello also conspired to obstruct justice and its
administration with one or more of the aforementioned
persons.

511.     For example, Mike Manzello and Tammi Fowler in the matter of Vernon Henry. Fowler and Manzello provided skewed mistruths and patently false statements in Defendants verified and position statements in the proceedings of Vernon Henry to the IDHR and EEOC.

512.     Every citizen has a constitutional right to the due process of law.

513.     Plaintiff asserts that Defendants intentionally conspired to obstructed justice in violation of 18.U.S.C. §1962(d).

514.     Plaintiff also asserts that Defendants intentionally conspired to obstructed justice in violation of 18.U.S.C. §1962(d) in violation of Plaintiff's and others right to the due process of law.

515.     Plaintiff asserts that Defendants intentionally conspired to obstructed justice in violation of 18.U.S.C. §1962(d) to avoid culpability and liability for violating protected rights of Plaintiff's and others rights through extortion, false representations, fraud, deceit, and other improper and unlawful means.

516.    Defendants' violations of state and federal law as set forth herein, each of which directly and proximately injured Plaintiff and other employees, constituted a continuous course of conduct spanning a period from approximately 2013 to present, which was intended to obstruct justice and its administration through extortion, false representations, fraud, deceit, and other improper and unlawful means. Therefore, said violations were a part of a pattern of racketeering activity under 18 U.S.C. §§ 1961(1) and (5).

517.    Defendants, each of whom are persons associated with, or employed by Mars, Inc., Kenco Logistics, The Kenco Group or the Kenco Mars facility and did knowingly, willfully and unlawfully conduct or participate, directly or indirectly, in its affairs through a pattern of racketeering activity with the meaning of 18 U.S.C. § 1961(1), 1961(5), and 1962(c). The racketeering activity was made possible by Defendants' regular and repeated use of Mars, Inc., Kenco Logistics, The Kenco Group or the Kenco Mars facility personnel, facilities and services. Defendants had the specific intent to engage in the substantive RICO violation alleged herein.

518.     Plaintiff asserts that Defendants have conducted and/or participated, directly and/or indirectly, in the conduct of the affairs of the alleged enterprises through a pattern of racketeering activity as defined herein in violation of 18 U.S.C. § 1962(c) & (d).

519.     Predicate acts of racketeering activity are acts which are in violation of the U.S. Code enumerated in 18 U.S.C. § 1961(1)(A) & (B), as more specifically alleged below. Defendants each committed at least two such acts or else aided and abetted such acts.

520.     The acts of racketeering were not isolated, but rather the acts of Defendants were related in that they had the same or similar purpose and result, participants, victims and method of commission. Further, the acts of racketeering by Defendants have been continuous. There was repeated conduct during a period of time beginning in approximately 2013 and continuing to present, and there is a continued threat of repetition of such conduct.

521.     Plaintiff specifically alleges that Defendants participated in the operation and management of Mars, Inc.,

Kenco Logistics, The Kenco Group or the Kenco Mars facility by overseeing and coordinating the commission of multiple acts of racketeering as described below.

522. The Predicate acts in violation of 18 U.S.C.§1962 are:

    a. Extortion in violation of 18 U.S.C §1951,

    b. Obstruction of Justice in Violation of U.S.C. 18 U.S.C. 1503

    c. Travel in Furtherance of Scheme to Obstruct Justice in violation of 18 U.S.C. §1952

    d. Use of Mails and Wires to Extort and Obstruct in Violation of U.S.C. 1341 and 1343

523. The unlawful actions of Defendants, and each of them, have directly, illegally, and proximately caused and continue to cause injuries to Plaintiff and Plaintiff's protected rights.

524. Even if some of the Defendants did not agree to harm Plaintiff specifically, the purpose of the acts they engaged in was to advance the overall object of the conspiracy, and the harm to Plaintiff was a reasonably foreseeable consequence of Defendants' actions.

PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court:

A. A declaratory judgment that Defendant KENCO LOGISTIC SERVICES, LLC and MARS, Inc. violated Szplett's right to be free from discrimination in the workplace pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§2000e et seq.; the Civil Rights Act of 1866, as amended by the Civil Rights Act of 1991, 42 U.S.C. §1981; 42 U.S.C. §1981A.

B. The entry of an injunction ordering Defendant KENCO LOGISTIC SERVICES, LLC and MARS, Inc. to make Szplett whole with full back pay, benefits and front pay.

C. An award to Szplett for compensatory damages in an amount to be shown at trial for past and future economic and non-economic losses, including extreme emotional distress and mental anguish, impairment of the quality of life; and consequential loses;

D. An award to Szplett for exemplary and/or punitive damages in an amount shown at trial;

E. An award to Szplett of reasonable attorneys' fees and costs, including but not limited to expert witness fees, as provide;

F. An award of interests on any awards at the highest rate allowed by law; and

G. Such other and further relief as this Court deems just and appropriate to be determined by a jury;

**PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL COUNTS**

Respectfully Submitted this 12 Day of April 2019 by:

Leonard A. Szplett
3421 W. 1500 NW RD.
Kankakee, ILL 60901
815-212-3125
Stkbnd2000@aol.com

***4T's Management, LLC***
***1125 Sycamore Road***
***Manteno, IL 60950***

TO: All Employees

FROM: Terri Tyson, President

DATE: February 15, 2013

RE: Notice of Mass Layoff and Plant Closing

As many of you already know, I have decided to retire and am cooperating with another distributor to take over the MARS account. Although it is expected that many of the employees will be hired by that entity and essentially perform the same work, since 4T's is technically closing down its plant and laying off all employees, we wanted to err on the cautious side and provide this notice. Accordingly, this letter constitutes formal written notice that 4T's Management, LLC will be permanently closing its business located at 1125 Sycamore Road, Manteno, Illinois and laying off all employees. This notice is provided pursuant to the Illinois Worker Adjustment and Retraining Notification Act.

This permanent plant closing and layoff will affect all employees working at Manteno. This plant closing, including your separation, is expected on April 20, 2013 and will be permanent. You do not have any "bumping," recall or reemployment rights at this or any 4T's Management location. You will be eligible for job-seeking assistance from the Illinois Bureau of Workforce Development and, if you continue working and remain in good standing through the closing date, for unemployment compensation benefits also, unless you have received a job offer from the new entity.

It has been a pleasure working with you all, I thank you for your service and wish all of you and your families the best of luck with your future endeavors.

For further information, please contact Terri Tyson at 203-762-8186

**Exhibit 1**

| Employee Name | Shift | Employ Hire Date | Current Position | Kenco Equivalent | Current Wage | Annual Amount | Base Wage Proposal 2 | Annual Amount 2 | Shift Differential | Difference in Current Wage vs. Kenco Proposed |
|---|---|---|---|---|---|---|---|---|---|---|
| WALSH, KELVIN | | 8/6/2007 | General Manager | General Manager | $51.44 | $106,999.88 | $51.92 | $107,997.75 | | $0.48 |
| SZPLETT, LEONARD | | 7/9/2001 | Accounting/HR Manager | | $33.00 | $68,636.88 | $31.73 | $66,000.94 | | -$1.27 |
| DEROSIER, MARCIA | | 7/19/1999 | Office Manager | | $25.61 | $53,277.90 | $25.63 | $53,312.45 | | $0.02 |
| CONTRERAS, JOEL | | 9/27/1999 | Supervisor | Supervisor | $25.00 | $52,000 | $25.00 | $51,999.84 | | $0.00 |
| BECK, SAUL | | 11/3/2002 | Supervisor | Supervisor | $25.00 | $52,000 | $25.00 | $51,999.84 | | $0.00 |
| WHITE, THOMAS | | 9/27/1999 | Operations Manager | DOT Manager | $30.05 | $62,500.10 | $25.72 | $53,499.66 | | -$4.33 |
| SPAULDING, DUSTIN | | 9/29/2008 | IT Manager | | $32.69 | $67,999.88 | $31.73 | $66,000.94 | | -$0.96 |
| SCHWERIN, WILLIAM | | 11/1/1999 | Bld Maintenance Manager | | $28.40 | $59,072.78 | $27.40 | $56,994.19 | | -$1.00 |
| MCCURRY, EDITH | 1.1 | 6/14/1999 | Accounting/HR Assistant | Clerical | $15.81 | $32,884.80 | $15.81 | $32,884.80 | | $0.00 |
| RICHARDS, CHARLES | 1.1 | 7/21/2003 | Facility Equipment Maintenance | Facility Equipment Maintenance | $21.68 | $45,094.40 | $21.00 | $43,680.00 | | -$0.68 |
| HART, TARESA | 1.1 | 12/20/2004 | Inventory Control Associate | Inventory Control Associate | $15.81 | $32,884.80 | $15.81 | $32,884.80 | | $0.00 |
| SLAGER, FRANK | 1.1 | 8/23/1999 | Lead Associate | Lead | $15.74 | $32,739.20 | $15.74 | $32,739.20 | | $0.00 |
| CARSTENS, JEFF | 1.4 | 1/5/2003 | Lead Associate | Lead | $15.74 | $32,739.20 | $15.74 | $32,739.20 | | $0.0 |
| BUSHEY, STACY | 2.1 | 8/23/1999 | Lead Associate | Lead | $15.74 | $32,739.20 | $15.74 | $32,739.20 | | $0.( |
| MARKSTEINER, SCOTT | 2.1 | 11/17/2008 | Lead Associate | Lead | $15.74 | $32,739.20 | $15.74 | $32,739.20 | | $0.00 |
| VERRETT, CURTIS | 3.1 | 4/12/2004 | Lead Associate | Lead | $15.74 | $32,739.20 | $15.74 | $32,739.20 | $0.35 | $0.35 |
| THOMPSON, ROBERT | 3.1 | 8/9/2006 | Lead Associate | Lead | $15.74 | $32,739.20 | $15.74 | $32,739.20 | $0.35 | $0.35 |
| LAMBERT, PRESTON | 1.1 | 8/23/1999 | Raws/Packaging Lead Associate | Raws/Packaging Lead Associate | $17.29 | $35,963.20 | $17.29 | $35,963.20 | | $0.00 |
| BELL, HAROLD | 1.1 | 2/5/2001 | Sanitation Coordinator | Warehouse Associate | $14.74 | $30,659.20 | $14.74 | $30,659.20 | | $0.00 |
| ROTH, BRENDA | 2.1 | 8/18/2003 | Shipping/Receiving Associate | Clerical | $14.74 | $30,659.20 | $15.81 | $32,884.80 | | $1.07 |
| MONTGOMERY, JOHN | 1.1 | 8/23/1999 | Spotter | Spotter | $15.74 | $32,739.20 | $16.55 | $34,424.00 | | $0.81 |
| TYSON, MORRIS | 1.1 | 1/19/2004 | Spotter | Spotter | $15.74 | $32,739.20 | $16.55 | $34,424.00 | | $0.81 |
| RINGO, MARDY D | 2.1 | 12/5/2010 | Spotter | Spotter | $15.74 | $32,739.20 | $16.15 | $33,592.00 | | $0.41 |
| Open | 3.1 | | Spotter | Spotter | | | $16.15 | $33,592.00 | $0.35 | $16.50 |
| DANSBY, DION | 3.1 | 06/04/12 | Spotter | Spotter | $15.74 | $32,739.20 | $16.15 | $33,592.00 | $0.35 | $0.76 |
| GARCIA, ARTURO | 2.2 | 6/4/2012 | Spotter | Spotter | $15.74 | $32,739.20 | $16.15 | $33,592.00 | | $0.00 |
| NELSON, JACQUELINE | 1.1 | 3/27/2000 | Supervisor | Safety Lead | $52,000 | $52,000 | $18.75 | $39,000.00 | | -$13,000.0 |
| Simon, Luke | 3.1 | 2/28/2013 | Temp/PeopleLink/Warehouse Associate | Warehouse Associate | $11.00 | $22,880.00 | $11.00 | $22,880.00 | | $0.00 |
| Schultz, Chad | 3.1 | 2/28/2013 | Temp/PeopleLink/Warehouse Associate | Warehouse Associate | $11.00 | $22,880.00 | $11.00 | $22,880.00 | | $0.00 |
| Cast, Randy | 3.1 | 2/4/2013 | Temp/PeopleLink/Warehouse Janitorial | Warehouse Associate | $9.00 | $18,720.00 | $11.00 | $22,880.00 | | $2.00 |
| Williams, Anthony | 1.1 | 7/9/2012 | Temp/The Reserve Network/Warehouse Associate | Warehouse Associate | $11.00 | $22,880.00 | $12.25 | $25,480.00 | | $1.25 |
| Paske, Dennis | 1.1 | 1/31/2013 | Temp/The Reserve Network/Warehouse Associate | Warehouse Associate | $11.00 | $22,880.00 | $11.00 | $22,880.00 | | $0.00 |
| Smith, Andrew | 1.3 | 5/31/2012 | Temp/The Reserve Network/Warehouse Associate | Warehouse Associate | $11.00 | $22,880.00 | $12.25 | $25,480.00 | | $1.25 |
| Beverly, Schnard | 1.3 | 8/27/2012 | Temp/The Reserve Network/Warehouse Associate | Warehouse Associate | $11.00 | $22,880.00 | $12.25 | $25,480.00 | | $1.25 |
| Coleman, Richard | 2.1 | 7/16/2012 | Temp/The Reserve Network/Warehouse Associate | Warehouse Associate | $11.00 | $22,880.00 | $12.25 | $25,480.00 | | $1.25 |
| Goranson, Joshua | 3.1 | 4/1/2012 | Temp/The Reserve Network/Warehouse Associate | Warehouse Associate | $11.00 | $22,880.00 | $12.25 | $25,480.00 | $0.35 | $1.60 |
| Kennedy, Jowan | 3.1 | 1/31/2013 | Temp/The Reserve Network/Warehouse Associate | Warehouse Associate | $11.00 | $22,880.00 | $11.00 | $22,880.00 | | $0.00 |
| Williams, Edwin | 3.1 | 2/28/2013 | Temp/The Reserve Network/Warehouse Associate | Warehouse Associate | $11.00 | $22,880.00 | $11.00 | $22,880.00 | | $0.00 |
| BAUMAN, LINDA | 1.1 | 8/2/1999 | TruckBuilder | Clerical | $15.81 | $32,884.80 | $15.81 | $32,884.80 | | $0.00 |
| DOYLE, DEANNA | 1.1 | 08/09/99 | TruckBuilder | Clerical | $15.81 | $32,884.80 | $15.81 | $32,884.80 | | $0.00 |
| WADE, JULIE | 1.1 | 10/22/2001 | TruckBuilder | Clerical | $15.81 | $32,884.80 | $15.81 | $32,884.80 | | $0.00 |
| PIEKARCZYK, DAVID | 1.1 | 3/13/2000 | Warehouse Associate | Warehouse Associate | $14.74 | $30,659.20 | $14.74 | $30,659.20 | | $0.00 |
| WILLIS, ANTHONY | 1.1 | 5/1/2000 | Warehouse Associate | Warehouse Associate | $14.74 | $30,659.20 | $14.74 | $30,659.20 | | $0.00 |
| LINDSEY, TERRENCE | 1.1 | 8/21/2000 | Warehouse Associate | Warehouse Associate | $14.74 | $30,659.20 | $14.74 | $30,659.20 | | $0.00 |
| LEWIS, WILLIAM | 1.1 | 5/14/2001 | Warehouse Associate | Warehouse Associate | $14.74 | $30,659.20 | $14.74 | $30,659.20 | | $0.00 |
| JORDAN, JAMES | 1.1 | 5/5/2002 | Warehouse Associate | Warehouse Associate | $14.74 | $30,659.20 | $14.74 | $30,659.20 | | $0.00 |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| VARELA, MAXIMINO | 1.1 | 7/1/2002 | Warehouse Associate | Warehouse Associate | $14.74 | $30,659.20 | $14.74 | $30,659.20 | | $0.00 |
| LAWRENCE, MICHAEL | 1.1 | 4/11/2004 | Warehouse Associate | Warehouse Associate | $14.74 | $30,659.20 | $14.74 | $30,659.20 | | $0.00 |
| MAYFIELD, JOSEPH | 1.2 | 4/12/2004 | Warehouse Associate | Warehouse Associate | $14.74 | $30,659.20 | $14.74 | $30,659.20 | | $0.00 |
| PETRICH, PERRY | 1.2 | 4/26/2004 | Warehouse Associate | Warehouse Associate | $14.74 | $30,659.20 | $14.74 | $30,659.20 | | $0.00 |
| WOODS, DANA | 1.3 | 4/12/2004 | Warehouse Associate | Warehouse Associate | $14.74 | $30,659.20 | $14.74 | $30,659.20 | | $0.00 |
| PAYNE, ROGER | 1.3 | 5/3/2004 | Warehouse Associate | Warehouse Associate | $14.74 | $30,659.20 | $14.74 | $30,659.20 | | $0.00 |
| GARCIA, JAVIER | 2.1 | 7/19/2004 | Warehouse Associate | Warehouse Associate | $14.74 | $30,659.20 | $14.74 | $30,659.20 | | $0.00 |
| CONWAY, CARL | 2.1 | 06/26/05 | Warehouse Associate | Warehouse Associate | $14.74 | $30,659.20 | $14.74 | $30,659.20 | | $0.00 |
| FLORES, IVAN | 2.1 | 3/6/2006 | Warehouse Associate | Warehouse Associate | $14.74 | $30,659.20 | $14.74 | $30,659.20 | | $0.00 |
| JASSO, CARLOS | 2.1 | 1/14/2007 | Warehouse Associate | Warehouse Associate | $14.74 | $30,659.20 | $14.74 | $30,659.20 | | $0.00 |
| MEYER, KARL | 2.1 | 6/28/2007 | Warehouse Associate | Warehouse Associate | $14.74 | $30,659.20 | $14.74 | $30,659.20 | | $0.00 |
| TOLEDO, MIGUEL | 2.1 | 7/15/2007 | Warehouse Associate | Warehouse Associate | $14.74 | $30,659.20 | $14.74 | $30,659.20 | | $0.00 |
| MEDINA, FABRICIO | 2.1 | 1/20/2008 | Warehouse Associate | Warehouse Associate | $14.74 | $30,659.20 | $14.74 | $30,659.20 | | $0.00 |
| ELLIS, KEITH | 2.1 | 8/17/2008 | Warehouse Associate | Warehouse Associate | $14.74 | $30,659.20 | $13.10 | $27,248.00 | | -$1.64 |
| CORREA, JOSE | 2.1 | 08/05/12 | Warehouse Associate | Warehouse Associate | $14.74 | $30,659.20 | $13.10 | $27,248.00 | | -$1.64 |
| MOLINA, RUBEN | 2.2 | 6/21/2009 | Warehouse Associate | Warehouse Associate | $14.74 | $30,659.20 | $13.10 | $27,248.00 | | -$1.64 |
| RICHCREEK, NOAH | 2.2 | 6/11/2012 | Warehouse Associate | Warehouse Associate | $14.74 | $30,659.20 | $13.10 | $27,248.00 | | -$1.6 |
| SEIFERS, JAMES | 2.2 | 6/11/2012 | Warehouse Associate | Warehouse Associate | $14.74 | $30,659.20 | $13.10 | $27,248.00 | | -$1.64 |
| FRANCO, JOSE | 2.2 | 6/18/2012 | Warehouse Associate | Warehouse Associate | $14.74 | $30,659.20 | $13.10 | $27,248.00 | | -$1.64 |
| GALLARDO, CARLOS | 2.2 | 6/18/2012 | Warehouse Associate | Warehouse Associate | $14.74 | $30,659.20 | $13.10 | $27,248.00 | | -$1.64 |
| DOSS, NATHAN | 2.2 | 8/14/2012 | Warehouse Associate | Warehouse Associate | $14.74 | $30,659.20 | $13.10 | $27,248.00 | | -$1.64 |
| HARRIS, TINA | 2.3 | 6/7/2010 | Warehouse Associate | Warehouse Associate | $14.74 | $30,659.20 | $13.10 | $27,248.00 | | -$1.64 |
| CAMP, BRIAN | 3.1 | 8/23/1999 | Warehouse Associate | Warehouse Associate | $14.74 | $30,659.20 | $14.74 | $30,659.20 | $0.35 | $0.35 |
| HOLLIS, LANISE | 3.1 | 5/17/2004 | Warehouse Associate | Warehouse Associate | $14.74 | $30,659.20 | $14.74 | $30,659.20 | $0.35 | $0.35 |
| BARRAZA, ROLANDO | 3.1 | 07/18/04 | Warehouse Associate | Warehouse Associate | $14.74 | $30,659.20 | $14.74 | $30,659.20 | $0.35 | $0.35 |
| JONES, MIDAS | 3.1 | 10/4/2004 | Warehouse Associate | Warehouse Associate | $14.74 | $30,659.20 | $14.74 | $30,659.20 | $0.35 | $0.35 |
| SHERROD, PIERRE | 3.1 | 10/11/2004 | Warehouse Associate | Warehouse Associate | $14.74 | $30,659.20 | $14.74 | $30,659.20 | $0.35 | $0.35 |
| STROMME, JESSE | 3.1 | 3/27/2006 | Warehouse Associate | Warehouse Associate | $14.74 | $30,659.20 | $14.74 | $30,659.20 | $0.35 | $0.35 |
| KINNARD, JEFFERY | 3.1 | 1/18/2009 | Warehouse Associate | Warehouse Associate | $14.74 | $30,659.20 | $13.10 | $27,248.00 | $0.35 | -$1.29 |
| HUNTE, PHILIP | 3.1 | 6/4/2012 | Warehouse Associate | Warehouse Associate | $14.74 | $30,659.20 | $13.10 | $27,248.00 | $0.35 | -$3,411.20 |
| DAVIS II, TRACY | 3.2 | 06/03/12 | Warehouse Associate | Warehouse Associate | $14.74 | $30,659.20 | $13.10 | $27,248.00 | $0.35 | -$3,411.20 |
| GIFFORD, JOSIAH | 3.2 | 6/4/2012 | Warehouse Associate | Warehouse Associate | $14.74 | $30,659.20 | $13.10 | $27,248.00 | $0.35 | -$3,411.20 |
| SANDNESS, ANASTASIA | 3.2 | 7/16/2012 | Warehouse Associate | Warehouse Associate | $14.74 | $30,659.20 | $13.10 | $27,248.00 | $0.35 | -$3,411.20 |

**FW: Warehouse Admin/ Supervisor**

**From:** Madison, Mary <Mar( idison@Kencogroup.com>
**To:** lagniappe26 <lagniappe26@aol.com>
**Date:** Fri, Aug 9, 2013 10:11 am
scan.pdf (225 KB)

---

Thank you kindly,

Mary Madison
Quality Engineer

Kenco/Mars
1125 West Sycamore Road
Manteno, IL 60950
815.468.4448
www.Kencogroup.com

This message and any attachments are intended only for the use of the addressee and may contain information that is privileged and confid intended recipient or an authorized representative of the intended recipient, you are hereby notified that any dissemination of this communic this communication in error, notify the sender immediately by return email and delete the message and any attachments from your system.

---

**From:** Pendleton, Jason
**Sent:** Wednesday, June 26, 2013 12:56 PM
**To:** Pendleton, Jason; Walsh, Kelvin; Madison, Mary
**Subject:** RE: Warehouse Admin/ Supervisor

Kelvin,

I did find this list of Kenco/4Ts equivalent job titles. Take a look at the Office Manager description I sent you this m Marci's job.

Jason Pendleton
Human Resource Development

Kenco Management Services, LLC
2001 Riverside Drive (37406)
Chattanooga, TN 37401
Phone: (423) 643-3301
Mobile: (801) 471-7908
Fax: (423) 643-3325
www.kencogroup.com

This message and any attachments are intended only for the use of the addressee and may contain information that is privileged and confid intended recipient or an authorized representative of the intended recipient, you are hereby notified that any dissemination of this communic this communication in error, notify the sender immediately by return email and delete the message and any attachments from your system.

---

**From:** Pendleton, Jason
**Sent:** Wednesday, June 26, 2013 8:31 AM

**To:** Walsh, Kelvin; Madison, Mary
**Subject:** RE: Warehouse Admin/ Supervisor

Kelvin,

Attached are all of the job descriptions that I have on file. I will look through emails and others files and let you kno

**Jason Pendleton**
**Human Resource Development**

**Kenco Management Services, LLC**
2001 Riverside Drive (37406)
Chattanooga, TN 37401
Phone: (423) 643-3301
Mobile: (801) 471-7908
Fax: (423) 643-3325
www.kencogroup.com

This message and any attachments are intended only for the use of the addressee and may contain information that is privileged and confid
intended recipient or an authorized representative of the intended recipient, you are hereby notified that any dissemination of this communic
this communication in error, notify the sender immediately by return email and delete the message and any attachments from your system.

---

**From:** Walsh, Kelvin
**Sent:** Tuesday, June 25, 2013 4:56 PM
**To:** Pendleton, Jason; Madison, Mary
**Subject:** Warehouse Admin/ Supervisor

Hi Jason,

During the onboarding for Manteno a supervisor admin position was created for Marci. I cannot seem to find the job posting our Audit coming up and I was hoping you might have a copy?

**Thanks,**

**Kelvin Walsh**
GM

**Kenco Logistics Services**
1125 W Sycamore Rd
Manteno, IL 60950
www.kencogroup.com
Email: Kelvin.Walsh@Kencogroup.com
Office: 815-468-4476
Cell: 815-474-5971
FAX: 815-468-2468

# Kenco/ 4T's Job Equivalences

| Current Positions | Kenco Equivalent | Number of Open Positions |
|---|---|---|
| Lead Associate | Lead | 6 |
| Inventory Control Associate | Inventory Control Associate | 2 |
| Facility Equipment Maintenance | Lead (Safety / Maintenance) | 1 |
| N/A | Kenco Operating System Engineer | 1 |
| N/A | Quality Engineer | 1 |
| IT Manager | IT Power User | 2 |
| General Manager | General Manager | 1 |
| Accounting / HR Manager | Office Manager | 1 |
| Facility Maintenance | Facility Maintenance | 1 |
| Office Manager | Warehouse Admin. Supervisor | 1 |
| Operations Manager | Operations Manager | 1 |
| Raws/Packaging Lead Associate | Raws/Packaging Lead Associate | 1 |
| Accounting / HR Assistant | Clerical | 6 |
| Shipping / Receiving Assistant | Clerical | |
| Truck Builder | Clerical | |
| Spotter | Spotter | 3 With 3 back-up |
| Supervisor | Warehouse Supervisor | 3 |
| Sanitation Coordinator | Warehouse Associate | 57 |
| Temp / People Link / Warehouse Associate | Warehouse Associate | |
| Temp / People Link / Warehouse Janitorial | Warehouse Associate | |
| Temp / Reserve Network / Warehouse Associate | Warehouse Associate | |
| General Warehouse Associate | Warehouse Associate | |

# INDEX TO THE 2013 - 2015 WAREHOUSE MANAGEMENT AGREEMENT

Kenco Logistic Services, LLC (Contractor)
and
Mars Chocolate North America, LLC

| Section | Title | Page |
|---|---|---|
| 1. | Scope of Agreement; Entire Agreement | 3 |
| 2. | *Term; Extensions* | 3 |
| | A. Term | 3 |
| | B. Extensions | 3 |
| 3. | Management Services; Standards of Performance; Hours of Operation | 4 |
| 4. | Operating Budget; Operating Expenses | 4 |
| | A. Payment by MARS | 4 |
| | B. Method of Payment | 5 |
| 5. | Management Fee | 6 |
| 6. | Contractor Responsibility for Warehoused Damage and Repairs | 6 |
| 7. | Covenants, Representations and Warranties | 6 |
| | A. Performance Warranty | 6 |
| | B. Compliance with Applicable Laws | 7 |
| | C. Status of Contractor | 7 |
| | D. International Exchange Visitors | 7 |
| 8. | Right, Title and Interest in Goods | 7 |
| 9. | Inbound Shipments; Transfer of Goods; Removal of Goods | 8 |
| 10. | Right of Refusal | 8 |
| 11. | Books, Records, Information and Data | 8 |
| 12. | On-Site Inspection | 9 |
| 13. | Termination | 9 |
| | A. Immediate Termination | 9 |
| | B. Termination After Right to Cure | 9 |
| | C. Termination at Will | 9 |
| | D. Final Accounting | 10 |
| | E. Acts of Insolvency | 10 |
| | F. Rights and Obligations of the Parties on Termination | 10 |
| | G. Operating Agreements | 11 |
| | H. Operating Assets | 11 |
| | I. Employees of Contractor | 12 |
| 14. | Indemnification | 12 |
| | A. By Contractor | 12 |
| | B. By MARS | 13 |
| 15. | Taxes | 13 |
| 16. | Confidential and Proprietary Information; Publicity | 14 |
| | A. Proprietary Information | 14 |
| | B. Publicity; Trademarks. etc | 14 |
| 17. | Assignment | 14 |
| 18. | Status as Independent Contractor | 14 |
| 19. | Insurance | 15 |
| | A. Required Coverage | 15 |
| | B. Insurance on Building Contents | 17 |

**Exhibit 2**

DEF000001

C. Product Liability Insurance .....17
D. Warehouseman's Legal Liability Insurance .....17
E. Notice of Loss or Damage to Goods.....17
F. Reimbursement of Insurance Premiums.....17
20. MASTERFOODS USA's Instructions.....18
21. Demurrage and Other Charges for Delay.....18
22. Force Majeure .....18
A. Force Majeure Defined.....18
B. Exclusions from Definition of Force Majeure.....19
23. Miscellaneous.....19
A. Headings.....19
B. Severability.....19
C. Cumulation of Remedies .....19
D. Notices.....19
E. Waiver .....20
F. Nondiscrimination .....20
G. Substance Abuse.....21
H. Choice of Law; Forum.....21
I. Financial Statements.....21
J. Entire Agreement; Ammendments.....20
K. Non-Solicitation.....21
L. Preparation.....21
M. Attorney's Fees.....21
N. Counterparts; Facsimile Signatures.....21
O. Survival.....21

Signatures
Appendix A – Final Operating Budget
Appendix B – Scope of Work
Exhibit 1 – MARS' North American Quality Manual
Appendix C – Operating Assets List
Appendix D - Transition Costs
Appendix E - Vendor Incentive Program

## 2013 WAREHOUSE MANAGEMENT AGREEMENT

THIS WAREHOUSE MANAGEMENT AGREEMENT, dated as of ________, 2013, by and between **Mars Chocolate North America, LLC** , a Delaware limited liability company having a place of business at 800 High Street, Hackettstown, NJ 07840 (hereinafter referred to as "MARS") and Kenco Logistic Services, LLC, having a main place of business located at 2001 Riverside Drive, Chattanooga, TN 37406 (hereinafter referred to as "Contractor"), sets forth the terms and conditions for Contractor's management of the warehouse facility located at 1125 Sycamore Road, Manteno, IL 60950 (hereinafter, the "Warehouse").

### *1. SCOPE OF AGREEMENT; ENTIRE AGREEMENT*

Subject to the terms and conditions contained herein, MARS hereby engages Contractor to provide the services herein described (and defined in Section 3 as the "Management Services") for the term set forth herein. This Warehouse Management Agreement, and all appendices and attachments incorporated herein by reference (hereinafter, collectively referred to as "the Agreement"), constitute the parties' entire understanding and agreement regarding the subject matter hereof.

### *2. TERM; EXTENSIONS*

A. Term. The term of this Agreement shall commence on April 21, 2013 ("Commencement Date") and expiring on March 31, 2015 ("Expiration Date"), subject to termination pursuant to the terms and provisions of this Agreement (the "Term").

B. Extensions. MARS shall have the option to extend this Agreement for subsequent terms (hereinafter, "Extension Term(s)") commencing immediately following the Agreement's Expiration Date of the relevant year, with a new Expiration Date to be determined (such dates also being referred to in this Agreement as the "Commencement Date" and "Expiration Date", respectively) exercisable by MARS' written notice of intent to extend (the "Extension Notice") which shall be delivered to Contractor at least ninety (90) calendar days prior to the Expiration Date of the initial Term or then-current Extension Term. MARS may, as part of its notice to Contractor, elect to negotiate new terms and conditions relevant to the Extension Term. Within thirty (30) calendar days after receiving MARS' written notice, Contractor shall deliver to MARS in writing a "Proposed Operating Budget" as described, and for the purpose set forth, in Section 5 hereof. Thereafter, the parties hereto shall promptly enter into good faith negotiations to agree upon the "Final Operating Budget" described in Section 5, and any other amendments to this Agreement with respect to the upcoming Extension Term. If the parties fail to reach agreement on such matters prior to the Expiration Date of the initial Term or then-existing Extension Term, which deadline shall be subject to extension by mutual written agreement of the parties, this Agreement shall expire on the Expiration Date, except as extended for the Transition Period defined below. With respect to each Extension Term, the parties shall execute a new Final Operating Budget covering the Extension Term which shall be attached to this Agreement as Appendix A in substitution of the Final Operating Budget for the expiring Term or Extension Term, and the Contractor shall provide to MARS copies of all insurance certificates evidencing the satisfaction by Contractor of the insurance requirements set forth in Section 19 for the upcoming Extension Term.

Notwithstanding anything in the foregoing to the contrary, the Contractor may, at its option, elect not to extend this Agreement for the ensuing Extension Term by giving MARS written notice thereof (the "Termination Notice") within seven (7) calendar days after receipt of the Extension Notice. In the event that the Contractor gives a Termination Notice, or in the event that the parties fail to reach agreement as

provided in this Section 2B, then, at MARS' election, the Agreement shall be extended and the Contractor shall continue to perform all of its obligations subject to the performance standards and other requirements set forth in this Agreement, as may be amended by the parties, in a responsible, and good-faith manner, with a high level of care, skill and diligence and consistent with recognized warehouse logistic operational best practices supporting the food industry for such period of time not to exceed three (3) months after the date that otherwise would have been the Expiration Date of the initial Term or Extension Term, as the case may be, (the "Transition Period"), in order to enable MARS to locate and finalize arrangements for the orderly, uninterrupted and efficient transition of the Management Services to the satisfaction of MARS. During the Transition Period, the Contractor shall provide its full cooperation and assistance as MARS may require in the operation of the Warehouse and the transition of the Management Services to MARS or its designee. During the Transition Period, the Management Fee and other applicable costs mutually agreed upon by both parties payable to the Contractor shall remain the same as that payable during the most recent Term unless otherwise negotiated between the parties, and MARS shall continue to pay or reimburse all Allowable Operating Expenses incurred during and in respect of the Transition Period, subject to the provisions of Section 5 hereof. On the date of expiration of the Transition Period, the Contractor and MARS shall be governed by the provisions of Sections 13D, 13F, 13G, 13H and 13I as if such date were the Expiration Date.

## *3. MANAGEMENT SERVICES; STANDARDS OF PERFORMANCE; HOURS OF OPERATION*

The Contractor shall, subject to this Agreement, provide warehousing management services with a high level of care, skill and diligence and consistent with recognized warehouse logistic operational best practices supporting the food industry including management of the day-to-day operations of the Warehouse, and oversight of the planned operations in the Warehouse, including but not limited to storage, handling, recouping, transportation management (including, but not limited to load building and carrier scheduling) and all other services as mutually agreed between the parties, subject to MARS' performance standards and other requirements set forth in (1) MARS' North American Warehouse Quality Assurance Manual ("Quality Manual"), (ii) the Vendor Assurance Program compiled by Contractor for the Warehouse in accordance with MARS' "Guidelines" and subject to MARS' approval, and (iii) Vendor Competency Standards based upon MARS Warehouse Vendor Competence Review Workbook, which are summarized in Appendix B hereto and in their totality are incorporated by reference into this Agreement. The Quality Manual is furnished to Contractor with this Agreement. The foregoing services, as may be more fully described in Appendix B, and supplemented by Exhibit 1 to Appendix B describing the Scope of Services and benchmarks related to the first 90 days of Contractor's Term shall be referred to herein as the "Management Services". The days and hours of operation of the Warehouse shall be as mutually agreed in writing by the parties hereto.

## *4. OPERATING BUDGET; OPERATING EXPENSES*

A. Payment by MARS. Contractor shall perform the Management Services at all times within the Final Operating Budget adopted in the manner herein provided. Contractor agrees to submit a "Proposed Operating Budget," as specified in Section 2B, which shall identify, describe and quantify, pursuant to the format and other requirements of MARS, all costs, expenses, and charges anticipated to be incurred in connection with operating the Warehouse. The "Proposed Operating Budget" shall be subject to negotiation between the parties, and the agreed budget resulting from said negotiations shall be the "Final Operating Budget" for the applicable period (which is subject to changes in the manner more fully described below). In the event the parties cannot reach agreement on a Final Operating Budget for the applicable Extension Term prior to its Commencement Date, then the Final Operating Budget shall be

deemed to be the prior calendar year's Final Operating Budget until agreement on a new Operating Budget is reached at which time any differences between the prior calendar year's Final Operating Budget and the new Operating Budget for the Extension Term shall be reconciled. Contractor and MARS shall periodically review the Final Operating Budget for a given year as part of the Review of Business Budgets (ROB) process. In such periodic reviews, Contractor and MARS may agree upon changes in the Final Operating Budget, which changes shall be memorialized in writing and approved by the Regional Distribution Manager and all references in this Agreement to the Final Operating Budget shall be deemed to include any such changes. Except as otherwise agreed upon herein, the parties agree that MARS shall be liable only for those specified fees, costs, and charges (hereinafter collectively referred to as "Allowable Operating Expenses") incurred in the operation of the Warehouse which are included in the "Final Operating Budget", and which have been approved for payment by MARS, subject to Section 4B, after submission of invoices by the Contractor. With respect to the Term of this Agreement, the Final Operating Budget is appended hereto as Appendix A and incorporated herein by reference. Such "Allowable Operating Expenses" shall be payable in the first instance, or reimbursable, by MARS. MARS shall not be liable, and shall not be obligated to reimburse Contractor, for any expense of any single item, product or service in excess of two thousand five hundred dollars ($2,500.00) which is incurred by Contractor and is not included in the "Final Operating Budget", unless Contractor shall have obtained the written approval of MARS' Regional Distribution Manager or other authorized MARS personnel in advance of Contractor's incurring such expense, notwithstanding that such item, product or service is utilized by Contractor in operation of the Warehouse. Should Contractor incur such expense, which is not an Allowable Operating Expense and for which MARS should elect not to make reimbursement, Contractor may, at its option, discontinue the activity which has resulted in such expense without penalty or recourse. The Contractor acknowledges that the Final Operating Budget will contain an allotted budget for the payment of needed repairs in the Warehouse, which amount will be determined in the sole discretion of MARS Payments made by Contractor for repairs paid from the allotted repair budget need not be approved in advance by MARS so long as the supporting documentation will justify the need for and amount of the repair. In the event said allotted repair budget has been depleted, Contractor must obtain MARS' approval, , prior to incurring any repair expenses, except that if a repair of an emergency nature arises which must be attended to immediately, MARS shall reimburse Contractor for said repair only if Contractor makes a good-faith effort under the circumstances to notify MARS of the emergency and obtain MARS' approval prior to incurring the cost of the repair. If unable to get any response from MARS despite Contractor's good-faith efforts, Contractor may proceed without prior approval to cause the repairs to be made, but only to the extent reasonably necessary to address the immediate emergency. In addition, certain of Contractor's costs and expenses to be reimbursed during this Agreement shall be described in Appendix D ("Start Up Costs") and Appendix E ("Transition Costs").

B. Method of Payment. Contractor shall promptly submit to MARS, or its designee, all invoices for Allowable Operating Expenses with all available supporting documentation meeting MARS' reasonable requirements therefore, and MARS shall review them for approval, which approval shall not be unreasonably withheld or delayed, and if approved, pay such valid invoices, or reimburse Contractor for payment made. MARS shall have the right to disapprove any billed expense (in which event it shall be paid by Contractor and not reimbursed by MARS) if in MARS' reasonable opinion (i) there is no suitable documentation relating to the expense, and the expense or charge is of a sort which usually can be documented, (ii) the documentation does not support the charge or expense, or (iii) the charge or expense is not an Allowable Operating Expense as defined in Section 5A, or has not been approved in writing by MARS' Regional Distribution Manager prior to the expense being incurred.

Notwithstanding anything herein to the contrary, the Contractor shall be primarily responsible and liable for the enforcement of all rights against all third parties who supply goods or services for the purposes of this Agreement, and the performance of all obligations with respect to such third parties, including the punctual payment of all monies owing to any such third party so as to take full advantage of any and all prompt payment discounts or incentives, and in any event so as to avoid any late payment

penalties or charges or claims for default of payment. In the event that MARS elects to pay any such third party directly due to Contractor's failure to perform its obligations with respect to such third party, including but not limited to, making payment in a timely manner, such payment shall not relieve the Contractor of its obligations hereunder with respect to such third party.

If MARS pays the Contractor for an Allowable Operating Expense or any other approved expense relating to the Warehouse, and the Contractor fails to pay the third party entitled thereto when due, MARS, at its option and without prejudice to any other right or remedy, may elect to pay the expense directly to the third party and to deduct it from any Management Fee or any other monies payable to the Contractor under this Agreement, or to receive from Contractor a refund, forthwith on demand of the amount paid by MARS provided there is not a valid basis for Contractor to withhold payment. MARS will pay all budgeted and properly documented invoices submitted by Contractor within ninety (90) days of the actual receipt date of invoice by MARS with billing done on a weekly basis, provided that MARS may make earlier payments in its sole discretion upon reasonable request by Contractor from time to time for earlier payment in order to take full advantage of any prompt payment discounts or incentives. As long as Contractor has complied with the MARS billing documentation criteria as identified in Section 4 B, MARS will not withhold payment for any alleged billing dispute. MARS shall make payment in full and the parties will work diligently in good faith to resolve any billing discrepancy/dispute in a timely manner. Notwithstanding anything to the contrary contained herein, any claims between the parties shall be handled separate from general invoicing.

## *5. MANAGEMENT FEE*

In consideration of the provision of Management Services described herein, and in addition to Allowable Operating Expenses, MARS shall pay to Contractor an annual Management Fee based upon MARS' standards for establishing such Management Fee, as such standards may be amended from time to time in MARS' sole, reasonable discretion provided there is a valid basis to amend the standards and Contractor mutually agrees to such amendment. The Management Fee for the Term shall be 6.5% of the agreed Final Operating Budget for the calendar year, with the exception of pallets, which will incur a fee of 3%. The total will be divided by the number of MARS periods remaining in the calendar year and be equal installments, provided a reasonably detailed invoice is submitted to MARS. Payment of agreed Management Fee shall be in accordance with Section 4B.

## *6. CONTRACTOR RESPONSIBILITY FOR WAREHOUSE DAMAGE AND REPAIRS*

Contractor shall be responsible for any damage, repairs or replacements (capital or otherwise, structural or otherwise, but in any such case reasonable wear and tear excepted) to the Warehouse to the extent such damage(s), repair(s) or replacement(s) is/are necessitated solely as a result of any negligent act or failure of Contractor, its employees, and/or agents. contractors, subcontractors, licensees and invitees . Contractor shall not be responsible for damage, repairs or replacement caused by any other party prior to Contractor's Commencement Date. Contractor shall document the condition of the Warehouse upon Commencement and shall provide a report detailing existing damages to MARS.

## *7. COVENANTS, REPRESENTATIONS AND WARRANTIES*

A. Performance Warranty. Contractor covenants, warrants and represents that (i) each of the Contractor, its managers, supervisors, employees, agents and any subcontractors it retains has and will at all times have the requisite experience, capacity, expertise and training necessary to perform the

Management Services in an efficient and effective manner, and shall properly, safely, and efficiently operate and manage the Warehouse for the purposes herein described with a high level of care, skill and diligence and in accordance with recognized warehouse logistic operational best practices supporting the food industry; (ii) it will maintain and keep all equipment used in the Warehouse in good operating order and will ensure that the equipment is operated in a safe manner by employees experienced in its use; (iii) it will strictly comply with the descriptions, representations, limitations and standards of performance as to the Management Services which appear, or are referenced, in this Agreement including any Appendix hereto; (iv) the Contractor, its managers, supervisors, employees, agents and any subcontractors it retains shall perform the Management Services in an efficient manner, with a high level of care, skill and diligence and consistent with recognized warehouse logistic operational best practices supporting the food industry; and (v) Contractor shall maintain and keep in neat and orderly condition, free from damage, deterioration, smell or taste taint, infestation and contamination all such goods as from time to time may be tendered by MARS for storage at the Warehouse in accordance with a high level of care, skill and diligence and consistent with recognized warehouse logistic operational practices supporting the food industry, and that it will strictly abide by (a) the temperature and humidity standards set forth in the Quality Manual, and (b) all housekeeping, sanitation, and pest control standards as set forth in the Quality Manual. The Contractor acknowledges that MARS is materially relying on the above mentioned covenants, representations and warranties, which have induced MARS to enter into this Agreement.

MARS will notify the Contractor in writing of any material amendments to the manuals, standards and programs referred to in this Section and in Section 4 hereof, which amendments are in the sole discretion of MARS provided Contractor is provided advanced notice of such amendments and reimbursed by MARS for any potential financial impact associated with the amendments.

B. Compliance with Applicable Laws. It is understood by Contractor that some or all of MARS' goods tendered for storage in the Warehouse are intended for human or animal consumption and are subject to Federal Food and Drug Administration or Department of Agriculture standards and regulations and other applicable federal, state and local laws affecting the storage and marketing of such products. Therefore, Contractor warrants that, in operating the Warehouse, it shall not violate or permit the violation of any such laws, nor shall MARS ask Contractor to knowingly violate any such laws. Contractor further warrants that it will not place MARS' goods in proximity to any other goods or materials which might lead to any damage, deterioration, contamination, infestation, smell or taste taint of MARS' goods, including packaging.

C. Status of Contractor. Contractor warrants and represents that it is a legal entity, duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization and in the jurisdiction where Contractor will perform the Management Services under this Agreement.

D. International Exchange Visitors. Contractor shall not utilize the J1 Visa International Exchange Visitors program established by the United States Government to provide labor relating to the Services under the Agreement without the prior written consent of Mars.

## 8. ***RIGHT, TITLE AND INTEREST IN GOODS***

Contractor acknowledges that it does not have, nor will it have at any time, any right, title or interest, and Contractor expressly waives any right to seek or assert a warehouseman's lien, in the goods stored in the Warehouse. Contractor shall, at any time as MARS may request, execute and deliver, or assist in executing and delivering, any statement which shows or indicates that Contractor has no right, title or interest in said goods. Contractor shall, at MARS' request and expense, assist MARS in protecting and defending the right, title or interest of MARS' and its affiliates in and to the goods against

any and all persons asserting a claim of any kind against or through Contractor. Contractor shall, upon demand of MARS, prepare to ship to any location and in the manner MARS so requests, all or any portion of the goods stored in the Warehouse.

## *9. INBOUND SHIPMENTS; TRANSFER OF GOODS; REMOVAL OF GOODS*

Contractor shall strictly follow the instructions of MARS with regard to effectuating, documenting and handling inbound shipments, and the transfer and removal of goods (including contaminated goods) as are set forth in the Quality Manual.

## *10. RIGHT OF REFUSAL*

Contractor may refuse to accept any MARS goods which the Contractor, acting responsibly and reasonably determines that, due to infestation visible during the inspection process mutually agreed upon by the parties, contamination or damage, might cause infestation, contamination or damage to other MARS goods stored in the Warehouse, and shall immediately notify MARS of such refusal. Contractor shall have no liability for any demurrage, detention, transportation or other charges by virtue of such refusal. Contractor shall observe the instructions of MARS with respect to the refusal or disposition of such goods as set forth in the Quality Manual or otherwise instructed by MARS.

## *11. BOOKS, RECORDS, INFORMATION AND DATA*

Contractor shall maintain complete and accurate books and records relating to the Management Services and all costs and expenses in connection therewith, in a form prescribed by MARS and, if no form is so prescribed, in accordance with generally accepted accounting practices. All such books and records, including without limitation, computer records, will be available at all times for MARS' inspection, auditing and copying.

Contractor acknowledges that all computer hardware and software used by it in the performance of the Management Services, is accessible by MARS in accordance with defined parameters as mutually agreed between the parties. Contractor further acknowledges that all data and information relating to the Management Services, the goods of MARS or the Warehouse, wherever and however prepared and/or maintained by or on behalf of the Contractor, or received from MARS, whether handwritten, typewritten or electronically entered or in any other form whatsoever, shall be and remain the exclusive property of MARS and MARS shall have the right to receive any and all such data and information from the Contractor immediately upon written notice. Notwithstanding the above, in the event of termination of the business relationship for any reason, Contractor may retain copies of all applicable business records.

MARS shall be responsible for installation and maintenance of the Warehouse Management System and training of one (1) Functional User of Contractor on use of the system(s) and related equipment. In order to assure accountability and control for any inventory transactions, MARS will supply documentation history to validate any discrepancies which need to be reconciled. Should adjustments be required, system entries are only able to be changed via a separate adjustment entry. MARS agrees not to make any inventory adjustments without Contractor's prior written consent. If such adjustments are made without prior written notification and Contractor identifies an inventory discrepancy, Contractor shall have ninety (90) days to reconcile such inventory discrepancy and MARS shall cooperate with Contractor in any such reconciliation. If Contractor can reasonably demonstrate that any unaccounted for

inventory was attributable to any MARS adjustments, Contractor shall not be responsible for the associated loss.

## *12.* ***ON-SITE INSPECTION***

MARS or any of its agents, employees or representatives reserve the right to enter the Warehouse at any time (with 24 hours advance notice to Contractor to the extent feasible) for the purpose of examining and counting all or any of the goods stored there and conducting any such tests as are necessary, in the judgment of MARS, to ensure that the Warehouse is in clean and sanitary condition, is free of any contamination and complies in all respects with any applicable law, regulation or standard, and for any other purpose whatsoever, and Contractor agrees to cooperate with MARS in any such on-site inspection and testing. MARS reserves the right to maintain a secure office within the Warehouse limited to designated MARS personnel and such personnel shall have the right to enter any area of the Warehouse operation at any time during Contractor's normal business hours.

## *13.* ***TERMINATION***

A. Immediate Termination. MARS may terminate this Agreement immediately by notice in writing if (i) Contractor breaches any of its obligations hereunder, and such breach (a) is not in dispute, (b) is attributable to the willful misconduct or negligence of the Contractor, and (c) results in any interruption of the continuous and efficient operation of the Warehouse for more than eight (8) consecutive business hours; or (ii) if Contractor abandons the Warehouse for more than eight (8) consecutive hours during times which the Warehouse is required to be open and operating as set forth in Section 4 of this Agreement; or (iii) there is an emergency (defined below).

B. Termination After Right to Cure. Either party has the right to terminate this Agreement if the other party is in default of any obligation, warranty, claim or representation hereunder, which default is incapable of cure, or which, being capable of cure, has not been cured within ten (10) business days after receipt of notice of such default, or such additional cure period as the non-defaulting party may authorize, provided, however, that if the noticed default shall not be an "emergency" ("emergency" being deemed to mean that said default, if not attended to immediately, might (i) result in injury or damage to persons or property, or (ii) interfere with the conduct of MARS' business in or upon the premises or the Warehouse, or (iii) damage MARS' inventory stored in the Warehouse such that the quality of said inventory would be affected as determined by MARS according to its own quality standards) and the defaulting party has, within ten (10) days, promptly commenced efforts to cure and is continuously and diligently pursuing said cure to completion, the defaulting party's failure to complete the cure within ten (10) days shall not constitute a default hereunder. The aforementioned written notice of default shall state with particularity the circumstances of the specific default or defaults alleged and the steps necessary to cure such default. In the event a default is not cured within the defined cure period, or is otherwise deemed incapable of cure, the non-defaulting party has the right to terminate this Agreement by providing written notice to the defaulting party.

C. Termination at Will. MARS may terminate this Agreement, in its sole discretion, without cause or reason and without being considered in default of any provision of this Agreement, at any time by giving one hundred and twenty (120) days' written notice thereof. The effective date of said termination shall be the one hundred and twenty-first (121st) calendar day after the date of delivery of the termination notice. In the event of such termination and within ninety (90) days after the receipt from Contractor of all supporting documentation subject to Section 13D herein below, MARS shall pay to Contractor any

Allowable Operating Expenses in the event that Contractor has paid said expenses on MARS' behalf and is entitled to reimbursement under this Agreement subject to Section 4B.

D. Final Accounting. Regardless of the reason or cause, if any, for termination of this Agreement, or upon expiration of this Agreement, Contractor shall submit to MARS invoices for all outstanding Allowable Operating Expenses (with all supporting documentation) no later than sixty (60) calendar days after such termination or expiration, otherwise MARS shall have no liability or obligation to pay or reimburse such Allowable Operating Expenses. Within ninety (90) days after the receipt from Contractor of such invoices, and all supporting documentation, MARS shall pay the Allowable Operating Expenses to which Contractor in entitled under Section 4 and any other mutually agreed upon costs.

E. Acts of Insolvency. Either party may terminate this Agreement by written notice to the other, and may regard the other party as in default of this Agreement, if the other party becomes insolvent, makes a general assignment for the benefit of creditors, suffers or permits the appointment of a receiver for its business or assets, or becomes subject to any proceeding under any bankruptcy or insolvency law (provided there is no dismissal or discharge within thirty (30) days), whether domestic or foreign, or has wound up or liquidated, voluntarily or otherwise. In the event that any of the above events occur, that party so affected shall immediately notify the other party of the occurrence.

F. Rights and Obligations of the Parties on Termination. Should Mars terminate this Agreement for any reason provided herein or Contractor terminates this Agreement under aforementioned Sections13A, 13 B or 13E , MARS shall pay to Contractor any unpaid Management Fee due and payable up to the date of termination, which Fee, in the case of a partial period, shall be pro-rated on a monthly basis. Upon termination, Contractor shall peacefully vacate the Warehouse, and forthwith return to MARS any records, documents, papers, materials, disks, computer programs, information, data, and any other property of MARS then in its possession or control which Contractor may have received from, or has access to through, MARS or which Contractor may have acquired or compiled for the purposes of performing its obligations under this Agreement. Contractor may retain a copy of any documentation that is necessary for audit or regulatory compliance purposes. . Contractor shall immediately return to MARS any advance payments it shall have received for Management Services which, as a result of the termination, will not be performed or have been rejected by MARS. Upon vacating the Warehouse, Contractor shall leave said premises in as good condition as when it first assumed its responsibilities hereunder, ordinary wear and tear excepted subject to Section 6.

The Contractor shall not remove any equipment, fixtures, tools, records, documents, papers, disks, computer programs, information, data, with the exception of Contractor's business records, or any other property at or used in connection with the operation of the Warehouse or terminate any services relating to the Warehouse, whether they are the subject matter of any Operating Agreements (as defined in Section 13G hereunder) or otherwise, without the prior written consent of MARS.

Until the termination of this Agreement after any period of notice or time to cure any default, if any, or the Expiration Date of the initial Term or Extension Term, as the case may be, the Contractor shall provide its full, complete and good faith cooperation to MARS in the provision of the Management Services and the turnover thereof to MARS or its designee, as MARS shall direct. Notwithstanding the foregoing, in the event that MARS exercises its right of termination under Section 13C of this Agreement, MARS may in its sole discretion request that the Contractor cease providing some or all of the Management Services at any time or times during the one hundred and twenty (120) day period of notice, whereupon the Contractor shall cease to provide such Management Services on the date so requested by MARS; provided however Contractor shall be compensated in full as if it were performing such services through the entire one hundred and twenty (120) day period. Nothing in this provision sentence shall prejudice the right of the Contractor to receive the monies which it would have been otherwise entitled to

receive under Section 13C nor relieve the Contractor from its obligations under Sections 13D, 13F, 13G, 13H, and 13I of this Agreement.

G. Operating Agreements. In performing its obligations under this Agreement, Contractor has separately entered into personal property leases, agreements for the supply of goods, agreements for the supply of services and other such agreements with third parties approved in writing by MARS; or has assumed such leases and agreements with third parties from Contractor's predecessor (collectively the "Operating Agreements"). Upon the expiration or termination of this Agreement, MARS or its designee shall : (i) request that Contractor terminate any one or all of the Operating Agreements, that for any such agreement which includes a provision requiring payment of a penalty upon early termination or termination prior to the defined lease term or fully amortized term, MARS shall pay such penalty only if Contractor notified MARS and obtained its agreement in writing to the inclusion of such a provision in the agreement prior to the time the agreement was executed; or (ii) have any one or all of the Operating Agreements assigned to MARS or its designee. Any Operating Agreement which by its terms cannot be terminated early shall be assumed by or assigned to MARS. Upon the effective date of termination or expiration of this Agreement, MARS shall assume the obligation of Contractor arising under any of the Operating Agreements which cannot be terminated. Contractor shall remain fully liable for all obligations under the Operating Agreements up until the date of termination or expiration of this agreement whichever occurs first. If any required approval by MARS hereunder is given verbally and not in writing, the burden shall be upon Contractor to prove that such approval was given. In addition, MARS shall reimburse Contractor in full for all amortized costs for which there is an outstanding balance within ninety (90) days of termination of the business relationship.

H. Operating Assets. Attached to this Agreement as Appendix C is a list of all assets including equipment, fixtures, tools, and the like, whether owned by Contractor, by MARS or by third parties and used in performing Contractor's obligations under this Agreement, and including assets the costs for which (including acquisition, maintenance and financing costs) are reimbursed by MARS as an Allowable Operating Expense (collectively, the "Operating Assets"). Upon the expiration or termination of this Agreement , the parties shall agree to mutually proceed with one of the following options as applicable : (i) purchase (on commercially reasonable terms including the payment on installment) any or all of the Operating Assets owned by Contractor at the greater of their then-current fair market value based on the remaining useful life of the asset, which value shall be calculated using a straight-line amortization method over the useful life of the asset after deducting any portion of the Contractor's original purchase price that has been paid or reimbursed by MARS or the outstanding balance of amortized payments to be paid by Mars;or (ii) lease any or all of the Operating Assets from the Contractor for the remainder of the defined lease term from the date of termination or expiration of this Agreement, and assume any remaining lease obligations on such terms as shall be reasonably acceptable to Contractor, and at a rental rate which shall be equal to the Allowable Operating Expense in the then-current Final Operating Budget for the acquisition, maintenance and financing costs of such Operating Assets; or (iii) Contractor may elect to keep the equipment as mutually agreed by the parties. Contractor shall not alter, exchange, sell, dispose of, or remove any Operating Assets from the Warehouse without the prior written consent of MARS provided Contractor is compensated for any costs that would normally be incurred by Contractor associated with such Operation Assets. Contractor shall provide copies of any or all agreements related to the Operating Assets promptly upon MARS' request therefore. In the event that MARS or its designee assumes the leases or buys the equipment, Contractor will be indemnified for any liability for loss, damages or injuries arising from the use of such materials, tools or equipment from and after the date that MARS or its designee assumes the leases or buys the equipment. The foregoing shall not be interpreted to require MARS to indemnify Contractor in the event the Contractor is liable for any loss, damages or injury arising from its proven negligence or use prior to the date MARS or its designee acquires the equipment.

I. Employees of Contractor. In the event this Agreement is terminated with or without cause or in the event that this Agreement expires at the end of the Term, Contractor shall be and remain liable and responsible for all employees employed at or in connection with the Warehouse, whether or not such employees are retained by Contractor or terminated from their employment, and all employee costs, expenses and obligations arising as a consequence of the termination or expiration of this Agreement, including all wages, salaries, severance pay, termination pay, vacation pay, benefits and other entitlements which may be incurred or which may arise as a consequence of the termination or expiration of this Agreement. To the extent any of the foregoing costs may have been approved and reimbursed by MARS as an Allowable Operating Expense prior to such termination, MARS shall not reimburse Contractor for any of the foregoing costs or expenses if termination is for cause unless such costs and expenses are for work that has actually been performed. Contractor shall indemnify and hold MARS harmless from any claim, demand, complaint, action, cause of action, damages, costs, expenses or any other liability or obligation to its employees in the event of termination or expiration of this Agreement.

Without detracting from or diminishing the obligations, responsibilities and liabilities of the Contractor with respect to its employees under this Agreement, in the event that this Agreement is terminated with or without cause, or in the event that this Agreement expires at the end of the Term, MARS or its designee shall have the right, but not the obligation, at any time whether before or after such termination or expiration to offer to any such employees of the Contractor, as MARS may deem desirable or necessary in order to secure the continuous and uninterrupted operation of the Warehouse, employment with MARS or its designee after the date of termination or expiration, and the Contractor hereby consents thereto. MARS shall provide Contractor with written notice of any employees MARS may desire to hire. In such event, the Contractor shall remain liable and responsible for all employees who are not extended offers of employment by MARS or a designee of MARS. In the case of employees of the Contractor who are extended offers of employment by MARS or its designee, MARS shall notify Contractor of those employees and at MARS' election the Contractor shall be liable for and shall pay all wages, salaries, vacation pay, benefits and other entitlements ("Employee Obligations") accruing up to the date prior to the date of their employment by MARS or any of its designee (subject to the Contractor's right to receive reimbursement thereof from MARS under this Agreement), and MARS or its designee shall assume the Employee Obligations arising from and after the date of such employment.

## *14. INDEMNIFICATION*

A. By Contractor. Contractor shall indemnify and hold harmless MARS, its parent and corporate affiliates, and its owners, shareholders, officers, directors, employees, agents, successors, and assigns (hereinafter, the "Indemnified Party") against claims, losses, damages, expenses, fees (including, without limitation, fines, penalties, court costs, and attorneys' fees) and liabilities (including strict, statutory and regulatory liability) (collectively, "Claims") regardless of the form of action brought against any Indemnified Party, arising out of the NEGLIGENCE or WILLFUL MISCONDUCT of Contractor, other than any Claims losses, damages, expenses or liabilities due to the negligence or willful misconduct of any Indemnified Party, arising from or in connection with, but not limited to, (i) Claims for bodily injury or death, personal injury, advertising injury or property damage (except for those damages covered under Section 6 herein) (including, but not limited to, theft) arising from the negligence of Contractor; including any incident with forklifts leased by Mars (ii) Claims for infringement of any intellectual property rights (including patents, trade secrets, copyright and trademarks), or for misuse of proprietary information related to any goods or services sold, provided or used by Contractor; (iii) Claims for any violation or threatened violation by Contractor of any law, rule or regulation of any governmental agency or authority (including, but not limited to, any environmental law related to contamination by, or the release or threat of release of, any hazardous or toxic substance, waste or pollutant into any environmental medium) but excluding any violation of government regulation when such violation is caused by

Contractor's compliance with MARS' North American Warehouse Quality Assurance Manual and/or compliance with guidance documentation and/or SOPs as provided by MARS ; (iv) Claims arising out of Contractor's acts, omissions or failure to perform any obligation with respect to Contractor's employees or any subcontractors; (v) Claims for Contractor's breach of any warranty, representation, covenant or other provision of this Agreement; (vi) Claims arising under the Operating Agreements prior to the termination or expiration of this Agreement except as otherwise addressed herein; and (vii) Claims for any other negligent act or negligent omission of Contractor in connection with its performance of this Agreement except as otherwise addressed herein. All references to "Contractor" in paragraphs (i) through (vii) of this Section shall be deemed to include Contractor's shareholder's, officers, directors, employees, agents, invitees contractors, subcontractors or any person or entity acting under Contractor's direction or control. Contractor expressly agrees to waive any immunity or exclusivity of any labor or workers' compensation or other similar statute. Contractor's obligation to indemnify any Indemnified Party will survive the expiration or termination of this Agreement by either party for any reason.

Each party shall promptly notify the other party of the existence of any Claim, demand or other action giving rise to a claim for indemnification under this Section. Promptly upon the request of MARS, Contractor shall conduct the defense of any action against the Indemnified Party arising under this Agreement unless indemnification falls under the scope of Section 14 B below, including the employment of counsel reasonably acceptable to MARS and the payment of all expenses of such defense. MARS shall at all times have the right to participate in such defense using its own counsel and if Contractor fails to assume the defense as required hereunder, then MARS shall have the absolute right to control the defense of such Claims. Unless otherwise expressly so provided, this indemnity shall not be limited by any insurance coverage obtained or required to be obtained by Contractor or any limits of liability or limits on the type of damages with respect thereto.

B. By MARS. MARS shall indemnify and hold harmless Contractor, its corporate affiliates, and its owners shareholders, officers, directors, employees, agents successors and assigns (hereinafter, "Contractor Indemnified Party") from and against any and all claims, losses, damages, expenses, fees (including, without limitation, all fines, penalties, court costs and attorneys' fees) and liabilities (including strict statutory, and regulatory liabilities) regardless of the form of action brought against any such Contractor Indemnified Party, other than any claims, losses, damages, expenses or liabilities due to the negligence or willful misconduct of any Contractor Indemnified Party, arising from claims for bodily injury or death, personal injury or property damage resulting from the negligence of MARS, its agents or employees and/or any violation of government regulation when such violation is caused by Contractor's compliance with MARS' North American Warehouse Quality Assurance Manual and/or compliance with guidance documentation and/or SOPs as provided by MARS.. This indemnification shall survive the expiration or termination of this Agreement.

## *15. TAXES*

Notwithstanding that certain of Contractor's taxes defined in this Agreement and any Appendix hereto may be reimbursable by MARS (except that nothing in this Agreement shall be deemed or construed to obligate MARS to pay, or reimburse Contractor for, taxes imposed on Contractor's net income), Contractor shall be responsible for the payment of all taxes imposed upon it, in connection with or as a result of this Agreement, to the appropriate taxing authority. In the event that Contractor is able to receive a refund or rebate of any taxes paid by it and reimbursed by MARS, Contractor shall immediately repay to MARS the amount of such refund or rebate. Contractor acknowledges that, inasmuch as its relationship to MARS is that of an independent contractor, Contractor is responsible for paying all Social Security taxes, FICA, payroll taxes or other taxes rendered or assessed by the Government of the United Sates or any state or local taxing unit on Contractor or Contractor's personnel. It is further understood and agreed that MARS shall not be responsible for withholding any taxes with respect to Contractor's

employees, and shall retain the right to require Contractor to present evidence of its compliance with the terms of this Section.

## *16. CONFIDENTIAL AND PROPRIETARY INFORMATION; PUBLICITY*

A. Proprietary Information. Each party acknowledges and agrees that any and all information emanating from the other's business (MARS' business being deemed to include the business of Mars, Incorporated, and any of Mars, Incorporated's divisions or subsidiaries), in any form including any compilations of otherwise public information is "Confidential and Proprietary Information," and each party agrees that it will not, during or after the initial Term or any Extension Term of this Agreement, permit the duplication, use or disclosure of any such Confidential and Proprietary Information to any person (other than its own employees, agents or representatives who must have such information for the performance of its or their obligations hereunder), unless such duplication, use or disclosure of such Confidential and Proprietary Information is specifically authorized in advance by the other party in writing. Each party shall be responsible for any unauthorized duplication, use or disclosure made by any of its employees, servants or agents and shall take reasonable precautions to prevent such duplication, use or disclosures. For the purposes of this subsection, the term "Confidential and Proprietary Information" is not meant to include any information which, at the time of disclosure, is generally known by the public and any competitors of MARS; information disclosed to the other party by third parties having a right to do so and who have not imposed upon the recipient thereof obligations of confidentiality, or information which is known to the other party prior to disclosure. Contractor shall promptly notify MARS of any requirements of, or requests from, any governmental authority or any request in the context of any legal proceeding to disclose any Confidential and Proprietary Information relating to MARS, and Contractor shall not disclose such information without first notifying MARS so that MARS may contest such disclosure and shall cooperate with MARS in resisting such disclosure, to the fullest extent permitted by law.

B. Publicity; Trademarks. etc. Contractor shall not use the name, trademarks or trade names (whether registered or not) of Mars, Incorporated or of any of its divisions or subsidiaries in publicity releases or advertising, or in any other manner, including customer lists, without the prior written consent of Mars, Incorporated.

## *17. ASSIGNMENT*

Neither party shall assign or subcontract the whole or any part of this Agreement without the other party's written consent, except that (i) MARS may assign this Agreement without the consent of the Contractor to any corporate affiliate of MARS provided that MARS remains the guarantor of, and is fully liable for, the performance of all of its obligations under this Agreement, and (ii) Contractor may assign its right to receive payments under this Agreement to such third parties as Contractor may desire without consent of MARS, provided that Contractor gives written notice (including evidence of such assignment) to MARS thirty (30) days in advance of any payment so assigned. Any subcontract made by Contractor with the consent of MARS as aforesaid shall incorporate by reference all terms of this Agreement.

## *18. STATUS AS INDEPENDENT CONTRACTOR*

It is agreed and understood by both parties that the relationship of Contractor to MARS is one of an independent contractor, that Contractor shall not represent to anyone in any manner, express or implied, that Contractor is an employee, or that Contractor's personnel are employees, of MARS, and that

nothing in this Agreement shall be construed to confer on Contractor any authority, express or implied, to bind or commit MARS to any third party in any way whatsoever. As an independent contractor, neither Contractor nor Contractor's personnel is entitled to the benefits provided by MARS to its employees, including, but not limited to, group and health insurance, deferred compensation and retirement benefits. As an independent contractor, Contractor has sole authority with respect to its employment policies, including, but not limited to, promotions, discipline, relocation, or termination, and such policies are not subject to agreement or consent on the part of MARS. Nothing in this Agreement shall be construed to suggest that the parties hereto are general partners, joint venturers or joint employers.

## *19. INSURANCE*

A. Required Coverage. Contractor is responsible for obtaining and maintaining in full force and effect commercial general liability, workers' compensation, employers' liability, business automobile liability, warehouse legal liability and umbrella liability insurance pursuant to the minimum limits and other requirements contained herein or reasonably requested by MARS. Coverage shall be maintained insuring Contractor and MARS, against liabilities whether or not asserted by or on behalf of Contractor's employees, invitees, officers, owners, directors, contractors, subcontractors or agents. Contractor shall comply with all state and local insurance statutes and regulations. Contractor's commercial general liability and umbrella insurance policies shall include contractual liability, with limits of not less than the amounts specified below, and shall include all defense costs, including, but not limited to, attorneys' fees, court costs, and other similar costs and expenses. It is understood and agreed that any insurance limits shall not be construed as a limitation on Contractor's liability except as specifically addressed in Section 19 D. The policies shall provide coverage for any liability Contractor (including its employees, agents, invitees, contractors or subcontractors) may have for bodily injury or death, personal and advertising injury, or property damage. MARS, including its divisions, subsidiaries, parent and corporate affiliates, and its owners, shareholders, officers, directors, employees, and agents shall be included as "additional insureds" under all insurance policies provided by Contractor (except workers' compensation and warehouse legal liability and umbrella coverage (which follows form). MARS shall not be deemed to fall within the definition of "an Insured" for purposes of any damage, loss, bodily injury or death to employee exclusions that may exist within Contractor's policies, and Contractor shall provide an endorsement to that effect. All such policies shall be primary to, and not contributory with, any coverage which may otherwise be available to MARS. Each such policy shall contain a "separation of insureds" clause which shall have the effect of insuring each person, firm or corporation insured hereunder in the same manner and to the same extent as if a separate policy has been issued to each.

All insurance required hereunder shall be obtained through an insurance company with a minimum rating of A-VII or better as evaluated by the most current A.M. Best rating guide. If the insurance company has a rating less than A-VII, Contractor must receive specific written approval from MARS prior to proceeding.

Not later than ten (10) days prior to the expiration of, or the effective date of any material change in, any policy or policies hereunder, Contractor shall deliver (or cause the insurance company to deliver) to MARS written notice if the policy or policies will be cancelled or the coverage materially changed. As evidence of renewal, Contractor shall, not later than ten (10) days prior to expiration, either (i) deliver (or cause the insurance company to deliver) to MARS a new certificate of insurance, together with evidence of payment of the premiums for the renewal period, or (ii) if Contractor is unable, after a good faith effort, to deliver any such policy or certificate by the specified date, Contractor shall notify MARS in writing of the reasons why such insurance has not been renewed, shall advise MARS of the anticipated date of such renewal and shall deliver to MARS copies of any such policy or certificate, and evidence of payment, promptly upon their becoming available. Failure to deliver such notices, policies or certificates, as the

case may be, or to pay the premiums on said policies when they become due, shall be deemed to be a default by Contractor under Section 13 hereof.

If at any time Contractor fails to obtain insurance (or provide proof of insurance) in accordance with this Agreement, or otherwise required by MARS, MARS may, but it not required to, obtain the coverage specified in this Agreement and charge all associated premiums and costs to Contractor. Contractor shall reimburse MARS the cost thereof within fifteen (15) days of receipt of notice from MARS or MARS may deduct the cost thereof from the Management Fee.

Insurance Specifications

Contractor agrees to maintain the following MINIMUM limits of insurance:

1. Workers' Compensation and Employers' Liability:

Limits:

| | | |
|---|---|---|
| a. | Workers' Compensation: | Statutory Limits |
| b. | Employers' Liability: | $1,000,000 |

Contractor may self-insure for Worker's Compensation in any jurisdiction where it is qualified to do so. In Texas, Contractor may non-subscribe for Worker's Compensation and provide alternate coverages. Contractor shall provide proof of a commercially reasonable non-subscriber plan if Contractor chooses Non-subscription.

2. Commercial General Liability: (Commercial General Liability Form ISO 1998 or later, including Contractual Liability and Products and Completed Operations, on an occurrence form for bodily injury and personal injury or property damage:

Limits:

| | | |
|---|---|---|
| a. | Bodily Injury & Property Damage | $1,000,000/occurrence |
| b. | Personal Injury & Advertising Injury | $1,000,000/occurrence |
| c. | Products/Completed Operations Aggregate | $1,000,000 |
| d. | General Aggregate per location: | $2,000,000 |

3. Automobile Liability: Liability coverage for any auto whether owned, rented, hired, borrowed or non-owned by the Contractor:

Limits:

| | | |
|---|---|---|
| a. | Combined Single Limit | $1,000,000/occurrence |
| b. | Personal Injury Protection (in applicable states) | Statutory |

4. Umbrella Liability: Liability coverage attaching excess of Commercial General Liability, Automobile Liability, and Employers' Liability policies.

Limits:

| | | |
|---|---|---|
| a. | Per Claim: | $10,000,000 |

Contractor shall cause any subcontractor to add Contractor and MARS, its divisions, subsidiaries, parent and corporate affiliates, and its owners, shareholders, officers, directors, employees, and agents, as "additional insureds" and endorsed as such under the Umbrella Liability, Commercial General Liability and Automobile Liability policies. Contractor shall cause any subcontractors to issue certificates of insurance indicating compliance with the insurance terms and conditions above, and shall be responsible for ensuring that subcontractors (i) comply with the requirements set forth above, and (ii) maintain such coverage with respect to their work.

If an affiliate of Contractor has entered into an Agreement for Lease of Warehouse leasing to MARS, or an affiliate of MARS, the Warehouse space, the insurance requirements of the Lease with respect to commercial general liability and automobile liability insurance may be satisfied by Contractor's causing the policy or policies it obtains pursuant to this Section 19A to name the landlord under the aforementioned Lease as a named insured in connection with said insurance.

B. Insurance on Building Contents. MARS shall, at its sole cost and expense, insure and keep insured any property in, on or about the Warehouse in which MARS has an insurable interest, including (but not limited to) MARS' inventory, furniture, fixtures, equipment and other of MARS' property.

C. Product Liability Insurance. MARS shall maintain product liability insurance and shall indemnify and hold Contractor harmless against all liability to third parties for injury resulting from consumption of a product manufactured by MARS, including any of its wholly-owned subsidiaries or divisions, except to the extent the injury resulted from the negligence of contractors or Contractor's employees agents, contractors and subcontractors.

D. Warehouseman's Legal Liability Insurance. Prior to occupancy of the Warehouse by MARS, the Contractor shall obtain Warehouseman's Legal Liability Insurance covering against risk of loss of inventory and property belonging to Mars, Incorporated, or any of its wholly-owned subsidiaries and divisions, resulting from the negligence of Contractor, which insurance shall be in the amount of $25 (twenty-five) million. Damaged inventory and product insured hereunder will be valued at Mars, Incorporated's actual replacement cost (defined as the cost of the raw materials and packaging material at actual cost, which excludes profit and any applicable taxes) for payment of claims, which claims shall be paid without regard to any deductible. The Contractor shall obtain such insurance and shall pay the premiums for such insurance coverage. Annually, MARS shall reimburse, as an Allowable Operating Expense pursuant to Section 5 of this Agreement, premiums for the required coverage, Contractor shall promptly deliver to MARS the policy or certificate of insurance, as MARS may request, together with evidence of payment of the premiums. Contractor's failure to deliver said policy or certificate or to pay the premiums on said policies when due shall be deemed a default by Contractor under Section 13 hereof. Such policy shall respond as primary coverage to any other insurance which may otherwise be available to MARS.

Contractor's liability for loss or injury to Goods shall be limited to loss or damage attributable to Contractor negligence subject to the limits of the warehouse legal liability insurance as identified herein, $25 million per occurrence based on actual replacement cost excluding profit, unless such limitation is increased by written request by MARS with acknowledgement by Contractor. Notwithstanding the above, in the event of Contractor liability MARS agrees to a shrinkage/damage allowance each calendar year during the term of the Agreement of .005% based on total cost of Goods variance divided by total cost of Goods received on an annual basis for which, in the case of loss or damage to GOODS or mysterious disappearance Contractor will not be liable not to exceed one hundred fifty thousand dollars ($ 150,000) on an annual basis. Liability in excess of the allowance shall be subject to $25 million per occurrence limitation identified above.

E. Notice of Loss or Damage to Goods. Contractor agrees to notify MARS promptly in writing of any known loss or damage, however caused, to goods stored or handled under the terms of this Agreement.

F. Reimbursement of Insurance Premiums. MARS shall reimburse Contractor for the cost of the premiums for the coverage required to be obtained by Contractor, at the minimum limits required,

under this Section 19, provided said coverage satisfies all of the requirements of this Section. MARS shall not pay for insurance in excess of the minimum limits specified herein.

## *20. MARS' INSTRUCTIONS*

Contractor acknowledges that MARS may, in its sole discretion, assign identified MARS' employees (whose salaries, fringe benefits and employer tax obligations shall be borne by MARS) to the Warehouse. Contractor shall not be responsible for obeying verbal instructions of MARS' employees which contradict written instructions. Further, Contractor shall ensure that its personnel assigned to the Warehouse shall attend, at MARS' request and expense, all training sessions held by MARS or its designee.

## *21. DEMURRAGE AND OTHER CHARGES FOR DELAY*

MARS shall be liable for the payment of any unpaid transportation charges in connection with the in-bound shipment of goods to the Warehouse, including undercharges, demurrage, detention, or any other charge incurred in connection with goods shipped, and it shall be the responsibility of MARS to plan the arrival of its shipments to avoid unreasonable bunching or other unloading problems. Contractor shall be liable for the payment of transportation charges in the event that such charges result from Contractor's failure to exercise reasonable care and judgment, including reasonable planning to ensure that unloading services and facilities are available upon the arrival of MARS' goods provided shipments are reasonably consistent with MARS shipping projection/forecast. It shall be the responsibility of Contractor to communicate immediately by telephone to the carrier upon the occurrence of any demurrage in excess of forty dollars ($40.00), and to maintain accurate records and documentation of the facts relating to such demurrage, detention or delays, including any actions taken by Contractor to alleviate such demurrage, detention or delays in order to assist MARS in processing any objection to carrier's imposition of such charges. If detention occurs for which Contractor is liable, payment of such detention shall be made by the Contractor to MARS unless otherwise directed by MARS.

## 22. *FORCE MAJEURE*

A. Force Majeure Defined. Neither Contractor nor MARS shall be liable to the other for any failure to perform pursuant to the terms and conditions of this Agreement to the extent such performance was prevented by an event of Force Majeure. "Force Majeure" as used in this Agreement means any event which is unforeseeable and beyond the reasonable control of the party whose performance is affected and which, with the exercise of due care, said party could not reasonably have been expected to avoid, including, but not limited to, acts of God, explosions or fires, floods, hurricanes, tornadoes, lightning, earthquakes, drought, epidemics, blight, famine, quarantine, blockade, acts or inactions of governmental authorities, insurrection or civil strife, rebellion, or sabotage.

To be excused from performance pursuant to this provision, however, the party whose performance is affected must (i) immediately give notice to the other party, including full details of the event of Force Majeure and its creation of an inability to perform, and (ii) exercise immediate and uninterrupted due diligence to remove its inability to perform. The burden of proof to establish the existence of an event of Force Majeure and any resulting inability to perform on its part shall be on the party seeking an excuse from performance due to Force Majeure. Upon receipt of the aforementioned notice, payment shall be suspended with respect to any Management Services not being performed. If the period of non-performance exceeds thirty (30) days from the event of Force Majeure, the party whose ability to perform has not been so affected, may by giving written notice, terminate this Agreement. If an

event of Force Majeure asserted by Contractor causes the cessation of operations of the Warehouse, MARS shall be entitled to undertake all reasonable actions to overcome the effect of the Force Majeure and to minimize its impact on MARS' operations.

B. Exclusions from Definition of Force Majeure. Notwithstanding anything in this Agreement to the contrary, "Force Majeure" shall not mean:

(i) Unavailability of equipment, repairs or spare parts for the Warehouse, except to the extent caused by a qualifying event of Force Majeure;

(ii) Any event to the extent caused by the negligence, willful misconduct or breach of this Agreement by the party claiming Force Majeure;

(iii) Any breakdown or failure of any mechanical or other component of the Warehouse which fully or partially curtails operations to the extent caused by the design or construction of the component or the failure to properly operate and maintain the component, irrespective of whether the failure is attributable to the negligence or fault of the party asserting Force Majeure;

(iv) Failure to perform by any subcontractor, vendor, manufacturer, supplier, provider, or other third person except to the extent the failure is also caused by a qualifying event of Force Majeure as defined in this Agreement. In this respect, the compliance of any person contracting with the Contractor or MARS shall be deemed to be within the control of Contractor or MARS, as applicable;

(v) Work stoppages by Contractor's employees.

## *23. MISCELLANEOUS*

A. Headings. The section headings contained herein are for convenience of reference only and shall not control the interpretation of any term or condition hereto.

B. Severability. Any invalidity, in whole or in part, of any provision of this Agreement shall not affect the validity of any other of its provisions.

C. Cumulation of Remedies. All remedies available to either party for breach of this Agreement are cumulative and may be exercised concurrently or separately, and the exercise of any one remedy shall not be deemed an election of such remedy to the exclusion of other remedies.

D. Notices. Any notices, consents, waivers, demands, approvals, statements, or other communications, which this Agreement requires or permits either party to give the other shall be given in writing and shall be mailed by registered or certified mail, return receipt requested, postage prepaid, or delivered by nationally recognized overnight delivery service to the parties at their respective addresses below. Either party may change its mailing address at any time by giving notice of such change to the other party at least ten (10) days prior to the effective date of such change. All notices shall be deemed given (i) if by hand, on the date of receipted delivery or refusal to accept delivery, or the date delivery is first attempted but cannot be made due to a change in the address of which no notice was given or (ii) if by mail, on the date actually delivered, or (iii) if by overnight delivery service, on the next business day after delivery to a nationally recognized overnight delivery service.

To MARS: Attention: Commercial Manager - Warehouse Services
800 High Street
Hackettstown, NJ 07840
(908) 798-1000
steven.y.sheldon@effem.com

With a copy (which shall not constitute notice) to
Regional Distribution Manager
2019 North Oak Park Avenue
Chicago, IL 60707
(773) 892-7735
robert.coffey@effem.com

To MARS' Counsel: Edgar Pew
Associate General Counsel-North America
800 High Street
Hackettstown, NJ 07840
(908) 979-5863
Edgar.pew@effem.com

To Contractor: VP of Operations - MARS Account
Kenco Logistic Services, LLC
2001 Riverside Drive
Chattanooga, TN 37406
(423) 290-3749
paula.hise@kencogroup.com

To KENCO's Counsel: Corporate Counsel
Kenco
2001 Riverside Drive
Chattanooga, TN 37406
(423) 643-3215
ann.christopher@kencogroup.com

E. Waiver. Any waiver, express or implied, or any breach of any term, covenant or condition of this Agreement shall not be, or be construed to be, a waiver of any subsequent breach of any term, covenant or condition hereof on either the part of Contractor or MARS.

F. Nondiscrimination. Federal Contractors Requirements. To the extent they are applicable, this document incorporates the following clauses by reference: the Equal Opportunity clause relating to equal employment opportunity for all persons without regard to race, color, religion, sex or national origin, 41 C.F.R. §60-1.4; the Affirmative Action clause regarding disabled veterans and veterans of the Vietnam-era, 41 C.F.R. §60-250.5; the Affirmative Action clause, regarding obligations to disabled veterans, recently separated veterans, other protected veterans and armed forces service medal veterans, 41 C.F.R. §60-300.5, and the Affirmative Action clause regarding obligations to individuals with disabilities, 41 C.F.R. §60-741.5. Contractor certifies that it complies with the non-discrimination and affirmative action requirements of these clauses, and all applicable laws, regulations, amendments and orders; requires subcontractors, if any, to do the same; and warrants that all Products and/or Services provided hereunder are in full compliance with these regulations.

Furthermore, to the extent applicable, during the term of this Agreement, Contractor agrees to post the notice and abide by the provisions set forth at 29 C.F.R. Part 471 Appendix A and incorporated herein by reference.

G. Substance Abuse. Contractor warrants that, in performing the Management Services that are the subject of its Agreement with MARS, it will promulgate a substance abuse policy and program covering its employees. Upon MARS' request, Contractor will provide MARS with information concerning its policy and enforcement. In addition, as with all individuals entering the Warehouse, Contractor will exclude from the site any contract-affiliated persons who are reasonably suspected of being under the influence of alcohol or other behavior-modifying drugs.

H. Choice of Law; Forum. This Agreement shall be interpreted, construed and enforced in accordance with the laws of the state of Delaware without regard to its principles of conflicts of law. Any dispute, controversy or claim of any nature arising out of or relating to this Agreement shall be adjudicated in either the Federal District Court or the State Trial Court of Delaware and the parties hereby consent (and waive any challenge or objection) to the personal jurisdiction and venue of said Court and state. Seller expressly acknowledges and affirms that, for the purposes of applying the law of commercial and contractual transactions, the Uniform Commercial Code as adopted by Delaware shall be applicable.

I. Financial Statements. Upon MARS' written request, but not more frequently that once a year, Contractor shall promptly furnish MARS with financial statements reflecting Contractor's then-current financial condition prepared in accordance with generally accepted accounting principles and certified by a corporate officer of Contractor. Contractor represents and warrants that all financial and other statements and information supplied to MARS with respect to Contractor's business are true, correct and complete in all material respects, and that Contractor has and will maintain financial resources sufficient to full perform this Agreement. Contractor shall promptly notify MARS of any material adverse change in its financial condition, any anticipated change in its corporate structure, and any threatened or pending litigation that may adversely impact the ability of Contractor to perform under this Agreement.

J. Entire Agreement; Amendments. This Agreement together with the Appendices and Exhibits specifically referenced herein and attached hereto, as the same may be amended, modified or supplemented from time to time, embodies the entire understanding and agreement between MARS and Contractor in regard to the subject matter hereof, and entirely replaces and supersedes any and all other prior or contemporaneous agreements, contracts, understandings, conditions, or representations, oral or written, with reference to such subject matter. Except as otherwise specifically stated herein, no amendment or modification shall be of any force or effect unless: (a) it is reduced to writing and signed by both parties; and (b) is expressly referred to as being an amendment or modification of this Agreement in such writing.

K. Non-Solicitation. Except in the case of a termination of this Agreement by MARS pursuant to Section 13A or 13B, neither party, except by general advertisement, shall solicit or offer employment to any of the other party's employees who have been directly involved in this Agreement with a view to offering them employment either during the term of this Agreement or for a period of one (1) year thereafter without the prior written agreement of the other party.

L. Preparation. This Agreement shall not be construed for or against either party by reason of or any presumption of preparation by such party, and both parties acknowledge that this Agreement has been fully negotiated between them.

M. Attorneys' Fees. The prevailing party in any arbitration or other action to enforce any of the terms hereof shall be entitled, in addition to any other relief granted, to all actual out-of-pocket costs and expenses incurred by such prevailing party in connection with such action, including, without limitation, all reasonable legal fees, and a right to such costs and expenses shall be deemed to have accrued upon the commencement of such action.

N. Counterparts; Facsimile Signatures. This Agreement may be executed in multiple counterparts, each of which shall be deemed an original and together shall constitute one and the same instrument. Facsimile signatures shall be as valid as the original signatures. Signatures delivered by facsimile shall be followed by delivery of the original signed document.

O. Survival. Any obligation of a party that by its terms or nature arises at, or is intended to continue beyond, the expiration or termination of this Agreement or a Services Addendum shall survive the termination or expiration of this Agreement or Services Addendum.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed and do each hereby warrant and represent that their respective signatory whose signature appears below has been and is on the date of this Agreement duly authorized by all necessary and appropriate corporate action to execute this Agreement.

| **CONTRACTOR:** | **Mars Chocolate North America, LLC** |
|---|---|
| Dwight Crawley (signature) | (signature) |
| Signature | Signature |
| Dwight Crawley | Steven F. Sheldon |
| Typed Name | Typed Name |
| Chief Financial Officer | Commercial Manager |
| Title | Title |
| 4-18-13 | April 22, 2013 |
| Date | Date |

**APPENDIX A**
**To the**
**WAREHOUSE MANAGEMENT AGREEMENT**
**between**
**MARS**
**and**

## FINAL OPERATING BUDGET

Rates and Charges: MARS will pay Contractor for the Management Services in accordance with the rates and charges to be set forth in this Appendix A.
The final Operating Budget may be revised from time to time due to changes in the assumptions underlying the foregoing calculations, but only with the prior written approval of Mars, not to be reasonable withheld.

**APPENDIX B**
**TO THE**
**WAREHOUSE MANAGEMENT AGREEMENT**
**BETWEEN**
**MARS**
**and**

**SCOPE OF SERVICES**

**EXHIBIT 1 TO APPENDIX B
TO THE
WAREHOUSE MANAGEMENT AGREEMENT
BETWEEN
MARS
and**

**MARS' NORTH AMERICA QUALITY MANUAL**

**APPENDIX C**
**TO THE**
**WAREHOUSE MANAGEMENT AGREEMENT**
**BETWEEN**
**MARS**
**and**

**OPERATING ASSETS LIST**

The following are the Operating Assets for the purposes of Section 13H of the Agreement. This Appendix may be amended, modified, expanded or diminished only with the prior written consent of MARS. Any computer generated listing must be prepared in the following format:

**APPENDIX D**
**TO THE**
**WAREHOUSE MANAGEMENT AGREEMENT**
**BETWEEN**
**MARS**
**and**

**TRANSITION COSTS**

**Transition Costs:**

Contractor will incur certain costs and expenses during the transition period preparing to perform the Management Services ("Transition Costs"). MARS will pay Contractor for the Transition Costs in accordance with the rates and charges to be set forth in this Appendix D.

Prior to agreement between Mars and Contractor on the total Transition Costs, Contractor agrees to provide backup for Transition Costs as may be reasonably requested by Mars. At the conclusion of the sixty (60) day Transition period, Mars and Contractor agree to review and update the table set forth in Appendix D to reflect total actual Transition Costs, including approved Transition Costs in excess of or less than the total cost as set forth in this Appendix D.

**APPENDIX E**

**TO THE
WAREHHOUSE MANAGEMENT AGREEMENT
BETWEEN
MARS
and**

**2013 Vendor Incentive to be added at a later date**

**APPENDIX A**
**To the**
**WAREHOUSE MANAGEMENT AGREEMENT**
**between**
**MARS**
**and**

## FINAL OPERATING BUDGET

Rates and Charges: MARS will pay Contractor for the Management Services in accordance with the rates and charges to be set forth in this Appendix A.
The final Operating Budget may be revised from time to time due to changes in the assumptions underlying the foregoing calculations, but only with the prior written approval of Mars, not to be reasonable withheld.

The balance of this page intentionally left blank

Mars RFP Pricing Template

*Only Submissions in Excel, in this format, will be considered*

*Please note Mars only expects your inputs in blue cells, like this one*

| Categ | Cost Component | Cost Model | Quantity | Price per Piece | Annual Cost | Total Cost by Subsection | Mars Comments | 3PL Comments |
|---|---|---|---|---|---|---|---|---|
| *Storage Expense Section:* | | | | | | | | |
| | HVAC Maintenance & Repair | Pass Thru | | | $79,800 | $79,800 | 3PL to contract and pay vendor, then pass thru costs to M… | |
| Other Building, Land & Assets: | | | | | | | | |
| | BL&A: Warehouse Lease | Direct | | | | | Mars handles this directly | |
| | BL&A: Taxes | Direct | | | | | Mars handles this directly | |
| | BL&A: Fire Protection | Direct | | | | | Mars handles this directly | |
| | BL&A: Insurance | Direct | | | | | Mars handles this directly | |
| | BL&A: License & Business | Pass Thru | | | $0 | $0 | Mars provided the 2013 estimate. | Calculated into the BL&A costs included in "Other Misc Expense" below |
| | BL&A: Rack Expense/Amortization | Direct | | | | | Mars handles this directly | |
| System Expense (Transitional Period): | | | | | | | | |
| | System Related Equipment | Pass Thru | | | $0 | $55,934 | | |
| | System Related Equipment Maintenance & Repair | Pass Thru | | | $0 | | | |
| | System Related Site Preparation | Pass Thru | | | $46,500 | | | |
| | System Related Travel | Pass Thru | | | $9,434 | | | Three (3) weeks for IT resource on-site... Year 1 only |
| System Expense (Stable, Steady State): | | | | | | | | |
| | System Related Equipment | Pass Thru | | | $18,050 | $125,390 | Anticipate tune ups potentially required | |
| | System Related Equipment Maintenance & Repair | Pass Thru | | | $43,200 | | | |
| | System Related Site Preparation | Pass Thru | | | $57,851 | | | On-going support |
| | System Related Travel | Pass Thru | | | $6,289 | | Anticipate travel and tune ups potentially required | Four (4) trips annually for training of Power Users (2) |
| Utilities: | | | | | | | | |
| | Electric | Pass Thru | | | $487,407 | $596,997 | Mars provided the 2013 estimate | |
| | Gas | Pass Thru | | | $32,500 | | Mars provided the 2013 estimate | |
| | Waste Disposal | Pass Thru | | | $43,316 | | Mars provided the 2013 estimate | |
| | Water/Sewage | Pass Thru | | | $33,774 | | Mars provided the 2013 estimate | |
| Warehouse Expense: | | | | | | | | |
| | Alarm System Monitoring | Pass Thru | | | $15,434 | $339,370 | Mars provided the 2013 estimate | |
| | Guard Service / Security | Pass Thru | | | $262,080 | | | Two (2) guards on duty included on a schedule of 24/7 |
| | Pest Control Service | Pass Thru | | | $41,856 | | | Pest control cost would be on a two-year agreement with the vendor |
| | Fogging | Pass Thru | | | $0 | | | Not applicable in Manteno, as indicated on facility tour |
| | Insurance | Pass Thru | | | $0 | | | Covered in "Other Expense" section below |
| | Tax: Personal Property | Pass Thru | | | | | 3PL to pay taxes, then pass thru costs. No estimate need… | |
| | Trailer Repairs: Carrier | Pass Thru | | | $20,000 | | | |
| Maintenance & Repair: | | | | | | | | |
| | Maint. & Rep: Building / Sprinklers | Pass Thru | | | $264,997 | $670,350 | Mars provided the 2013 estimate | |
| | Maint. & Rep: Doors / Docks | Pass Thru | | | $90,479 | | Mars provided the 2013 estimate | |
| | Maint. & Rep: Grounds | Pass Thru | | | $86,396 | | Mars provided the 2013 estimate | |
| | Maint. & Rep: Sanitation | Pass Thru | | | $206,559 | | Mars provided the 2013 estimate | |
| | Maint. & Rep: Racks | Pass Thru | | | $19,919 | | Mars provided the 2013 estimate | |
| | Maint. & Rep: Other | Pass Thru | | | $2,000 | | Mars provided the 2013 estimate | |
| Equipment & Supplies: | | | | | | | | |
| | Floor Cleaning / Cleaning Supplies | Pass Thru | | | $54,900 | $125,039 | | Cleaning supplies, janitorial service for office, breakroom and restroom cleaning |
| | Pest Control | Pass Thru | | | $5,000 | | | Striping and sanitation lines upkeep, along with initial re-striping |
| | Safety | Pass Thru | | | $2,500 | | | Safety equipment, signage, training |
| | Lighting | Pass Thru | | | $6,000 | | | |
| | Other - Equipment & Supplies | Pass Thru | | | $56,639 | | | Cost for scrubber, golf cart (1), scissor lift, and stretchwrappers (2) |
| External Storage Sell Off Space: | | | | | | | | |
| | Market Price Charged to External Parties | Pass Thru | - | $0 | $0 | $0 | This is passing a credit back to Mars, based on the price t… | Not applicable in Manteno per Q&A response |
| | Fee Charged to Mars for the Service of Selling Space | Pass Thru | - | $0 | $0 | | What is the fee per pallet charged to Mars for selling our… | Not applicable in Manteno per Q&A response |
| *Handling Expense Section:* | | | | | | | | |
| Spotting (without labor): | | | | | | | | |
| | Outside Service | Pass Thru | | | $0 | $97,586 | | |
| | Cost / Lease | Pass Thru | | | $27,309 | | | |
| | Insurance | Pass Thru | | | $4,200 | | | |
| | Maintenance & Repair | Pass Thru | | | $15,135 | | | |
| | Fuel | Pass Thru | | | $50,943 | | | |
| Pallets: | | | | | | | | |
| ? | Pallets Purchase (GMA Grade A) | Pass Thru | 425,047 | $6.15 | $2,614,042 | $2,614,042 | | Current market rate for Grade A GMA pallets. Volume was given by Mars in Q&A |
| ? | Pallets Repair/Credit/Reimbursement | Pass Thru | | | $0 | | This is passing a credit back to Mars | |
| Operating Supplies: | | | | | | | | |
| | Dunnage / Dessicant | Pass Thru | | | $7,452 | $203,465 | Mars provided 2013 estimate? | |
| | Seals & Truck | Pass Thru | 27,360 | $0.125 | $3,420 | | | Basic plastic seals |
| | Supplies | Pass Thru | | | $55,531 | | Mars provided 2013 estimate? | |
| | Slipsheets | Pass Thru | 5,054 | $1.17 | $5,913 | | | Assume 5% replace for partial pallet shipments of inbound slips |
| | Reefer Refueling & Snack | Pass Thru | | | $66,454 | | | |
| | Stretchwrap | Pass Thru | 808,680 | $0.08 | $64,694 | | | |
| | Recycling Proceeds? | Pass Thru | | | $0 | | This is passing a credit back to Mars | Limited or no re-cycle opportunity, as indicated on tour. When re-cycle is implemented, Mars will be given the $$$ |
| CHEP Pallets: | | | | | | | | |
| | Issue Fee | Pass Thru | 34,695 | $2.650 | $91,941 | $137,739 | | Cost benchmarked against a Fenco-operated facility. Actual rates would have to be negotiated or utilize Mars' rates |
| | Delivery Fee | Pass Thru | 34,695 | $0.104 | $3,608 | | | Fuel Surcharge |
| | Transfer Charge | Pass Thru | 34,695 | $1.140 | $39,552 | | | |
| | Daily Rental Charge / Adjustment | Pass Thru | 90,838 | $0.047 | $4,269 | | | Quantity is days |
| | In Transit Charge / (Credit) | Pass Thru | 34,695 | -$0.047 | ($1,631) | | | |
| | Loss / Shortage Charge | Pass Thru | | | $0 | | | |
| Trailer Fumigation: | | | | | | | | |
| | Trailer Fumigation | Pass Thru | | | $0 | $0 | | Not applicable in Manteno, as indicated on facility tour. If needed, this would be a carrier expense |
| Product Destruction: | | | | | | | | |
| | Product Destruction | Pass Thru | | | $0 | $0 | | Cost of equipment and pickup would be provided by feed company. Fenco's labor is already included in labor sectio… |
| Payroll/Labor: (only include if applicable) | | | | | | | | |
| | Management/Overhead (GM, Operations, Facilities, etc | Pass Thru | 2.0 | $121,742 | $243,484 | $4,669,859 | | General Manager (1), Operations Manager (1) |
| | Warehouse Supervisor | Pass Thru | 5.0 | $90,312 | $451,559 | | | Warehouse Supervisors |
| | Clerical | Pass Thru | 6.0 | $27,477 | $164,864 | | | See org chart |
| | - Clerical Overtime | Pass Thru | 6.0 | $4,666 | $27,994 | | This should not include Customer Service | |
| | Team Leader(s) | Pass Thru | 7.0 | $44,785 | $313,493 | | | See org chart |
| | - Team Leader(s) Overtime | Pass Thru | 7.0 | $4,710 | $32,973 | | | |
| | Warehouse Associates | Pass Thru | 50.0 | $43,515 | $2,175,745 | | | See org chart |
| | - Warehouse Associates Overtime | Pass Thru | 50.0 | $4,312 | $215,599 | | | |
| | Spotting | Pass Thru | 6.0 | $47,643 | $285,860 | | Labor should not be included in the above "Spotting" sect… | |
| | - Spotting Overtime | Pass Thru | 6.0 | $5,606 | $33,638 | | Labor should not be included in the above "Spotting" sect… | |
| | Support/Other | Pass Thru | 4.0 | $81,154 | $324,615 | | | Office Supervisor (1), Quality/Industrial Engineer (1), Power Users (2) |
| | - Support/Other Overtime | Pass Thru | - | $0 | $0 | | | |
| | Customer Service | Pass Thru | - | $0 | $0 | | Customer Service should not be included in the Clerical li… | Out of scope per information during site visit |
| | Annual Bonus | Pass Thru | 80.3 | $1,566 | $125,700 | | | Bonus plus employee benefits |
| | Maintenance & Repair / Safety Champion | Pass Thru | 2.0 | $55,765 | $111,531 | | | Category changed from Human Resources. Added per presentation meeting with Mars |
| | Payroll processing | Pass Thru | - | $0 | $24,019 | | Explain any "Other" payroll costs | Cost for Fenco to process the weekly payroll |
| | Cycle Count Personnel | Pass Thru | 1.0 | $44,360 | $44,360 | | Explain any "Other" payroll costs | Count entire facility once per quarter |
| | Lean Champion | Pass Thru | 1.0 | $94,426 | $94,426 | | Explain any "Other" payroll costs | Track and administer Lean objects and projects throughout warehouse and office |
| Management Fee: | | Direct | | | 7% | | To be entered as a percentage. Example: Pass through… | |
| Material Handling: | | | | | | | | |
| | MHE Lease/Amortization? | Direct | | | | $72,273 | Mars handles this directly | |
| | MHE Maintenance & Repair | Pass Thru | | | $72,273 | | Mars provided 2013 estimate | |
| | MHE Short Term Material Handling Rental | Pass Thru | | | $0 | | | With the equipment that is on-hand, no equipment should be needed |
| Uniforms & Warehouse: | | Pass Thru | | | $0 | $0 | | Not Applicable |
| Office Expense: | | | | | | | | |
| | Telephone (Local & Long Distance | Pass Thru | | | $37,570 | $99,594 | Mars provided 2013 estimate | Assume that this cost is the base service and the telephone charges would be in addition to this cost and passed thru |
| | Travel & Entertainment | Pass Thru | | | $12,250 | | | Travel for site management and personnel to travel to Mars and Fenco Corporate Office |
| | Maintenance & Repair | Pass Thru | | | $2,700 | | | If Mars equipment has maintenance included in rate, this cost would be zero |
| | Office Equipment | Pass Thru | | | $0 | | | Provided by Mars, based on tour information |
| | Office Furniture | Pass Thru | | | $0 | | | Provided by Mars, based on tour information |
| | PC Software | Pass Thru | | | $0 | | | Provided by Mars, based on tour information |
| | Postage/Subscriptions/Other | Pass Thru | | | $5,250 | | | |
| | Freight (Overnight / UPS) | Pass Thru | | | $0 | | | |
| | Office Supplies | Pass Thru | | | $41,825 | | | Estimate based on staffing level |
| Miscellaneous Expense: | | | | | | | | |
| | Employee Relations | Pass Thru | | | $1,680 | $471,045 | | Two (2) events annually |
| | Pre-Employment/Medical Testing | Pass Thru | 91.3 | $437 | $39,861 | | | Average of $437 per associate for hiring cost |
| | Training | Pass Thru | | | $27,688 | | | |
| | Other - Miscellaneous Exp. | Pass Thru | | | $401,816 | | 3PL explanation required for any entry on this line | G&A |
| Warehouse Fumigation: | | | | | | | | |
| | Whole Wharehouse Fumigation | Pass Thru | | | $0 | $0 | This would be event driven, and only as needed | Not applicable in Manteno, as indicated on facility tour |
| External Handling Sell Off Space: | | N/A | | | | | 3PL retains the handling fee charged to the 3rd party | |
| Other Expense Section: | | | | | | | | |
| Insurance: | | | | | | | | |
| | General Liability | Pass Thru | | | $56,993 | $94,143 | From RFP Brief Attachment F | |
| | Warehouseman's Legal Liability | Pass Thru | | | $37,150 | | From RFP Brief Attachment F $25M requirement | |
| Amortization Percentage: | | | | | | Prime plus 2.0% | In the event Mars requests the 3PL to amortize an expen… | |
| Payment Terms: | | | | | | 90 days | What payment terms are offered? Net 90 preferred, but… | |

| | |
|---|---|
| Total Costs | $10,452,626 |
| Management Fee | $679,420.68 |
| Grand Total Costs | $11,132,047 |

$576,538 6.5% on all expenses except pallets. Pallets are calculated at 3%

1 The only property taxes included in the Contractor proposal are for the equipment that was purchased by the Contractor. Mars is responsible for all other property taxes

Continuous Improvement:

- Effective in Year 2 of this agreement, Kenco shall actively seek opportunities for continuous improvement in its warehouse management practices for application in the Services provided hereunder. For each year, periods 1-13, as part of Kenco's continuous improvement efforts, Kenco will achieve either 1) efficiency improvements of 5% to the sites budgeted productivity for warehouse and contract labor personnel, or 2) savings of $85,000 to the site budget. The parties acknowledge that the budget is built on certain volume and order profile expectations and mutually agree to evaluate the impact of certain business profile parameters on productivity. The parties agree that these cost savings are cumulative and, as such, any cost savings achieved by Kenco in excess of the goal for a given year will carry over to the next year and will be applied as a credit to the cost savings goals for the following year. In the event that the cost savings goal is not met for a given year, the parties will calculate the difference between the savings goal and actual savings, and Kenco will reimburse the difference to Mars based upon a mutually agreed upon reconciliation.

**APPENDIX B**
**TO THE**
**WAREHOUSE MANAGEMENT AGREEMENT**
**BETWEEN**
**MARS**
**and**

## SCOPE OF SERVICES

The scope of services is the receipt, warehousing, yard management, and fulfillment of order for Goods.

The following are specifically out of scope:

- Inbound and Outbound Transportation
- Material Handling Equipment leasing
- Mars WMS (MARC, Red Prairie, or SAP) and IT Infrastructure
- Facility leases
- Various small categories (ex – facility and grounds maintenance)

Services:

- Contractor shall perform only those Services that are set forth herein in accordance with Mars communicated standards and guidelines. Contractor shall ensure that its SOP's and performance hereunder are in compliance with such standards and guidelines.
- Mars may, at any time, request changes to the Services through the Change Order process. Each such Change Order shall be executed by authorized representatives of both Mars and Contractor and shall be deemed an amendment to the applicable scope of work.
- Mars may invite Contractor to bid on services not included within the scope of work. In the event that Mars elects to retain Contractor to perform such additional services, the parties agree that a new scope of work shall be entered into by the parties to address such work.
-

Inbound:
A significant percentage of the inventory will be shipped to the Warehouse on quality hold, as specified in the Mars WMS and not immediately available for customer orders. Inventory will be released by MARS' Quality Assurance associates either in transit to the Warehouse or after receipt. The Goods shall include Wrigley, and any other applicable subsidiary of Mars, inventory which will most often arrive in a released status. There will be times when inventory either needs to be placed on hold status or released from hold status and this will be via a notification to the Warehouse via request by Phone, Fax, Internet, E-Mail and/or EDI from MARS and upon such notification the Warehouse will manually update the status in the WMS system. Chicago/Burr Ridge material is not in WMS, it is in SAP. Wrigley, and other applicable subsidiaries of Mars, outside overflow storage is housed in the Contractor's WMS.

The Inbound process is:

- A carrier will be identified by MARS to handle Inbound trucking from manufacturing, import or other MARS regional distribution centers.
- All Chocolate inbound carrier arrivals are preceded by an ASN notice of shipment including inventory description and code date and quantity. Wrigley, other applicable subsidiaries of Mars, Mars Chocolate Co-pack and Co-manufacturing inbound arrivals will not have an ASN.
- The carrier arrives at the Warehouse and is gated, as defined by the applicable SOP, in by the Contractor.
- The truck is either put directly in a door for immediate unloading or dropped in yard for unloading later in shift.
- The Contractor will move the trailer from the yard to the door for unloading when loads are "dropped" by carrier.

- Contractor reviews Advance Notice of Receipt against the actual inbound receipt for correct item UPC, item quantity, item lot, zone within MARS' WMS and generates the putaway locations when ready to begin unloading.
- All pallets must be scanned at the door, MARS' WMS then generates a put away location for the forklift operator.
- Contractor will inspect all inbound trailers for visible damage. If the trailer is visibly damaged or trailer number does not match Bill of Lading ("BOL"), Contractor will note on BOL and timely contact Mars providing necessary detail to receive instructions for processing the trailer.
- All inbounds will be inspected for apparent over, short and damage and processed per Mars' guidelines.
- If any product posses an infestation threat or is hazardous, as defined by applicable law which would include poisons, flammables, or explosives, Mars will make best efforts to remove such material from the facility immediately, and make every reasonable effort to remove such material within one business day of Contractor's notification to Mars of such.
- The Contractor proceeds to the putaway location and confirms on the RF unit that the pallet is putaway, the RF unit instructs the forklift operator to move to the next task.
- Contractor will pick up inbounds for the on-site co-packer as designated by Mars WMS

Outbound:

- Outbound customer shipments will be a combination of approximately 80% straight pallets of 1 item and 20% pallets containing multiple items built by Contractor (case-pick).
- Outbound orders are processed through the Mars WMS for shipment.
- The Mars WMS directs the forklift operator to specific locations within the Warehouse to build customer orders. This may be full pallets from bulk storage or in the example of case pick; the operator will be given specific commands to build pallets from multiple items. Once a pick-pallet is complete it is shrink- wrapped, labeled and moved to the staging area for shipment. Straight pallets of 1 item will be moved directly from a location within bulk storage area to staging for outbound shipment. A count back procedure or manual physical audit process shall be implemented when picking case pick orders.
- Contractor will utilize the Transportation Management Execution System, as provided by Mars, for tendering shipments to carriers.
- Contractor is responsible for facilitating on-time carrier performance of pick up of shipments and managing 3PL/Warehouse/Carrier relationship with performance management through Mars Distribution Manager.
- Contractor is responsible for inspecting trailers for cleanliness, in accordance with Mars Quality Manual, prior to loading.
- Contractor is responsible for loading trucks according to Mars instructions, per a mutually approved SOP.
- From the staging area or directly from picking, pallets are loaded to the truck, scanned out and the truck ID is manually input to the RF gun.
- The spotter moves the trailer from door to the location within the yard (for drop orders) or moves the trailer directly to the gate for pick up if live load.
- Contractor must place seals on each load prior to leaving the yard.

Additional notes:

- Inventory will frequently be received on quality hold status within the Mars WMS. Once inventory is released by MARS' QA associates, the Mars WMS will be updated automatically making inventory available for shipment to customers.
- Contractor shall design the layout in the Mars WMS to maximize efficiencies through zoning and reduction of travel time within the space operated by the Contractor.
- Contractor shall establish a case pick area considering product dimensions and volume projections as provided by Mars to maximize efficiency of the operation.
- The WMS will generate replenishment moves from bulk storage into case pick area as needed.
- Contractor shall provide a daily operation report to MARS' Regional Distribution Manager as well as ad hoc reports as requested in a mutually agreed upon timeframe.
- Contractor will move and stage product to the on-site co-packer as determined by Mars WMS.

Inventory Management

- Contractor shall perform cycle counts as requested and in accordance with Mars guidelines.
- The cycle count process for Wrigley items requires a frequency of 1x every 60 days, vs MARS' Goods of 1x every 90 days. The Wrigley cycle count process requires blind counts, whereas, the MARS process provides item information for the location being counted. Cycle counts for other subsidiaries will be mutually agreed upon by the parties.
- Contractor will maintain a segregated area for damaged product, on hold and awaiting pick-up or disposal.
- Contractor is responsible for tracking CHEP pallet movements to and from the warehouse and will reconcile CHEP pallet inventory levels within a mutually agreed upon time frame.
- Contractor will follow Mars' guidance and direction as it pertains to product holds, nonconforming products, recalled products, and expired products.

Warehouse Standards:

- Records must be kept in compliance with local, state, and Federal legislation.
- Contractor shall maintain documented procedures that describe how they will meet the standards below:
  - Contractor shall perform tracing hold and release by receiving a request by an authorized Mars representative via Phone (live voice, no voicemail messages), Fax, Internet, E – Mail, EDI 24 hours/day, 7 days/week.
  - Contractor shall perform tracing hold and release by receiving a request with any of the following: Batch code, serial shipping container code, best-before date, bill of lading, pallet license plate number.
  - The Mars WMS is capable of maintaining multiple hold status independent of volumes.
  - Contractor shall trace Goods within a 4-hour period upon the request of an authorized Mars representative.
  - Contractor shall be able to trace 24 hours a day / 7 days a week.
  - For those warehouses that do not operate 24/7, there must be a tracing procedure in place (names, contact hierarchy, email address, and telephone numbers (cell and/or home) for all incidents outside normal opening time.
  - Contractor shall identify full dispatch details, address, date of dispatch, quantities cases, carrier, and trailer number.
- Contractor is responsible for arranging facility maintenance, pest control and sanitation. Contractor will ensure that the facility is serviced by a licensed pest control operator.
- Contractor is responsible for monitoring facility temperatures with Mars provided equipment to ensure all products are stored according to the Mars supplied quality agreement.
- Contractor will adhere to security requirements as provided by Mars.

Quality:

- Contractor will comply with the Mars North American Quality Agreement as set forth in Appendix 1 to Exhibit B. Mars will notify Contractor when any material charges are made to this Appendix.
- Contractor will ensure that the facility is registered with the US Food and Drug Administration.
- Contractor will maintain training records, sanitation logs and temperature charts for seven (7) years.

**Key Performance Indicators, Forecasting, and Reporting**

- Contractor will report KPIs to Mars no later than the 5th business day of each period using the following calculations:

Contractor will be held accountable for the following KPI's as outlined below:

| KPI | Chocolate | Food |
|---|---|---|
| **Operations** | | |
| Rec & Put Away (standard shipments) | < 48 hrs | < 48 hrs |
| Rec & Put Away (priority shipments) | < 12 hrs | < 12 hrs |
| Load Ready Time Compliance | 99% | 99% |
| Over, Short & Damage | < 2.0% | < 2.0% |
| Warehouse Cuts | 10% | 10% |
| Warehouse Loss & Damage | < 0.005% | < 0.005% |
| Cycle Count Accuracy | 99.7% | 99.7% |
| Productivity (t-put pallets per man hour) | > 7.85 | |
| **Customer Service** | | |
| Required Response Time | < 1 hr | < 1 hr |
| Orders Appointed (OTR Planned) | > 95% | > 95% |
| Order/Invoice Accuracy | N/A | N/A |
| Orders Tendered | < 2 hrs | < 2 hrs |
| Truck Weight (lbs) | > 30,000 | > 30,000 |
| Truck Cube | > 1,460 | > 1,460 |
| OTA | 92.50% | 0.925 |
| **Management/Site** | | |
| Safety/OSHA Reportables (TRIR) | < 5.5 | < 5.5 |
| Mars Quality & Food Safety (Q&FS) Audit | > 99% | > 99% |

- Productivity is measured by Total Throughput Pallets/Hour. The average goal for the entire year is 7.85 pallets /hour and we will have a progressive target to this metric to account for a learning curve:
- P5 Pallet/Hour Target = 85% of avg (6.67)
- P6 Pallet/Hour Target = 90% of avg (7.06)
- P7 Pallet/Hour Target = 95% of avg (7.45)
- Contractor will provide reporting on a mutually agreed upon time frame for an agreed upon set of volume, profile, and service metrics.
- Mars and Contractor acknowledge that volumes, inventories, and/or space requirements may fluctuate from month to month as a result of demand, seasonality, unexplained, or unanticipated events. Mars also acknowledges that its ability to accurately forecast operation volumes could ultimately affect Contractor's information of forecasted operation volumes (to be mutually defined), schedule changes, or any other issue that may have an effect on Contractor's performing its obligations and pricing under this agreement. Mars will:
    - Deliver an annual forecast at least 3 months prior to the beginning of each calendar year during the term of this agreement.
    - Deliver a period forecast on a rolling basis.

**Operating Assumptions**

Goods may be received via several different sized trailers. Goods are received on CHEP pallets, wood pallets, and slip sheets.

Inbound receipts:

- Inbound Goods arrive directly from the MARS' production facility; approximately 68% on slip sheets, 5% on CHEP and 27% on GMP pallets.
- Current outbound order profile is as follows: 80% straight pallets and 20% of pallets containing multiple items.
- Live unloads must be unloaded within 2 hours of arrival at the gate, during scheduled hours of operation.

**Volume Assumptions:**

Category-Inbound

| PD | Trucks | Tonnes | Pounds | Pallets | Cases |
|---|---|---|---|---|---|
| 1 | 1,190 | 11,784 | 25,979,180 | 39,832 | 1,635,508 |
| 2 | 1,097 | 13,612 | 30,010,681 | 37,277 | 1,818,191 |
| 3 | 1,228 | 15,504 | 34,180,481 | 52,130 | 2,024,296 |
| 4 | 1,473 | 15,644 | 34,489,971 | 54,509 | 2,223,852 |
| 5 | 1,635 | 18,846 | 41,548,986 | 59,971 | 2,309,570 |
| 6 | 1,845 | 19,517 | 43,027,813 | 69,045 | 2,272,889 |
| 7 | 1,780 | 19,547 | 43,094,301 | 63,885 | 2,228,324 |
| 8 | 1,729 | 20,383 | 44,937,365 | 64,001 | 2,505,817 |
| 9 | 1,581 | 16,178 | 35,667,851 | 53,540 | 2,316,301 |
| 10 | 1,604 | 16,547 | 36,481,054 | 54,586 | 2,366,577 |
| 11 | 1,488 | 15,204 | 33,518,960 | 48,048 | 2,172,604 |
| 12 | 1,354 | 13,727 | 30,262,923 | 44,189 | 2,067,337 |
| 13 | 1,459 | 13,751 | 30,315,901 | 48,738 | 2,020,529 |
| **Totals** | **19,463** | **210,244** | **463,515,467** | **689,751** | **27,961,795** |

Category-Outbound

| PD | Orders | Trucks | Tonnes | Pounds | Avg. Lines | Pallets | Cases | Case pick cases |
|---|---|---|---|---|---|---|---|---|
| 1 | 2,553 | 1,110 | 13,729 | 30,267,989 | 6.9 | 41,569 | 1,869,245 | 258,188 |
| 2 | 2,256 | 1,038 | 12,992 | 28,643,488 | 8.8 | 36,119 | 1,677,156 | 321,825 |
| 3 | 2,360 | 1,252 | 16,401 | 36,158,318 | 9.3 | 47,743 | 1,908,594 | 352,823 |
| 4 | 2,400 | 1,268 | 15,556 | 34,295,675 | 7.9 | 48,627 | 1,862,630 | 263,390 |
| 5 | 2,660 | 1,363 | 18,454 | 40,684,727 | 7.9 | 54,365 | 2,244,627 | 295,362 |
| 6 | 2,935 | 1,429 | 21,346 | 47,060,353 | 7.4 | 59,270 | 2,272,835 | 323,018 |
| 7 | 2,748 | 1,378 | 20,889 | 46,053,022 | 7.6 | 62,667 | 2,272,765 | 294,936 |
| 8 | 2,899 | 1,580 | 21,516 | 47,435,150 | 7.5 | 70,367 | 2,508,912 | 300,974 |
| 9 | 2,760 | 1,475 | 20,184 | 44,499,580 | 8.3 | 60,096 | 2,238,379 | 317,989 |
| 10 | 2,932 | 1,521 | 20,237 | 44,616,196 | 8.9 | 60,704 | 2,478,631 | 376,494 |
| 11 | 2,661 | 1,298 | 16,561 | 36,511,490 | 8.3 | 47,994 | 2,147,514 | 350,835 |
| 12 | 2,848 | 1,305 | 16,763 | 36,956,753 | 7.3 | 46,843 | 2,173,763 | 343,942 |
| 13 | 3,065 | 1,371 | 17,802 | 39,247,005 | 6.8 | 52,875 | 2,117,627 | 312,861 |
| **Totals** | **35,077** | **17,388** | **232,431** | **512,429,746** | **7.9** | **689,239** | **27,772,678** | **4,112,637** |

MARS anticipates volume growth of approximately 4 % - 5 % per year.

**Facility:**

The Warehouse is approximately 571,000 sq ft. The facility is racked with approximately 79,000 pallet positions. The site is defined as at capacity when volume hits 85% of the racked positions. Contractor operates in approximately 478,000 sq ft.

**Min Inventory:** 44,000 pallets
**Avg Inventory:** 58,500 pallets
**Max Inventory:** 75,500 pallets

**Orders:**

Customer orders will be received throughout the day Monday through Friday. Customer orders are picked, staged, and shipped on daily basis subject to customer order volume. Inbound product received on slipsheets will need to be palletized at receipt, prior to put-away, on GMP white wood pallets. Prior to shipping to the Customer, the Contractor, as directed by the Mars WMS, may need to transfer Goods from GMP white wood pallets to CHEP pallets before shipping.

Case fill will be optimized to include product that arrives on site within 16 hours of planned outbound departure.

**General:**

Hours of Operation:

- Minimum business hours are 7:00 AM to 5:30 PM U.S. CST, Monday through Friday for office personnel.
- Warehouse operations are expected to tender orders to Mars designated carriers so to facilitate delivery of all customer orders on time to appointment.
- Contractor shall support emergency requests or occasional volume spikes beyond normal business hours and days of operation
- Contractor shall have a 7 day by 24 hour communication plan

Holidays:

Observed holidays will mirror Mars U.S. Holiday Schedule, which may vary from year to year but generally includes: New Years Day, Memorial Day, Independence Day, Labor Day, Thanksgiving Day, the Day after Thanksgiving, Christmas Eve, Christmas Day, and one floating holiday.

Material Handling Equipment ("MHE") maintenance is the responsibility of the Contractor, however MARS shall reimburse Contractor for such costs. All MHE must be maintained in accordance with the MHE lease which MARS shall provide to Contractor. Contractor may select the maintenance provider, however, the selection will be reviewed by MARS' MHE Services Auditor.

**Contractor WMS (WES) System:**

If for any reason the Services Agreement is terminated, CONTRACTOR agrees to provide transition assistance to MARS as outlined below.

1. CONTRACTOR agrees to leave the Contractor WMS operating on our servers supporting the Mars's site or sites until such time as Mars makes a decision on the successor WMS system that will be used in its sites. CONTRACTOR will provide user help desk support for any installed instances of the Contractor WMS and will assist Mars in making a smooth transfer and conversion of its data and history to the new software system.

Modifications to the Contractor WMS system will not be made if another 3PL or operator assumes operation of the warehouse during the interim period. The interim period begins on the date that the Services Agreement ends and continues for a period not to exceed 9 months. The software will be used "as is" during the interim period. Contractor will continue to provide software support to Mars during the interim period for a monthly software maintenance fee to be negotiated between the parties. Fees will depend on amount of data being stored, number of sites using the WMS, and other costs related to providing the WMS to Mars. In the event of non-payment of the monthly maintenance fees by the invoice due date, Contractor may suspend all access to the system.
Any new interfaces between WES and another operator's systems will be estimated and priced per hour at the then prevailing hourly billing rate for Contractor's IT services. Payment of invoices for interfaces is required in advance of

any work being performed.

2. CONTRACTOR will assist with the Mars's I.T. staff to protect Mars data residing on the Contractor WMS servers. See section 4 for details.

3. Contractor will assist the Mars's I.T. staff in transferring Mars data to the new WMS servers at such time as the new system is ready to receive this data. Data will be copied to CD or tape and sent via overnight courier. Fees for this assistance will either be factored into the monthly software maintenance fee outlined in Section 1 above, or will be priced per hour at the then prevailing hourly billing rate for Contractor's I.T. services. Invoices for data conversion fees will be based upon an estimate prepared by the Contractor IT staff. Payment for data conversion invoices is required in advance of any work being performed.

4. Contractor will retain a copy of Mars's data on the Contractor WMS server until Mars indicates, in writing, that data has transferred successfully to the new server environment. Upon receipt of this written confirmation, Contractor will delete all Mars data files from our WMS servers. During the interim period, Contractor is relieved of all responsibility and obligation to maintain Mars data, and any liability related to retaining Mars's data.

5. Real-time data backup will remain in place during the interim period. Fees for the use of these data protection services will be factored into the monthly software maintenance fee outlined in Item 1 above.

6. Mars shall continue to pay the cost of data connectivity to the Contractor data center from its wide area network. In the event of non-payment of the connectivity fees by the invoice due date, Contractor may suspend all access to the system.

7. Contractor will retain Mars ship of the WMS source code. In no circumstances will Mars have right to the WES source code as a result of paying license fees for the use of this software.

Representation/Warranty – Contractor represents and warrants (i) that the IT services performed pursuant to this Agreement will be performed in a professional manner by individuals qualified to perform such work; (ii) that Contractor has no obligations, legal or otherwise, inconsistent with the terms of this Agreement or with Contractor's undertaking this relationship with MARS; (iii) that the performance of the IT services called for by this Agreement do not and will not violate any applicable law, rule or regulation or any proprietary or other right of any third party; and (iv) that Contractor has not entered into any agreement in conflict with this Agreement.
NOTWITHSTANDING THE ABOVE, CONTRACTOR MAKES NO WARRANTIES, EXPRESSED OR IMPLIED, INCLUDING BUT NOT LIMITED TO, THE IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, ASSOCIATED WITH THE IT SERVICES AND/OR ANY SPECIFIC IT PROJECT.

**EXHIBIT 1 TO APPENDIX B**
**TO THE**
**WAREHOUSE MANAGEMENT AGREEMENT**
**BETWEEN**
**MARS**
**and**

**MARS' NORTH AMERICA QUALITY MANUAL**

Contractor will follow the Quality & Food Safety Standards for Transport & Storage of Mars NA Semi-finished Wrapped and Finished Goods Quality Manual
September 2012

# APPENDIX C
# TO THE
# WAREHOUSE MANAGEMENT AGREEMENT
# BETWEEN
# MARS
# and

## OPERATING ASSETS LIST

The following are the Operating Assets for the purposes of Section 13H of the Agreement. This Appendix may be amended, modified, expanded or diminished only with the prior written consent of MARS. Any computer generated listing must be prepared in the following format:

## Contractor Asset Listing:

| | Item Description | Leased from | Leased amount (monthly) | Lease Terms | Kenco paid amount | Penalties | Notes |
|---|---|---|---|---|---|---|---|
| 1 | 2014 Ottowa Yard Spotter | Ryder | $ 2,276.00 | 24 months | $ - | $ 2,276 would need to be paid monthly, until its relocated to new operation | |
| 2 | Tennant Model 7300 Electric Scrubber | KFS | $ 720.00 | 60 months | $ - | $720 would need to be paid through the 60 months. | |
| 3 | 2010 Kalmar Ottowa Yard Spotter<br>Scissors Lift<br>Golf Carts (2) | | | | $ 51,690.00 | | Kenco will buy this from 4T's and pass expense through to Mars. See Depreciable tab for details |
| 4 | MHE Batteries (56) | Wells Fargo | $ 7,466.48 | 60 months | $ - | Remaining lease will have to be paid out | Lease started in July 2012 ends July 2017 |
| 5 | MHE Batteries (56) | Raymond | $ 8,097.60 | 60 months | $ - | Remaining lease will have to be paid out | Lease started in July 2011 ends July 16 2016 |
| 6 | Cascade Carton Clamp | KFS | $ 388.00 | 24 months | $ - | $ 388 would need to be paid through the 24 months | |
| | **IT Equipment** | | **Total Amount** | | | | |
| | (3) Laptop Computers | | $ 9,929.93 | 36 months | $ - | In the event that Kenco's assignment is ended after the 24 months, the site will continue to pay for equipment until it can be re-located to another site | |
| | (5) UPS / (2) Printers | MCA | $ 1,570.11 | 36 months | $ - | | |
| | (1) UPS / (1) Printer | | $ 262.21 | 36 months | $ - | | |
| | (3) Zebra Printers | BARCOM | $ 4,773.46 | 36 months | $ - | | |
| | Misc Juniper / SRX Services Gateway 220 | | $ 3,977.08 | 36 months | $ - | | |
| | Misc Juniper and support equipment | Enteredge | $ 3,989.81 | 36 months | $ - | | |
| | | | $ 24,502.60 | | | | |

DEF000040

**Contractor Asset Amortization Schedule:**

AMORTIZATION SCHEDULE - Normal Amortization

| | Date | Payment | Interest | Principal | Balance |
|---|---|---|---|---|---|
| Loan | 5/1/13 | | | | 51,690.00 |
| 1 | 6/1/13 | 2,469.56 | 226.14 | 2,243.42 | 49,446.58 |
| 2 | 7/1/13 | 2,469.56 | 216.33 | 2,253.23 | 47,193.35 |
| 3 | 8/1/13 | 2,469.56 | 206.47 | 2,263.09 | 44,930.26 |
| 4 | 9/1/13 | 2,469.56 | 196.57 | 2,272.99 | 42,657.27 |
| 5 | 10/1/13 | 2,469.56 | 186.63 | 2,282.93 | 40,374.34 |
| 6 | 11/1/13 | 2,469.56 | 176.64 | 2,292.92 | 38,081.42 |
| 7 | 12/1/13 | 2,469.56 | 166.61 | 2,302.95 | 35,778.47 |
| 2013 Totals | | 17,286.92 | 1,375.39 | 15,911.53 | |
| | | | | | |
| 8 | 1/1/14 | 2,469.56 | 156.53 | 2,313.03 | 33,465.44 |
| 9 | 2/1/14 | 2,469.56 | 146.41 | 2,323.15 | 31,142.29 |
| 10 | 3/1/14 | 2,469.56 | 136.25 | 2,333.31 | 28,808.98 |
| 11 | 4/1/14 | 2,469.56 | 126.04 | 2,343.52 | 26,465.46 |
| 12 | 5/1/14 | 2,469.56 | 115.79 | 2,353.77 | 24,111.69 |
| 13 | 6/1/14 | 2,469.56 | 105.49 | 2,364.07 | 21,747.62 |
| 14 | 7/1/14 | 2,469.56 | 95.15 | 2,374.41 | 19,373.21 |
| 15 | 8/1/14 | 2,469.56 | 84.76 | 2,384.80 | 16,988.41 |
| 16 | 9/1/14 | 2,469.56 | 74.32 | 2,395.24 | 14,593.17 |
| 17 | 10/1/14 | 2,469.56 | 63.85 | 2,405.71 | 12,187.46 |
| 18 | 11/1/14 | 2,469.56 | 53.32 | 2,416.24 | 9,771.22 |
| 19 | 12/1/14 | 2,469.56 | 42.75 | 2,426.81 | 7,344.41 |
| 2014 Totals | | 29,634.72 | 1,200.66 | 28,434.06 | |
| | | | | | |
| 20 | 1/1/15 | 2,469.56 | 32.13 | 2,437.43 | 4,906.98 |
| 21 | 2/1/15 | 2,469.56 | 21.47 | 2,448.09 | 2,458.89 |
| 22 | 3/1/15 | 2,469.56 | 10.67 | 2,458.89 | 0.00 |
| 2015 Totals | | 7,408.68 | 64.27 | 7,344.41 | |
| | | | | | |
| Grand Totals | | 54,330.32 | 2,640.32 | 51,690.00 | |

Last interest amount decreased by 0.09 due to rounding.

Manteno Site Support Vendor Contracts:

| VENDOR | Type of Svc | Status | Main Contact | Phone | Email | Term | $ Exposure >24 months | Exit option |
|---|---|---|---|---|---|---|---|---|
| Aqua Illinois | Utility City water to whse. | Complete | Customer Service | 877-987-2782 | n/a | monthly | $ - | on notice |
| City of Kankakee | Utility Sewer discharge Pat Schatz 815-933-0487 | Complete | Pat Schatz | 815-933-0487 | peschatz@citykankakee-il.gov | monthly | $ - | on notice |
| Nicor Gas | Utility Nat gas delivery pipes | Complete | Customer Service | 630-983-4040 | | monthly | $ - | on notice |
| Orkin | Pest control | Complete | Kevin Haddox | 980-253-0114 | khaddox@rollins.com | 24 months | $ - | Kenco Corporate Agreement |
| S&K Security | Security Alarm System Burg | Complete | Steven Dehaan | 708-946-6133 | sandksecurity@hotmail.com | 12 months | $ - | 30-day notice |
| SDG | Security Guard Service | Complete | Thomas Harwood | 815-509-5360 | thomash@sdgglobalinc.com | 12 months | $ - | 30-day notice |
| Staples | office supplies | Complete | Heather Walker | 865-859-0352 | Heather.Walker@Staples.com | Kenco Corporate Agreement | $ - | Kenco Corporate Agreement |
| Xpedx | Pallets | Complete | Cindy Butler | 423-240-9271 | cindy.butler@ipaper.com | Kenco Corporate Agreement | $ - | Kenco Corporate Agreement |
| Xpedx | warehouse and packaging supplies | Complete | Cindy Butler | 423-240-9271 | cindy.butler@ipaper.com | Kenco Corporate Agreement | $ - | Kenco Corporate Agreement |
| Access One | Utility Local/Long distance phone svc. | Forms in Process, on schedule | Alison Balthazor | 312-441-9959 | ABalthazor@accessoneinc.com | 24 months | $ - | 24-months, can cancel if cease operations |
| Grainger | misc materials | Forms in Process, on schedule | Amy Stewart | | | Kenco Corporate Agreement | $ - | Kenco Corporate Agreement |
| Constellation Gas | Utility Gas | Forms Submitted, on schedule | Phyllis DeCoste | 262.506.6617 | Phyllis.DeCoste@constellation.com | month to month | $ - | on notice |
| MidAmerican Energy | Utility Electricity | Forms Submitted, on schedule | Cheryl Bergmann | 563-333-8564 | CLBergmann@midamerican.com | month to month | $ - | on notice |
| EJ Equipment | Fuel/spotter repairs | Legal Review | Kory Mann | 815-370-7673 | kory@ejequipment.com | month to month | $ - | on notice |
| Hometown Vending | Vending machines | Legal Review | Ken Martin | 708-514-0259 | trivendken2@sbcglobal.net | no charge | $ - | on notice |
| Innovative Refrig. | HVAC maintenance | Legal Review | Linsey Diehl | (540)941-1992 | ldiehl@r717.net | 12 months | $ - | tbd |
| Kankakee/AJ | Disposal Waste pick-ups/product destructions | Legal Review | Eric Tillotson | 815-932-1115 | etillotson@homewooddisposal.com | month to month | $ - | on notice |
| Servicemaster | Cleaning Services | Legal Review | Timothy McGrath | 815-937-0585 | servicemasterk3@yahoo.com | month to month | $ - | on notice |
| Thyssen-Krupp | Elevator maintenance | Legal Review | Steve Gilles | 309-258-0672 | steve.gilles@thyssenkrupp.com | 24 months | $ - | 30-day notice |
| Cintas | Uniforms/mats/medical supplies? Shop rags/dry mops | Negotiations | Mike Sealy | 219-313-4988 | sealym@cintas.com | tbd | tbd | tbd |
| Crystal Clean | Haul away hazardous material: used oil, light bulbs, electronic waste, etc. | no historical contract | John Beilfuss | 219-384-3656 | john.beilfuss@crystal-clean.com | as required | $ - | on notice |
| Crown | MHE repairs/parts | Proposal Rejected | John Paternostro | 708-516-7151 | john.paternostro@crown.com | tbd | $ - | n/a |
| United Radio | Hand radios Paul Kuzel 815-693-7029 | site completing forms | | | | as required | $ - | on notice |
| Fred's | Mowing/salting/snow removal | waiting on proposal | Fred | 815-693-3767 | n/a | month to month | $ - | on notice |
| Raymond | LT battery lease | waiting on proposal | Dan Mcauliffe | 630.588.7642 | dmcauliffe@associated-solutions.com | 38 months | $ 104,530.72 | sell-out |
| Simplex Grinnell | Alarm System Fire | waiting on proposal | Elizabeth Coy | 219-406-7799 | ecoy@simplexgrinnell.com | 12 months | $ - | 30-day notice |
| Wells Fargo | LT battery lease | waiting on proposal | Linda Haroldson | 800-570-3607 | Linda.Haroldson@wellsfargo.com | 51 months | $ 218,635.20 | sell-out |
| | | | | | | | | |
| | | | | | **Estimated Exposure beyond 24 months** | | **$ 323,165.92** | |

DEF000042

**APPENDIX D**
**TO THE**
**WAREHOUSE MANAGEMENT AGREEMENT**
**BETWEEN**
**MARS**
**and**

## TRANSITION COSTS

**Transition Costs:**

Contractor will incur certain costs and expenses during the transition period preparing to perform the Management Services ("Transition Costs"). MARS will pay Contractor for the Transition Costs in accordance with the rates and charges to be set forth in this Appendix D.

Prior to agreement between Mars and Contractor on the total Transition Costs, Contractor agrees to provide backup for Transition Costs as may be reasonably requested by Mars. At the conclusion of the sixty (60) day Transition period, Mars and Contractor agree to review and update the table set forth in Appendix D to reflect total actual Transition Costs, including approved Transition Costs in excess of or less than the total cost as set forth in this Appendix D.

Contractor will issue monthly invoices to Mars with appropriate backup and justification for the Transition Cost invoices.

| One Time Start-Up Fee - Detail | | | |
|---|---|---|---|
| **Operations Start Up - Detail** | | | |
| Transition Project Management | | | |
| Salary Project Manager | 10.5 Weeks | **$ 44,573** | |
| Travel Expenses for PM | | $ 16,509 | |
| Lean Implementation | | $ 48,162 | |
| Quality Assessment | | $ 4,500 | |
| ***Subtotal*** | | **$ 113,743** | |
| Transition Hiring/Training | | | |
| Testing/screening | | $ 22,823 | |
| Training (pre-hire employees) | | $ 62,260 | |
| Travel - Corp. Resources | | $ 12,390 | |
| ***Subtotal*** | | **$ 97,473** | |
| Transition Building Preparation | | | |
| Fire Extinguishers | | $ - | |
| Dock hardware | | $ - | |
| Office Supplies Startup | | $ - | |
| Vacation true-up | | $ 29,000 | |
| Initial Physcial Inventory | | $ 16,890 | |
| Signage | | $ 2,096 | |
| ***Subtotal*** | | **$ 47,986** | |
| **Operations Start Up Total** | | | **$ 259,202** |
| **Startup Cost Discount** | | | $ (105,608) |
| **Start Up Total** | | | **$ 153,594** |
| **IT Start Up - Detail** | | | |
| WMS Software Integration Fee | | $ 30,000 | |
| WMS Training / Implementation / Installation | | $ 25,934 | |
| **IT Start Up Total** | | | **$ 55,934** |
| **Mars Portion of Start Up Fees** | | | $ 209,527 |

| Kenco's Contribution to the Sign On Bonus | $ 47,544 | no payment due in startup expense |
|---|---|---|

DEF000044

**APPENDIX E**

**TO THE**
**WAREHHOUSE MANAGEMENT AGREEMENT**
**BETWEEN**
**MARS**
**and**

**2013 Vendor Incentive to be added at a later date**

**Mars, please provide commencement date, timeline, and requirements to include Contractor in the Mars Vendor Incentive Program.**



MasterfoodsUSA™
A Division of Mars, Incorporated

| | |
|---|---|
| **Supplier:** | **Manteno Distribution Center**<br>**4Ts Management Warehouse**<br>**1125 Sycamore Road**<br>**Manteno, IL 60950** |
| **Audit Date:** | **July 11/12, 2006** |
| **Buying Area:** | **Warehousing/Distribution and Secondary Co-Packing** |

Pat,

I would like to thank you and your staff at 4Ts Management for a job well done in preparing for the audit. Please extend my gratitude for the hospitality, hard work and cooperation extended to me.

**Audit Summary**

The quality assessment of 4Ts Management warehousing and co-packing operation in Manteno, Illinois was performed on July 11 & 12, 2006. The audit was facilitated by Marcus Carter, Copack Manager and Patrick Leigh, General Manager. The audit objective was to verify the facility and quality system effectiveness for conformance to MasterfoodsUSA standards for finished goods warehousing, distribution and co-packing of secondary wrapped product.

The 4Ts Management's Manteno facility remains **Approved**. Audit observations and nonconformities are listed below. Please review and provide corrective actions with a committed timeline for implementation. The time line will assist both MasterfoodsUSA and 4Ts Management, furthering our commitment of continuous improvement for quality. A follow-up will be scheduled by the MasterfoodsUSA QS representative.

## Required Corrective Actions:

1) Building security to prevent access
2) Upgrade building sanitation and Master Sanitation Schedule
3) Review and revise quality procedures per MFUSA requirements - Tom White
4) Enforce trailer seal requirements per MFUSA requirements
5) Upgrade Pest Control Program to include periodic management reviews
6) Upgrade Backflush Procedure to meet traceability requirements

Exhibit 3

# Audit Findings - Non-conformance Report

## Facility

| Question | Type | Score | Comments |
|---|---|---|---|
| Were all unused doors closed during the audit? | M | 1 | At time of audit the locking latch to the door to Ammonia Room was complete broken. The door could not be close or locked. Must repair door and keep locked (if required by code) when not in use. |
| Are there procedures that define the general housekeeping required, including operational areas, oveheads, corridors, stairways and external areas? | M | 1 | At time of audit it was noted that the support beams on the south wall of the co-pack area had a very thick layer of cardboard dust. Must clean the support beams and add to the Master Sanitation Schedule with frequency. |
| Are the outside grounds kept clean, free of discarded equipment, litter, refuse and uncut weeds and grasses? | S | 1 | At time of audit many cut trailer seals were noted discarded in the parking lot by the trailer stage areas. Must include to Master Sanitation Schedule the cleaning with frequency the trailer stage areas. |
| Are the truck docks and under dock plates cleaned on a regular basis? And free of infestation? | S | 1 | At time of audit the dock pits had debris build-up. Must review in Master Sanitation Schedule frequency of cleaning the dock pits. |
| Are spills, trash or other clutter of any type found in the storage areas or along the walls? | S | 1 | At time of audit a large rice spill was noted between the racks in the Uncle Bens storage area. Must review internal GMP walk-through to include floor areas in between storage racks. |
| Are ceiling fixtures, piping, cracks and crevices, ledges and supports free of accumulated dirt build-up? | S | 1 | At time of audit no accumulation of dirt build-up was noted, but the did notice a cardboard dust build-up in the co-pack area. |
| Are non-essential materials and equipment properly stored/removed from the operations area? (ie cleaning supplies, bad pallets) | S | 1 | At time of audit by the battery changing area noted racking material and old light fixtures. The area is in need of cleaning and order. Must properly store non-essential materials and equipment. |

## Quality Records

| Question | Type | Score | Comments |
|---|---|---|---|
| When is a component verification completed? How often a shift? | M | 1 | At time of audit at 11:00am the component verification form had not been started. This quality check is performed twice a shift. At the beginning of the shift and 4 hours later. Must perform quality checks per MasterfoodsUSA requirements. |

## Trailer Inspection

| Question | Type | Score | Comments |
| --- | --- | --- | --- |
| Are all inbound and outbound trailers checked to ensure all trailer doors are sealed? | M | 1 | At time of audit trailer seals of staged trailers of both inbound and outbound were audited. Noted some trailers without seals on the port holes. |

**Pest Control**

| Question | Type | Score | Comments |
| --- | --- | --- | --- |
| Are your pest control findings trended to identify problems areas? | S | 0 | No. No evidence of pest control trending of findings or activity. No periodic management review with documentation of corrective actions available. |
| Is the facilty pest control program effective? Signs of infestation? | S | 1 | Pest control program appeared to be effective. This was confirmed by a review of the detailed inspection records. Based on the NAWQM, it is recommended that the pheromone monitoring be expanded to include additional insects. Several exterior rodent bait stations were not secure. The plastic tab for locking the cover was broken. Several exterior rodent bait stations were not secure. The plastic tab for locking the cover was broken. |

**Traceability of Copacked Items**

| Question | Type | Score | Comments |
| --- | --- | --- | --- |
| If the items were not built to specifications, was an Exception report attached to the documentation? | S | 1 | The following items were audited.<br>1. Two (2) pallets of M15361-00 - 768 Bags Total Count full Retail Display Pallet: No non-conformities found.<br>2. Two (2) pallets of M10454-00 - Total 192 Count Mixed Display Shipper: No non-conformities found.<br>3. Two (2) pallets of M21024 – Snickers Brand Miniatures 40oz 6/Case: No non-conformities found.<br>4. Two (2) pallets of M13413 – Snickers Brand Mixed Miniatures Variety Bag 21oz 12/Case: No non-conformities found.<br>5. Two (2) pallets of S31181-00 – Mixed Combos Inner/Outer Floorstand 72 Total count: On one pallet it was noted that it had two Gozinto code dates not listed in the back-flush records. Further investigation found that two different co-packing lines were side by side with the same Gozinto item. Multiple code dates were picked, likely mixed at point of use. |

## Graphical Summary

| | Should | Must | Total |
|---|---|---|---|
| Facility Audits | 0% | 100% | 100% |
| Facility | 83.33% | 93.75% | 90.43% |
| Code Date & Best Before | 100% | 100% | 100% |
| Safety | 100% | 100% | 100% |
| Quality Records | 100% | 97.50% | 97.67% |
| GMP's | 100% | 100% | 100% |
| Consumer Protection Devices | 0% | 0% | 0% |
| Nonconforming Product | 100% | 100% | 100% |
| Trailer Inspection | 0% | 90% | 90% |
| Preventative Maintenance | 100% | 0% | 100% |
| Regulatory Visits | 100% | 100% | 100% |
| Pest Control | 70% | 100% | 93.48% |
| Traceability of Copacked Items | 90% | 100% | 94.44% |
| Allergens | 100% | 0% | 100% |
| Warehouse Storage and Handling | 100% | 100% | 100% |
| Total | 92.74% | 97.70% | **96.40%** |



Masterfoods

Supplier Name: ROMARK LOGISTICS OF PA INC
Buying Area: 4. EF/Cocosub North America

## Quality Management

| Ref | Question | Must / Should / Best | Answer (0/1/2) | Comments |
|---|---|---|---|---|
| ***Quality Management Policy and Review*** | | | | |
| GG.1005.10.20 | Is there a trained individual on site with overall responsibility for quality? | M | | |
| GG.1005.10.30 | Is there a Quality Policy or Quality Mission Statement with clear definitions and objectives? | S | | |
| GG.1005.10.40 | Do you have a structured quality review programme where issues are reviewed and actions identified and implemented? | M | | |
| GG.1005.10.50 | Are suitable quality management tools in place? | S | | |
| GG.1005.10.60 | Do you have effective internal audits for all areas of your facility (including transport and external warehousing) to ensure conformance to procedures? | S | | |
| ***Documentation control*** | | | | |
| GG.1005.20.20 | Do you have a process for ensuring you work to the latest specification version? | M | | |
| GG.1005.20.30 | Are all quality procedures documented, controlled and authorised, for example in a Quality Manual? | M | | |

| | | | | |
|---|---|---|---|---|
| GG.1005.20.50 | Are records appropriately maintained and stored to demonstrate the effective control of finished product safety , quality, security & legality? | M | | |
| ***Supplier Management and Material Control*** | | | | |
| GG.1005.30.10 | Do you have a documented approval or qualification procedure for your suppliers, and is it based on risk assessment? | M | | |
| GG.1005.30.20 | Do you provide your suppliers with clear specifications to deliver to? | M | | |
| GG.1005.30.30 | Do you have a system for the effective monitoring of food safety risks for your incoming raw materials? | M | | |
| GG.1005.30.40 | Do you have a procedure to assure that incoming materials conform to specification? | M | | |
| GG.1005.30.50 | Do you ensure that incoming materials are used on a first-in first out basis (or by expiry date) ? | M | | |
| ***Non-Conformance Management*** | | | | |
| GG.1005.40.10 | Do you have a procedure for identifying, investigating and resolving non-conforming materials and finished products? | M | | |
| GG.1005.40.20 | Do you analyse data on non-conforming materials and use this to drive improvements in your process / at your supplier? | S | | |
| GG.1005.40.30 | Are 'non conforming materials' labelled & physically segregated in a separate area to avoid inadvertent use? | M | | |
| GG.1005.40.40 | Is there an effective hold and release procedure and is every hold and release action recorded? | M | | |
| GG.1005.40.50 | Do you have a documented recall procedure and is it tested regularly ? | M | | |
| ***Traceability*** | | | | |

| | | | | |
|---|---|---|---|---|
| GG.1005.50.10 | Do you register details of all incoming material deliveries, (name of the material, name of supplier, delivery date or manufacturing date, quantity, batch code/system, shelf life, storage)? | M | | |
| GG.1005.50.20 | Is there a unique 'identification' system for every incoming and outgoing batch of material? | M | | |
| GG.1005.50.30 | Can you formally trace all batches of incoming materials (raws, packaging and chemicals) back to their original source? | M | | |
| GG.1005.50.70 | Do you have an effective system that ensures that nominated people can be easily contacted should there be an emergency ? | M | | |
| ***Consumer complaints*** | | | | |
| GG.1005.60.20 | Are complaints collated, analysed and trended with results communicated in a timely manner ? | S | | |
| GG.1005.60.30 | Do you have a returned goods procedure and is it effective ? | M | | |
| ***Calibration and Measurement*** | | | | |
| GG.1005.70.10 | Are all measuring devices calibrated by a recognised method and labelled, and are suitable records maintained? | M | | |
| ***Training*** | | | | |
| GG.1005.80.20 | Are training competency records kept for all employees? | M | | |
| GG.1005.80.30 | Do you have adequately trained staff to cover for absence / holidays / sickness? | S | | |

## Transport/Warehouse/Shipping

| Ref | Question | Must / Should / Best | Answer (0/1/2) | Comments |
|---|---|---|---|---|
| ***General*** | | | | |

| | | | | |
|---|---|---|---|---|
| GG.1020.10.10 | Are there suitable Transportation and Storage procedures in place and are they being followed effectively ? | M | | |
| GG.1020.10.20 | Is all material being shipped properly marked to identify contents? | M | | |
| GG.1020.10.30 | Are there any materials or products present that may lead to contamination of product when being stored or shipped? If so, are the properly controlled ? | S | | |
| GG.1020.10.40 | Are all pallets clean, dry, in good physical condition and odour free? | M | | |
| GG.1020.10.50 | Are appropriate shipping containers used? | M | | |
| GG.1020.10.60 | Are storage areas well managed and conform to all GMP requirements? | M | | |
| GG.1020.10.70 | Are temperature controlled storage areas suitably managed? | M | | |
| GG.1020.10.80 | Are all materials stored in such a way as to allow inspection and cleaning ? | M | | |
| GG.1020.10.90 | Are there procedures in place to ensure that on-site tankers and silo's are cleaned appropriately ? | M | | |
| GG.1020.10.100 | Are the loading and unloading areas shielded from bad weather? | M | | |

## GMP

| Ref | Question | Must / Should / Best | Answer (0/1/2) | Comments |
|---|---|---|---|---|
| ***Personnel Practices and Hygiene Facilities*** | | | | |
| GG.1030.10.40 | Is there a policy in place which ensures that smoking, drinking and eating are only carried out in dedicated areas? | M | | |
| GG.1030.10.70 | Are hand-washing and hand drying facilities installed? | M | | |

| | | | | |
|---|---|---|---|---|
| GG.1030.10.80 | Are there signs posted to remind employees about cleanliness and hand-washing? | M | | |
| GG.1030.10.110 | Is there a formal, documented, cleaning / hygiene / sanitation program in place? | M | | |
| GG.1030.10.120 | Are all visitors informed about the fundamental hygiene and safety measures to observe during their presence on the site ? | M | | |
| ***Building Integrity*** | | | | |
| GG.1030.20.10 | Are the activities in the areas immediately surrounding the factory ( industrial/agricultural) such that contamination/infection of the factory by chemical, physical or microbiological hazards unlikely? | S | | |
| GG.1030.20.20 | Is there an effective program in place to ensure production areas are clean and tidy? | M | | |
| GG.1030.20.30 | Is lighting adequate for the needs of the operation and are lights sheilded where necessary? | M | | |
| GG.1030.20.40 | Is there a documented, active pest control programme in place? | M | | |
| GG.1030.20.50 | Is the condition of the doors, windows, and other openings sound so as to effectively exclude insects, birds and rodents? | M | | |
| GG.1030.20.60 | Is the condition of maintenance of the buildings in keeping with a food manufacturing facility? | M | | |
| GG.1030.20.70 | Are the grounds well maintained, ensuring that at least one meter from the building perimeter is vegetation free? | S | | |
| GG.1030.20.80 | Is the structural condition / fabric of the factory acceptable in terms of floors, walls, windows, ceilings & overheads ? | S | | |
| GG.1030.20.90 | Is there any evidence of accumulation of dust, dirt, product, etc, on floors, walls, equipment, etc? | S | | |
| GG.1030.20.100 | Are valves, pipes, pumps & conveyors, etc free from leaks? | S | | |

| | | | | |
|---|---|---|---|---|
| GG.1030.20.110 | Are cleaning materials, pesticides and other toxic materials controlled / stored / handled / labelled to prevent contamination of product ( including the ware house)? | M | | |

## Labour Practices

| Ref | Question | Must / Should / Best | Answer (0/1/2) | Comments |
|---|---|---|---|---|
| ***Child Labour / Young Workers*** | | | | |
| GG.1040.10.10 | Are there any workers employed in any of the companies facilities being audited that are below the legal working age limit? | M | | |
| GG.1040.10.20 | Do they have suitable records for confirming that all workers are of legal age including start date? | M | | |
| ***Discipline and Harassment*** | | | | |
| GG.1040.50.20 | Do they have established, written, and communicated discipline procedures, plant regulations, rules and code of conduct? | M | | |
| GG.1040.50.30 | Are the discipline procedures, plant rules, regulations and code of conduct reasonable ? | M | | |
| ***Factory Procedures*** | | | | |
| GG.1040.80.20 | Are there sufficiently maintained & detailed personnel records ? | M | | |
| GG.1040.80.30 | Are there full clear employment contracts for all employees where required by national and local legislation ? | M | | |

## Health & Safety

| Ref | Question | Must / Should / Best | Answer (0/1/2) | Comments |
|---|---|---|---|---|
| ***General*** | | | | |
| GG.1045.10.10 | Is the employer's insurance certificate displayed and up to date? | M | | |
| GG.1045.10.30 | Do all new starters go through a detailed safety training program before starting work ? | M | | |
| GG.1045.10.40 | Have the premises been inspected by the appropriate authority, and has a fire certificate been issued (if required) or a formal risk assessment taken place? | M | | |
| GG.1045.10.50 | Are appropriate checks and fire drills undertaken on a regular basis to ensure that any emergency can be handled adequately ? | M | | |
| GG.1045.10.60 | Do you have first-aiders on site and are the trained by a recognised body? | M | | |
| GG.1045.10.70 | Is there a documented procedure for the reporting of appropriate accidents to either factory management or the local governmental authorities (as applicable) ? | M | | |
| GG.1045.10.80 | Is there suitable first aid equipment in close proximity to the work areas? | S | | |
| ***Fire Exits*** | | | | |
| GG.1045.20.10 | Are the fire exits and exit routes clearly labelled in suitable languages and kept clear and unlockedat all times to allow evacuation in cases of fire or other emergencies ? | M | | |
| ***Equipment*** | | | | |
| GG.1045.30.10 | Is there some form of audible system to alert employees to an emergency? | M | | |
| GG.1045.30.20 | Are suitable fire extinguishers provided on site which are checked and maintained by a competent person? | M | | |
| GG.1045.30.30 | Has all manufacturing equipment been guarded to meet government regulations? | M | | |

| | | | | |
|---|---|---|---|---|
| GG.1045.30.40 | Is there designated personal protective equipment available and is it being worn where required? | M | | |
| GG.1045.30.50 | Is all electrical equipment well maintained, checked and in a safe condition? | M | | |

## Security

| Ref | Question | Must / Should / Best | Answer (0/1/2) | Comments |
|---|---|---|---|---|
| ***General*** | | | | |
| GG.1050.10.10 | Is there someone responsible for all security matters? | S | | |
| GG.1050.10.20 | Is the building / site able to restrict unknown personnel access? | M | | |
| GG.1050.10.30 | Is there an effective system in place to ensure that all scrap Mars branded packaging is made unusable e.g. shredded, compacted, defaced etc | M | | |
| GG.1050.10.40 | Do your vendors ship material to you in sealed/tamper evident containers, do you record and document their receipt? Do you record the seal numbers? | M | | |
| GG.1050.10.50 | Do you use tamper proof security measures (seals) for outbound loads?Are there procedures and accountability for how high-security seals are controlled, affixed and verified for reliability? Are the seal numbers always recorded on the bill of lading? Are the seal numbers recorded on the Bill of Lading? | M | | |
| GG.1050.10.60 | Do you require seals to be replaced if they are removed at inspection points or intermediate delivery? | S | | |

| | | | | |
|---|---|---|---|---|
| GG.1050.10.70 | Are all the external inlet and outlet points for bulk materials capped and secured? | M | | |

## Security - extended version

| Ref | Question | Must / Should / Best | Answer (0/1/2) | Comments |
|---|---|---|---|---|
| ***Management systems & procedures*** | | | | |
| GG.1065.10.20 | Are security procedures part of the standard internal audit process | S | | |
| GG.1065.10.30 | Is all scrap & unuseable Mars branded packaging materials made unuseable e.g. shredded, compacted, defaced etc | M | | |
| ***Physical security*** | | | | |
| GG.1065.20.10 | Is the level of lighting sufficient throughout the facility ? | B | | |
| GG.1065.20.20 | Do the production & warehouse facilties have entry systems or procedures to to restrict access to only approved personnel. | M | | |
| GG.1065.20.30 | Is there a policy for after hours entry into the facility ? Are records maintained of all entries & exits of personnel after hours ? | S | | |
| GG.1065.20.40 | If an outside security company is used is their a formal review of the company and how they screen their people. | B | | |
| GG.1065.20.50 | Upon the termination of an employee, are procedures in place to immediately restrict access to the facility by this individual | M | | |
| ***Transportation*** | | | | |
| GG.1065.40.10 | Is there a system in place to show the shipping history of the containers used ? | B | | |

| | | | | |
|---|---|---|---|---|
| GG.1065.40.20 | Is there always a designated person responsible to supervise the loading of the container. ? Is there name recorded for each container. | M | | |
| GG.1065.40.30 | Is there a documented process to thoroughly inspect the front wall, left side, right side, floor, ceiling/roof, inside/outside doors, and outside/undercarriage prior to loading of the container? Are records kept on a shipment-to-shipment basis for at least 12 months from the shipment date? | M | | |

## External Factory - General

| Ref | Question | Must / Should / Best | Answer (0/1/2) | Comments |
|---|---|---|---|---|
| ***Consumer Protection - Metal Detection*** | | | | |
| NAE.4001.40.10 | For machine filled products, do they have an in-line metal detector? (Metal wrappers and foils excluded) | M | | |
| NAE.4001.40.20 | Do they have the MFUSA metal detector test standards? (1.0m Chrome Steel and 1.6m Stainless Steel) | M | | |
| NAE.4001.40.30 | Is there an operating procedure for metal detectors which includes how to perform checks? | M | | |
| NAE.4001.40.40 | What is the frequency of the checks and does the checks cover detection and rejection of the test standards? | M | | |
| NAE.4001.40.50 | Is there a current concession on file if the metal detector is incapable of meeting MFUSA standards? | M | | |

| | | | | |
|---|---|---|---|---|
| NAE.4001.40.60 | Are there documented procedures in place to define actions if metal detector checks fail? (ie..perform a recheck, stop the machine, hold product back to last successful check and prevent any reoccurrence) | S | | |
| ***Consumer Protection - Weighing Systems*** | | | | |
| NAE.4001.50.10 | If a pack has a declared weight or count, are there procedures in place to ensure tests are performed to meet all MFUSA targets and government regulations? | M | | |
| NAE.4001.50.20 | If a pack has a declared weight, is there a check-weigher or weigh scale in use? | S | | |
| NAE.4001.50.30 | Is there a procedure to ensure that all checkweighers and weigh scales are tested and signed off at agreed internals? | M | | |
| NAE.4001.50.40 | When measuring devices or equipment is used, are there checks to calibrate and record the results at defined intervals? | M | | |
| NAE.4001.50.50 | Is there a formal procedure to ensure that causes of Consumer Protection Device failures are analyzed? | M | | |
| NAE.4001.50.60 | Are there documented procedures in place to define action if checkweighers and or weigh scales show a failure which includes holding product back to last successful check and rechecking, and a log of action taken? | M | | |
| ***Facility - Audit and Corrective Action Response*** | | | | |
| NAE.4001.60.10 | Were the corrective actions from the last copack audit addressed and completed? | M | | |
| ***Facility - Building*** | | | | |
| NAE.4001.70.10 | Is the warehouse in good repair, suitable size, construction, and location to allow proper warehousing? | M | | |
| NAE.4001.70.20 | Are ceilings, floors and walls well maintained to prevent product contamination and dock areas protected from inclement weather? | M | | |

| | | | | |
|---|---|---|---|---|
| NAE.4001.70.30 | Are roofs kept clean, in good repair, and free of evidence of leaking? | M | | |
| NAE.4001.70.40 | Is building properly lit? (i.e... 20 ft candle minimum for storage area and 50 ft. minimum for copacking and rework) | S | | |
| NAE.4001.70.50 | Is warehouse equipment (forklifts, tow-motors, conveyors) functional and in good repair? | M | | |
| NAE.4001.70.60 | Is the storage and charging area for forklifts, tow-motors isolated and located separate from the product storage area? | S | | |
| NAE.4001.70.70 | Are light bulbs, fixtures or other glass suspended over food products of a safety type to prevent contamination due to breakage? (Shielded lights are required in the recoup and copack area.) | M | | |
| ***Facility - Building Sanitation*** | | | | |
| NAE.4001.80.30 | Are the outside grounds kept clean, free of discarded equipment, litter, refuse and uncut weeds and grasses? | M | | |
| NAE.4001.80.40 | Are the trash collection areas (dumpsters, compactors) clean, free of spills and covered to prevent the attraction of pests? | S | | |
| NAE.4001.80.50 | Are the truck docks and under dock plates cleaned on a regular basis? And free of infestation? | M | | |
| NAE.4001.80.60 | Are spills, trash or other clutter of any type found in the storage areas or along the walls? | M | | |
| NAE.4001.80.70 | Are ceiling fixtures, piping, cracks and crevices, ledges and supports free of accumulated dirt build-up? | S | | |
| NAE.4001.80.80 | Are non-essential materials and equipment properly stored/removed from the operations area? (i.e. cleaning supplies, bad pallets) | S | | |
| ***Facility - Environmental Control*** | | | | |
| NAE.4001.90.10 | Were all unused doors to the exterior closed during the audit? | M | | |

| | | | | |
|---|---|---|---|---|
| NAE.4001.90.20 | Are there records of storage temperatures and relative humidity? | M | | |
| NAE.4001.90.30 | Is equipment for recording temperature and relative humidity calibrated regularly? | S | | |
| NAE.4001.90.50 | Were temperatures and relative humidity readings within acceptable ranges during the audit? | M | | |
| NAE.4001.90.60 | Is there a formal procedure to ensure that action is taken if the environment is outside the acceptable temperature and relative humidity range? | S | | |
| NAE.4001.90.70 | Are temperature and relative humidity readings monitored during non-business hours? Who is contacted if an emergency situation occurs? | S | | |
| ***Good Manufacturing Practices*** | | | | |
| NAE.4001.110.10 | Are all personnel adhering to GMP's? If not, list violations. | M | | |
| NAE.4001.110.40 | Do employees know what to do with product that falls on the floors? | M | | |
| NAE.4001.110.50 | Is there a storage area for personal belongings? And are these storage areas monitored and cleaned at least once per year? | M | | |
| NAE.4001.110.70 | Is the hand washing area in close proximity to the work area? Does the company have hand sanitizers available for use? | S | | |
| NAE.4001.110.120 | Are the lunchrooms clean, doors closed and separate from the rest of warehouse and/or manufacturing area? | S | | |
| NAE.4001.110.130 | Are food, beverage. tobacco products and vending machines permitted only the break/eating areas? | M | | |
| NAE.4001.110.140 | Are the restroom facilities adequate, regularly maintained and are there "Hand Wash" signs posted? | M | | |

| | | | | |
|---|---|---|---|---|
| NAE.4001.110.150 | Do restrooms have the necessary provisions? (toilet paper, hot water, soap, paper towels, covered trash containers) | M | | |
| NAE.4001.110.160 | Are the restroom doors kept closed at all times and have self-closing doors? | M | | |
| NAE.4001.110.180 | Are GMP training records available for all workers? Permanent personnel? Temporary workers? Management? | S | | |
| NAE.4001.110.190 | Is there an annual program for GMP refresher training? Are there formal training materials provided? | S | | |
| ***Inventory Control*** | | | | |
| NAE.4001.120.30 | Does the warehouse have a system to adequately respond to and manage product Holds? | M | | |
| NAE.4001.120.40 | Does the warehouse have a system to disposition and destroy nonconforming products? | M | | |
| NAE.4001.120.50 | Review the Hold system for the warehouse? Is it adequate to contain nonconforming products and prevent nonconforming product to be shipped? | M | | |
| NAE.4001.120.60 | What steps would be taken if Hold product was shipped? Who would be notified at MFUSA? | M | | |
| NAE.4001.120.70 | Is there a first in/first out (FIFO) system for materials and/or products in use? | S | | |
| ***Non-Conforming Product*** | | | | |
| NAE.4001.130.20 | Are there procedures in place to document non-conformities/exceptions for raw materials, packaging or finished product? | M | | |
| NAE.4001.130.40 | Are all non-conformities documented using the Flexible Supply exception reporting process? Are records available for review? | S | | |
| ***Pest Control*** | | | | |

| NAE.4001.140.10 | Is there an effective pest control program in place? Frequency of visits? | M | | |
|---|---|---|---|---|
| NAE.4001.140.20 | Do you have a licensed pest control service? What is the name of the company and are all licenses and insurances current? | S | | |
| NAE.4001.140.30 | Is there a formal management review of pest monitoring trends? Are the results documented with appropriate corrective actions? Is there evidence for follow-up of corrective actions? | S | | |
| NAE.4001.140.40 | Is there a current map of all pest control devices? Does it include the exterior perimeter? | M | | |
| NAE.4001.140.50 | Is there a pesticide usage log documenting quantities of pest control chemicals used with location? | M | | |
| NAE.4001.140.60 | Is a written report supplied by the pest control service? | M | | |
| NAE.4001.140.70 | Is there written documentation that pest control issues have been addressed with appropriate corrective actions and follow-up? | M | | |
| NAE.4001.140.80 | Are your pest control findings trended to identify problems areas? | S | | |
| NAE.4001.140.90 | Are the MSDS (Material Safety Data Sheets) available and current for all chemicals used by the pest control company? | M | | |
| NAE.4001.140.110 | Are pest control chemicals stored on-site? Are they stored properly? | S | | |
| NAE.4001.140.120 | Are all pest control chemicals used approved for food manufacturing and storage applications? | M | | |
| NAE.4001.140.130 | Was there any evidence of pest activity or infestation? | S | | |
| NAE.4001.140.140 | If organic products are stored in the facility, are pest control application guidelines for organic products being adhered to? | M | | |

| **_Quality Records - General_** | | | | |
|---|---|---|---|---|
| NAE.4001.160.60 | Are all quality incidents/exceptions reported in writing? | M | | |
| NAE.4001.160.80 | Is there a procedure or process to ensure the employees are aware of the quality standards to which they have to work? | S | | |
| **_Regulatory Inspections_** | | | | |
| NAE.4001.170.10 | Is there a process for communicating regulatory site inspections to Masterfoods? | M | | |
| NAE.4001.170.30 | Are the results of the last regulatory visit available for review? Are any citings followed up with appropriate corrective actions? | M | | |
| NAE.4001.170.40 | Is there a procedure and communication requirement in the event of a FDA or other regulatory inspection? | S | | |
| **_Warehouse Storage_** | | | | |
| NAE.4001.200.10 | Are incoming materials properly handled, stored and segregated to prevent damage, contamination and/or loss? Are damaged materials removed before storage? | S | | |
| NAE.4001.200.50 | Are all pallets free of contamination, damage and any evidence of pests? | M | | |
| NAE.4001.200.100 | Are M&M's/Kal Kan/Uncle Ben's products properly stored? Are stacking heights properly observed? | M | | |

**Masterfoods**USA™
A Division of Mars, Incorporated

**Supplier:** **Romark RDC (Waco)**
**7900 Mars Drive &**
**1108 Jewell Drive**
**Waco, TX 76712**
**Audit Date:** **June 13 & 14, 2006**
**Buying Area:** **External Factory – Co-Packing/Market Quality**

**Audit Summary**

I would like to thank you Pat, David and all the other personnel there at Romark for a job well done in preparing for the audit. Please extend my gratitude to your personnel for the hospitality, hard work and co-operation during the audit.

The quality assessment of Romark warehousing and co-packing operation in Waco, Texas was performed on June 12 & 13, 2006. The Romark facility and the quality systems provide evidence of conformance for warehousing finished goods and co-packing secondary wrapped products. Romark facilities are **approved** for warehousing and co-packing.

The objective for this audit was to verify continuous improvements of Romark 's current quality systems to MasterfoodsUSA requirements for warehousing and co-packing. It was apparent during the MAS audit that Romark continues to demonstrate commitment for continuous improvement to quality. Please review the required corrective actions below and provide a time line for follow-up. The time line should include corrective actions with written procedures to prevent reoccurrence, and due dates for corrections. This time line will assist both MasterfoodsUSA and Romark, furthering commitment of continuous improvement for quality.

**Required Corrective Actions**:

1) Upgrade Pest Control Program
   - Implement and Manage Trend Analysis and Risk Assessment
   - Review pest control activity logging practices
2) Review master sanitation schedule procedures
   - Include high ceiling areas to cleaning schedule
3) Review safety procedures
   - Implement a procedure for responsibilities of visiting contracting personnel
4) Review facility's Building integrity
   - Repair gap in joint of wall and roof.
5) Review warehousing for allergen and ingredients/raw materials procedures
   - Implement a program for storage and handling practices for allergen or raw materials
6) Increase frequency of MasterfoodsUSA InPlant instruction review with personnel
   - Adhere to MasterfoodsUSA specifications

See details below of audit findings.

## *Action list*

| Question | Type | Score | Comments |
|---|---|---|---|
| **Pest Control Program** | | | |
| Is there an effective pest control program in place? Frequency of visits? | M | 1 | Upon review of the pest control program it was noted to have gaps in the system that need to be addressed. **(I.e. Risk assessment, trend analysis, activity location, count of activity and pesticide usage log.)** The contracting pest control service visits the facility weekly or upon request. |
| Has a risk assessment been carried out by the pest control company? (pest control device map, insect counting etc.) | S | 0 | No, at time of audit the pest control service has not perform a risk assessment. **Requested for the contracting pest control vendor to provide trend analysis for all activity.** |
| Is there a pesticide usage log? With quantities of pest control chemicals used? | M | 1 | Yes, the PCO has a pesticide usage log for applied pesticides. Review of PCO activity report indicates that Max Force was applied, but not included on the pesticide usage log. **PCO must update pesticide usage log when any pesticide application is performed.** |
| Are your pest control findings trended to identify problems areas? | S | 1 | No, at time of audit the pest control service had not performed a risk assessment or a trend analysis. **Requested for PCO to provide trend analysis on all activity. Implement one or two page summary of activity by monitoring devices.** Review of pest control activity reports indicated insect activity in light traps, pheromone monitoring devices and rodent activity in glue boards. None of the reports detailed how much or where activity actually occurred. **Activity noted by the PCO must identify monitoring device number. Must identify insect type and count found in light traps and glue boards.** |
| Is the facility pest control program effective? Signs of infestation? | S | 1 | During the GMP walk-through the facility showed no signs of infestation.<br>Items noted;<br>-live ant and ant carcass were noted in building A<br>-rodent droppings were noted in two areas of building A by bays A36-11 and A63-46.<br>-review of pest control records did indicate rodent activity, but did not note what monitoring device the activity was caught.<br>-records indicated the usage of pesticide for ants, but did not note where it was applied.<br>-pest control records indicated insect activity on light traps, glue boards and pheromone monitoring devices, but did not note on which monitoring device the activity occurred.<br><br>**Requested the PCO to add more glue boards in the area where droppings were noted and monitor closely for other activity. PCO must record the monitoring device number on the PCO activity reports.** |
| **Building Sanitation** | | | |
| Are there procedures that define the general | M | 1 | Yes, the form and the master sanitation schedule has a procedure statement. The |

| | | | |
|---|---|---|---|
| housekeeping required, including operational areas, overheads, corridors, stairways and external areas? | | | master sanitation schedule has a list for housekeeping of internal and external areas.<br>-Large spider webs were noted in two areas of 'building A' where the wall and the roof meet. **Must add cleaning of high ceiling areas to the master sanitation schedule.**<br>-A cigarette butt was noted by the vending machines inside of building A.<br>-Six cigarette butts were noted on the roof of building A. **This is a safety concern, must implement or review the facility's safety procedure with all visiting or working contracting personnel.** |
| Are the outside grounds kept clean, free of discarded equipment, litter, refuse and uncut weeds and grass? | S | 1 | The grounds of the co-pack warehouse had cans, plastic bottles and roof debris. **Must maintain grounds clean and free of debris.** Note: At time of audit roof repairs were in process from tornado damage. |
| **Building** | | | |
| Are ceilings, floors and walls well maintained to prevent product contamination and dock areas protected from inclement weather? | M | 1 | In 'building A' north wall in section 2 by bay A36-11, daylight was noted in the ceiling where wall and ceiling join. **Must seal opening to protect the finished goods from precipitation.** |
| **Allergen Separation** | | | |
| What materials considered allergens are stored in your facility? (i.e. peanuts, tree nuts, soy) | S | 1 | In the co-pack warehouse there are some ingredients stored for the Waco plant.<br>-Powder Egg albumen stored over Starburst fruit chews packaging material.<br>-Liquid color ingredients were stored over Snickers wrapping material. **Must not store liquid ingredients or powder materials over packaging material.**<br>-Pallets with drums of Soy oil commingled with the corrugated packaging material in the warehouse floor. **Allergen materials must be isolated and confined to one area.** |
| **Traceability Audit** | | | |
| Was a MANMAN backflush completed for all items audited? When was it completed? | S | 1 | The following items were audited.<br>1. Two (2) pallets of M16389-00 - Mixed Singles Quarter Pallet Display – Total product count (1260) Singles: **No non-conformities found.**<br>2. Two (2) pallets of M16109-00 - Mixed Display Shipper – Total count 144: **No non-conformities found.**<br>3. Two (2) pallets of M16000-00 – "STARBURST" TROPICAL FRUIT CHEWS 16 OZ - 28/CA: All shippers audited had incorrect bag orientation as laid-out in the IN-PLANT instructions. The second pallet audited had no issues. **Must review IN-PLANT instructions with co-packing personnel.** |

## Rebekah Funk

**From:** Coffey, Robert
**Sent:** Tuesday, January 07, 2014 9:52 AM
**To:** Moore, Todd; Pacchioli, Michael; Millerick, Michael; Helveston, Andrew; Bush, Zakhary; Maurer, Melody; Harvey, Shelley; Wasik, Toni; Search, Jeremy
**Subject:** Manteno Site Update

Labor shortages continued into 3rd shift due to ice road conditions last night. The site is currently running 8 hours behind on loading HR times for Tuesday with an additional 5 shipments from Tuesday that did not bring in equipment to load.

Site will be mandating 12 hour work days for the next several shifts to quickly bring the site back on track. We continue to communicate with the carriers on the status of their loads.

Below is a list of trucks still loaded in the yard- waiting to be picked up:

| | | | | | |
|---|---|---|---|---|---|
| 5083213779 | | ALDI INC | SPRINGFIELD | OH | ALLIANCE |
| 5083222834 | | THE WORNICK | CINCINNATI | OH | ALLIANCE |
| | 3-Jan-14 | | | | |
| | 3:00 | | 968006M | | |
| 5083219043 | | MCLANE MIDWEST | DANVILLE | IL | CUSTOMER |
| | 4:00 | | 968016M | | |
| 5083219042 | | MCLANE MIDWEST | DANVILLE | IL | CUSTOMER |
| | 16:00 | | 966865M | | |
| 5083219035 | | DOT FOODS INC (POI) | MOUNT STERLING | IL | LTI TRUCKING |
| | 18:00 | | 968854M | | |
| 5083186770 | | VICTORVILLE DFC - | VICTORVILLE | CA | PRIME INC |
| | 18:00 | | 969172M | | |
| 5083235114 | | Jeff Claassen | Topeka | KS | LTI TRUCKING |
| | 4-Jan-14 | | | | |
| | 8:00 | | 970546M | | |
| 5083169182 | | VICTORVILLE DFC - | VICTORVILLE | CA | PRIME INC |
| 5083169182 | | VICTORVILLE DFC - | VICTORVILLE | CA | PRIME INC |
| | 6:00 | | 964525M | | |
| 5083216872 | | PEYTONS NORTH | BLUFFTON | IN | KLLM INC |
| | 6-Jan-14 | | | | |
| | 1:00 | | 964579M | | |
| 5083213773 | | COSTCO WHOLESALE 268 | MORRIS | IL | ALLIANCE |
| | 1:00 | | 966734M | | |
| 5083151381 | | MCLANE MINNESOTA | NORTHFIELD | MN | PRIME INC |
| | 1:00 | | 969169M | | |
| 5083234340 | | MCLANE MINNESOTA | NORTHFIELD | MN | PRIME INC |
| | 1:00 | | 969402M | | |
| 5083219041 | | MCLANE MIDWEST | DANVILLE | IL | CUSTOMER |
| | 2:00 | | 969398M | | |
| 5083164160 | | MCLANE MIDWEST | DANVILLE | IL | CUSTOMER |

Exhibit 4

DEF000303

| | | | | | |
|---|---|---|---|---|---|
| | 3:00 | | 969394M | | |
| 5083164159 | | MCLANE MIDWEST | DANVILLE | IL | CUSTOMER |
| | 6:00 | | 964045M | | |
| 5083210343 | | PEYTONS NORTH | BLUFFTON | IN | KLLM INC |
| | 6:00 | | 969232M | | |
| 5083169154 | | CHAMBERS & OWEN | JANESVILLE | WI | MIDWEST |
| | 7:00 | | 966799M | | |
| 5083170952 | | WALMART DC 7018 | NORTH PLATTE | NE | KLLM INC |
| | 7:00 | | 968057M | | |
| 5083163566 | | SUPER VALU 16 MPLS | HOPKINS | MN | SHAFFER |
| | 7:00 | | 970328M | | |
| 5083235999 | | MARS CHOCOLATE | HAZLE TOWNSHIP | PA | KLLM INC |
| | 7:00 | | 970556M | | |
| 5083166343 | | TARA INTERNATIONAL | HODGKINS | IL | J & R SCHUGEL |
| | 8:00 | | 959156M | | |
| 5083168178 | | BELVIKA TRADE & | EAST | | ERB |
| | 9:00 | | 968473M | | |
| 5083201051 | | ROMARK LOGISTICS INC | WACO | TX | SHAFFER |
| | 10:00 | | 970377M | | |
| 5083164165 | | MCLANE OZARK | REPUBLIC | MO | KNIGHT |
| 5083232502 | | MCLANE OZARK | REPUBLIC | MO | KNIGHT |
| | 12:00 | | 970596M | | |
| 5083166344 | | TARA INTERNATIONAL | HODGKINS | IL | KENNEDY |
| | 16:00 | | 970406M | | |
| 5083151378 | | AMCON DISTRIBUTING CO | QUINCY | IL | ALLIANCE |
| 5083151383 | | AMCON DISTRIBUTING CO | QUINCY | IL | ALLIANCE |
| 5083232497 | | AMCON DISTRIBUTING CO | QUINCY | IL | ALLIANCE |
| | 18:00 | | 966738M | | |
| 5083235119 | | CVS WHSE | INDIANAPOLIS | IN | KLLM INC |
| | 18:00 | | 966833M | | |
| 5083169153 | | RITE AID INC | WATERFORD | MI | KLLM INC |
| 5083235103 | | RITE AID INC | WATERFORD | MI | KLLM INC |
| | 19:00 | | 970353M | | |
| 5083166345 | | TARA INTERNATIONAL | HODGKINS | IL | J & R SCHUGEL |
| | 20:00 | | 966736M | | |
| 5083235099 | | MCLANE MINNESOTA | NORTHFIELD | MN | J & R SCHUGEL |
| | 20:00 | | 970761M | | |
| 5083186824 | | WESCO INC | MUSKEGON | MI | KLLM INC |
| 5083206831 | | WESCO INC | MUSKEGON | MI | KLLM INC |
| 5083235116 | | KRISPAK INC G- | GRAND RAPIDS | MI | KLLM INC |
| | 23:00 | | 970933M | | |
| 5083150284 | | TARGET STORES INC | FRIDLEY | MN | LOAD |
| 5083151372 | | MCLANE MINNESOTA | NORTHFIELD | MN | LOAD |
| 5083219037 | | MCLANE MINNESOTA | NORTHFIELD | MN | LOAD |
| 5083232503 | | MCLANE MINNESOTA | NORTHFIELD | MN | LOAD |
| | 7-Jan-14 | | | | |

| | | | | | |
|---|---|---|---|---|---|
| | 1:00 | | 969716M | | |
| 5083152681 | | MCLANE MINNESOTA | NORTHFIELD | MN | PRIME INC |
| | 2:00 | | 967590M | | |
| 5083219036 | | COSTCO WHOLESALE 268 | MORRIS | IL | ALLIANCE |

**Robert Coffey**
**Regional Distribution Manager - Midwest**
**Chicago Plant**
**2019 North Oak Park Ave,**
**Chicago, IL 60707**

**M:** 773-892-7735
**E:** robert.coffey@effem.com

**Rebekah Funk**

| | |
|---|---|
| **Subject:** | After Action Review- Meeting Placeholder |
| **Location:** | Chicago Plant - 2019 North Oak Park Ave, Chicago, IL, 60707 - .CHI-Conference Rm 7 RESTRICTED |
| **Start:** | Fri 2/7/2014 10:00 AM |
| **End:** | Fri 2/7/2014 3:00 PM |
| **Show Time As:** | Tentative |
| **Recurrence:** | (none) |
| **Meeting Status:** | Not yet responded |
| **Organizer:** | Coffey, Robert |
| **Required Attendees:** | Helveston, Andrew; Friker, Kevin; Moore, Todd; Gundlach, Daniel; 'Daniel.Day@Kencogroup.com'; Dawson, Daniel; Sheldon, Steven; Tumpane Jr., Bill; Kelvin Walsh (kelvin.walsh@kencogroup.com); Gordon Steele (Gordon.Steele@Jacobsonco.com); Paula Hise (paula.hise@kencogroup.com) |
| **Optional Attendees:** | 'Dunlap, Andy'; Chardoussin, Jill; Weisel, Gabi; Tanner Jeff; Cobaugh, Christine |

Telephone Conf if joining remotely:

Phone: 1-720-362-7958
Passcode: 580-620-51#

This meeting is to review identified gaps, project team and determine next steps in the review of the site and security of the DFC. We will want to discuss the missing 72 pallets of product from the Manteno DFC as well as take some time to review the gaps identified by Jacobson, Mars and Kenco in doing their Independent Site and Security Audits.

If there is time remaining at the end of the day I would like to get an update from the team on the progress of the Red Prairie Installation.

Manteno Site and Secuirty 2_7_...

Kenco questions outstanding.do...

Kenco Dec 31 Loss Prevention ...

Exhibit 4

DEF000437


Jacobson
Manteno Securit...

2

DEF000438

**Rebekah Funk**

| | |
|---|---|
| **From:** | Coffey, Robert |
| **Sent:** | Thursday, January 30, 2014 9:47 AM |
| **To:** | Wasik, Toni; Hart, Tari; Moore, Todd; Chick, Matthew; Finch, Michelle; Chick, Matthew; Goodman, Terry |
| **Cc:** | Walsh, Kelvin |
| **Subject:** | RE: QA Hard Hold/Inspect- INBOUND INVOLVED IN ACCIDENT BOL US1000029306 |

Terry/Matt- looking for some QA guidance on this- looks like we should inspect since it was involved in an accident...

**Robert Coffey**
**Regional Distribution Manager - Midwest**
**Chicago Plant**
**2019 North Oak Park Ave,**
**Chicago, IL 60707**

**M:** 773-892-7735
**E:** robert.coffey@effem.com

**From:** Wasik, Toni
**Sent:** Wednesday, January 29, 2014 3:57 PM
**To:** Hart, Tari; Moore, Todd; Coffey, Robert; Chick, Matthew; Finch, Michelle
**Cc:** Walsh, Kelvin
**Subject:** RE: QA Hard Hold/Inspect- INBOUND INVOLVED IN ACCIDENT BOL US1000029306

Adding Michelle to the distro, please keep her in the loop, she is looking for assistance. Thanks!

**Toni Wasik**
**Transportation Operations Manager**
**MARS CHOCOLATE NORTH AMERICA**
**T:** 908.813.4665 | **M:** 908-798-1368
**E:** toni.wasik@effem.com

*CONFIDENTIALITY. This email and any attachments are confidential and may also be privileged. If received in error, please do not disclose the contents to anyone, but notify the sender by return email and delete this email and any attachments from your system.*

**From:** Hart, Tari [mailto:Tari.Hart@Kencogroup.com]
**Sent:** Wednesday, January 29, 2014 4:51 PM
**To:** Moore, Todd; Coffey, Robert; Chick, Matthew
**Cc:** Wasik, Toni; Walsh, Kelvin
**Subject:** RE: QA Hard Hold/Inspect- INBOUND INVOLVED IN ACCIDENT BOL US1000029306

Todd, I sent an email describing the visual from the tail. Do you want us to unload based on this information. We will not do so until told to at this point. I assume we will need pictures from nose to tail and a Mars associate to witness?

*Thankyou*
*Have a good day*

Exhibit 4

DEF000405

*Tari Hart*
*Inventory Control*
*Kenco*
*1125 Sycamore Drive*
*Manteno, IL 60950*
*ph: 815-468-4452*
*fx: 815-468-2468*
*email: tari.hart@kencogroup.com*

**From:** Moore, Todd [mailto:todd.moore@effem.com]
**Sent:** Wednesday, January 29, 2014 3:44 PM
**To:** Coffey, Robert; Chick, Matthew
**Cc:** Hart, Tari; Wasik, Toni; Walsh, Kelvin
**Subject:** RE: QA Hard Hold/Inspect- INBOUND INVOLVED IN ACCIDENT BOL US1000029306

Story makes me want to off load, inspect on QA hard hold, and release a new order with fresh product. Carrier may be liable. If we lost control without notice, food safety is a risk.

**From:** Coffey, Robert
**Sent:** Wednesday, January 29, 2014 4:22 PM
**To:** Moore, Todd; Chick, Matthew
**Cc:** Tari Hart - 4Ts (Tari.Hart@kencogroup.com)
**Subject:** FW: URGENT ISSUE ON INBOUND INVOLVED IN ACCIDENT BOL US1000029306

Tari called me on this and it's the first I've heard of it- If we get confirmation from the carrier, is it OK to offload and ship or will we need to do a deeper QA dive?

**Robert Coffey**
**Regional Distribution Manager - Midwest**
**Chicago Plant**
**2019 North Oak Park Ave,**
**Chicago, IL 60707**

**M:** 773-892-7735
**E:** robert.coffey@effem.com

**From:** Hart, Tari [mailto:Tari.Hart@Kencogroup.com]
**Sent:** Wednesday, January 29, 2014 3:08 PM
**To:** Finch, Michelle; 'john'; 'jennifer'
**Cc:** Plastino, Cherie; Walsh, Kelvin; Manzello, Mike; Coffey, Robert
**Subject:** URGENT ISSUE ON INBOUND INVOLVED IN ACCIDENT BOL US1000029306

Southern Refrigerated brought in BOL US1000029306 on trailer 16951. It had no seals on it. The driver tells us that the original trailer (17073) was in an accident and was totaled. The driver also tells us that an adjuster watched it transload. However, we do not have any seals on the trailer nor any documentation advising of an accident. We are being told by the carrier that the shipper is aware of the issue. I spoke to Cherie and she said she knew nothing about

it. Can you please advise if you have any information on this load? Did you witness the transloading from one trailer to the other or do you know where it went to be transloaded? Finally, with no seals on the trailer, I cannot be certain that it was not tampered with after it was transloaded. Can you please provide any information you may have on this load? It is a hot inbound needed for all of our short picks today.

*Thankyou*
*Have a good day*

*Tari Hart*
*Inventory Control*
*Kenco*
*1125 Sycamore Drive*
*Manteno, IL 60950*
*ph: 815-468-4452*
*fx: 815-468-2468*
*email: tari.hart@kencogroup.com*

KENCO

**Rebekah Funk**

**From:** Coffey, Robert
**Sent:** Wednesday, January 29, 2014 4:25 PM
**To:** Moore, Todd; Chick, Matthew
**Subject:** FW: Trailer accident PRO# 7227598

More information on the trailer involved in the accident

**Robert Coffey**
**Regional Distribution Manager - Midwest**
**Chicago Plant**
**2019 North Oak Park Ave,**
**Chicago, IL 60707**

**M:** 773-892-7735
**E:** robert.coffey@effem.com

**From:** Wade, Julie [mailto:Julie.Wade@Kencogroup.com]
**Sent:** Wednesday, January 29, 2014 2:41 PM
**To:** Hart, Tari; Manzello, Mike; Walsh, Kelvin
**Cc:** Coffey, Robert
**Subject:** FW: Trailer accident PRO# 7227598

This is everything I have regarding the SRT trailer that was involved in the accident. I have not heard back from anyone since this email.

**Thank you,**

**Julie Wade**
CSR Load Planner / Claims
1125 Sycamore • Manteno, IL 60950
Office: 815-468-4432 • Main: 815-468-9999
Fax: 815-468-2468

*The information contained in this electronic communication and any accompanying document is confidential and is intended only for the use of the addressee. Unauthorized use, disclosure or copying of this communication, or any part of it, is strictly prohibited and may be unlawful. If you have received this communication in error, please notify the sender immediately by return email, and destroy this communication and all copies of it, including all attachments.*

**From:** Wade, Julie
**Sent:** Wednesday, January 29, 2014 12:31 PM
**To:** 'Argucita Webster'
**Cc:** Cliff Brown; Joe Bell; Lee Harris; Daryl Young
**Subject:** RE: Trailer accident PRO# 7227598

My many concern is that this trailer was not resealed after it was transloaded.

Exhibit 4

DEF000398

**Thank you,**

**Julie Wade**
CSR Load Planner / Claims
1125 Sycamore • Manteno, IL 60950
Office: 815-468-4432 • Main: 815-468-9999
Fax: 815-468-2468

*The information contained in this electronic communication and any accompanying document is confidential and is intended only for the use of the addressee. Unauthorized use, disclosure or copying of this communication, or any part of it, is strictly prohibited and may be unlawful. If you have received this communication in error, please notify the sender immediately by return email, and destroy this communication and all copies of it, including all attachments.*

**From:** Argucita Webster [mailto:webarg@southernref.com]
**Sent:** Wednesday, January 29, 2014 12:21 PM
**To:** Wade, Julie
**Cc:** Cliff Brown; Joe Bell; Lee Harris; Daryl Young; Argucita Webster
**Subject:** RE: Trailer accident PRO# 7227598

Julie,

I have ordered a police report and will send it to you upon receipt. It was ordered on January 24, 2014. It generally takes about two weeks before it is available.

Thanks,
Cita

**From:** Daryl Young
**Sent:** Wednesday, January 29, 2014 8:03 AM
**To:** 'Wade, Julie'
**Cc:** SRT-RISK
**Subject:** RE: Trailer accident PRO# 7227598

Julie,
I'm going to pass you off to our accident department

Daryl Young
Southern Refrigerated Transport
Texas -- C S R
888 778 7674 (Phone)
870 216 4138 (fax)
youdar@southernref.com

**From:** Wade, Julie [mailto:Julie.Wade@Kencogroup.com]
**Sent:** Wednesday, January 29, 2014 8:02 AM
**To:** Daryl Young
**Subject:** RE: Trailer accident

Can you send me anything you have? My biggest concern right now is that there were no seals on this trailer.

**Thank you,**

**Julie Wade**
CSR Load Planner / Claims
1125 Sycamore • Manteno, IL 60950
Office: 815-468-4432 • Main: 815-468-9999
Fax: 815-468-2468

*The information contained in this electronic communication and any accompanying document is confidential and is intended only for the use of the addressee. Unauthorized use, disclosure or copying of this communication, or any part of it, is strictly prohibited and may be unlawful. If you have received this communication in error, please notify the sender immediately by return email, and destroy this communication and all copies of it, including all attachments.*

**From:** Daryl Young [mailto:youdar@southernref.com]
**Sent:** Wednesday, January 29, 2014 7:58 AM
**To:** Wade, Julie
**Subject:** RE: Trailer accident

Yes ma'am and I didn't realize that corporate or even the PA plant didn't make y'all aware of it

Daryl Young
Southern Refrigerated Transport
Texas -- C S R
888 778 7674 (Phone)
870 216 4138 (fax)
youdar@southernref.com

**From:** Wade, Julie [mailto:Julie.Wade@Kencogroup.com]
**Sent:** Wednesday, January 29, 2014 7:46 AM
**To:** Daryl Young
**Subject:** Trailer accident

Hi

Do you know anything about US1000029306 being involved in an accident and being reloaded onto another trailer? Original trailer was 17073 and was off loaded onto trailer 16951, this has arrived in Manteno however the trailer was not sealed and there was notification about any accident forwarded to us. Can you help?

**Thank you,**

**Julie Wade**
CSR Load Planner / Claims

1125 Sycamore • Manteno, IL 60950
Office: 815-468-4432 • Main: 815-468-9999
Fax: 815-468-2468

The information contained in this electronic communication and any accompanying document is confidential and is intended only for the use of the addressee. Unauthorized use, disclosure or copying of this communication, or any part of it, is strictly prohibited and may be unlawful. If you have received this communication in error, please notify the sender immediately by return email, and destroy this communication and all copies of it, including all attachments.

---

This e-mail has been scanned by MCI Managed Email Content Service, using Skeptic(tm) technology powered by MessageLabs. For more information on MCI's Managed Email Content Service, visit http://www.mci.com.

---

---

This communication and the information transmitted is intended solely for the individual or entity to which it is addressed and may contain confidential and/or privileged material. Any review, retransmission, dissemination or other use of or taking action in reliance upon this information by persons or entities other than the intended recipient is prohibited. If you have received this email in error please contact the sender immediately and delete the material from any computer. As a recipient of this email, you are responsible for screening its contents and the contents of any attachments for the presence of viruses. Covenant Transportation Group, Inc. and its subsidiary Southern Refrigerated Transport, Inc. accept no liability for any damages caused by any virus transmitted by this email.

---

This e-mail has been scanned by MCI Managed Email Content Service, using Skeptic(tm) technology powered by MessageLabs. For more information on MCI's Managed Email Content Service, visit http://www.mci.com.

---

---

This communication and the information transmitted is intended solely for the individual or entity to which it is addressed and may contain confidential and/or privileged material. Any review, retransmission, dissemination or other use of or taking action in reliance upon this information by persons or entities other than the intended recipient is prohibited. If you have received this email in error please contact the sender immediately and delete the material from any computer. As a recipient of this email, you are responsible for screening its contents and the contents of any attachments for the presence of viruses. Covenant Transportation Group, Inc. and its subsidiary Southern Refrigerated Transport, Inc. accept no liability for any damages caused by any virus transmitted by this email.

**Rebekah Funk**

**From:** Coffey, Robert
**Sent:** Wednesday, January 22, 2014 10:03 AM
**To:** Moore, Todd
**Subject:** FW: Manteno OSHA recordable

This makes two in PD1- they can have one more on the year, after that, they will fail the 5.5 TRIR.

Regards,

**Robert Coffey**
**Regional Distribution Manager - Midwest**
**Chicago Plant**
**2019 North Oak Park Ave,**
**Chicago, IL 60707**

**M:** 773-892-7735
**E:** robert.coffey@effem.com

**From:** Walsh, Kelvin [mailto:Kelvin.Walsh@Kencogroup.com]
**Sent:** Wednesday, January 22, 2014 7:31 AM
**To:** Hise, Paula; Coffey, Robert
**Subject:** Manteno OSHA recordable

Hi Paula/ Robert,

As mentioned in yesterday's call, Manteno had a 2nd OSHA recordable in P1. While frt picking the associate felt a pain in his lower back and was sent for evaluation. Due to him being prescribed medication, the incident registered as an OSHA incident.

Again, I apologize for not getting this information to you earlier.

**From:** Nelson, Jackie
**Sent:** Friday, January 10, 2014 11:01 AM
**To:** Walsh, Kelvin
**Cc:** Manzello, Mike; Szplett, Len; Beck, Saul
**Subject:** [redacted]

Kelvin:

I just spoke with [redacted] he stated he has an appointment with Occupational Health Center today at 1:30pm. He also, stated that his back hurts to move. Last night at the emergency room the doctor took several x-rays and gave him prescription for pain. I told [redacted] once he leaves the Occupational Health clinic he needs to bring in his work status paperwork to myself or Len.

***Jackie Nelson***
***Safety Lead***

**Exhibit 4**

DEF000346

**Kenco Logistics Services**
1125 W Sycamore Rd
Manteno, IL 60950
**Email:** Jackie.Nelson@Kencogroup.com
**Office:** 815-468-9999 ext.380

Exhibit 4

**Rebekah Funk**

**From:** Coffey, Robert
**Sent:** Tuesday, December 31, 2013 11:54 AM
**To:** Moore, Todd; Helveston, Andrew
**Subject:** FW: [redacted]... corneal abrasion OSHA

P1D1 – Sorry to be the bearer of more bad news at the Manteno site- unfortunately the associate kept scratching his eye which led the hospital to administer eye medication and a subsequent OSHA recordable...

Regards,

**Robert Coffey**
**Regional Distribution Manager - Midwest**
**Chicago Plant**
**2019 North Oak Park Ave,**
**Chicago, IL 60707**

**M:** 773-892-7735
**E:** robert.coffey@effem.com

**From:** Walsh, Kelvin [mailto:Kelvin.Walsh@Kencogroup.com]
**Sent:** Tuesday, December 31, 2013 10:41 AM
**To:** Hise, Paula; Coffey, Robert
**Subject:** FW: [redacted]... corneal abrasion OSHA

Hi Robert/ Paula,

The site occurred an OSHA recordable on Sunday December 29th. While the associate was pulling down pallets a piece of dust/ wood dropped into his eye. The associate continued to rub his eye to the point of causing an abrasion. After work the associate took it upon himself to go to the emergency room where he was given two prescriptions. He was out of work yesterday and returned to work as of this morning.

**From:** Nelson, Jackie
**Sent:** Tuesday, December 31, 2013 9:41 AM
**To:** Walsh, Kelvin
**Subject:** RE: [redacted]... corneal abrasion

Yes, due to the day away from work Monday and also the ER issued him prescription.

***Jackie Nelson***
***Safety Lead***

**Kenco Logistics Services**
1125 W Sycamore Rd
Manteno, IL 60950
**Email**: Jackie.Nelson@Kencogroup.com
**Office**: 815-468-9999 ext.380

**From:** Walsh, Kelvin
**Sent:** Tuesday, December 31, 2013 8:15 AM
**To:** Nelson, Jackie
**Subject:** RE: [redacted]... corneal abrasion

Is this a recordable?

**From:** Nelson, Jackie
**Sent:** Tuesday, December 31, 2013 8:12 AM
**To:** Walsh, Kelvin
**Subject:** [redacted].. corneal abrasion

Kelvin:

[redacted] returned to work today with full release from Occupational health center. I also spoke with [redacted] this morning he stated he's good. Joe wear glasses but I gave him a pair of safety glasses.

[redacted] scheduled off day is Tuesday but since he was off yesterday, he's working today.

***Jackie Nelson***
***Safety Lead***

---

**Kenco Logistics Services**
1125 W Sycamore Rd
Manteno, IL 60950
**Email:** Jackie.Nelson@Kencogroup.com
**Office:** 815-468-9999 ext.380

**Illinois Department of Public Health Food Processing Establishment Evaluation Report**

525 West Jefferson St. Springfield, IL 62761
Phone: 217-785-2439 TTY: 800-547-0466

[ ] New Firm [X] Name Change [ ] Change of Ownership [ ] Out of Business [ ] Change of Address [ ] No Change

Name: ~~4 T's Management Llc~~ Kinco City SV LLC
Address: 1125 Sycamore St
City/State/Zip: Manteno, IL 60950-0000
County: Kankakee
Type of Food Processing: Warehouse

Mailing Address:
City/State/Zip: Manteno, IL 60950-0000
State ID: 28370
Establishment Size: $0 - $24,999
Phone: 815-468-9999

Type of Inspection: FDD Inspection-Routine
Inspection Tracking No.: 59510
Federal Establishment Number: 3004331051
Category Codes:
Interstate Sales: _______ %

TO WHOM IT MAY CONCERN: BASED ON AN INSPECTION THIS DAY, THE ITEMS MARKED BELOW IDENTIFY OBSERVATIONS MADE AT THE ABOVE LOCATION CONDUCTED UNDER AUTHORITY OF THE ILLINOIS FOOD, DRUG AND COSMETIC ACT, (410 ILCS 620/1 et seq), THE SANITARY INSPECTION LAW (410 ILCS 650/1.1 et seq) AND RULES PROMULGATED UNDER THESE ACTS. FAILURE TO CORRECT THE DEFICIENCIES WITHIN THE TIME SPECIFIED MAY RESULT IN PROSECUTION UNDER THE ENFORCEMENT PROVISIONS OF THESE ACTS

| Item No. | X/C | R | Correct By | Remarks |
|---|---|---|---|---|
| 4 | X | | | Multiple product spills throughout warehouse |
| 24 | X | | | multiple rodent droppings throughout warehouse |
| | | | | see attached supplemental |
| | | | | In conjunction w/ complaint visit 7/9/14 |

Correct By Date ______
Phone 815-239-6800
Sanitarian Lauren Hansen
Regional Office West Chicago Regional Office
Signature [signature]
Remarks

Interviewed X Len Szplett
Interviewed Date 7-11-14

| Task | Date / Time In | | Date / Time Out |
|---|---|---|---|
| FDA contract complaint F/U | 7-11-14 | 9:20a | 7-11-14 |

**Inspection Activities**

[ ] Refusal [ ] Down Time [ ] Complaint [ ] FBI [ ] Advisory [ ] Record Audit
[ ] Embargo [ ] Destruct [ ] Equipment Review [ ] Inspector Audit [ ] Survey [ ] Recall Activities
[ ] Denied Permit [ ] Sample [ ] Other

Len Szplett - HR/Accounting
Owner/Operator Jane Greer - owner / William Schwerin - Fac. Mngr
Sanitizer or Caustic Solution
Related Firms/Sources 4 other in US
Follow Up NRI
Sample Numbers
Refrigerated Storage Temp 40°F (cooled room)
Frozen Storage Temp

IL 482-0201(Rev09/04) (1)

Printed: 7/9/2014 3:19 PM

CONFIDENTIAL

**Exhibit 4**

DEF001440



| Document Number: CP-BP-4.2.1.001 | Title: QMS DOCUMENTATION | | | |
|---|---|---|---|---|
| Original Date: 06/07/06 | Revision Date: 07/12/12 | Revision #: 1 | Effective Date: 08/01/12 | 1 of 4 |

| |
|---|
| Author: **Quality Assurance and Regulatory Affairs Director, Best Practices/Date** 07/16/12 |
| Approval: **QC, Best Practices/Date** 07/16/12 |
| Approval: **VP, Best Practices/Date** 07/16/12 |

## 1.0 PURPOSE / SCOPE

The purpose of this document is to define the documentation requirements and implementation of the Quality Management System (QMS).

This document applies to all divisions, sites, departments, and functions.

## 2.0 ROLES AND RESPONSIBILITIES

**Kenco Management Services (KMS) – Quality Assurance, Best Practices –** responsible for the maintenance of this procedure.

**Site Quality Coordinator –** ensures this procedure is properly implemented at the site.

**Author Group Quality Coordinator –** processes exceptions from sites for documents written by their respective group.

**Site Management** – ensures that this procedure is enforced at the site.

**All Associates –** are responsible to understand the structure and process of a Quality Management System.

## 3.0 POLICY

All Kenco sites are required to maintain compliance to the Kenco Quality Management System (KQMS) and its documentation requirements. All sites must use this procedure as the minimum standard for:

- Documenting a Quality Policy
- Documenting Quality Objectives
- Controlling the addition, changes, and removal of controlled documents within their QMS
- Development of quality plans, appendices, and other documents filed in the Quality Manual

**Exhibit 6**



| Document Number: CP-BP-4.2.1.001 | Title: QMS DOCUMENTATION | | | |
|---|---|---|---|---|
| Original Date: 06/07/06 | Revision Date: 07/12/12 | Revision #: 1 | Effective Date: 08/01/12 | 2 of 4 |

- Development of documents, including records necessary to ensure the effective planning, operation, and control of processes

## 4.0 PROCEDURE

**4.1** A Quality Policy must be developed and documented appropriate to the organization, include commitments to both meeting requirements and improvement and provide a framework for review of the Quality Objectives. The Quality Policy must be communicated and personnel must demonstrate understanding and their role in carrying out the policy. The Quality Policy must be reviewed for continued suitability.

**4.2** Quality Objectives must support and align with the Quality Policy. Methods to measure this support are alignment of performance of everyday work to the objectives. The Quality Objectives must be established at the relevant group, site, department, and shift responsibility level.

**4.3 Document Types**

**4.3.1** Best Practices (BP), Control Procedures (CP), and Policies (POL) are created and maintained by any approved group and distributed to sites through kencoconnection.com.

**4.3.2** Rivermill Procedures (RMP) are created and maintained by any approved group and apply to Kenco Rivermill activities.

**4.3.3** Quality Plans (QPs), Standard Operating Procedures (SOP), Work Instructions (WI), Standard Work (SW), Job Descriptions (JD), and Forms can be written and issued by personnel at departments and sites in accordance with department and site policies that control this process and/or *ISO-BP-4.2.3.001 Control of Documents*.

**4.4 Creating BPs, CPs, QPs, SOPs, WIs, SW, and Forms**

**4.4.1** Development of new documents is determined by management, quality, and subject matter experts. Once the content is confirmed, a template from kencoconnection/quality is used to create the document. Review of the document will include personnel indicated in the Roles and Responsibilities section of the document. Participants in the development of forms will reference the associated document's Roles and Responsibilities. Flowcharts should be created prior to the documentation of a process.

**4.4.2** Final document approval is executed by management and quality with a signature and date. The author signs as the subject matter creator but not as approval.

**4.5 Adding and Removing Documents to the Control Procedure Manual or Site Quality Manual**



**4.5.1** Documents must be added to manuals on their effective date. New and revised processes "Go Live" on the effective date with personnel trained and signed off by the trainer (reference *CP-QE-6.2.2.001 Job Training and Certification Program*). Training is completed after documents are approved with appropriate signatures and dates but prior to or on the effective date. Update the appropriate master list.

**Note: Process changes may be implemented immediately if a safety or risk hazard must be mitigated. The specific failure for the safety or risk hazard must be documented in the corrective action document.**

**4.5.2** Previous versions of CPs are removed from the manual and destroyed. The originals are maintained by Best Practices and filed with the corresponding DCN. A new Appendix F (on kencoconnection.com) must be printed and placed in the CP manual.

**4.5.3** Previous versions of a site document are removed and filed with the corresponding DCN. Update "*Appendix A*" (reference *ISO-BP-4.2.3.001 Control of Documents*) in the SQM and update any controlled copies.

**4.6 BPs and CPs Releases and Exceptions**

**4.6.1** New and revised BPs, CPs, and related forms releases are scheduled on the 15th of each month by Best Practices on the kencoconnection "New Releases and Revisions page". **Note: Releases may occur other than the 15th of each month as "Special Releases".**

**4.6.2** Review the document with necessary personnel, management, quality and appropriate advocate or site subject matter expert.

**4.6.3** Determine if an exception is needed. Exceptions are granted for valid business reasons only. Exceptions must be approved by the Author Group that wrote the document. If the Site Manager and Quality Coordinator determine that an exception is needed, submit a *CP-QE-4.2.1.001-2 Exception Form*, stating the business case (justification) and the section of the document in question, to the listed email address on the form: KQMS.Exceptions@kencogroup.com .

**4.6.4** Once the exception is received by the Author Group QC, it is documented on the exception form and within 45 business days the exception must be closed out.

**4.6.5** If the exception is approved, the Author Group QC will scan and forward a signed copy of the exception form for the site to file, and the Site QC will indicate the exception on the site's "*Appendix D*".

**4.6.6** If the site does not receive an exception, the Author Group will inform the site of the reason for the rejection.

**4.6.7** Sites must develop a document to meet the requirements for a Best Practice. Best Practices are not filed at the site level.



| Document Number: CP-BP-4.2.1.001 | Title: QMS DOCUMENTATION | | | |
|---|---|---|---|---|
| Original Date: 06/07/06 | Revision Date: 07/12/12 | Revision #: 1 | Effective Date: 08/01/12 | 4 of 4 |

**4.7 SOPs, WIs, SW, and Forms Releases**

**4.7.1** Departments and sites schedule releases of their documents. Appropriate time for training after approval of a document but prior to effective date must be considered as a part of document development. Effective documents will be filed in the Site Quality Manual as described in *ISO-BP-4.2.3.001 Control of Documents*.

## 5.0 REFERENCES

*ISO-BP-4.2.3.001 Control of Documents*
*CP-BP-4.2.3.001-2 Exception Form*
*CP-QE-6.2.2.001 Job Training and Certification Program*

## 6.0 REVISION TABLE

| Revision # | Revision Date | Description |
|---|---|---|
| 0 | 06/07/06 | Document created. |
| 1 | 07/12/12 | Complete revision. |

*Proprietary Information - Kenco*

 Lloyd's Register
LRQA

# LRQA Assurance Statement

## Relating to Mars Incorporated's selected environmental metrics reported in the Principles in Action Summary for the calendar year 2013

This Assurance Statement has been prepared for Mars Incorporated (Mars) in accordance with our contract but is intended for the readers of this Report.

### Terms of Engagement

Lloyd's Register Quality Assurance, Inc. (LRQA) was commissioned by Mars to provide independent assurance on its seven selected environmental metrics reported in the Principles in Action (PiA) Summary for the calendar year 2013 to a limited level of assurance using LRQA's verification approach.

Our assurance engagement covered Mars' operations worldwide, with the exception of data from Logistics, Warehouses and Co-Processors, and specifically evaluated the reliability of the selected environmental metrics:

- Fossil Energy
- Renewable Energy
- Water Use
- Waste to Landfill
- Packaging Materials
- Raw Materials
- Production Tonnes

Note: This Assurance Statement may be used to support the AA1000AS assurance engagement undertaken by Corporate Citizenship

LRQA's responsibility is only to Mars. LRQA disclaims any liability or responsibility to others as explained in the end footnote. Mars' responsibility is for collecting, aggregating, analysing and presenting all the data and information within the PiA and for maintaining effective internal controls over the systems from which the PiA is derived. Ultimately, the Report has been approved by, and remains the responsibility of Mars.

### LRQA's Opinion

Based on LRQA's approach nothing has come to our attention that would cause us to believe that Mars has not disclosed reliable performance data, as no errors or omissions were detected within the seven selected environmental metrics reported in the PiA.

The opinion expressed is formed on the basis of a limited level of assurance and at the materiality of the professional judgement of the Verifier.

### LRQA's Approach

LRQA's assurance engagement was carried out in accordance with our verification approach; which is based on current best practice and uses the principles of AA1000AS (2008) and processes defined in ISAE3000. The following tasks though were undertaken as part of the evidence gathering process for this assurance engagement:

- Reviewing Mars' data collection and management processes with a central (corporate) resource who is located in Cleveland, Tennessee
- Evaluating Mars' data assumptions, calculation methods and data checking processes
- Confirming effective implementation of the data collection processes by visiting nine selected sites representative of four of Mars' six Global Business Segments:
  - Mars Chocolate
  - Mars Food
  - Mars Petcare
  - Wrigley



The sites visited were located in Australia, Canada, France, Spain, Thailand, United Kingdom and United States.

- Interviewing key personnel responsible for data collection, aggregation and data entry
- Interviewing the central data manager responsible for overall data collection, aggregation and checking
- Verifying a sample of the performance data back to its original source to check reliability of data entry into Mars reporting processes.

## Observations

Further observations and findings, made during the assurance engagement, are:

- Processes were in place to ensure that sites contributing to these seven selected environmental metrics understood Mars corporate reporting obligations
- Mars should continue working on LRQA's previous recommendations to:
  - Strengthen the internal communication processes for the Mars Data Manuals
  - Use direct transfer of environmental data from the source where possible to reduce the risk of manual data entry errors
  - Develop calibration requirements for meters used to measure environmental data

The above is an excerpt from the findings reported back to the management of Mars. They do not affect our opinion.

## LRQA's competence and independence

LRQA ensures the selection of appropriately qualified individuals based on their qualifications, training and experience. The outcome of all verification and certification assessments is then internally reviewed by senior management to ensure that the approach applied is rigorous and transparent. LRQA is Mars a certification body for 2nd Party Assessments Quality and Food Safety, Safety and Environmental, and Market Units and Mars 3rd Party Assessments for ISO 9001, ISO 14001, FSSC and ISO 22000.

The certification assessments are the only work undertaken by LRQA for Mars and as such do not compromise our independence or impartiality.

Signed

Dated: May 15, 2014

Andrea M. Bockrath
LRQA Lead Verifier
On behalf of Lloyd's Register Quality Assurance, Inc.

LRQA Reference: UQA4001571

Lloyd's Register Group Limited, its affiliates and subsidiaries, including Lloyd's Register Quality Assurance Limited (LRQA), and their respective officers, employees or agents are, individually and collectively, referred to in this clause as 'Lloyd's Register'. Lloyd's Register assumes no responsibility and shall not be liable to any person for any loss, damage or expense caused by reliance on the information or advice in this document or howsoever provided, unless that person has signed a contract with the relevant Lloyd's Register entity for the provision of this information or advice and in that case any responsibility or liability is exclusively on the terms and conditions set out in that contract.

The English version of this Assurance Statement is the only valid version. Lloyd's Register Group Limited assumes no responsibility for versions translated into other languages.


Lloyd's Register
LRQA

# LRQA's Data Assurance Statement

## Relating to Mars Incorporated's selected environmental metrics reported in the 2015 Principles in Action Summary

This Assurance Statement has been prepared for Mars Incorporated (Mars) in accordance with our contract but is intended for the readers of this Report.

### Terms of Engagement

Lloyd's Register Quality Assurance, Inc. (LRQA) was commissioned by Mars to provide independent assurance on seven selected environmental metrics reported in its Principles in Action Summary (PiA) for the calendar year 2015 to a moderate level of assurance using LRQA's verification approach.

Our assurance engagement covered Mars' operations worldwide and specifically evaluated the following requirements:

- Evaluating adherence to data reporting requirements in the Mars Data Manuals
- Reliability of the environmental metrics selected by Mars:
  - Energy (Fossil Fuels and Electric)
  - Renewable Energy
  - Water Use
  - Waste to Landfill
  - Packaging Materials
  - Raw Materials
  - Production Tonnes

Our assurance engagement excluded data from Logistics, Warehouses and Co-Processors.

LRQA's responsibility is only to Mars. LRQA disclaims any liability or responsibility to others as explained in the end footnote. Mars' responsibility is for collecting, aggregating, analysing and presenting all the data and information within the PiA and for maintaining effective internal controls over the systems from which the PiA is derived. Ultimately, the Report has been approved by, and remains the responsibility of Mars.

### LRQA's Opinion

Based on LRQA's approach nothing has come to our attention that would cause us to believe that Mars has not:

- Met the requirements of above
- Disclosed reliable performance data related to the seven selected environmental metrics

The opinion expressed is formed on the basis of a moderate level of assurance and at the materiality of the professional judgement of the Verifier.

**Note:** The extent of evidence-gathering for a moderate assurance engagement is less than for a high assurance engagement. Moderate assurance engagements focus on aggregated data rather than physically checking source data.

### LRQA's Approach

LRQA's assurance engagement was carried out in accordance with LRQA's verification approach. The following tasks were undertaken as part of the evidence gathering process for this assurance engagement:

- Reviewing Mars' data collection and management processes with a central (corporate) resource who was located in Cleveland, Tennessee
- Evaluating Mars' data assumptions, calculation methods and data checking processes
- Confirming effective implementation of the data collection processes by visiting ten selected sites representative of five of Mars' six Global Business Segments:
  - Mars Chocolate
  - Mars Food
  - Mars Petcare
  - Wrigley
  - Mars Symbioscience

  The sites visited were located in Russia, New Zealand, Argentina and United States.



Lloyd's Register
LRQA

- Interviewing key personnel responsible for data collection, aggregation and data entry
- Interviewing the central data manager responsible for overall data collection, aggregation and checking
- Verifying a sample of the performance data back to its original source to check reliability of data entry into Mars reporting processes.

## Observations

Further observations and findings, made during the assurance engagement, are:

- Processes were in place to ensure that sites contributing to these seven selected environmental metrics understood Mars corporate reporting obligations
- Clear evidence was present aligning site activities with PiA sustainability goals: Sending zero waste to landfill was the norm and some sites visited were purchasing or generating sustainable energy supporting the Mars 2040 goal of zero emissions
- Mars should continue working on LRQA's previous recommendations to:
  - Strengthen the internal communication processes for data collection, reporting and checking including awareness of the Mars Data Manuals and training for data reporters
  - Use direct transfer of environmental data from the source where possible to reduce the risk of manual data entry errors. Mars has begun developing and testing electronic data transfer processes
  - Develop calibration requirements for meters used to measure environmental data.
- Mars should review wastes generation and disposition associated with construction, remodelling and projects. These wastes are often managed by contractors and may not be in line with Mars Zero Waste to Landfill goal

The above is an excerpt from the findings reported back to the management of Mars. They do not affect our opinion.

## LRQA's Competence and Independence

LRQA ensures the selection of appropriately qualified individuals based on their qualifications, training and experience. The outcome of all verification and certification assessments is then internally reviewed by senior management to ensure that the approach applied is rigorous and transparent.

LRQA is the certification body for Mars' 2nd Party Assessments for:

- Quality and Food Safety
- Safety and Environmental
- Social audits of Mars sites

and Mars' 3rd Party Assessments for:

- ISO 9001
- ISO 14001
- FSSC and ISO 22000
- WRI/WBCSD GHG Protocol.

These assessments are the only work undertaken by LRQA for Mars and as such do not compromise our independence or impartiality.

Signed

Dated: May 27, 2016

Andrea M. Bockrath
LRQA Lead Verifier

Lloyd's Register Group Limited, its affiliates and subsidiaries, including Lloyd's Register Quality Assurance Limited (LRQA), and their respective officers, employees or agents are, individually and collectively, referred to in this clause as 'Lloyd's Register'. Lloyd's Register assumes no responsibility and shall not be liable to any person for any loss, damage or expense caused by reliance on the information or advice in this document or howsoever provided, unless that person has signed a contract with the relevant Lloyd's Register entity for the provision of this information or advice and in that case any responsibility or liability is exclusively on the terms and conditions set out in that contract.

The English version of this Assurance Statement is the only valid version. Lloyd's Register Group Limited assumes no responsibility for versions translated into other languages.



Lloyd's Register
LRQA

On behalf of Lloyd's Register Quality Assurance, Inc.
1330 Enclave Pkwy, Suite 200
Houston, Texas 88077
LRQA Reference: UQA4001571

Lloyd's Register Group Limited, its affiliates and subsidiaries, including Lloyd's Register Quality Assurance Limited (LRQA), and their respective officers, employees or agents are, individually and collectively, referred to in this clause as 'Lloyd's Register'. Lloyd's Register assumes no responsibility and shall not be liable to any person for any loss, damage or expense caused by reliance on the information or advice in this document or howsoever provided, unless that person has signed a contract with the relevant Lloyd's Register entity for the provision of this information or advice and in that case any responsibility or liability is exclusively on the terms and conditions set out in that contract

The English version of this Assurance Statement is the only valid version. Lloyd's Register Group Limited assumes no responsibility for versions translated into other languages.



| Document Number: ISO-BP-4.2.3.001 | Title: CONTROL OF DOCUMENTS | | | |
|---|---|---|---|---|
| Original Date: 04/07/06 | Revision Date: 07/16/12 | Revision #: 1 | Effective Date: 08/01/12 | 1 of 8 |

Author: **Quality Assurance and Regulatory Affairs Director, Best Practices/Date**

07/17/12

Approval: **QC, Best Practices/Date**

07/17/12

Approval: **VP, Best Practices/Date**

Jason J. Minghini 07/17/12

## 1.0 PURPOSE / SCOPE

The purpose of this document is to identify actions and responsibilities for ensuring the control of all quality documents pertaining to Kenco's Quality Management System (KQMS).

This document applies to all Kenco functions and operations and encompasses all internal and external documents used to manage, perform, or verify work including those included at the top tier level as Policies (POLs), Control Procedures (CPs), Best Practices (BPs), ISO Control Procedures (ISOs), Rivermill Procedures (RMPs), and at the site level in Quality Plans (QPs), Standard Operating Procedures (SOPs, Work Instructions (WIs), Standard Work (SW), and Forms.

## 2.0 ROLES AND RESPONSIBILITIES

**Kenco Management Services (KMS) – Best Practices** – has overall responsibility for the document control system, including the issuance and maintenance of this procedure. KMS-Best Practices controls and maintains all electronic information systems and the distribution, as well as, both hard copy and electronic copies of Policies (POL), ISO Control Procedures (ISO), Control Procedures (CP), Best Practices (BP), and Rivermill Procedures (RMP). All proposed changes and other suggestions for improvement of these procedures can be submitted online via the kencoconnection.com page.

**Site Quality Coordinator** – controls and maintains all electronic information systems and the distribution of related information, as well as, both hard copy and electronic copies of the Site Quality Manual, all SOPs, Job Descriptions (JD), and all forms ( and formats) used to create quality records.

**Designated Approval Authorities** – responsible to approve, reapprove and ensure adequacy of documents prior to release.

**Site Managers** – ensure conformance to this procedure at their site.

**All Associates** – are responsible to understand the structure and process of the Control of Documents Control Procedure.



| Document Number: ISO-BP-4.2.3.001 | Title: CONTROL OF DOCUMENTS | | | |
|---|---|---|---|---|
| Original Date: 04/07/06 | Revision Date: 07/16/12 | Revision #: 1 | Effective Date: 08/01/12 | 2 of 8 |

## 3.0 POLICY

**3.1** The primary objective of the document control process is to ensure that documents are available to achieve the desired results. Document control is a critical factor in achieving standardization and measurement to achieve customer satisfaction, process effectiveness and improvement. The document control process provides adequate control for all documents and media, including hard copy, firmware, and software control.

**3.2** KMS-Best Practices controls, maintains, and distributes Quality Management system (QMS) documentation via kencoconnection for POLs, ISOs, CPs, BPs, and RMPs.

**3.3** POL, ISO, CP, BP, and RMP documents are approved for adequacy prior to release for use by a cross-functional panel called the Quality Review Board (QRB). Records of signed approvals are maintained by KMS-Best Practices.

**3.4** The sites control, maintain, and distribute all customer-provided and site generated documents such as quality plans, related inspection/test procedures, specifications, etc., including all QPs, SOPs, WIs, SW, JDs, Forms, or other documents as defined by the customer or site needs.

**3.5** Site documents are approved for adequacy by the Site Manager and Quality Coordinator (QC) prior to release, and personnel are trained after approval but before the documents are effective.

**3.6** Approved Author Groups will review top tier documents annually, and the documents are reviewed for policy and accuracy, availability and legibility. All document updates and changes are approved prior to re-issue.

**3.7** Site leadership will review site documents annually, and the documents are reviewed for process accuracy, availability and legibility. All document updates and changes are approved prior to re-issue.

**3.8** External documents are identified on Appendix B and their distribution controlled.

**3.9** Records are a special type of document and are controlled in accordance with provisions contained in this procedure and *ISO-QE-4.2.4.001 Control of Records*.

**3.10** Obsolete documents are processed and maintained as described in Section 4.7 of this procedure.

## 4.0 PROCEDURE

**4.1** Documents will be identified with a unique identification number including the date of issue, which indicates the revision, appearing on all pages of the document.

**4.2 Identification of Top Tier Procedures**



| Document Number: ISO-BP-4.2.3.001 | Title: CONTROL OF DOCUMENTS | | | |
|---|---|---|---|---|
| Original Date: 04/07/06 | Revision Date: 07/16/12 | Revision #: 1 | Effective Date: 08/01/12 | 3 of 8 |

**4.2.1** Documents including POLs, BPs, CPs, ISOs, and RMPs will be identified with a unique identification number including a 2-digit code which indicates the approved author group which created the document.

**4.2.2** The document number will be numbered as: **[Document Type]** – **[Author Group Code]** – **[ISO Clause].[Sequential Number].** For example: The **third Control Procedure** written by **Human Resources** discussing **Training (Clause 6.2.2 in ISO)** would be: **CP-HR-6.2.2.003**.

**Note:** Forms add a dash then a number to the document number which relates to them. The training form for the above procedure would be **CP-HR-6.2.2.003-1**.

**4.2.3** The **Document Type** would be **POL** for Policies, **ISO** for ISO Procedure, **CP** for Control Procedure, **BP** for Best Practices or **RMP** for Rivermill Procedure.

**4.2.4** The **Author Group Code** from the list below will follow the document type:

| Approved Author Groups | Code |
|---|---|
| Best Practices | BP |
| Executive Management | EM |
| Finance | FN |
| Human Resources | HR |
| Internal Communications | IC |
| Insurance | IN |
| Information Technology | IT |
| Logistics Engineering | LE |
| Legal | LG |
| Operations | OP |
| Procurement | PO |
| Quality Engineering | QE |
| Risk Management | RM |
| Sales/Marketing | SA |
| Training | TR |

**4.2.5** The **Appropriate ISO Clause** will follow the **Author Group Code**. Consult the "Cracking the Case of ISO 9001:2008 for Service" book by Cianfrani and West.

**4.2.6** To find the next **Sequential Document Number** for a given ISO Clause, the QC must view the complete document list for their Author Group.

**4.2.7** **ISO Procedures (ISO) –** ISO Procedures are procedures developed by KMS-Best Practices Department that directly controls the KQMS. These ISO procedures are identified as ISO-BP-##. An example can be found in the header of this document.



**4.2.8 Rivermill Procedures (RMP)** – Rivermill Procedures are documents developed by approved author groups that only apply to the Rivermill office. These procedures will be identified as RMP-(Author Group Code)-##.

**4.2.9 Best Practices (BP)** – Best Practices are documented practices that provide guidance to sites in the development of SOPs. The sites must address the content of these documents in their procedures, however, the BPs themselves are not retained by the sites. All Best Practices are identified as BP-(Author Group Code)-##.

**4.2.10 Control Procedures (CP)** – Control Procedures are directives. These procedures will be identified as CP-(Author Group Code)-##.

**4.2.11 Policies (POL)** – Policies are documents developed by approved author groups describing general principles and identified as POL-(Author Group Code)-##.

**4.3 Numbering Identification of Site Documents**

**4.3.1** The document number will be numbered as: **[Document Type]-[ISO Clause].[Sequential Number]**. For example: The third **SOP** written discussing **Training (Clause 6.2.2. in ISO)** would be: **SOP-6.2.2.003**.

Note: Forms add a dash then a number to the SOP number which relates to them. The training form for the above procedure would be **SOP-6.2.2.003**-1.

**4.3.2** The Document Type would be SOP for Standard Operating Procedure or JD for Job Description, WI for Work Instruction, SW for Standard Work, etc.

**4.3.3** The appropriate ISO Clause follows the Document Type: Consult the "Cracking the Case of ISO 9001:2008 for Service" book by Cianfrani and West.

**4.3.4** To find the next Sequential Document Number for a given ISO Clause. The QC must view the complete document list for their site.

**4.3.5 Standard Operating Procedures (SOP)** – SOPs will be identified as SOP ## with the number of the SOP corresponding to the associated Site Quality Plan (SQP) clause. For example: "SOP-6.2.2.001 indicates the SOP corresponds to Clause 6.2.2 of the site's SQP and is procedure 001.

**4.3.6 Job Descriptions (JD) –** JDs will be identified as JD-5.5.1.## with the number of the JD corresponding to the associated SQP 5.5.1 Clause (Responsibility and Authority). For example, "JD-5.5.1.001" indicate the first JD in the system.



4.3.7 All forms applicable to a document will be identified as **[Document Type]-[ISO Clause].[Sequential Number]-[Form Number]**. **Effective Date** in the footer at the bottom of the form. For example: **SOP-7.5.1.001-2 Effective 04/01/08**. This example is the second form attached to **SOP-7.5.1.001** and was **last revised on 04/01/08**. The identification number, effective date of issue or revision date will be shown on all pages of documents.

**4.4 Document Approval –** The first page of each document will identify:

**4.4.1** The Author as the Subject Matter Expert that is responsible for developing the document or changes.

**4.4.2** The QC as the reviewer/approver responsible for its periodic review for compliance with KQMS requirements, consistency with established policy and objectives, update and maintenance.

**4.4.3** The relevant approval authority (i.e. VPs or Directors are assigned approval authority for top tier documents, Site Manager is assigned overall responsibility in the QP for managing the process and authorizing release of site documents).

**4.5 Master Lists –** At a minimum, the following master lists will be established and maintained. These lists must contain a date identifying when the list was last updated:

**4.5.1** A master list of Site KQMS Documents (SOPs, JDs, WIs, and SW) is maintained as Appendix "A" of the QP.

**4.5.2** A master list of all external documents, customer procedures and manuals are maintained in Appendix "B" of the QP.

**4.5.3** A master list of quality plans, specifications, and related inspection/test procedures are maintained in Appendix "C" of the QP.

**4.5.4** A master list of exceptions to top tier documents is maintained in Appendix "D" of the QP. Exceptions are obtained per instructions in *CP-BP-4.2.1.001 QMS Documentation*.

**4.5.5** A master list of site distribution of manuals is maintained in Appendix "E" of the QP.

**4.5.6** A master list of Control Procedures is maintained by KMS-Best Practices and the sites print this as Appendix "F" of their QP.

**4.5.7** A master list of records is recorded in the Index of Quality Records. Reference *ISO-QE-4.2.4.001 Control of Records*.

**4.6 Document Issue and Retrieval**



**4.6.1** Hard copy master signed originals of all controlled documents will be identified with original signature and dates of the relevant approval authority. Controlled copies will be clearly identified with a red ink stamp identifying the document as a "CONTROLLED COPY". A controlled copy stamp signifies the QC guarantees that the controlled copy is identical to the master signed copy.

**Note:** Controlled copy stamps may only be applied to documents which the QC is in possession of master signed copies (in indelible ink). Verification of accuracy of controlled copies cannot be guaranteed without physical comparison to the master site copy.

**4.6.2** Uncontrolled copies may be made, but the recipient of these documents must be advised that they are for information only and cannot be guarantee of their accuracy once copied.

**4.6.3** Sites that must maintain compliance of documentation for regulatory agencies, [i.e. Food and Drug Administration (FDA)] will be provided current controlled copies of ISOs and CP-QE/BPs from Best Practices. Best Practices and site's QCs will complete *ISO-BP-4.2.3.001-3 Controlled Copy Distribution Form* as controlled copies are distributed, obsolete, and destroyed.

**4.7 Document Changes**

**4.7.1** KMS-Best Practices uses a *Document Change Notice (DCN) ISO-BP-4.2.3.001-1* to request and document any changes to the POL, BP, CP, RMP or forms.

**4.7.2** Sites use a DCN to request and document any changes to QPs, SOPs, WIs, SW, JDs, or forms.

**4.7.3** The following steps describe how to use DCNs in the internal document change control process:

**4.7.3.1** The personnel requesting a document change completes the applicable part of the DCN and forwards the DCN to the QC.

**4.7.3.2** The QC will review the recommended change to the document and submit to the relevant approval authority with related comments concerning any policy or procedural issues. The QC will keep a log of the DCN to track the progression of the document change process. See *DCN System Control Log (ISO-BP-4.2.3.001-2).*

**4.7.3.3** The QC will keep their DCN Log up-to-date in their Quality folder on the Kenco network drive, or if no access is available they will send a copy of the DCN Log to KMS-Best Practices on the first Tuesday of every month.

**4.7.3.4** The relevant approval authority will utilize SMEs to determine if the change is required, effectiveness of the change, safety issues and possible related processes that may be affective by the change. Once the SME has completed the determination and adjusted the content of the document back to the approval authority for final review.



**4.7.3.5** If the relevant approval authority decides to implement the proposed change, they will approve the DCN and return it along with any related comments and recommendations to the QC for preparation of a final "ready for signature" copy of the revised document.

**4.7.4** Upon receiving the approval authority signature, the QC will:

**4.7.4.1** Change the appropriate portion of the document. The revised document must be reissued in its entirety.

**4.7.4.2** Update the Revision Date, Revision #, and Effective Date in the header of the document.

**4.7.4.3** Submit the "ready for signature" copy of the document to the author for signature as the SME of the process.

**4.7.4.4** Submit the "ready for signature" copy of the document to the relevant approval authority for signature. The approval authority will verify the accuracy and legibility of the document before approving. The QC must also approve the document.

**4.7.4.5** Reissue the document in its entirety. The revised documents may be accompanied by a memo summarizing the nature of the change or providing instructions regarding disposition of obsolete documents or pages.

**4.7.4.6** Retrieve the obsolete controlled document(s).

**4.7.4.7** Archive the obsolete master (signed) controlled document and file with the DCN (destroy the obsolete controlled copies).

**4.7.4.8** Update the applicable master list.

**4.7.4.9** Coordinate with the designated trainer to ensure the timely provision of needed training if deemed necessary, (i.e. the change impacts the policy or procedure). Simple grammatical or typographical changes (administrative changes) do not require training.

**4.7.5** If the relevant approval authority decides not to implement the proposed change, they will reject the DCN and contact the originator with an explanation.

- If the originator chooses to dispute the rejection, they can submit the DCN and any related comments to the QC for mediation. If the QC rejects the DCN, the rejection will be communicated to the relevant approval authority and originating associate. If the QC determines that the proposed change (or a modified version of the initial proposed change) merits further review, they will initiate a new DCN and forward it to the relevant approval authority with related comments and recommendations.



KENCO

| Document Number: ISO-BP-4.2.3.001 | Title: CONTROL OF DOCUMENTS | | | |
|---|---|---|---|---|
| Original Date: 04/07/06 | Revision Date: 07/16/12 | Revision #: 1 | Effective Date: 08/01/12 | 8 of 8 |

## 5.0 REFERENCES

*CP-BP-4.2.1.001 QMS Documentation*
*ISO-BP-4.2.3.001-1 DCN Change Notice Form*
*ISO-BP-4.2.3.001-2 DCN System Control Log*
*ISO-BP-4.2.3.001-3 Controlled Copy Distribution List*
*ISO-QE-4.2.4.001 Control of Records*

## 6.0 REVISION TABLE

| Revision # | Revision Date | Description |
|---|---|---|
| 0 | 04/07/06 | Document created. |
| 1 | 07/16/12 | Complete revision. |

*Proprietary Information - Kenco*

< 277 Results for edith

**FW: Employee Relations Announcement**

From: Madison, Mary <Mary.Madison@Kencogroup.com>
To: lagniappe26 <lagniappe26@aol.com>
Date: Fri, Aug 9, 2013 9:42 am

Copy of KLS Org Char...pdf (183 KB)

---

Thank you kindly,

Mary Madison
Quality Engineer

Kenco/Mars
1125 West Sycamore Road
Manteno, IL 60950
815.468.4448
www.Kencogroup.com

This message and any attachments are intended only for the use of the addressee and may contain information that is privileged and confidential. If the reader of the message is not the intended recipient or an authorized representative of the intended recipient, you are hereby notified that any dissemination of this communication is strictly prohibited. If you have received this communication in error, notify the sender immediately by return email and delete the message and any attachments from your system.

---

**From:** McCurry, Edith
**Sent:** Monday, July 08, 2013 7:59 PM
**To:** Madison, Mary
**Subject:** FW: Employee Relations Announcement

Edith McCurry

Kenco Logistics Services
1125 Sycamore Rd
Manteno, IL 60950
www.kencogroup.com
Email: Edith.McCurry@KencoGroup.com
Office 815-468-9999, X464
Fax 1-815-468-2468

---

**From:** Register, Eddy
**Sent:** Friday, June 28, 2013 9:07 AM
**Cc:** Tate, Tammie; Fowler, Tammi; Register, Eddy
**Subject:** Employee Relations Announcement

*All,*

*The Human Resources department has restructured the site reporting responsibility for all Employee Relations concerns/issues. Currently, Tammi Fowler is the Senior Manager of Employee Relations for all sites and Tammie Tate is the Senior HR Manager for the Stryker and Whirlpool accounts. To ensure that all of our sites continue to receive exceptional support and guidance from the HR department, we have reallocated their areas of responsibility. I have attached a chart which details the specifics of the new reporting structure.*

*With these changes and the addition of Marti Donovan to the HR team, we will better equipped to meet your Employee Relations needs and provide outstanding support to all of our sites. These changes will be effective July 1, 2013. Tammi Fowler, Tammie Tate, and Marti Donovan will report directly to the VP of Human Resources.*

*Please do not hesitate to contact me if you have any concerns and or questions about the new structure.*

*Regards,*

**Eddy Register**
**Director of Recruiting & Development**
**Kenco Human Resources**

**Kenco Management Services, LLC**
**P.O. Box 1607**
**2001 Riverside Drive (37406)**
**Chattanooga, TN 37401**
**Phone: 423-643-3235**
**Fax: 423-643-3325**
**www.kencogroup.com**

Exhibit 9

KENCO
KENCO LOGISTIC SERVICES, LLC ORGANIZATIONAL CHART
SHELIA CRANE, PRESIDENT - KENCO
DAVID CAINES, President, Kenco Logistic Services, LLC
Employee Relations Responsibility
Total Headcount 3693
TODD JOHNSON
Senior Vice President, Operations
SEAN COAKLEY
Senior Vice President, Sales & Marketing
JOHN LAMB
Senior Vice President, Operations
TBD
Senior Vice President, Transportation
CARTECH
MIN
INVISTA
DUPONT - Orange, TX
CARRIER - Chatt, TN
AMERICAN STD - Dallas, TX
GSK-CONSUMER
GSK - PHARM
VALEANT
MARS
TBD
GMCR/KEURIG
USG
GPI
Chuck Cobb, Grp Mgr
KOHLER
STEELCASE
Rachel Bousello, Grp Mgr
WHIRLPOOL
WP CANADA
STRYKER SITES
CUMMINS
HONEYWELL
HAIER
ELECTROLUX
KOMATSU
RALSTON
6/28/2013

KENCO
Common Sense Uncommon Value

# KOS Update – Quality Management System

DISTRIBUTION & FULFILLMENT

TRANSPORTATION MANAGEMENT

SUPPLY CHAIN INTELLIGENCE

## Accomplishments to Date:

1. 2013 Mars QA Audit = 9 findings w/ 9 closed
2. QA library established (Appendix A)
   1. SOPs = 62
   2. Job Descriptions = 20
   3. Work Instructions = 15
   4. QA chapters = 9
3. CPAR process fully implemented
4. 2014 Job Training Matrix & Schedule developed.
   1. 10 week initial round 1 training
5. FDA, OSHA & ISO complainant
6. Red Prairie Job Training Matrix & Schedule defined and currently implemented



## Coming Soon:

1. Internal auditing. Site QA schedule visit to Zeeland Site for shadow training w/ Corp QA
2. Audit schedule is developed but execution awaits QA training.
3. Internal Audit Teams (shift advocates)
4. Red Prairie Process Flow Reviews
5. Creation of Red Prairie SOP
6. 2014 Facility Training Strategy

Exhibit 10







CONFIDENTIAL

# MARS MANTENO
## APPENDIX A

Last Updated:

| SQP INDEX | DOCUMENT TITLE | DOCUMENT NUMBER | EFFECTIVE |
|---|---|---|---|
| | | | |
| **MISSION, POLICY, VALUES & BELIEFS** | | | |
| | | | |
| **1. Scope** | | | |
| 1.1 General | | | |
| 1.2 Application | | | |
| | | | |
| **2. Normative Reference** | | | |
| | | | |
| **3. Terms and Definitions** | | | |
| | | | |
| **4. Quality Management System** | | | |
| 4.1 General Requirements | | | |
| 4.2 Documentation Requirements (Title Only) | | | |
| 4.2.1 General | | | |
| 4.2.2 Quality Manual | | | |
| 4.2.3 Control of Documents | Control Of Documents | ISO-QE-4.2.3.001 | Printed |
| | | | |
| | | | |
| | | | |
| 4.2.4 Control of Records | Control of Records | ISO-QE-4.2.4.001 | Printed |
| | Document Rentention Personnel Files | SOP-HR-4.2.4.001 | Need |
| | | | |
| **5. Management Responsibilities** | | | |
| 5.1 Management Commitment | | | |
| 5.2 Customer Focus | | | |
| | Customer Review | SOP-OP-5.2.001 | Need |
| 5.3 Quality Policy | Quality Policy | POL-BP-5.3.001 | Need |
| | Food Safety Policy | POL-BP-5.3.002 | Need |
| | | | |
| | | | |
| 5.4 Planning (Title Only) | | | |
| 5.4.1 Quality Objectives | | | |
| 5.4.2 Quality Management System Planning | | | |
| 5.5 Responsibility, Authority and Communication (Title Only) | | | |
| 5.5.1 Responsibility and Authority | | | |
| | General Manager | JD-5.5.1001 | Placed in book |
| | Operations Manager | JD-5.5.1002 | Placed in book |
| | Qualtiy Engineer | JD-5.5.1003 | Placed in book |
| | KOS Engineer | JD-5.5.1004 | Placed in book |
| | Facility Manager | JD-5.5.1005 | Placed in book |
| | Office Manger | JD-5.5.1006 | Placed in book |
| | HR Admin | JD-5.5.1007 | Placed in book |
| | Power User | JD-5.5.1008 | Placed in book |
| | Safety Coordinator | JD-5.5.1009 | Placed in book |
| | Office Supervisor | JD-5.5.1010 | Placed in book |
| | Warehouse Supervisor | JD-5.5.1011 | Placed in book |
| | General Maintenance | JD-5.5.1012 | Placed in book |
| | Inventory Clerk | JD-5.5.1013 | Placed in book |
| | Wareshouse lead | JD-5.5.1014 | Placed in book |
| | Warehouse Associates | JD-5.5.1015 | Placed in book |
| | Claims Clerk | JD-5.5.1016 | Placed in book |
| | Clerk | JD-5.5.1017 | Placed in book |
| | Yard Spotter | JD-5.5.1018 | Placed in book |
| | Cycle Counter | JD-5.5.1019 | Placed in book |
| | Lift Maintenance | JD-5.5.1020 | Placed in book |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| 5.5.2 Management Representative | | | |
| 5.5.3 Internal Communication | | | |
| 5.6 Management Review | | | |
| 5.6.1 General | | | |
| 5.6.2 Review Input | | | |
| | | | |
| | | | |
| 5.6.3 Review Output | | | |
| | | | |
| **6. Resource Management** | | | |
| | | | |
| 6.1 Provision of Resources | Visitor & Contractor Procedure | SOP-OP-6.1.001 | is this the inbound, outnoud security policy, if so need update, if not needed |
| | | | |
| | | | |
| | | | |
| 6.2 Human Resources | | | |
| | | | |
| | | | |

# MARS MANTENO
## APPENDIX A

Last Updated:

| SQP INDEX | DOCUMENT TITLE | DOCUMENT NUMBER | EFFECTIVE |
|---|---|---|---|
| 6.2.1 General | | | |
| | Dress Code | SOP-HR-6.2.1.001 | need updated version |
| 6.2.2 Competence, Awareness, and Training | | | |
| | Current Good Manufacturing Practices (cGMPs) | SOP-BP-6.2.2.002 | need updated version |
| 6.3 Infrastructure | | | |
| | Glass/Brittle Policy | SOP-OP-6.3.001 | |
| | Equipment Controls | SOP-OP-6.3.002 | need updated version |
| 6.4 Work Environment | | | |
| | Ammonia | | are we using the SOP's for these |
| | Emergency Contingency Plan | | |
| | Basic First Aid | | |
| | Temeprature Stress-Heat | | |
| | Pest Control | | Verify number |
| **7. Product/Service Realization** | | | |
| 7.1 Planning of Product/Service Realization | | | |
| 7.2. Customer Related Processes | | | |
| 7.2.1 Determination of Requirements Related to the Product/Service | | | |
| 7.2.2 Review of Requirements Related to the Product/Service | | | |
| 7.2.3 Customer Communication | | | |
| 7.3 Design and Development | | | |
| 7.3.3 | Change Control | SOP.BP.7.3.3.001 | Added to list |
| 7.4 Purchasing | | | |
| 7.4.1 Purchasing Process | | | |
| 7.4.2 Purchasing Information | | | |
| 7.4.3 Verification of Purchased Product | | | |
| 7.5 Product and Service Provision (Title Only) | | | |
| 7.5.1 Control of Product and Service Provision | | | |
| | HACCP Policy | POL-BP-7.5.1.001 | need updated vrrsin |
| | HACCP Plan | POL-BP-7.5.1.001-1 | |
| | HACCP Flow Chart | POL-BP-7.5.1.001-2 | |
| | Ice Cream Overflow | | |
| | In and Out Log | | |
| | Pallet Infestation | | |
| | Pallet Inspection | | |
| | Pallet Receipt | | |
| | Seal and Temp Compliance | | |
| | Temp & Humidity | | |
| | Trailer Departure | | |
| | Welcome Center Training | | |
| | Grinder | | |
| | Cutting outbound Shipments | | |
| | Unloading Procedure | | |
| | Inbound Unloading | | |

# MARS MANTENO
## APPENDIX A

Last Updated:

| SQP INDEX | DOCUMENT TITLE | DOCUMENT NUMBER | EFFECTIVE |
|---|---|---|---|
| | Replen Process | | |
| | Loading Process | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | GMP | | |
| | Good Safe Practices | | |
| | Allergen Protocol | | |
| | | | |
| | Dock Inspection | | |
| | | | |
| | Dock Door Inspection | | |
| | Refrigeration inspection | | |
| | Rack Inspection | | |
| | Kenco Fall Protection | | |
| | | | |
| | Exit Check | | |
| | | | |
| | Kenco Fire Pump Maintenance | | |
| | Fire Pump Test Form2 | | |
| | Fire Pump Test Form Electrical | | |
| | Fire Valve Inspection | | |
| | Kenco Inspection & Testing | | |
| | Fire Safety auidt | | |
| | Gen Set 2013 | | |
| 7.5.2 Validation of Processes for Production and Service Provision | | | |
| 7.5.3 Identification and Traceability | Count Back | SOP-OP-7.5.3.201 | |
| | | | |
| | | | |
| | | | |
| 7.5.4 Customer Property | | | |
| 7.5.5 Preservation of Product | | | |
| | Trailer Arrival | SOP-OP-7.5.5.101 | |
| | Trailer Departure | SOP-OP-7.5.5.102 | |
| | Yard Spotting | SOP-OP-7.5.5.103 | |
| | Spotter Checklist | | |
| | Lot Checks | | |
| | Pallet Inspection | | |
| | | | |
| | | | |
| | | | |
| | Processes for Interleaving, Bulk Picking, Putaway and Transfer | SOP-OP-7.5.1.201 | |
| | Freight Picking | SOP-OP-7.5.1.202 | |
| | | | |
| | | | |
| | | | |
| | Shipping Process | SOP-OP-7.5.5.204 | |
| | | | |
| | | | |
| | Cycle Count | SOP-OP-7.5.5.301 | |
| | Physical Inventory | SOP-OP-7.5.15302 | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| 7.6 Control of Monitoring and Measuring Devices | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | Equipment Controls | SOP-OP-6.3.002 | |
| **8. Measurement, Analysis, and Improvement** | | | |
| 8.1 General | | | |
| 8.2 Monitoring and Measurement (Title Only) | | | |
| 8.2.1 Customer Satisfaction | | | |
| 8.2.2 Internal Audit | | | |
| | Internal Audits | ISO-QE-8.2.2.001 | |
| 8.2.3 Monitoring and Measurement of Processes | | | |
| 8.2.4 Monitoring and Measurement of Product | | | |
| 8.3 Control of Nonconforming Product | | | |
| | Control of Nonconforming Product | ISO-QE-8.3.001 | |
| | Overages, Shortages and Damages | SOP-OP-8.3.001 | |
| | | | |

# MARS MANTENO
## APPENDIX A

Last Updated:

| SQP INDEX | DOCUMENT TITLE | DOCUMENT NUMBER | EFFECTIVE |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| 8.4 Analysis of Data | | | |
| 8.5 Improvement (Title Only) | | | |
| 8.5.1 Continual Improvement | | | |
| | Continual Improvement | ISO-QE-8.5.1.001 | |
| 8.5.2 Corrective Action | | | |
| 8.5.3 Preventive Action | | | |
| | | | |

# Top Tier Documents (Appendix F)

Forms included on this appendix are not required to be printed in this manual. Forms are printed from w

Content last updated: 5/15/13

| SQP INDEX | DOCUMENT TITLE | DOCUMENT TYPE | DOCUMENT NUMBER | EFFECTIVE |
|---|---|---|---|---|
| **1.0 Scope** | | | | |
| 1.1 General | | | | |
| 1.2 Application | | | | |
| **2. Normative Reference** | | | | |
| **3. Terms and Definitions** | | | | |
| **4. Quality Management System** | | | | |
| 4.1 General Requirements | | | | |
| 4.2 Documentation Requirements (Title Only) | | | | |
| 4.2.1 General | QMS Documentation | Control Procedure | CP-BP-4.2.1.001 | 8/1/2012 |
| 4.2.1 General | Exception Form | Form | CP-BP-4.2.1.001-2 | 8/1/2012 |
| 4.2.2 Quality Manual | | | | |
| 4.2.3 Control of Documents | Control of Documents | ISO Procedure | ISO-BP-4.2.3.001 | 8/1/2012 |
| 4.2.3 Control of Documents | DCN Form and Log | Form | ISO-BP-4.2.3.001-1 thru 2 | 8/1/2012 |
| 4.2.3 Control of Documents | Controlled Copy Distribution Form | Form | ISO-BP-4.2.3.001-3 | 8/1/2012 |
| 4.2.4 Control of Records | Control of Records | ISO Procedure | ISO-QE-4.2.4.001 | 3/1/2010 |
| 4.2.4 Control of Records | Index of Quality Records | Form | ISO-QE-4.2.4.001-1 | 6/1/2008 |
| 4.2.4 Control of Records | Central Safety/Security File Policy | Control Procedure | CP-RM-4.2.4.100 | 1/1/2013 |
| 4.2.4 Control of Records | OSHA Recordkeeping Policy and Procedure | Control Procedure | CP-RM-4.2.4.101 | 6/1/2009 |
| **5. Management Responsibilities** | | | | |
| 5.1 Management | | | | |
| 5.2 Customer Focus | | | | |
| 5.3 Quality Policy | | | | |
| 5.4 Planning (Title Only) | | | | |
| 5.4.1 Quality Objectives | | | | |
| 5.4.2 Quality Management System Planning | | | | |
| 5.5 Responsibility, Authority and Communciation (Title | | | | |
| 5.5.1 Responsibility and Authority | IT Kenco Power User | Control Procedure | CP-IT-5.5.1.001 | 4/1/2008 |
| 5.5.1 Responsibility and Authority | Lean Champion | Control Procedure | CP-LE-5.5.1.001 | 5/1/2011 |
| 5.5.1 Responsibility and Authority | Quality Coordinator | Control Procedure | CP-QE-5.5.1.001 | 10/1/2011 |
| 5.5.1 Responsibility and Authority | Quality Coordinator Training Record | Form | CP-QE-5.5.1.001-1 | 8/1/2011 |
| 5.5.1 Responsibility and Authority | EIP Coordinator | Control Procedure | CP-QE-5.5.1.002 | 9/1/2010 |
| 5.5.1 Responsibility and Authority | EIP Coordinator Training Record | Form | CP-QE-5.5.1.002-1 | 1/1/2011 |
| 5.5.1 Responsibility and Authority | KFMS Coordinator | Control Procedure | CP-QE-5.5.1.003 | 5/1/2011 |
| 5.5.1 Responsibility and Authority | KFMS Coordinator Training Record | Form | CP-QE-5.5.1.003-1 | 5/1/2011 |
| 5.5.1 Responsibility and Authority | CMV Site Fleet Safety Coordinator Responsibilities | Control Procedure | CP-RM-5.5.1.001 | 12/1/2012 |
| 5.5.1 Responsibility and Authority | Site Fleet Safety Coordinator Training Record | Form | CP-RM-5.5.1.001-1 | 12/1/2012 |
| 5.5.1 Responsibility and Authority | Site Fleet Safety Coordinator Job Posting | Form | CP-RM-5.5.1.001-2 | 4/1/2008 |
| 5.5.1 Responsibility and Authority | Safety-Security Advocate Policy | Control Procedure | CP-RM-5.5.1.100 | 10/1/2012 |

Exhibit 11

| | | | | |
|---|---|---|---|---|
| 5.5.1 Responsibility and Authority | Security Equipment Inspection Checklist | Form | CP-RM-5.5.1.100-1 | 1/1/2009 |
| 5.5.1 Responsibility and Authority | Safety-Security Advocate Job Training Record | Form | CP-RM-5.5.1.100-2 | 9/1/2010 |
| 5.5.1 Responsibility and Authority | Regional Safety-Security Advocate Policy | Control Procedure | CP-RM-5.5.1.101 | 9/1/2010 |
| 5.5.1 Responsibility and Authority | Monthly Call in Summary Report | Form | CP-RM-5.5.1.101-1 | 3/1/2013 |
| 5.5.1 Responsibility and Authority | Regional Safety-Security Advocate Job Training Record | Form | CP-RM-5.5.1.101-3 | 9/1/2010 |
| 5.5.1 Responsibility and Authority | Senior Regional Safety-Security Advocate Job Training Record | Form | CP-RM-5.5.1.101-4 | 5/1/2009 |
| 5.5.1 Responsibility and Authority | Requirements for Kenco Managed Security Officers | Control Procedure | CP-RM-5.5.1.200 | 12/1/2010 |
| 5.5.1 Responsibility and Authority | Security Officer Shift Report | Form | CP-RM-5.5.1.200-1 | 12/1/2010 |
| 5.5.2 Management Representative | | | | |
| 5.5.3 Internal Communication | Communication SIte Advocate Responsibilities | Control Procedure | CP-IC-5.5.3.015 | 4/1/2008 |
| 5.5.3 Internal Communication | Staff Sign-off Log and Completion Form | Form | CP-IC-5.5.3.015-1,2 | 3/1/2011 |
| 5.6 Management Review (Title Only) | | | | |
| 5.6.1 General | | | | |
| 5.6.2 Review Input (Internal Performance Review) | | | | |
| 5.6.3 Review Output (Action Plan) | | | | |
| **6. Resource Management** | | | | |
| 6.1 Provision of Resources | Termination Process | Control Procedure | CP-HR-6.1.002 | 9/1/2011 |
| 6.1 Provision of Resources | Termination Change Form | Form | CP-HR-6.1.002-1 | 4/1/2008 |
| 6.1 Provision of Resources | Termination Checklist | Form | CP-HR-6.1.002-2 | 9/1/2011 |
| 6.1 Provision of Resources | 401(k) Notice of Termination | Form | CP-HR-6.1.002-3 | 8/1/2008 |
| 6.1 Provision of Resources | Open Enrollment | Control Procedure | CP-HR-6.1.003 | 4/1/2008 |
| 6.1 Provision of Resources | Open Enrollment Acknowledgement | Form | CP-HR-6.1.003-1 | 4/1/2008 |
| 6.1 Provision of Resources | Medical Support Court Orders | Control Procedure | CP-HR-6.1.004 | 4/1/2008 |
| 6.1 Provision of Resources | Payroll Verification Procedures | Control Procedure | CP-HR-6.1.006 | 11/1/2010 |
| 6.2 Human Resources | General Employment Policy | Policy | POL-HR-6.2.001 | 5/1/2013 |
| 6.2 Human Resources | Prohibited Conduct Policy | Policy | POL-HR-6.2.002 | 5/1/2013 |
| 6.2 Human Resources | Workplace Violence Policy | Policy | POL-HR-6.2.003 | 6/1/2013 |
| 6.2 Human Resources | Anti-Harassment Policy | Policy | POL-HR-6.2.004 | 5/1/2013 |
| 6.2 Human Resources | Solicitation & Distribution Policy | Policy | POL-HR-6.2.005 | 6/1/2013 |
| 6.2 Human Resources | Drug Free Workplace Policy | Policy | POL-HR-6.2.006 | 5/1/2013 |
| 6.2 Human Resources | Workers' Compensation | Control Procedure | CP-RM-6.2.100 | 3/1/2013 |
| 6.2 Human Resources | Authorization for Treatment | Form | CP-RM-6.2.100-1 | 3/1/2013 |
| 6.2 Human Resources | Assossiate Written Report of Injury | Form | CP-RM-6.2.100-2 | 3/1/2013 |
| 6.2 Human Resources | Witness Statement | Form | CP-RM-6.2.100-3 | 3/1/2013 |
| 6.2 Human Resources | Assossiate Duties After Injury | Form | CP-RM-6.2.100-4 | 3/1/2013 |
| 6.2 Human Resources | Refusal of Medical Treatment | Form | CP-RM-6.2.100-5 | 3/1/2013 |
| 6.2 Human Resources | Incident Investigation and Reporting | Control Procedure | CP-RM-6.2.101 | 3/1/2013 |
| 6.2.1 General | Personal Leave Form | Form | CP-HR-6.2.1.002-1 | 4/1/2008 |
| 6.2.1 General | Benefit Changes | Control Procedure | CP-HR-6.2.1.003 | 4/1/2008 |
| 6.2.1 General | Benefit Change Form | Form | CP-HR-6.2.1.003-1 | 2/1/2010 |
| 6.2.1 General | Hartford PHA Form | Form | CP-HR-6.2.1.003-3 | 4/1/2008 |
| 6.2.1 General | COBRA Administration | Control Procedure | CP-HR-6.2.1.004 | 4/1/2008 |
| 6.2.1 General | Background Investigation Program | Control Procedure | CP-HR-6.2.1.005 | 3/1/2010 |
| 6.2.1 General | Background Release Form | Form | CP-HR-6.2.1.005-1 | 11/1/2011 |
| 6.2.1 General | Compensation or Job Change Procedure | Control Procedure | CP-HR-6.2.1.006 | 8/1/2008 |
| 6.2.1 General | Intra-Company Employee Transfers | Control Procedure | CP-HR-6.2.1.007 | 7/1/2008 |
| 6.2.1 General | Non Exempt Overtime Pay Policy | Control Procedure | CP-HR-6.2.1.009 | 10/1/2010 |
| 6.2.1 General | 401k Processes | Control Procedure | CP-HR-6.2.1.010 | 1/1/2011 |
| 6.2.1 General | All 401k Forms | Form | CP-HR-6.2.1.010-1 to | 11/1/2011 |
| 6.2.1 General | Exempt Work Week Policy | Control Procedure | CP-HR-6.2.1.012 | 8/1/2008 |
| 6.2.1 General | Solicitation & Distribution Policy | Control Procedure | CP-HR-6.2.1.015 | 6/1/2010 |
| 6.2.1 General | EEOC Complaint Procedure | Control Procedure | CP-HR-6.2.1.016 | 08/01/09 |
| 6.2.1 General | Non-Exempt Paid Time Off (PTO) Policy | Control Procedure | CP-HR-6.2.1.017 | 10/1/2010 |
| 6.2.1 General | PTO Cash-Out Request Form | Form | CP-HR-6.2.1.017-1 | 10/1/2010 |
| 6.2.1 General | HIPAA Privacy Policy | Control Procedure | CP-HR-6.2.1.022 | 12/1/2010 |
| 6.2.1 General | Non-Exempt Travel Time Pay Policy | Control Procedure | CP-HR-6.2.1.031 | 08/01/09 |
| 6.2.1 General | CMV Driver DOT Physical Examination | Control Procedure | CP-RM-6.2.1.301 | 12/1/2012 |
| 6.2.1 General | DOT Medical Authorization Form | Form | CP-RM-6.2.1.301-1 | 12/1/2012 |
| 6.2.1 General | Non-Exempt Attendance Policy | Policy | POL-HR-6.2.1.001 | 5/1/2013 |
| 6.2.2 Competence, Awareness and Training | Tuition Reimbursement | Control Procedure | CP-HR-6.2.2.001 | 3/1/2011 |
| 6.2.2 Competence, Awareness and Training | Tuition Reimbursement Application | Form | CP-HR-6.2.2.001-1 | 3/1/2011 |

| | | | | |
|---|---|---|---|---|
| 6.2.2 Competence, Awareness and Training | Performance Management Process for Hourly Employees | Control Procedure | CP-HR-6.2.2.005 | 12/1/2011 |
| 6.2.2 Competence, Awareness and Training | Hourly Performance Appraisal Forms | Form | CP-HR-6.2.2.005-1 and 2 | 1/1/2009 |
| 6.2.2 Competence, Awareness and Training | Performance Management for Exempt Employees Policy | Control Procedure | CP-HR-6.2.2.009 | 3/1/2012 |
| 6.2.2 Competence, Awareness and Training | Performance Evaluation Forms | Form | CP-HR-6.2.2.009-1 thru 4 and 6 | 3/1/2012 |
| 6.2.2 Competence, Awareness and Training | Performance Evaluation Form - Corporate Manager | Form | CP-HR-6.2.2.009-7 | 03/01/09 |
| 6.2.2 Competence, Awareness and Training | Non-Exempt Job Posting Procedure | Control Procedure | CP-HR-6.2.2.011 | 6/1/2008 |
| 6.2.2 Competence, Awareness and Training | Non-Exempt Hiring Requisition Form | Form | CP-HR-6.2.2.011-1 | 6/1/2008 |
| 6.2.2 Competence, Awareness and Training | Non-Exempt Interview Process | Control Procedure | CP-HR-6.2.2.012 | 6/1/2008 |
| 6.2.2 Competence, Awareness and Training | Non-Exempt Interview Forms | Form | CP-HR-6.2.2.012-1 thru 3 | 6/1/2008 |
| 6.2.2 Competence, Awareness and Training | Exempt Hiring Procedure | Control Procedure | CP-HR-6.2.2.013 | 3/1/2012 |
| 6.2.2 Competence, Awareness and Training | Exempt Job Posting Requisition Form | Form | CP-HR-6.2.2.013-1 | 8/1/2009 |
| 6.2.2 Competence, Awareness and Training | Kenco Non Driver Application | Form | CP-HR-6.2.2.013-2 | 11/1/2011 |
| 6.2.2 Competence, Awareness and Training | Exempt Candidate Evaluation Form | Form | CP-HR-6.2.2.013-3 | 8/1/2009 |
| 6.2.2 Competence, Awareness and Training | Offer Letter Summary Form | Form | CP-HR-6.2.2.013-4 | 3/1/2010 |
| 6.2.2 Competence, Awareness and Training | Relocation Allowance Policy | Control Procedure | CP-HR-6.2.2.014 | 3/1/2010 |
| 6.2.2 Competence, Awareness and Training | Opportunity for Improvement Procedure (Non-Exempt) | Control Procedure | CP-HR-6.2.2.015 | 4/1/2010 |
| 6.2.2 Competence, Awareness and Training | Opportunity for Improvement Form | Form | CP-HR-6.2.2.015-1 | 4/1/2010 |
| 6.2.2 Competence, Awareness and Training | Job Training & Certification Program | Control Procedure | CP-QE-6.2.2.001 | 8/1/2010 |
| 6.2.2 Competence, Awareness and Training | Job Certification Forms | Form | CP-QE-6.2.2.001-1 thru 3 | 3/1/2011 |
| 6.2.2 Competence, Awareness and Training | Powered Industrial Truck Program | Control Procedure | CP-RM-6.2.2.100 | 5/1/2010 |
| 6.2.2 Competence, Awareness and Training | PIT Forms | Form | CP-RM-6.2.2.100-1 thru 4 | 8/1/2008 |
| 6.2.2 Competence, Awareness and Training | Safety Metrics Training Tracking Policy | Control Procedure | CP-RM-6.2.2.102 | 6/1/2009 |
| 6.2.2 Competence, Awareness and Training | Monthly Safety Metrics Report | Form | CP-RM-6.2.2.102-1 | 1/1/2013 |
| 6.2.2 Competence, Awareness and Training | CMV Fleet Safety Driver Training and Metrics Policy | Control Procedure | CP-RM-6.2.2.305 | 12/1/2010 |
| 6.2.2 Competence, Awareness and Training | CMV Driver Safety Training Metrics Report | Form | CP-RM-6.2.2.305-1 | 12/1/2010 |
| 6.2.2 Competence, Awareness and Training | CMV Driver DOT Drug and Alcohol Policies and Procedures | Control Procedure | CP-RM-6.2.2.310 | 12/1/2012 |
| 6.2.2 Competence, Awareness and Training | Reasonable Suspicion Form | Form | CP-RM-6.2.2.310-1 | 3/1/2010 |
| 6.2.2 Competence, Awareness and Training | Letter of Disqualification | Form | CP-RM-6.2.2.310-2 | 3/1/2010 |
| 6.2.2 Competence, Awareness and Training | CMV Hours of Service Policy and Procedures | Control Procedure | CP-RM-6.2.2.315 | 7/1/2010 |
| 6.2.2 Competence, Awareness and Training | Hours of Service 100 Air-Mile Radius Summary | Form | CP-RM-6.2.2.315-1 | 12/1/2009 |
| 6.2.2 Competence, Awareness and Training | Driver's HOS Log/vehicle Inspection Certification | Form | CP-RM-6.2.2.315-2 | 7/1/2010 |
| 6.3 Infrastructure | Fixed Asset Policy And Procedures | Control Procedure | CP-FN-6.3.001 | 9/1/2012 |
| 6.3 Infrastructure | Fixed Asset Forms | Form | CP-FN-6.3.001-1,2,2a,2b | 9/1/2012 |
| 6.3 Infrastructure | User Access Request | Control Procedure | CP-IT-6.3.005 | 7/1/2009 |
| 6.3 Infrastructure | Kenco Cell Phone Hardware and Plan Policy | Control Procedure | CP-IT-6.3.006 | 9/1/2012 |
| 6.3 Infrastructure | KMS-IT Installation Policy | Control Procedure | CP-IT-6.3.007 | 9/1/2009 |
| 6.3 Infrastructure | KMS-IT Help Desk Procedures | Control Procedure | CP-IT-6.3.008 | 12/1/2011 |
| 6.3 Infrastructure | IT Security Policy | Control Procedure | CP-IT-6.3.009 | 12/1/2009 |
| 6.3 Infrastructure | Acceptable Use and Security Policy | Control Procedure | CP-IT-6.3.011 | 9/1/2011 |
| 6.3 Infrastructure | Remote Access Policy | Control Procedure | CP-IT-6.3.012 | 3/1/2009 |
| 6.3 Infrastructure | IT Equipment Purchase & Move Request | Control Procedure | CP-IT-6.3.014 | 07/01/09 |
| 6.3 Infrastructure | Modification-Feature Request Procedures | Control Procedure | CP-IT-6.3.019 | 3/1/2011 |
| 6.3 Infrastructure | CMV Vehicle Inspection, Repair and Maintenance | Control Procedure | CP-RM-6.3.300 | 11/1/2011 |
| 6.3 Infrastructure | CMV Preventive Maintenance Schedule | Form | CP-RM-6.3.300-1 | 4/1/2008 |

| | | | | |
|---|---|---|---|---|
| 6.3 Infrastructure | Commercial Motor Vehicle (CMV) Fleet Safety Program Policy | Control Procedure | CP-RM-6.3.301 | 12/1/2009 |
| 6.3 Infrastructure | CMV Fleet Safety Program Checklist | Form | CP-RM-6.3.301-1 | 12/1/2009 |
| 6.4 Work Environment | Drug Screen Procedure | Control Procedure | CP-HR-6.4.001 | 4/1/2008 |
| 6.4 Work Environment | Safety And Health Philosophy Procedure | Control Procedure | CP-RM-6.4.100 | 4/1/2008 |
| 6.4 Work Environment | Safety and Health Philosophy (Signed) | Form | CP-RM-6.4.100-1 | 1/1/2013 |
| 6.4 Work Environment | Employee Acknowledgement (Safety and Health Philosophy) | Form | CP-RM-6.4.100-2 | 6/1/2008 |
| 6.4 Work Environment | General Safety Rules | Policy | POL-RM-6.4.102 | 1/1/2013 |
| 6.4 Work Environment | Employee Acknowledgement (General Safety Rules) | Form | CP-RM-6.4.102-1 | 4/1/2008 |
| 6.4 Work Environment | Hazard Communication Plan | Control Procedure | CP-RM-6.4.103 | 5/1/2013 |
| 6.4 Work Environment | Chemical Inventory Form | Form | CP-RM-6.4.103-1 | 5/1/2013 |
| 6.4 Work Environment | Fire Prevention Plan | Control Procedure | CP-RM-6.4.104 | 1/1/2013 |
| 6.4 Work Environment | Bloodborne Pathogens Exposure Control Plan | Control Procedure | CP-RM-6.4.106 | 10/1/2012 |
| 6.4 Work Environment | Fire Impairment Program | Control Procedure | CP-RM-6.4.105 | 5/1/2013 |
| 6.4 Work Environment | Bloodborne Pathogens Forms | Form | CP-RM-6.4.106-1 thru | 10/1/2012 |
| 6.4 Work Environment | Control of Hazardous Energy Lockout/Tagout | Control Procedure | CP-RM-6.4.107 | 3/1/2011 |
| 6.4 Work Environment | Control of Hazardous Energy for Affected Employees PowerPoint | Form | CP-RM-6.4.107-1 | 3/1/2011 |
| 6.4 Work Environment | Control of Hazardous Energy for Affected Employees Quiz | Form | CP-RM-6.4.107-2 | 3/1/2011 |
| 6.4 Work Environment | Control of Hazardous Energy for Authorized Employees PowerPoint | Form | CP-RM-6.4.107-3 | 3/1/2011 |
| 6.4 Work Environment | CFR 1910. 147 Review Certification | Form | CP-RM-6.4.107-4 | 3/1/2011 |
| 6.4 Work Environment | Control of Hazardous Energy Test for Authorized Employees | Form | CP-RM-6.4.107-5 | 3/1/2011 |
| 6.4 Work Environment | Personal Protective Equipment | Control Procedure | CP-RM-6.4.108 | 10/1/2012 |
| 6.4 Work Environment | PPE Hazard Assessment Certification | Form | CP-RM-6.4.108-1 | 4/1/2008 |
| 6.4 Work Environment | Job Hazard Analysis | Form | CP-RM-6.4.108-2 | 11/1/2012 |
| 6.4 Work Environment | Medical and First Aid Program | Control Procedure | CP-RM-6.4.109 | 10/1/2012 |
| 6.4 Work Environment | Hot Work Procedure | Control Procedure | CP-RM-6.4.111 | 10/1/2012 |
| 6.4 Work Environment | Hot Work Warning/Permit | Form | CP-RM-6.4.111-1 and | 10/1/2012 |
| 6.4 Work Environment | Cellular Phone/Electronic Use Policy | Control Procedure | CP-RM-6.4.112 | 1/1/2011 |
| 6.4 Work Environment | Cellular Phone/Electronic Use Policy Acknowledgement | Form | CP-RM-6.4.112-1 | 4/1/2011 |
| 6.4 Work Environment | Contractor and Vendor Safety Procedures | Control Procedure | CP-RM-6.4.114 | 5/1/2013 |
| 6.4 Work Environment | Contractor and Vendor Safety Rules | Form | CP-Rm-6.4.114-1 | 5/1/2013 |
| 6.4 Work Environment | Contractor Pre-Qualification Evaluation | Form | CP-RM-6.4.114-2 | 5/1/2013 |
| 6.4 Work Environment | Emergency Response Plan | Control Procedure | CP-RM-6.4.115 | 1/1/2012 |
| 6.4 Work Environment | Dock Safety Policy | Control Procedure | CP-RM-6.4.117 | 12/1/2010 |
| 6.4 Work Environment | Trailer/Container Inspection Worksheet | Form | CP-RM-6.4.117-1 | 10/1/2011 |
| 6.4 Work Environment | Dock Area Visual Inspection Worksheet | Form | CP-RM-6.4.117-2 | 12/1/2010 |
| 6.4 Work Environment | Security Incident Reporting Requirements | Control Procedure | CP-RM-6.4.120 | 8/1/2011 |
| 6.4 Work Environment | Security-Suspicious Activity Report Forms | Form | CP-RM-6.4.120-1 and | 01/01/09 |
| 6.4 Work Environment | Supplemental Security Reporting | Form | CP-RM-6.4.120-3 | 6/1/2010 |
| 6.4 Work Environment | Loss Prevention and Security - General Rules and Training Requirements | Control Procedure | CP-RM-6.4.121 | 7/1/2010 |
| 6.4 Work Environment | Security Orientation PowerPoint | Form | CP-RM-6.4.121-1 | 3/1/2010 |
| 6.4 Work Environment | Security Orientation Quiz | Form | CP-RM-6.4.121-2 | 3/1/2010 |
| 6.4 Work Environment | Security Orientation Answer Key | Form | CP-RM-6.4.121-3 | 3/1/2010 |
| 6.4 Work Environment | Ethics and Honesty Code of Conduct | Form | CP-RM-6.4.121-4 | 3/1/2010 |
| 6.4 Work Environment | Property Removal Form | Form | CP-RM-6.4.121-5 | 7/1/2010 |
| 6.4 Work Environment | Loss Prevention and Security - Cargo and Inventory Policy | Control Procedure | CP-RM-6.4.122 | 9/1/2010 |
| 6.4 Work Environment | Suspicious Mail/Packages & Bomb Threats | Control Procedure | CP-RM-6.4.123 | 1/1/2011 |
| 6.4 Work Environment | Suspicious Mail PowerPoint | Form | CP-RM-6.4.123-1 | 11/1/2010 |
| 6.4 Work Environment | Telephone Bomb Threat Checklist | Form | CP-RM-6.4.123-2 | 11/1/2010 |
| 6.4 Work Environment | Site Physical Security Requirements (Non-System) | Control Procedure | CP-RM-6.4.124 | 4/1/2010 |
| 6.4 Work Environment | Physical Security Forms | Form | CP-RM-6.4.124-1 and | 4/1/2010 |
| 6.4 Work Environment | CMV Federal Motor Carrier Safety Regulation Compliance and Kenco Responsibilities | Control Procedure | CP-RM-6.4.300 | 11/1/2011 |
| 6.4 Work Environment | CMV Driver List and Expiration Request Form | Form | CP-RM-6.4.300-1 | 11/1/2010 |
| 6.4 Work Environment | CMV Driver Qualifications and Hiring Policies and Procedures | Control Procedure | CP-RM-6.4.301 | 10/1/2011 |
| 6.4 Work Environment | Packet 1-CMV Driver Application/Employment GAP | Form | CP-RM-6.4.301-1 | 11/1/2010 |
| 6.4 Work Environment | Packet 2- Background and Screening | Form | CP-RM-6.4.301-2 | 12/1/2012 |
| 6.4 Work Environment | Packet 3- Orientation and Training | Form | CP-RM-6.4.301-3 | 12/1/2012 |
| 6.4 Work Environment | CMV Security Requirements | Control Procedure | CP-RM-6.4.302 | 11/1/2010 |
| 6.4 Work Environment | CMV Security Requirements PowerPoint | Form | CP-RM-6.4.302-1 | 11/1/2010 |
| 6.4 Work Environment | CMV Security Requirements Quiz | Form | CP-RM-6.4.302-2 | 11/1/2010 |
| 7. Product/Service | | | | |

| | | | | |
|---|---|---|---|---|
| 7.1 Planning of Product/Service Realization | | | | |
| 7.2 Customer Related Processes (Title Only) | | | | |
| 7.2.1 Determination of Requirements Related to the Product/Service | Bankruptcy Procedures | Control Procedure | CP-FN-7.2.1.001 | 1/1/2012 |
| 7.2.1 Determination of Requirements Related to the Product/Service | Collections Procedures | Control Procedure | CP-FN-7.2.1.002 | 1/1/2012 |
| 7.2.2 Review of Requirements Related to the | Margin Review | Control Procedure | CP-OP-7.2.2.001 | 6/1/2008 |
| 7.2.2 Review of Requirements Related to the | Margin Review Templates | Form | CP-OP-7.2.2.001-1 | 1/1/2008 |
| 7.2.3 Customer Communication | | | | |
| 7.3 Design and Development (Title Only) | | | | |
| 7.3.1 Design and Development Planning | | | | |
| 7.3.2 Design and Development Inputs | | | | |
| 7.3.3 Design and Development Outputs | | | | |
| 7.3.4 Design and Development Review | | | | |
| 7.3.5 Design and Development Verification | | | | |
| 7.3.6 Design and Development Validation | | | | |
| 7.3.7 Control of Design and Development Changes | | | | |
| 7.4 Purchasing (Title Only) | | | | |
| 7.4.1 Purchasing Process | Gift/Incentive Card Procedures | Control Procedure | CP-FN-7.4.1.001 | 7/1/2012 |
| 7.4.1 Purchasing Process | Gift/Incentive Card Request Form | Form | CP-FN-7.4.1.001-1 | 7/1/2012 |
| 7.4.1 Purchasing Process | Gift/Incentive Card Distribution Form | Form | CP-FN-7.4.1.001-2 | 7/1/2012 |
| 7.4.1 Purchasing Process | Purchase Orders | Control Procedure | CP-OP-7.4.1.001 | 8/1/2012 |
| 7.4.2 Purchasing Information | | | | |
| 7.4.3 Verification of Purchased Product | | | | |
| 7.5 Product and Service Provision (Title Only) | | | | |
| 7.5.1 Control of Product and Service Provision | Cut-off and Monthly Reporting | Control Procedure | CP-FN-7.5.1.002 | 8/1/2011 |
| 7.5.1 Control of Product and Service Provision | Month End Closing Checklist | Form | CP-FN-7.5.1.002-1 | 8/1/2011 |
| 7.5.1 Control of Product and Service Provision | Purchasing and Accounts Payable Procedures | Control Procedure | CP-FN-7.5.1.003 | 7/1/2011 |
| 7.5.1 Control of Product and Service Provision | Kenco Authorized Bank Account Policy | Control Procedure | CP-FN-7.5.1.004 | 8/1/2011 |
| 7.5.1 Control of Product and Service Provision | Petty Cash Procedures | Control Procedure | CP-FN-7.5.1.005 | 7/1/2011 |
| 7.5.1 Control of Product and Service Provision | Petty Cash Forms | Form | CP-FN-7.5.1.005-1 & 2 | 11/1/2009 |
| 7.5.1 Control of Product and Service Provision | Customer Billing Procedures | Control Procedure | CP-FN-7.5.1.006 | 8/1/2011 |
| 7.5.1 Control of Product and Service Provision | Management Fee Reconciliation Form | Form | CP-FN-7.5.1.006-1 | 8/1/2011 |
| 7.5.1 Control of Product and Service Provision | Accounts Receivable Procedures | Control Procedure | CP-FN-7.5.1.007 | 8/1/2011 |
| 7.5.1 Control of Product and Service Provision | Signed Rate Quotes Procedures | Control Procedure | CP-FN-7.5.1.008 | 7/1/2011 |
| 7.5.1 Control of Product and Service Provision | Physical Warehouse Receipts Procedures | Control Procedure | CP-FN-7.5.1.009 | 8/1/2011 |
| 7.5.1 Control of Product and Service Provision | Warehouse Receipts Exception Form | Form | CP-FN-7.5.1.009-1 | 8/1/2011 |
| 7.5.1 Control of Product and Service Provision | Travel and Expense Policy | Control Procedure | CP-FN-7.5.1.010 | 10/1/2011 |
| 7.5.1 Control of Product and Service Provision | Other Site Income | Control Procedure | CP-FN-7.5.1.011 | 4/1/2008 |
| 7.5.1 Control of Product and Service Provision | Other Site Income Disclosure Form | Form | CP-FN-7.5.1.011-1 | 4/1/2008 |
| 7.5.1 Control of Product and Service Provision | CMV Accident Policies and Procedures | Control Procedure | CP-RM-7.5.1.302 | 12/1/2012 |
| 7.5.1 Control of Product and Service Provision | CMV Accident Forms | Form | CP-RM-7.5.1.302-1 and 2 | 7/1/2012 |

| | | | | |
|---|---|---|---|---|
| 7.5.1 Control of Product and Service Provision | Kenco Appeal Request Form | Form | CP-RM-7.5.1.302-3 | 2/1/2012 |
| 7.5.1 Control of Product and Service Provision | Letter of Notification | Form | CP-RM-7.5.1.302-4 | 2/1/2012 |
| 7.5.1 Control of Product and Service Provision | CMV Mileage-Accident Register | Form | CP-RM-7.5.1.302-6 | 12/1/2010 |
| 7.5.2 Validation of Processes for Production and Service Provision | | | | |
| 7.5.3 Identification and Traceability | | | | |
| 7.5.4 Customer Property | Procedure for Inventory Control | Procedure | CP-OP-7.5.4.006 | 6/1/2013 |
| 7.5.5 Preservation of Product | | | | |
| 7.6 Control of Monitoring and Measuring Devices | | | | |
| 8. Measurement, Analysis and Improvement | | | | |
| 8.1 General | | | | |
| 8.2 Monitoring and Measurement (Title Only) | | | | |
| 8.2.1 Customer Satisfaction | | | | |
| 8.2.2 Internal Audit | Benefit Invoice Audit Processing | Control Procedure | CP-HR-8.2.2.001 | 4/1/2008 |
| 8.2.2 Internal Audit | Internal Audit | ISO Procedure | ISO-QE-8.2.2.001 | 2/1/2010 |
| 8.2.2 Internal Audit | Internal Audit Forms | Form | ISO-QE-8.2.2.001-1thru 3 | 1/1/2010 |
| 8.2.2 Internal Audit | Best Practices Audit/Assessment Exception Request | Control Procedure | CP-BP-8.2.2.001 | 3/1/2013 |
| 8.2.2 Internal Audit | Best Practices Audit/Assessment Exception Request Form | Form | CP-BP-8.2.2.001-1 | 3/1/2013 |
| 8.2.2 Internal Audit | Facility Self Audit | Control Procedure | CP-RM-8.2.2.102 | 5/1/2013 |
| 8.2.2 Internal Audit | Facility Self Audit Form | Form | CP-RM-8.2.2.102-1 | 5/1/2013 |
| 8.2.2 Internal Audit | Emergency Inspection Forms | Form | CP-RM-8.2.2.102- | 5/1/2013 |
| 8.2.3 Monitoring and Measurement of Processes | Kenco Lean Operations System Policy | Control Procedure | CP-LE-8.2.3.001 | 5/1/2011 |
| 8.2.3 Monitoring and Measurement of Processes | Takt Boards and Schedule Attainment | Control Procedure | CP-LE-8.2.3.002 | 5/1/2011 |
| 8.2.3 Monitoring and Measurement of Processes | Gemba Walks | Control Procedure | CP-LE-8.2.3.003 | 5/1/2011 |
| 8.2.3 Monitoring and Measurement of Processes | 6S | Control Procedure | CP-LE-8.2.3.004 | 5/1/2011 |
| 8.2.3 Monitoring and Measurement of Processes | Employee Suggestion Process | Control Procedure | CP-LE-8.2.3.005 | 5/1/2011 |
| 8.2.3 Monitoring and Measurement of Processes | Kaizen Events | Control Procedure | CP-LE-8.2.3.006 | 5/1/2011 |
| 8.2.3 Monitoring and Measurement of Processes | Kaizen Training | Form | CP-LE-8.2.3.006-1 | 5/1/2011 |
| 8.2.3 Monitoring and Measurement of Processes | Kaizen Newspapers | Form | CP-LE-8.2.3.006-2 | 5/1/2011 |
| 8.2.3 Monitoring and Measurement of Processes | Lean Monthly Reporting | Control Procedure | CP-LE-8.2.3.007 | 5/1/2011 |
| 8.2.3 Monitoring and Measurement of Processes | Baseline Data/Site Financial Measurement | Form | CP-LE-8.2.3.007-1 | 5/1/2011 |
| 8.2.3 Monitoring and Measurement of Processes | Margin Audit Procedure | Control Procedure | CP-OP-8.2.3.001 | 6/1/2008 |
| 8.2.3 Monitoring and Measurement of Processes | Margin Audit Template | Form | CP-OP-8.2.3.001-1 | 10/1/2007 |
| 8.2.3 Monitoring and Measurement of Processes | Efficiency Improvement Program (EIP) Policy | Control Procedure | CP-QE-8.2.3.001 | 3/1/2010 |
| 8.2.3 Monitoring and Measurement of Processes | EIP Observation Process | Control Procedure | CP-QE-8.2.3.002 | 9/1/2010 |
| 8.2.3 Monitoring and Measurement of Processes | EIP Observation Forms | Form | CP-QE-8.2.3.002-1 & 2 | 1/1/2011 |
| 8.2.3 Monitoring and Measurement of Processes | EIP Process Development and Evaluation | Control Procedure | CP-QE-8.2.3.003 | 8/1/2011 |
| 8.2.3 Monitoring and Measurement of Processes | EIP Work Standards | Control Procedure | CP-QE-8.2.3.004 | 8/1/2011 |
| 8.2.3 Monitoring and Measurement of Processes | EIP Data Collection and Entry | Control Procedure | CP-QE-8.2.3.005 | 11/1/2009 |
| 8.2.3 Monitoring and Measurement of Processes | EIP Project Management and Organization | Control Procedure | CP-QE-8.2.3.006 | 5/1/2009 |
| 8.2.3 Monitoring and Measurement of Processes | EIP Assessment | Form | CP-QE-8.2.3.006-1 | 10/1/2010 |
| 8.2.3 Monitoring and Measurement of Processes | KFMS Policy | Control Procedure | CP-QE-8.2.3.100 | 8/1/2010 |
| 8.2.3 Monitoring and Measurement of Processes | KFMS Assessment | Form | CP-QE-8.2.3.100-1 | 8/1/2010 |

| | | | | |
|---|---|---|---|---|
| 8.2.3 Monitoring and Measurement of Processes | Departmental Clocking Policy and Procedure | Control Procedure | CP-QE-8.2.3.101 | 12/1/2010 |
| 8.2.3 Monitoring and Measurement of Processes | KFMS Index-Profile Measurement | Control Procedure | CP-QE-8.2.3.102 | 10/1/2009 |
| 8.2.3 Monitoring and Measurement of Processes | KFMS Cost Management Reporting | Control Procedure | CP-QE-8.2.3.103 | 11/1/2009 |
| 8.2.3 Monitoring and Measurement of Processes | Risk Management Watch List Program | Control Procedure | CP-RM-8.2.3.103 | 10/1/2012 |
| 8.2.3 Monitoring and Measurement of Processes | Watch List Program Requirement Tracker | Form | CP-RM-8.2.3.103-1 | 10/1/2012 |
| 8.2.3 Monitoring and Measurement of Processes | KFMS Activity Based Costing | Control Procedure | CP-QE-8.2.3.104 | 8/1/2010 |
| 8.2.3 Monitoring and Measurement of Processes | OSHA Inspection Procedures | Control Procedure | CP-RM-8.2.3.100 | 8/1/2008 |
| 8.2.4 Monitoring and Measurement of Product | | | | |
| 8.3 Control of nonconforming Product | Control of Non Conforming Product | ISO Procedure | ISO-QE-8.3.001 | 4/1/2008 |
| 8.3 Control of nonconforming Product | MDR Form and LOG | Form | ISO-QE-8.3.001-1,2 | 5/1/2008 |
| 8.4 Analysis of Data | EIP Reporting System | Control Procedure | CP-QE-8.4.001 | 9/1/2010 |
| 8.5 Improvement | | | | |
| 8.5.1 Continual Improvement | Business Improvement Plan (BIP) | Control Procedure | CP-OP-8.5.1.002 | 3/1/2009 |
| 8.5.1 Continual Improvement | BIP Template | Form | CP-OP-8.5.1.002-2 | 3/1/2009 |
| 8.5.1 Continual Improvement | Continual Improvement | ISO Procedure | ISO-QE-8.5.1.001 | 8/1/2012 |
| 8.5.1 Continual Improvement | CPAR/A3 Form and Log | Form | ISO-QE-8.5.1.001-1 thru 3 | 7/1/2012 |
| 8.5.2 Corrective Action | | | | |
| 8.5.3 Preventive Action | | | | |
| | | | | |
| | | | | |



| Document Number: CP-QE-6.2.2.001 | Title: Job Training & Certification Program | Effective Date: 08/01/10 |
|---|---|---|
| Procedure Owner: **Kenco Management Services - Quality Engineering Manager** | | |
| Created Date: **05/20/07** | | **Page 1 of 12** |

| Approval: **QC, Kenco Management Services – Quality Engineering** | Approval: **Director, Kenco Management Services – Quality Engineering** |
|---|---|

## 1.0 PURPOSE / SCOPE

To provide a systematic process to train personnel on site level and Top Tier documents and to document that training.

## 2.0 ROLES AND RESPONSIBILITIES

**Site Manager**- is responsible for the enforcement of this procedure at a site.

**Quality Coordinator (QC)** - is responsible for the maintenance of this procedure and the forms that it requires. The Quality Coordinator also coordinates the training program at the site.

**Site HR Administrator (or Designee)** – Responsible to conduct New Hire Orientation Training for new employees.

**Site Management** - are responsible for follow up of the training of their direct reports and the final completion of training forms.

**Job Trainers** – Responsible to train employees according to this procedure. Required to receive training on completion of training forms and proper training methods.

## 3.0 POLICY / PROCEDURES

### Job Certification System Setup

**3.1 The Kenco Quality Management System requires that training and recordkeeping be standardized and that objective evidence of compliance can be shown at each site. This procedure sets the standard and states guidelines to maintain a robust training program. Employees will be trained on the documents which are relevant to their job. Site documents include Job Descriptions (JD), Standard Operating Procedures (SOP), and Work Instructions (WI). Top Tier Documents include ISO Procedures (ISO) and Control Procedures (CP). The site will be organized into the specific job descriptions which are performed in the operation. Job Certification Forms will be maintained to ensure that all employees are trained in according to set expectations. The following steps outline setting up a training program which ensures compliance and Training effectiveness.**



KENCO
ESTABLISHED 1950

**3.2** Download a Copy of the *CP-QE-6.2.2.001-1,2,3 KQMS Job Certification Training Forms.*

**3.3** These Job Descriptions are populated into *CP-QE-6.2.2.001-1 Job Certification Matrix*. The job titles will be across the top, with employee names down the left column. These names will be arranged in some logical pattern, by shift perhaps. Place the current date in the "Last Updated" Square. *See Attachment A* for an example completed matrix.

**Note:** Job Descriptions may be generic such as "Lift Operator" or "Supervisor", however there may be multiple job areas which have different training requirements. At that point you would include multiple columns, listing each area. Example: if there are three Supervisory areas (i.e. Office Supervisor, Inventory Supervisor, Shipping Receiving Supervisor) you would list each on the *CP-QE-6.2.2.001-1 Job Certification Matrix*.

**3.4** In the *CP-QE-6.2.2.001-2 Job Certification Form,* the QC will populate the Job Descriptions in the appropriate column locations, and under the document column and place an "x" in the intersecting cell. These Job Descriptions will match the Job Description columns listed on the *CP-QE-6.2.2.001-1 Job Certification Matrix*. These forms will include columns for Job Descriptions which cross reference the site level documents (SOPs, WI) each position trains on. (See instructions tab in forms).

**3.5** The QC will populate all other Site Documents (SOPS, WI) in the rows and place an "x" in each intersecting column for the Job Descriptions that train on the document.

**3.6** The QC will place the current date in the "Last Updated" block.

**3.6.1** The QC will keep the master copies of these forms electronically. The content on the form will only be changed through *ISO-QE-4.2.3.001 Control of Documents*.

**3.7** These forms are then sorted to print the form for the Job Description needing to be trained. (See instructions in template). See *Attachment B* for an example.

**3.8** An "Active Training forms" basket will be labeled and placed in an appropriate area (usually Supervisor's Office) to retain training forms that are in process.

**3.8.1** The Job Trainers will deposit these forms at the end of each shift, and retrieve them as needed.

**3.8.2** Site Management will review these forms to check the status of their employees in training and ensure that training is being concurrently documented.

## Use of the Job Certification Forms (Site Documents)

**3.9** The *CP-QE-6.2.2.001-2 Job Certification Form* is used for a Many-to-One training event. (*Many* Items to *One* person) Examples of this type of event are New Hire Training, Cross Training, Retraining (Two year job recertification requirement).



**3.9.1** The QC sorts and prints the appropriate form. The QC will enter the name of the employee on the *CP-QE-6.2.2.001-1 Job Certification Matrix*, and adjusts the "Last Updated Date" on the Matrix.

**3.9.2** The QC completes the following information in the header: Employee Name, Trainer Name, Training Start Date and check the appropriate Training Event Type.

**3.10 New Hire Orientation**

**3.10.1** The form is then given to the Site HR Administrator to conduct New Hire Orientation. The Site HR Administrator will sign as trainer on these items on the orientation portion of the form.

**3.10.2** The employee is passed to their direct Supervisor to introduce them to the Site Management, conduct a facility tour, and introduce them to their Job Trainer.

**3.11 On the Job Training.**

**Note:** Job Trainers are selected to provide the best training possible and embody the culture management wishes to project to new employees. Some criteria for selection of Job Trainers are:

- Demonstrates high performance
- Is skilled in the new employee's job
- Is proud of the organization
- Is a peer of the new employee
- Has patience and good communication/interpersonal skills
- Wants to be a Job Trainer
- Is a positive role model (highly regarded and accepted by current employees)
- Has been employed more than one year

**3.11.1** The new employee is introduced to their Job Trainer, and the training form is then given to the Job Trainer to start training the employee.

**Note:** The Job Trainer is responsible to mentor the new employee, helping the employee through the stressful transition into their new position. The Job Trainer is responsible to teach the employee about the culture and social aspects of the site and Kenco, the locations of important areas, as well as introduce them to the other employees to make them feel a welcome part of the team. The Job Trainer will also communicate safety, quality and performance expectations.

**3.11.2** The Job Trainer familiarizes the employee with the documentation such as Job Descriptions (JD) Standard Operating Procedures (SOP) and Work Instructions (WI). The Job Trainer will repeatedly instruct the employee on where to locate their documents.

**3.11.3** The Job Trainer picks the initial topic(s) to be trained. Training on each topic will include the following steps:



- The employee is allowed to read the document pertaining to the training.
- The Job Trainer demonstrates the procedure to the new employee
- The employee performs the procedure hands-on until comfortable with the process, while the Job Trainer coaches
- The Document is reviewed again for understanding and reinforcement

**Note:** Demonstration does not apply to "read and understand" documents or policies that have no steps that are directly performed by the employee.

**3.11.4** Once the Job Trainer is confident in the new employee's ability to perform the procedure, the Job Trainer and employee will sign off on the line for that training topic.

**3.11.5** At the end of each shift, the training form is placed in the "Active Training Forms" basket.

**3.11.6** The Job Trainer repeats steps 3.11.2 – to 3.11.5 until all training topics listed on the training form are complete, providing frequent updates to management on the progress of the employee.

**Note:** If at any time the employee is having difficulties unrepresentative of most trainees in the position, or does not demonstrate necessary skills that are prerequisite to the position per the Job Description, be sure to inform the direct supervisor.

**3.11.7** When the Job Trainer has completed the training topics, and feels satisfied that the trainee can perform all outlined duties, satisfactorily meeting all safety, quality and productivity goals, the Job Trainer will sign off the employee in the "Completion of Training" section of the form.

**Note:** This releases the employee from the trainer, as well as signifies the trainer's guarantee of a properly trained employee, and should not be signed unless this is the intent of the trainer.

**3.12 Management Follow up** - All Site Management is responsible to ensure that employees are trained using these forms, and to conduct follow up for the training.

**3.12.1** After the "Training Completion" sign off by the Job Trainer, The appropriate Site Management is responsible to place the employee on productive work.

**Note:** Management will not coerce a Job Trainer to sign off an employee if they feel the employee is not currently capable of performing the job satisfactorily. The direct supervisor may sign in the Job Trainer's place, however, full responsibility for any future issues with the employee will reflect on this decision.

**3.12.2** This Site Management must complete a follow-up evaluation of the employee within 60 days, for the purpose of ensuring appropriate training by the Job Trainer, the employee's ability to perform to expectations, and to answer any questions on the part of the employee. This evaluation will include the following:



- Quizzing the employee on content of SOPs, and requirements around safety, quality and productivity
- Questioning the employee on the adequacy of training they received, and how they feel it could be improved
- Random observation of selected processes

**3.12.3** The Site Management and employee will sign and date in the follow-up section.

**3.12.4** This Site Management will make copies, one will be filed in the employee's file, and the original will be forwarded to the Quality Coordinator.

**3.13 Job Certification Matrix Update -** The QC will place a green square in the cell corresponding to the job and employee who was trained on that job if this is the employee's normal job. If they are being cross trained, the QC will place a yellow square with the date of training. They will also enter the date of training completion.

**3.13.1** The QC will then file the training form by job description in the Quality Files.

**3.13.2** All employees *will* have a green square on the matrix. Best in class performance requires that each job description has at least one yellow square for each shift of operation.

## Updates Training (Site Documents)

**3.14** The *CP-QE-6.2.2.001-3 Training Log* is used for a One-to-Many training event. (*One* Item to *Many* people) Examples of this type of event are new SOPs, changed SOPs, retraining of groups or individuals on specific SOPs.

**3.15** Updates Training for new documents

**3.15.1** Upon the issue of a new document, the Job Descriptions requiring training on the new procedure will be listed in the "Roles and Responsibilities" section of the SOP.

**3.15.2** The QC will update the *CP-QE-6.2.2.001-2 Job Certification Form* related to those jobs. The QC will add the SOP to the table, placing an "x" on the form for each Job Description listed in the "Roles and Responsibilities" section of the document. This form will be changed per *ISO-QE-4.2.3.001 Control of Documents.*

**3.15.3** The QC will reference *CP-QE-6.2.2.001-1 Job Certification Matrix* and list all the employees who have a green or yellow square on those jobs.

**3.15.4** These employees will be trained on the new procedure. The training will be documented on *CP-QE-6.2.2.001-3 Training Log* listing their name and a signature line. This will effectively return the site training program to a compliant state. *See Attachment C for Example Training Log.*



**3.16** Updates Training for revised documents

**3.16.1** For a document change with impact, all employees trained and cross trained on the old revision will be trained on the new revision.

**3.16.2** Completion of training will be documented on *CP-QE-6.2.2.001-3 Training Log* listing each employee's name and a signature line. *See Attachment C for Example Training Log.*

## New Hire Training (Top Tier Documents ISO - CP)

**3.17** Download Appendix F from Kenconnection.

**3.18** Unhide columns to the right to expose the training recommendations matrix.

**3.19** The Quality Coordinator and General Manager will determine which job titles need to be trained on each procedure using this recommendations matrix. The matrix was developed from the "Roles and Responsibilities" section of the documents for use as a minimum guideline.

**3.20** Hide Job Description columns that are not needed.

**3.21** Click on the job description, Select "X". *See Attachment D for example.*

**3.22** Print the Appendix.

**3.23** Upon hire of a new employee, the Site Advocates and General Manager will train the appropriate personnel according to this recommendation matrix, signing off in the appropriate areas.

***3.24*** This training record will be filed the same way as *CP-QE-6.2.2.001-2 Job Certification Forms*, one copy in the employee file, the other by Job Description by the QC.

## Updates Training (Top Tier Documents ISO - CP)

**3.25** The QC will go to the Quality Page/New Releases page on Kencoconnection.

**3.26** The QC will print a copy of the New Releases Page for the current month.

**3.27** For each New / Updated Document, the QC and General Manager will determine which job titles need to be trained on each procedure using the "Roles and Responsibilities" section as a minimum guideline.

**3.28** The QC will make copies of the last page (Log) of the procedure and attach to the New Releases Page.

**3.29** Site Manager and appropriate advocate or site subject matter expert will read and interpret the procedure together, and both sign off as trainee *and* trainer.



| Document Number: CP-QE-6.2.2.001 | Title: Job Training & Certification Program | Effective Date: 08/01/10 |
|---|---|---|
| Procedure Owner: **Kenco Management Services - Quality Engineering Manager** | | |
| Created Date: **05/20/07** | | **Page 7 of 12** |

**3.30** The QC will reference the matrix and list all the employees who have a green or yellow square on those jobs.

**3.31** These employees will be trained on the new procedure and training will be documented on the log listing their name and a signature line. *See Attachment E for an example completed log.*

## 4.0 REPORTS / METRICS

*CP-QE-6.2.2.001-1 Job Certification Matrix*
*CP-QE-6.2.2.001-2 Job Certification Form*
*CP-QE-6.2.2.001-3 Training LOG*

# Attachment A: Example Job Certification Matrix

### ANYWHERE, USA Warehouse Job Matrix

Matrix Last Updated: xx/xx/xxxx

Current Job (green) | Cross Trained (yellow) — Date of training Month/Year in cell

**Job Title**

| Shift | Employee Name | JD-5.5.1.001 Administrative Assistant | JD-5.5.1.002 Facility Manager | JD-5.5.1.003□Group HR - Training - BI Administrator | JD-5.5.1.004□Operations Manager | JD-5.5.1.005□Warehouse Supervisor | JD-5.5.1.006□Warehouse Worker | JD-5.5.1.007□Office Clerk | JD-5.5.1.009□Accounting Manager | JD-5.5.1.010□Quality Manager | JD-5.5.1.011□Inventory Coordinator | JD-5.5.1.012□Site Quality - BI Coordinator | JD-5.5.1.013□EIP Coordinator | JD-5.5.1.014□HR Coordinator | JD-5.5.1.015□Safety Coordinator |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Bob Roberts | 12/1/06 | | | | | | | | | | | | | |
| 1 | Sharon Johnson | | 6/1/06 | 1/3/07 | | | | | | | | | | | |
| 1 | Frank Drebin | | | 5/19/07 | 6/19/07 | | | | | | | | | | |
| 1 | Dusty Bottoms | | | | 11/3/06 | | | | | | | | | | |
| 1 | Terry Hopgood | | | | | 12/1/06 | | | | | | | | | |
| 1 | Fred Rogers | | | | | | 11/3/06 | | | | | | | | |
| 1 | Patricia Trek | | | 4/6/07 | | | | 12/1/06 | | | | | | | |
| 2 | Ned Niederlander | | | 2/5/07 | | | | | | | | | | | |
| 2 | Lucky Day | | | 1/9/06 | | | | 11/7/05 | | | | | | | |
| 2 | Ted Striker | | | | | 3/1/06 | | 12/1/06 | | | | | | | |



| Document Number: CP-QE-6.2.2.001 | Title: Job Training & Certification Program | Effective Date: 08/01/10 |
|---|---|---|
| Procedure Owner: **Kenco Management Services - Quality Engineering Manager** | | |
| Created Date: **05/20/07** | | **Page 8 of 12** |

# Attachment B: Example Job Certification Form

| Employee Name: | Training Start Date: | Form Last Updated: xx/xx/xxxx<br>**REASON FOR TRAINING**<br>☐ NEW HIRE<br>☐ CROSS TRAINING<br>☐ RETRAINING |
|---|---|---|
| Trainer Name: | Completion Date: | |
| Total Training Hours: | | |

| Employee Signature | Date | Trainer Initials | Number | Subject | JD-5.5.1.003 Group HR - Training - BI Administrator |
|---|---|---|---|---|---|
| | | | **Orientation** | | |
| | | | Video | Forklift Safety | X |
| | | | **Job Descriptions** | | |
| | | | JD-5.5.1.003 | Group HR / Training BI | X |
| | | | **QUALITY** | | |
| | | | SOP 4.1.002.001 | Preparation of SOPs and Instructions | X |
| | | | SOP 4.2.1.001.001 | QMS Documentation | X |
| | | | SOP 6.2.2.001.002 | Temporary Employee Training | X |
| | | | **HR** | | |
| | | | SOP-4.2.4.002.001 | Document Retention Personnel Files | X |
| | | | SOP-6.2.1.001.001 | Dress Code Policy | X |
| | | | WI-HR-6.2.1.002 | TimeSaver Work Instruction | X |
| | | | SOP-6.2.1.003 | Visitor Procedure | X |
| | | | SOP-6.2.1.005.001 | Background Reference Check | X |
| | | | CP-6.2.1.006 | Compensation or Job Change Procedure | X |
| | | | **FINANCIAL** | | |
| | | | **Operations** | | |

## COMPLETION OF TRAINING

The associate has read and understands the above procedures and has successfully completed the necessary on-the-job-training

Trainer Signature ____________ Associate Signature ____________ Date ____________

## FOLLOW UP OF TRAINING

***To be conducted 60 days from completion of training**

The associate has read and understands the above procedures, has successfully completed the necessary on-the-job-training, and has demonstrated the necessary skills to perform the job.

Supervisor Signature ____________ Associate Signature ____________ Date ____________



KENCO
ESTABLISHED 1950

| Document Number: CP-QE-6.2.2.001 | Title: Job Training & Certification Program | Effective Date: 08/01/10 |
|---|---|---|
| Procedure Owner: **Kenco Management Services - Quality Engineering Manager** | | |
| Created Date: **05/20/07** | | **Page 9 of 12** |

# Attachment C

## Training and Project Log

**DATE OF TRAINING CLASS: ________________**

| SITE NAME: | | | | |
|---|---|---|---|---|
| ADDRESS: | | CITY / STATE / ZIP: | | |
| ADVOCATE / INSTRUCTOR: | | TRAINING TOPIC/Procedure | | |
| The employees listed below have satisfactorily participated in the listed Company training requirements. | | | | |
| PRINT NAME | ☑ KENCO EMPLOYEE | ☑ TEMP EMPLOYEE | SIGN NAME | DATE |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

*Proprietary Information - Kenco*



| Document Number: CP-QE-6.2.2.001 | Title: **Job Training & Certification Program** | Effective Date: **08/01/10** |
|---|---|---|
| Procedure Owner: **Kenco Management Services - Quality Engineering Manager** | | |
| Created Date: **05/20/07** | | **Page 10 of 12** |

# Attachment D

**Top Tier Documents (Appendix F)**

Content last updated: 07/12/2010

| Employee Name | Training Start Date |
|---|---|
| | |

| SQP INDEX | DOCUMENT TITLE | Document Type | DOCUMENT NUMBER | Effective | Department | Area | Employee Signature | Trainer Signature | Date | Site Quality Coordinator |
|---|---|---|---|---|---|---|---|---|---|---|
| 4.2.1 General | QMS Documentation | Control Procedure | CP-QE-4.2.1.001 | 7/1/2008 | Quality Engineering | KQMS | | | | x |
| 4.2.1 General | GAP Analysis Checklist | Form | CP-QE-4.2.1.001-1 | 10/1/2009 | Quality Engineering | KQMS | | | | x |
| 4.2.1 General | Exception Form | Form | CP-QE-4.2.1.001-2 | 5/1/2010 | Quality Engineering | KQMS | | | | x |
| 4.2.3 Control of Documents | Control of Documents | ISO Procedure | ISO-QE-4.2.3.001 | 9/1/2008 | Quality Engineering | KQMS | | | | x |
| 4.2.3 Control of Documents | DCN Form and Log | Form | ISO-QE-4.2.3.001-1 thru 2 | 4/1/2008 | Quality Engineering | KQMS | | | | x |
| 4.2.4 Control of Records | Control of Records | ISO Procedure | ISO-QE-4.2.4.001 | 3/1/2010 | Quality Engineering | KQMS | | | | x |
| 4.2.4 Control of Records | Index of Quality Records | Form | ISO-QE-4.2.4.001-1 | 6/1/2008 | Quality Engineering | KQMS | | | | x |
| 5.5.1 Responsibility and Authority | Quality Coordinator | Control Procedure | CP-QE-5.5.1.001 | 12/1/2008 | Quality Engineering | KQMS | | | | x |
| 5.5.1 Responsibility and Authority | Quality Coordinator Training Record | Form | CP-QE-5.5.1.001-1 | 10/1/2008 | Quality Engineering | KQMS | | | | x |
| 6.2 Human Resources | Workers Comp Return to Work | Control Procedure | CP-RM-6.2.100 | 4/1/2008 | Risk Management | Safety | | | | x |
| 6.2.2 Competence, Awareness and Training | Procedural Training Documentation | Control Procedure | CP-QE-6.2.2.001 | 3/1/2009 | Quality Engineering | KQMS | | | | x |
| 6.4 Work Environment | Safety And Health Philosophy Procedure | Control Procedure | CP-RM-6.4.100 | 4/1/2008 | Risk Management | Safety | | | | x |
| 6.4 Work Environment | Safety and Health Philosophy (Signed) | Form | CP-RM-6.4.100-1 | 4/1/2008 | Risk Management | Safety | | | | x |
| 6.4 Work Environment | Employee Acknowledgement (Safety and Health Philosophy) | Form | CP-RM-6.4.100-2 | 6/1/2008 | Risk Management | Safety | | | | x |
| 6.4 Work Environment | Hazard Communication Plan | Control Procedure | CP-RM-6.4.103 | 4/1/2008 | Risk Management | Safety | | | | x |
| 6.4 Work Environment | Fire Prevention Plan | Control Procedure | CP-RM-6.4.104 | 4/1/2008 | Risk Management | Safety | | | | x |
| 6.4 Work Environment | Hot Work Procedure | Control Procedure | CP-RM-6.4.111 | 4/1/2008 | Risk Management | Safety | | | | x |
| 6.4 Work Environment | Hot Work Warning/Permit | Form | CP-RM-6.4.111-1 and 2 | 4/1/2008 | Risk Management | Safety | | | | x |
| 8.2.2 Internal Audit | Internal Audit | ISO Procedure | ISO-QE-8.2.2.001 | 2/1/2010 | Quality Engineering | KQMS | | | | x |
| 8.2.2 Internal Audit | Internal Audit Forms | Form | ISO-QE-8.2.2.001-1thru 3 | 1/1/2010 | Quality Engineering | KQMS | | | | x |
| 8.2.3 Monitoring and Measurement of Processes | EIP Process Development and Evaluation | Control Procedure | CP-QE-8.2.3.003 | 4/1/2009 | Quality Engineering | EIP | | | | x |
| 8.2.3 Monitoring and Measurement of Processes | EIP Work Standards | Control Procedure | CP-QE-8.2.3.004 | 7/1/2010 | Quality Engineering | EIP | | | | x |
| 8.2.3 Monitoring and Measurement of Processes | EIP Data Collection and Entry | Control Procedure | CP-QE-8.2.3.005 | 11/1/2009 | Quality Engineering | EIP | | | | x |
| 8.2.3 Monitoring and Measurement of Processes | EIP Project Management and Organization | Control Procedure | CP-QE-8.2.3.006 | 5/1/2009 | Quality Engineering | EIP | | | | x |
| 8.2.3 Monitoring and Measurement of Processes | EIP Assessment | Form | CP-QE-8.2.3.006-1 | 4/1/2010 | Quality Engineering | EIP | | | | x |
| 8.3 Control of nonconforming Product | Control of Non Conforming Product | ISO Procedure | ISO-QE-8.3.001 | 4/1/2008 | Quality Engineering | KQMS | | | | x |
| 8.3 Control of nonconforming Product | MDR Form and LOG | Form | ISO-QE-8.3.001-1.2 | 5/1/2008 | Quality Engineering | KQMS | | | | x |
| 8.5.1 Continual Improvement | Business Improvement Plan (BIP) | Control Procedure | CP-OP-8.5.1.002 | 3/1/2009 | KLS- Operations | Operations | | | | x |
| 8.5.1 Continual Improvement | BIP Template | Form | CP-OP-8.5.1.002-2 | 3/1/2009 | KLS- Operations | Operations | | | | x |
| 8.5.1 Continual Improvement | Continual Improvement | ISO Procedure | ISO-QE-8.5.1.001 | 8/1/2008 | Quality Engineering | KQMS | | | | x |
| 8.5.1 Continual Improvement | CPAR Form and Log | Form | ISO-QE-8.5.1.001-1.2 | 4/1/2009 | Quality Engineering | KQMS | | | | x |



| Document Number: CP-QE-6.2.2.001 | Title: Job Training & Certification Program | Effective Date: 08/01/10 |
|---|---|---|
| Procedure Owner: **Kenco Management Services - Quality Engineering Manager** | | |
| Created Date: **05/20/07** | | **Page 11 of 12** |

# Attachment E: Example Top Tier Training Log

KENCO
ESTABLISHED 1950

| Document Number: CP-RM-6.2.2.315 | Title: CMV Hours of Service Policy and Procedures | Effective Date: 07/01/10 |
|---|---|---|
| Procedure Owner: **Fleet Safety Manager, Kenco Management Services – Safety & Security** | | |
| Created Date: **10/15/02** | | **Page 4 of 4** |

**Please ensure that all associates at your site listed in Roles and Responsibilities (Section 2.0) sign and date this log indicating they have read and understand the current content of this procedure.**

| PRINT NAME | SIGNATURE | DATE |
|---|---|---|
| Jay Ralston | [signature] | 6-22-10 |
| Rich Pelletier | [signature] | 6-22-10 |
| Kyle Stowers | [signature] | 6/22/10 |
| Graham Cano | [signature] | 06-22-10 |
| Teresa Meeks | [signature] | 06/22/10 |
| Craig Riggins | [signature] | 6/22/10 |
| Tracie Clifford | [signature] | 6/29/2010 |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

Trainer: Jay Ralston Signature: [signature] Date: 6-22-10

Trainer: Tracie Clifford Signature: [signature] Date: 6/29/10

**A training file is to be kept at each site containing copies of all training records for Control Procedures. These training logs are completed and retained for all newly released and revised procedures. All current employees must be trained prior to the effective date as procedure changes occur. Affected new employees will sign off on the logs within 60 days of hire. These records are to be filed by procedure, and are maintained by the Quality Coordinator.**

**Note: You may print additional copies of this page for additional space to record training.**

*Proprietary Information-Kenco*



| Document Number: CP-QE-6.2.2.001 | Title: Job Training & Certification Program | Effective Date: 08/01/10 |
| --- | --- | --- |
| Procedure Owner: Kenco Management Services - Quality Engineering Manager | | |
| Created Date: 05/20/07 | | Page 12 of 12 |

**Please ensure that all associates at your site listed in Roles and Responsibilities (Section 2.0) sign and date this log indicating they have read and understand the current content of this procedure.**

| PRINT NAME | SIGNATURE | DATE |
| --- | --- | --- |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

**Trainer:________________Signature:__________________Date:_________**

**Trainer:________________Signature:__________________Date:_________**

**A Training File is to be kept at each site containing copies of all training records for Control Procedures. These training logs are completed and retained for all newly released and revised procedures. All current employees must be trained prior to the effective date as procedure changes occur. Affected new employees will sign off on the logs within 60 days of hire. These records are to be filed by procedure, and are maintained by the Quality Coordinator.**

**Note: You may print additional Copies of this page for additional space to record training.**

*Proprietary Information - Kenco*

KENCO

# KQMS Request for Exception

| | | | |
|---|---|---|---|
| **Document Number:** | | | |
| **Document Title:** | | | |
| **Document Subsection(s):** | | | |
| **Site Name/Location:** | | | |
| **Date:** | | **Site QC Name:** | |
| **Justification:** | | | |
| **Author Group Receipt Date** | | **Proposed Close Date** | |
| **Author Group Approval** | | **Signature:** | |
| ☐ Accepted ☐ Rejected | | **Date:** | |
| **Operations Approval Required?** | ☐ Yes (Required) ☐ No (Not Required) | | |
| **Author Group Comments:** | | | |
| **Operations Approval** | | **Signature:** | |
| ☐ Accepted ☐ Rejected | | **Date:** | |
| **Operations Comments:** | | | |

**Notes:**

- Site Quality Coordinators along with Site Management will evaluate top tier documents and determine need for exceptions
  - o Exceptions are not necessary for sites outside the scope listed in the document in question
  - o Exception descriptions must be specific to section(s) in the document
  - o Complete Blue Section and Email this exception form to the following email: KQMS.exceptions@kencogroup.com
- The Author Group Quality Coordinator for the document in question will log the date the exception was received and the tenative 45 business day close date, process the approval of exceptions (Yellow Section, and Green section, if necessary) on this form and return a scanned copy to the Site Quality Coordinator. Original signed forms are maintained by the Author Group
- If exception is rejected, the Author Group must inform the Site Quality Coordinator and Site Manager of the reason for rejection, and ensure the justification is documented on this form
- After obtaining exception, the signed copy of this form is filed by the Site Quality Coordinator, and the exception is listed on Appendix D of the Site Quality Plan
- Proof of Exception (this signed form) for any exception entry on Appendix D must be provided to Kenco Management Services or representative upon request

**Exhibit 14**

**Subject:** Re: Signing Incentive for Mars Employees
**Date:** Thursday, March 7, 2013 12:58:24 PM ET
**From:** Caines, David
**To:** Craig, Judy
**CC:** Hise, Paula

No worries. Makes sense and the impact to us is smaller so I'm fine.

David Caines
President

Kenco Logistic Services
2001 Riverside Drive
Chattanooga, TN 37406
tel: +1 (423) 605 8009
david.caines@kencogroup.com

On Mar 7, 2013, at 12:10 PM, "Craig, Judy" <Judy.Craig@Kencogroup.com> wrote:

Oh boy, David. I need to retract some of this. Can we review this afternoon. The revision should be:

$97,000 was added to Mars Operating Budget by Kenco to cover the 90 day waiting period. Of that, Mars will pay $49,457 to cover Starbridge for the employees. That leaves $47,544 of the $97K from Mars and Kenco will add the same, $47,544, to total $95,000 for the signing incentive for the employees. The (5 divided by 72 is a rough $1,300.00 per employee or $433.00 for the 3 payment.

Kenco's portion is $47,544 and the employees get $433.00 per month for the months.

I am so sorry for the confusion...

<F68F1FFC-87DC-4FA2-9974-892728296323[8].jpg>

**From:** <Caines>, David Caines <david.caines@Kencogroup.com>
**To:** Judy Craig <judy.craig@kencogroup.com>
**Cc:** Paula Hise <Paula.Hise@Kencogroup.com>
**Subject:** Re: Signing Incentive for Mars Employees

So $590 per employee (72 total employees) paid out at the 30-60 & 90 day marks?

Assuming this is correct . . . How much of the $127K are we covering & how much is covered by MARS?

**David Caines**

Exhibit 15

President
Office: 423-643-3426
Mobile: 423-605-8009
Email: david.caines@kencogroup.com

**Kenco**
2001 Riverside Drive
Chattanooga, TN 37406
www.kencogroup.com

*The information contained in this electronic communication and any accompanying document is confidential and is intended only for the use of the addressee. It is the property of Kenco. Unauthorized use, disclosure or copying of this communication, or any part of it, is strictly prohibited and may be unlawful. If you have received this communication in error, please notify the sender immediately by return email, and destroy this communication and all copies of it, including all attachments. Electronic communication may be susceptible to data corruption, interception and unauthorized tampering and Kenco disclaims all liability of any kind for such actions or any consequences that may arise directly or indirectly therefrom.*

**From:** <Craig>, Judy Craig <Judy.Craig@Kencogroup.com>
**Date:** Wednesday, March 6, 2013 5:04 PM
**To:** David Caines <david.caines@kencogroup.com>
**Cc:** Paula Hise <Paula.Hise@Kencogroup.com>
**Subject:** Signing Incentive for Mars Employees

Hi David,
The transition is going well so far! Hope all is well with you!

We'd like show you the final on the signing incentive structure for approval before we show the final to Mars. This signing incentive was to help employees who transfer from 4T's bridge the gap of expenses in the Kenco 90 day benefits waiting period. They can use it for whatever they like and it will be paid in 30 day increments over the first 90 days of employment with Kenco. It will be for 4T's employees who transition to Kenco, only.

Here is the history. In our first estimate, the signing incentive we presented to Mars for them to pay was $177,000. We put it in their start up fees, but then they came back and asked us to help them with this as it was making us not competitive with the other bidders. We then talked with you and Sean and from those conversations we would add the cost of benefits to our operating budget as if Mars was paying for full benefits from day 1, and Kenco would handle the signing incentive. This worked for Mars so the operating budget to Mars for the day 1 – 90 benefits expense was increased by $97,000. We won the business.

Last week, 4T's announced they would not be able to cover COBRA, so our solution was that Kenco would offer Starbridge insurance to the employees for the first 90 days to help them bridge insurance until their Kenco benefits kicked in. The Starbidge cost will be $49,457.00 if all take it. What we now need to do before we begin the employee interview process is to have Mars see how much the signing incentive will be for the employees and the calculations.

Starbrige will not be provided to temporary labor at the DC.

Original Estimate $177,000 ; Amount Added to Mars Proforma Operating Expense - $97,000.00; Kenco To Pass to Employees - $80,000.00

Mars Pass Thru in Operating Expenses in Proforma: $97,000.00
Mars to pay for Starbridge from the $97K:        -$49,457.00
Balance Kenco to Pass thru to Mars:        $47,544.00 +

Kenco To Pass to Employees: $80,000.00
Total to be presented to Employees$127,544 to 72 employees or $1770.00 per person if hired by Kenco as a signing incentive.

The employee must pass the background and drug screen.  The first payment is after the first 30 days.

The original estimate was about $1999.00 per person, so this is a little less, but close.

Please let me know if okay or if changes are needed.  I'm in the office tomorrow or you can reach me by cell tonight.

Thanks so much.


<F68F1FFC-87DC-4FA2-9974-892728296323[10].jpg>

**McCurry, Edith**

**From:** Marlin, Chelsea
**Sent:** Tuesday, March 25, 2014 7:58 AM
**To:** McCurry, Edith; LePage, Claire
**Cc:** Szplett, Len; Walsh, Kelvin
**Subject:** RE: Rodney Carroll

Edith – I believe this is an hourly posting for your site. Corporate only handles exempt postings and since this is an hourly position, it should be managed by your site only. KencoConnection is only for exempt postings, so anyone interested in this hourly posting should contact you or the hiring manager to apply.

Thanks!

**Chelsea Marlin**
Talent Management Coordinator
2001 Riverside Drive • Chattanooga, TN 37406
Office: 423-643-3455 • Fax: 423-643-3325

*The information contained in this electronic communication and any accompanying document is confidential and is intended only for the use of the addressee. Unauthorized use, disclosure or copying of this communication, or any part of it, is strictly prohibited and may be unlawful. If you have received this communication in error, please notify the sender immediately by return email, and destroy this communication and all copies of it, including all attachments.*

**From:** McCurry, Edith
**Sent:** Monday, March 24, 2014 5:28 PM
**To:** Marlin, Chelsea; LePage, Claire
**Cc:** Szplett, Len; Walsh, Kelvin
**Subject:** Rodney Carroll

Good afternoon,

Rodney Carroll is a temporary employee here at Kenco-Mars Manteno who wants to apply for the Lead Warehouse position Kelvin had me post.
Rodney does not have access to Kencoconnection, therefore, to whom would I send the attached resume? I've also attached the job posting.

Edith McCurry

Kenco Logistics Services
1125 Sycamore Rd
Manteno, IL 60950
www.kencogroup.com
Email: Edith.McCurry@KencoGroup.com
Office 815-468-9999, X464
Fax 1-815-468-2468

**From:** Manteno-Scans@kencogroup.com [mailto:Manteno-Scans@kencogroup.com]
**Sent:** Monday, March 24, 2014 3:32 PM
**To:** McCurry, Edith
**Subject:** Kenco-Manteno Scanned Document

**Exhibit 16**

Case: 1:19-cv-02500 Document #: 1 Filed: 04/12/19 Page 340 of 363 PageID #:340

**McCurry, Edith**

---

**From:** Marlin, Chelsea
**Sent:** Tuesday, March 25, 2014 7:58 AM
**To:** McCurry, Edith; LePage, Claire
**Cc:** Szplett, Len; Walsh, Kelvin
**Subject:** RE: Rodney Carroll

Edith – I believe this is an hourly posting for your site. Corporate only handles exempt postings and since this is an hourly position, it should be managed by your site only. KencoConnection is only for exempt postings, so anyone interested in this hourly posting should contact you or the hiring manager to apply.

Thanks!

**Chelsea Marlin**
Talent Management Coordinator
2001 Riverside Drive • Chattanooga, TN 37406
Office: 423-643-3455 • Fax: 423-643-3325

*The information contained in this electronic communication and any accompanying document is confidential and is intended only for the use of the addressee. Unauthorized use, disclosure or copying of this communication, or any part of it, is strictly prohibited and may be unlawful. If you have received this communication in error, please notify the sender immediately by return email, and destroy this communication and all copies of it, including all attachments.*

---

**From:** McCurry, Edith
**Sent:** Monday, March 24, 2014 5:28 PM
**To:** Marlin, Chelsea; LePage, Claire
**Cc:** Szplett, Len; Walsh, Kelvin
**Subject:** Rodney Carroll

Good afternoon,

Rodney Carroll is a temporary employee here at Kenco-Mars Manteno who wants to apply for the Lead Warehouse position Kelvin had me post.
Rodney does not have access to Kencoconnection, therefore, to whom would I send the attached resume? I've also attached the job posting.

Edith McCurry

Kenco Logistics Services
1125 Sycamore Rd
Manteno, IL 60950
www.kencogroup.com
Email: Edith.McCurry@KencoGroup.com
Office 815-468-9999, X464
Fax 1-815-468-2468

---

**From:** Manteno-Scans@kencogroup.com [mailto:Manteno-Scans@kencogroup.com]
**Sent:** Monday, March 24, 2014 3:32 PM
**To:** McCurry, Edith
**Subject:** Kenco-Manteno Scanned Document

**Rebekah Funk**

**From:** Coffey, Robert
**Sent:** Monday, March 03, 2014 6:18 PM
**To:** Moore, Todd
**Subject:** RE: High Importance- Manteno WMS Implementation Status

Agreed – We discussed Nate in particular this morning and Kelvin will be holding him accountable – if he is not getting it he will not be around to bring the site down – the other two that Russ had mentioned have been following the training and the story has changed on them. The team will be giving each associate a scorecard and grade on training which is on schedule.

This is the first I heard of the yard utilization and load ready times and after discussion with Kelvin – He confirmed that the yard utilization is status quo for the site and does not see it as a risk- the 200 yard spaces that we have available has always been fully utilized and will continue to be. The load ready times are related to the CPU customers and I've asked for a list of the offenders due to CPU issues and will have the team address them now rather than later.

The area of concern has been and continues to be the co-pack area. John Lella will be here this evening and we will be working to solve this issue this week. I will follow up with Anthony to ensure that I am consulted on the scorecard moving forward.

Regards,

**Robert Coffey**
**Regional Distribution Manager - Midwest**
**Chicago Plant**
**2019 North Oak Park Ave,**
**Chicago, IL 60707**

**M:** 773-892-7735
**E:** robert.coffey@effem.com

**From:** Moore, Todd
**Sent:** Monday, March 03, 2014 3:49 PM
**To:** Coffey, Robert
**Subject:** FW: High Importance- Manteno WMS Implementation Status

PLEASE make sure your hand is on this readiness report prior to sending out. Also, we do not need ISI warning the business of Kenco's ability "to make load ready times and maintain yard utilization". You need to be more hands on and require others to bounce concerns off you early and often.

How do you feel?

**From:** Iuvone, Anthony
**Sent:** Monday, March 03, 2014 4:45 PM
**To:** Moore, Todd; Dostal, Russell; Coffey, Robert; Fischer, Brandi
**Subject:** RE: Manteno WMS Implementation Status Update

Exhibit 17

DEF000534

**Rebekah Funk**

| | |
|---|---|
| **From:** | Coffey, Robert |
| **Sent:** | Thursday, September 18, 2014 12:51 PM |
| **To:** | Maggio, Jennifer;Moore, Todd |
| **Cc:** | Tumpane Jr., Bill;Clancy, Erin |
| **Subject:** | RE: Manteno Behind Schedule |

Hi Jenn- Mario will be adding you to the daily recovery plan call at 11:00 central. Melissa (copack liason) has assumed the role of Operations Manager since Mike has left and has been in constant communication with co-pack as well. Next week between inbounds, co-pack production, and Halloween outbounds will be our largest to date.

The WH is committed to adhering to all customer requirements and considers Jacobson their #1 customer. As you may know, the site has re-routed 3,300 pallets in the last 9 days and between 93-99% of what has been built – a significant achievement! Communication needs to continue and will be reinstituting the weekly touch-point calls.

Mario and I will call you this afternoon to address any additional concerns you may have.

Regards,

**Robert Coffey**

**Mars Chocolate, North America**
**Regional Distribution Manager - Midwest**
**Chicago Plant**
**2019 North Oak Park Ave,**
**Chicago, IL 60707**

**M:** 773-892-7735
**E:** robert.coffey@effem.com

**From:** Maggio, Jennifer
**Sent:** Thursday, September 18, 2014 10:26 AM
**To:** Moore, Todd; Coffey, Robert
**Cc:** Tumpane Jr., Bill; Clancy, Erin
**Subject:** RE: Manteno Behind Schedule

Todd –
Thank you for the communication and notice.
I don't see anything mentioned below regarding the Kenco service to Jacobson copack. I know we have had some challenges in the past, and I know that Keith called out a concern to Kenco this week, but haven't seen any response from Kenco.
In addition, I spoke with Keith yesterday and he informed me that the Wednesday meeting between Kenco and Jacobson was not happening – this has been the case since Mario started. Why was this stopped?
Looking to understand what the potential risk is to the copack service as you are listing several issues below with corrective actions.
Would like to know we are being proactive with copack service so we don't go down – Manteno is currently running higher than Kennesaw right now primarily due to Mixed Mini bags (XMAS peak production) and XMAS tins.

CONFIDENTIAL

## Exit Interview

| Date Completed: | |
|---|---|

### Employee Information

| | | | |
|---|---|---|---|
| **Employee Name:** | TOM WHITE | **Title:** | Supervisor |
| **Hire Date:** | 9-27-99 | **Termination Date:** | resignation 4-18-14 |
| **Location:** | MARS-MANTENO | **Supervisor/Manager:** | |
| **Gender:** Male | **Age:** 42 | **Rate:** | **Race:** White |

**Reason for termination:** Resigned

| Question | Strongly Agree | Agree | Disagree | Strongly Disagree | N/A |
|---|---|---|---|---|---|
| 1. Kenco was a great place to work. | ☐ | ☐ | ☐ | ☐ | ☐ |

**Comments:** I want to say yes but it is hard for me to say after the way I was treated.

| Question | Strongly Agree | Agree | Disagree | Strongly Disagree | N/A |
|---|---|---|---|---|---|
| 2. Management was accessible and approachable. | ☐ | ☐ | X | ☐ | ☐ |

**Comments:** OM yes
GM No - GM seemed like you were bothering him and had little time to listen to you When I did talk to him it seemed like was it ever listening

| Question | Strongly Agree | Agree | Disagree | Strongly Disagree | N/A |
|---|---|---|---|---|---|
| 3. I was always informed of changes in company policies and practices. | ☐ | ☑ | ☐ | ☐ | ☐ |

**Comments:**

| Question | Strongly Agree | Agree | Disagree | Strongly Disagree | N/A |
|---|---|---|---|---|---|
| 4. Managers / supervisors communicated with employees on a timely basis. | ☐ | ☐ | X | ☐ | ☐ |

**Comments:** For the most part with the floor employees but not so much with the supervisors. Instead of giving me a huge write up for all the things I was doing wrong all at once. They could have let me know what ahead of time things could impro

| Question | Strongly Agree | Agree | Disagree | Strongly Disagree | N/A |
|---|---|---|---|---|---|
| 5. Managers / supervisors were fair and consistent. | ☐ | ☐ | X | ☐ | ☐ |

**Comments:** All of the supervisors should have been wrote up if everything was true in my write up. Because we were all performing the same and I don't believe that they were written up.

| Question | Strongly Agree | Agree | Disagree | Strongly Disagree | N/A |
|---|---|---|---|---|---|
| 6. I was fairly compensated for the work I did. | ☑ | ☐ | ☐ | ☐ | ☐ |

**Comments:**

| Question | Strongly Agree | Agree | Disagree | Strongly Disagree | N/A |
|---|---|---|---|---|---|
| 7. I was given enough information about the company and the job. | ☐ | ☑ | ☐ | ☐ | ☐ |

**Comments:**

**Exhibit 18**

| Statement | Strongly Agree | Agree | Disagree | Strongly Disagree | N/A |
|---|---|---|---|---|---|
| 8. The job was challenging. | ☐ | ☒ | ☐ | ☐ | ☐ |
| Comments: | | | | | |
| 9. I was given sufficient training to perform my job satisfactorily. | ☐ | ☒ | ☐ | ☐ | ☐ |
| Comments: | | | | | |
| 10. There was opportunity for advancement. | ☐ | ☒ | ☐ | ☐ | ☐ |
| Comments: | | | | | |
| 11. I had the opportunity to learn new skills. | ☐ | ☒ | ☐ | ☐ | ☐ |
| Comments: | | | | | |
| 12. I received regular feedback about my job performance. | ☐ | ☐ | ☐ | ☒ | ☐ |
| Comments: Never was told good job, and never had anything encouraging to say to me. I was hardly ever told how I was doing I should say I was never told good job one on one | | | | | |
| 13. The company provided a safe work environment. | ☐ | ☒ | ☐ | ☐ | ☐ |
| Comments: | | | | | |
| 14. The company provided the appropriate equipment for me to do my job. | ☐ | ☒ | ☐ | ☐ | ☐ |
| Comments: | | | | | |
| 15. The working conditions were satisfactory (i.e. ventilation, lighting, restrooms, eating facilities). | ☐ | ☒ | ☐ | ☐ | ☐ |
| Comments: | | | | | |
| 16. Ethical and honest behavior was always displayed in the workplace. | ☐ | ☐ | ☒ | ☐ | ☐ |
| Comments: | | | | | |

| 17. The workplace was free of discrimination of any kind. | ☐ Strongly Agree | ☐ Agree | ☒ Disagree | ☐ Strongly Disagree | ☐ N/A |
|---|---|---|---|---|---|

Comments:

Like I wrote in the comments field on the first page. I was the only supervisor wrote up for the same performance. 90% of the stuff in the write up was inaccurate, which lead me to resign.

| 18. The company benefit plan was fully explained to me at the beginning of my employment | ☒ Strongly Agree | ☐ Agree | ☐ Disagree | ☐ Strongly Disagree | ☐ N/A |
|---|---|---|---|---|---|

Comments:

| 19. My benefit plan met my needs. | ☐ Strongly Agree | ☒ Agree | ☐ Disagree | ☐ Strongly Disagree | ☐ N/A |
|---|---|---|---|---|---|

Comments:

| 20. The company could have done something different to keep me. | ☒ Strongly Agree | ☐ Agree | ☐ Disagree | ☐ Strongly Disagree | ☐ N/A |
|---|---|---|---|---|---|

Comments:

The OM or the GM did not want to even go into detail about the write up. Nor could they explain to me why some of the stuff was in the write up.

| 21. I would consider returning to work for Kenco. | ☒ Strongly Agree | ☐ Agree | ☐ Disagree | ☐ Strongly Disagree | ☐ N/A |
|---|---|---|---|---|---|

Comments:

| 22. I would recommend Kenco to a friend looking for employment. | ☒ Strongly Agree | ☐ Agree | ☐ Disagree | ☐ Strongly Disagree | ☐ N/A |
|---|---|---|---|---|---|

Comments:

23. Are there any issues Human Resources or the executive staff should be aware of?

Comments:

The GM told me I needed to be more of an asshole. He told me that on my last day. Those words made my mind up to leave Kenco.

24. What are your plans after leaving the company?

Comments:

Look for another job

25. Is there anything else you would like to add?

Comments:

You don't have to be an asshole to get a job done or to be successful. You do it by treating people with honesty and respect. I worked in that building for over 15 yrs and it is very disheartening to leave this way. It really ripped my heart and soul to receive a write up so untrue and inaccurate after all the hard work I have done.

**Exhibit 19**

**Rebekah Funk**

**From:** Coffey, Robert
**Sent:** Wednesday, June 04, 2014 3:17 PM
**To:** Helveston, Andrew; Tumpane Jr., Bill; Friker, Kevin; Weisel, Gabi; Terrell, Larry; Charboneau, Meghan; Pacchioli, Michael; Wasik, Toni; Search, Jeremy; Bush, Zakhary; Maurer, Melody; Bennett, Keith; Iuvone, Anthony; Lella, John; Waguespack, David; Knies, Ingrid; Latham, Kimberly; Haywood, St Clair; Martinez, Michael; Maggio, Jennifer
**Cc:** Moore, Todd
**Subject:** FW: Personnel Change Announcement

**Importance:** High

Please see below for the Personnel Change Announcement for the Manteno site and forward to any other contacts that you feel are appropriate.

Regards,

**Robert Coffey**

**Mars Chocolate, North America**
**Regional Distribution Manager - Midwest**
**Chicago Plant**
**2019 North Oak Park Ave,**
**Chicago, IL 60707**

**M:** 773-892-7735
**E:** robert.coffey@effem.com

**From:** Hise, Paula [mailto:Paula.Hise@Kencogroup.com]
**Sent:** Wednesday, June 04, 2014 12:36 PM
**To:** Coffey, Robert
**Cc:** Moore, Todd; Jabaley, David
**Subject:** Personnel Change Announcement

Good afternoon,
Effective immediately, Kelvin Walsh is no longer serving in the role of General Manager at the Manteno site. We are currently recruiting for a permanent replacement. In the meantime, David Jabaley will be acting as the interim site General Manager. Please work directly with David related to any projects or activities that might have otherwise gone to Kelvin. Additionally, please circulate this announcement to the applicable contacts within the Mars organization. David's email address is david.jabaley@kencogroup.com and his cell number is 423-593-6045.

Thanks, and we will keep you informed of our progress in recruiting a permanent replacement for this open position.

Paula Hise
Group VP, Health & Personal Care
2001 Riverside Drive • Chattanooga, TN 37406
Office: 423-643-3248 • Mobile: 423-290-3749

**Rebekah Funk**

**From:** Coffey, Robert
**Sent:** Monday, March 03, 2014 6:18 PM
**To:** Moore, Todd
**Subject:** RE: High Importance- Manteno WMS Implementation Status

Agreed – We discussed Nate in particular this morning and Kelvin will be holding him accountable – if he is not getting it he will not be around to bring the site down – the other two that Russ had mentioned have been following the training and the story has changed on them. The team will be giving each associate a scorecard and grade on training which is on schedule.

This is the first I heard of the yard utilization and load ready times and after discussion with Kelvin – He confirmed that the yard utilization is status quo for the site and does not see it as a risk- the 200 yard spaces that we have available has always been fully utilized and will continue to be. The load ready times are related to the CPU customers and I've asked for a list of the offenders due to CPU issues and will have the team address them now rather than later.

The area of concern has been and continues to be the co-pack area. John Lella will be here this evening and we will be working to solve this issue this week. I will follow up with Anthony to ensure that I am consulted on the scorecard moving forward.

Regards,

**Robert Coffey**
**Regional Distribution Manager - Midwest**
**Chicago Plant**
**2019 North Oak Park Ave,**
**Chicago, IL 60707**

**M:** 773-892-7735
**E:** robert.coffey@effem.com

**From:** Moore, Todd
**Sent:** Monday, March 03, 2014 3:49 PM
**To:** Coffey, Robert
**Subject:** FW: High Importance- Manteno WMS Implementation Status

PLEASE make sure your hand is on this readiness report prior to sending out. Also, we do not need ISI warning the business of Kenco's ability "to make load ready times and maintain yard utilization". You need to be more hands on and require others to bounce concerns off you early and often.

How do you feel?

**From:** Iuvone, Anthony
**Sent:** Monday, March 03, 2014 4:45 PM
**To:** Moore, Todd; Dostal, Russell; Coffey, Robert; Fischer, Brandi
**Subject:** RE: Manteno WMS Implementation Status Update



# David PIP - 60 Day Review

## Recent Accomplishments

» RP Interleaving implemented with some initial success. Configuration issues have been addressed and another trial on 12/4 to assess improvement potential.

» Productivity reports posted for every shift and used for coaching.

» Established a Training Leader (Jackie Nelson) and conducted 400+ hours of initial/cross training.

» Fully implemented New Hire Cross Training Plan (All MHE types included).

» Implemented Temp Provider performance tracking and accountability measures; HR Manager is reviewing daily.

» Reset Kenco attendance performance tracking and accountability measures; We have issued 8 verbal warnings and 8 OFI 3 suspensions.

» Established 2015 Temp vs Perm targets.

» Hired Lori Varvel as new HR Mgr and promoted Melissa Hansen to Ops Mgr.

» Load Planner (Julie Wade) is cross training on Power User responsibilities and Co-pack support.

» Open supervisor position was filled internally by Tony Willis.

CONFIDENTIAL

**Rebekah Funk**

**From:** Coffey, Robert
**Sent:** Thursday, September 18, 2014 12:51 PM
**To:** Maggio, Jennifer;Moore, Todd
**Cc:** Tumpane Jr., Bill;Clancy, Erin
**Subject:** RE: Manteno Behind Schedule

Hi Jenn- Mario will be adding you to the daily recovery plan call at 11:00 central. Melissa (copack liason) has assumed the role of Operations Manager since Mike has left and has been in constant communication with co-pack as well. Next week between inbounds, co-pack production, and Halloween outbounds will be our largest to date.

The WH is committed to adhering to all customer requirements and considers Jacobson their #1 customer. As you may know, the site has re-routed 3,300 pallets in the last 9 days and between 93-99% of what has been built – a significant achievement! Communication needs to continue and will be reinstituting the weekly touch-point calls.

Mario and I will call you this afternoon to address any additional concerns you may have.

Regards,

**Robert Coffey**

**Mars Chocolate, North America**
**Regional Distribution Manager - Midwest**
**Chicago Plant**
**2019 North Oak Park Ave,**
**Chicago, IL 60707**

**M:** 773-892-7735
**E:** robert.coffey@effem.com

**From:** Maggio, Jennifer
**Sent:** Thursday, September 18, 2014 10:26 AM
**To:** Moore, Todd; Coffey, Robert
**Cc:** Tumpane Jr., Bill; Clancy, Erin
**Subject:** RE: Manteno Behind Schedule

Todd –
Thank you for the communication and notice.
I don't see anything mentioned below regarding the Kenco service to Jacobson copack. I know we have had some challenges in the past, and I know that Keith called out a concern to Kenco this week, but haven't seen any response from Kenco.
In addition, I spoke with Keith yesterday and he informed me that the Wednesday meeting between Kenco and Jacobson was not happening – this has been the case since Mario started. Why was this stopped?
Looking to understand what the potential risk is to the copack service as you are listing several issues below with corrective actions.
Would like to know we are being proactive with copack service so we don't go down – Manteno is currently running higher than Kennesaw right now primarily due to Mixed Mini bags (XMAS peak production) and XMAS tins.

CONFIDENTIAL

We have some critical production these next few weeks that we can't miss.

Thank you,

**Jennifer Maggio**
**Value Stream Manager - Contract Manufacturing**
**MARS CHOCOLATE NORTH AMERICA**
**T:** 908-850-7865 | **M:** 908-235-2558
**E:** jennifer.maggio@effem.com

*CONFIDENTIALITY. This email and any attachments are confidential and may also be privileged. If received in error, please d contents to anyone, but notify the sender by return email and delete this email and any attachments from your system.*

MARS

**From:** Moore, Todd
**Sent:** Thursday, September 18, 2014 9:27 AM
**To:** Helveston, Andrew; Suwalski, Brian; Bennett, Keith; Tumpane Jr., Bill; Bush, Zakhary; Maurer, Melody; Snow, Lisa; Fox-Carney Jones, Alison; MacDonald, Murray; Sheldon, Steven; Gropp, Alan; Pritchard, Chantelle; Myler, Paul; Shaw, David; Maggio, Jennifer; Romano, Anthony; Trout, Matthew; Search, Jeremy; Wittman, Mike
**Subject:** RE: Manteno Behind Schedule

SCLT Members,

We have yet again run into issues with the Manteno DFC, run by Kenco, falling behind with customer orders and unloading. We have reinstated the daily connection point, I will be meeting with the Director of the Mars account tomorrow at the Kenco corporate office, and we are aligning with Commercial to consider next steps due to repeated poor performance. The root cause of the latest backlog and short term countermeasures are outlined below. The estimated date to be current with outbound and inbound volumes is next Monday, September 22. Please feel free to contact me directly if you wish more details (423.618.7835).

<u>Short term recovery plan:</u>

1. Manteno Site issue:
   - Not Picking and staging/loading and unloading on time –
     - The inability to load and unload on a consistent basis (7 days a week) is backing up the throughput at the site
2. Inability to load/unload on-time driven by:
   - Right associate skill set across the whole week – not enough fork truck operators working on weekend shift
   - Past weekend had 9 associates call off who were designated to assist unloading & loading
     - Impact of at least 90 truck loads
3. Immediate activity to close gaps:
   - Staffing 110% Mon-Sun
     - Site staffing to 100% of equipment usage
   - Continued priority list delivered to shift from CSR's
     - Working to minimize customer service issues
   - Immediately holding associates accountable to their mandated days
4. What site owes the business:

- Realistic outlook of capability
  - Graphical representation of sites capability and ability to manage through issues
    - Adjust metric of "pick ahead" to "load ready"
- Morning update call
  - Initiated call on Sep 17 for 1100 central 1200 eastern
    - On the call – Kenco/Manteno Staff, Trace Spier, David Jabaley, Todd Moore, Robert Coffey
    - Invites to – Andy Helveston, Todd Johnson

CONFIDENTIAL

**Rebekah Funk**

**From:** Coffey, Robert
**Sent:** Wednesday, September 24, 2014 4:28 PM
**To:** Moore, Todd;Helveston, Andrew;Sheldon, Steven;Weisel, Gabi
**Subject:** RE: Manteno HR Manager

It's been identified as a root cause that leadership at the site is lacking and needs to be addressed immediately. The talent pool in that area is difficult to attract as has been validated by the hard time that we have been having recruiting with any open roles (management, hourly, etc... ) the addition of the co-pack liaison has paid dividends as we have not heard of many stir ups from that side of the wall lately and I would like to believe that if we have these individuals identified by Kenco below that we can address the leadership and accountability at the site which it is severely lacking – I believe that any provider that would be introduced to this site would have to add similar roles to be successful.

Regards,

**Robert Coffey**

**Mars Chocolate, North America**
**Regional Distribution Manager - Midwest**
**Chicago Plant**
**2019 North Oak Park Ave,**
**Chicago, IL 60707**

**M:** 773-892-7735
**E:** robert.coffey@effem.com

**From:** Moore, Todd
**Sent:** Wednesday, September 24, 2014 2:28 PM
**To:** Helveston, Andrew; Sheldon, Steven; Weisel, Gabi; Coffey, Robert
**Subject:** FW: Manteno HR Manager

They are asking for approval to add to the overhead costs. As a reminder, I previously agreed to the manager to work with co-pack and the floor outside current year budget. HR is a shared resource at ABW and Exel. Romark has a dedicated HR Manager for both Waco and Hazelton. I agree an HR Manager on site is desperately needed, and am not real excited to incur this incremental cost given current cost to Mars Kenco is already having with inefficiencies.

Thoughts?

**From:** Jabaley, David [mailto:David.Jabaley@Kencogroup.com]
**Sent:** Wednesday, September 24, 2014 3:20 PM
**To:** Moore, Todd
**Subject:** HR Manager

Todd, below is the Manteno salary survey. Let me know if Mars is okay with moving on this.

CONFIDENTIAL

| | Minimum | Midpoint | Maximum |
|---|---|---|---|
| Supervisor | $ 42,350 | $ 52,938 | $ 63,526 |
| Office Manager | $ 37,813 | $ 47,266 | $ 56,719 |
| Operations Manager | $ 53,124 | $ 66,405 | $ 79,686 |
| Accounting Manager | $ 51,859 | $ 64,824 | $ 77,789 |
| **HR Manager** | **$ 57,892** | **$ 69,470** | **$ 81,048** |

**David Jabaley**
Director, Operations
2001 Riverside Drive • Chattanooga, TN 37406
Office: 423-643-3336 • Mobile: 423-593-6045

*The information contained in this electronic communication and any accompanying document is confidential and is intended only for the use of the addressee. Unauthorized use, disclosure or copying of this communication, or any part of it, is strictly prohibited and may be unlawful. If you have received this communication in error, please notify the sender immediately by return email, and destroy this comm*

CONFIDENTIAL

**Rebekah Funk**

**From:** Coffey, Robert
**Sent:** Tuesday, September 23, 2014 3:34 PM
**To:** Moore, Todd
**Subject:** RE: Kenco PIP, Draft
**Attachments:** Kenco 2014 PIP.docx

Updated the file to represent at least 60% of current floor associates are temps. Added trailers = 0 >48 hours, 2 operations managers

**Robert Coffey**

**Mars Chocolate, North America**
**Regional Distribution Manager - Midwest**
**Chicago Plant**
**2019 North Oak Park Ave,**
**Chicago, IL 60707**

**M:** 773-892-7735
**E:** robert.coffey@effem.com

**From:** Moore, Todd
**Sent:** Tuesday, September 23, 2014 1:22 PM
**To:** Helveston, Andrew; Coffey, Robert; Sheldon, Steven; Weisel, Gabi
**Subject:** Kenco PIP, Draft

Andy, Steve, Gabi, Robert-
Your inputs are requested. I tried to stay in the current year with data, and referenced back to the Kenco promise during the bid and award. The only 2013 data point included was the theft. I would like to align all of us today and tomorrow, and present to Kenco Thursday. This allows them Friday to circle the wagons and message to Kenco management team and ownership.

Thanks- Todd

**Rebekah Funk**

**From:** Coffey, Robert
**Sent:** Thursday, September 18, 2014 2:13 PM
**To:** Moore, Todd
**Subject:** Kenco Meeting and Deliverables
**Attachments:** image001.png; image002.png; image003.png; image004.png; image005.png

For your meeting tomorrow- a few of the points we need to make sure that Kenco understands:

- Site lacks structure overall – we knew this going into it and thought it had been addressed – to a large extent it has. This latest round of shift structure only highlights the need for additional clarity on the structure of the site and the glaring weakness that it represents. There's no mystery in that when we have people here working and being held accountable we are productive and get caught up- we need to have that mindset and accountability throughout the week/end.
- Drive Accountability – I was being told that the associates are getting points when they call in or don't show up; however, that was not being done. Kelvin had allowed the associates basically to pick their shifts, come in when they want and was difficult for the leads to know who was were on what and for how long – that needs to be addressed immediately with this shift structure that is going into place.
- <u>WH</u> LEADERSHIP – GM, Shift Leads, Shift Supervisors - Mario may be a leader- but he is brand new and NOT a WH leader yet– this was highlighted during Kelvin's tenure and needs to be resolved with Mario's – the how's and why's of warehousing are not immediately visible to our new GM- or shift leads/sups. In my opinion besides David, we have a large GAP at the site given the new (and yet to be hired) associates. We need to ramp up recruiting and get some seasoned veterans that know how to run a WH at all levels of the organization. What is Mario's continuing education look like? Does he have a checklist of what you should or should not be doing – this is a huge jump in roles for him and I don't want him to get swallowed up or go down the wrong path... Do we have visible leadership at all levels throughout all shifts- or a plan to get there and how much that will cost for 2015 budget?
- <u>KOS</u> – visual representation of site status and the continued journey- the busy season has put us behind in implementation but the foundation is there
- <u>RP optimization</u>- continue to work with Russ and the FE team to optimize the system. We have fallen behind and many still believe that the system is cumbersome. It took HAZ over a year to see it's benefits- we need to understand faster.
- Co-Pack Relationship – Mario and Keith started off on the wrong foot- Mario needs to reconcile that relationship and continue to proactively work with that group.
- Successful WFM Implementation – of all the WH's I've spoken to or visited- this is a consensus #1 productivity and morale improving tool – it drives accountability and visibility at the site- things that the site is desperately in need of. This begs the question of who and how it will be effective- and bullets 1-3. We need site leadership and accountability to make this work- I know it's hard to recruit for talent in this market and especially at this site- but aren't there any stars in Kenco that may be up for a short term assignment to help guide and lead on shifts here? Like Red Prairie and KOS the successful implementation of this tool is paramount for the site in Q1 2015.

Hope that helps- let me know if you need anything else from me.

**Robert Coffey**

**Mars Chocolate, North America**
**Regional Distribution Manager - Midwest**
**Chicago Plant**
**2019 North Oak Park Ave,**

**Chicago, IL 60707**

**M:** 773-892-7735
**E:** robert.coffey@effem.com

**From:** Spier, Trace [mailto:Trace.Spier@Kencogroup.com]
**Sent:** Thursday, September 18, 2014 10:54 AM
**To:** Helveston, Andrew; Moore, Todd; Coffey, Robert
**Cc:** Jabaley, David; Lopez, Mario
**Subject:** FW: Eby Brown

Mars Team,

As we continue to evolve our plan to close gaps and sustain execution, it is important to not loose sight of the ultimate priority, our end customer. I asked David to reach out personally to Eby Brown and am glad to see this touch point was well received as part or our relationship management strategy. Our desire to identify and destroy all root causes that are leading to performance inhibitors is ongoing, and I will be giving additional support and required accountability to this matter as part of our go forward counter measures. I also look forward to meeting with Todd Moore personally tomorrow morning as we partner to correct remaining issues and gaps both short term and long term.

Kind Regards,

**Trace Spier**
Group VP, Fast Moving Consumer Goods (FMCG)
2001 Riverside Drive • Chattanooga, TN 37406
Office: 423-643-3339 • Mobile: 423-309-5718

*The information contained in this electronic communication and any accompanying document is confidential and is intended only for the use of the addressee. Unauthorized use, disclosure or copying of this communication, or any part of it, is strictly prohibited and may be unlawful. If you have received this communication in error, please notify the sender immediately by return email, and destroy this communication and all copies of it, including all attachments.*

**From:** <Jabaley>, David Jabaley <David.Jabaley@Kencogroup.com>
**Date:** Thursday, September 18, 2014 11:43 AM
**To:** Trace Spier <Trace.Spier@kencogroup.com>
**Subject:** FW: Eby Brown

**David Jabaley**
Director, Operations

Phone: 423-643-3336
Mobile: 423-593-6045

*The information contained in this electronic communication and any accompanying document is confidential and is intended only for the use of the addressee. Unauthorized use, disclosure or copying of this communication, or any part of it, is strictly prohibited and may be unlawful. If you have received this communication in error, please notify the sender immediately by return email, and destroy this comm*

**From:** Lee Canon [mailto:Lee.Canon@eby-brown.com]
**Sent:** Thursday, September 18, 2014 10:38 AM
**To:** Jabaley, David
**Subject:** RE: Eby Brown

David,

Was pulled away for a meeting...I appreciate the note and will follow up with you asap. I do appreciate the fact that you made it a point to follow up on the delays we have been experiencing.

Lee

**From:** Jabaley, David [mailto:David.Jabaley@Kencogroup.com]
**Sent:** Thursday, September 18, 2014 9:31 AM
**To:** Lee Canon
**Subject:** FW: Eby Brown

First of all, Eby-Brown has our attention. We've struggled at the site on off. We've made some personnel changes and expect the performance will improve dramatically.
I want you and your team to have a direct line to me.

Below are the loads we've had with you the last couple of days, We were several hours late on three of the four. There is an understanding at our site that this hampers your ability to provide the service you were hired to provide. We only have visibility to one load in the future, but all of your loads will prioritized regardless of the site's challenges.

The Kenco Manteno team is committed to providing you excellent service and better communication. Please call my cell or respond to this email if there is anything you would like to discuss or anything you know that would be helpful to me.

Thanks Lee.

**David Jabaley**
Director, Operations
2001 Riverside Drive • Chattanooga, TN 37406
Office: 423-643-3336 • Mobile: 423-593-6045

*The information contained in this electronic communication and any accompanying document is confidential and is intended only for the use of the addressee. Unauthorized use, disclosure or copying of this communication, or any part of it, is strictly prohibited and may be unlawful. If you have received this communication in error, please notify the sender immediately by return email, and destroy this comm*

**From:** Derosier, Marci
**Sent:** Wednesday, September 17, 2014 10:12 AM

**Kimberly Overbaugh**

|  |  |
|---|---|
| **From:** | Coffey, Robert |
| **Sent:** | Saturday, July 12, 2014 12:29 PM |
| **To:** | Moore, Todd; Helveston, Andrew; Pacchioli, Michael; Tumpane Jr., Bill; Maggio, Jennifer; Chick, Matthew |
| **Cc:** | 'David.Jabaley@Kencogroup.com'; Paula Hise (paula.hise@kencogroup.com); Gordon Steele (Gordon.Steele@Jacobsonco.com); 'keith.fron@jacobsonco.com' (keith.fron@jacobsonco.com) |
| **Subject:** | FW: State Healh Dept & FDA & OSHA Visit |
| **Attachments:** | scan.pdf; scan.pdf |
| **Importance:** | High |

Team – Earlier this week the site had terminated a disgruntled employee for performance related issues – Friday morning the FDA, OSHA and Health Department paid a visit to the site. The report below is a summary of the investigation and findings.

Due to the harsh winter and adverse conditions, it is common for an increase in rodent activity – as such, Kenco has increased the level of Orkin supervision (and were on site this week on Wednesday). We have seen an increase in pests in the area and have increased the number of traps both inside and outside the building in compliance of Orkin's recommendation.

The official reports are attached and Bill Schwerin the Facility Maintenance Engineers' unfiltered account of the visit is below. No major findings were discovered; however, there is cause for concern around the amount of spilled product and mouse activity in all areas including the Jacobson area where large amounts of product is exposed. The FDA inspector said that he will be back on Monday for a follow up. I will also be on site at that time.

At the end of the shift, the site was on time to have ready and still hovering around 90% full. Kenco and Jacobson are committed to operating the facility safely, efficiently while adhering to Mars quality principles.

**In summary, we are not anticipating any major findings from the inspection and will follow up with any additional questions or concerns.**

Regards,

**Robert Coffey**

**Mars Chocolate, North America**
**Regional Distribution Manager - Midwest**
**Chicago Plant**
**2019 North Oak Park Ave,**
**Chicago, IL 60707**

**M:** 773-892-7735
**E:** robert.coffey@effem.com

**From:** Schwerin, William [mailto:William.Schwerin@Kencogroup.com]
**Sent:** Friday, July 11, 2014 7:04 PM

CONFIDENTIAL

**To:** Jabaley, David; Hise, Paula; Coffey, Robert
**Cc:** Szplett, Len; Manzello, Mike
**Subject:** State Healh Dept & FDA & OSHA Visit

Hello,

At roughly 9:00AM the Welcome center called me the state inspector was here, shortly after the FDA inspector was here.

We had the Welcome center send them though to meet us. (David Jabaley & myself) They asked questions about Kenco and Mar's

Operation. They said that they were here for a regular inspection and also a complaint.

David answered all of the questions that the FDA asked, the state health had a few more that I took notes that we were unsure of. They asked for last 6

Month Pest Control records and Sanitation records. I was told to find them then catch up with them. At that time I let Keith with Jacobson know that Health & FDA were here for an inspection. He said OK. Dave let me know that he had given Jacobson notice also.

I caught up with them just shortly before the toured the warehouse FDA and the State inspection started well finding only minor things such as some boxes that looked as though they were not taped well and a little damage cases here and there not anything they were noting about except one spill that we had our janitor take care of immediately. Roughly about 10:15 OSHA is at the gate. David had me continue with the FDA & State Health. We just had finished at that point with Room 1 and then continued to Room 2. We walked down aisle A then aisle B found a found a few droppings in 2BN 32 these were noted, continued on about a third of Room two and found a few more product spills, I had noted that and let our Janitor know to clean up as well.

We found some more product spills and they stated that this being a large warehouse this looked to be more of a sanitation issue then a pest issue. The FDA stated that he had done other inspections else where they had real problems with pest in the boxes. I let them know we have had some sightings here and our pest control company did catch some mice here, so they would know when they checked our records they knew were doing our job of cleaning and Pest control.

After about half of Room 2 we came up to the Jacobson area. They noticed the baggers and a few tables with some green plastic bins with opened bags with only a few candies in them. I let them know it was their little QA station, that they check to make sure the product is in conformance. (Good Seals & QA that it is inspected periodically and checked) They said that makes sense. From there they wanted to see more aisles. We continued down the middle aisle in room 2. There were forklifts down most of the aisles till we came to 2PS, then they wanted to see more that way. We were walking down the aisle there, the aisle was not full , giving them opportunity to walk under the rack with their flash lights looking for anything. They found that the Jacobson racks were more dusty and Dirty they stated and asked if we clean these locations. I let them know that Jacobson cleans their own racks and that we do let them know when our Pest control and myself find areas that need cleaning. Just as we were half way the FDA inspector found a Milky way bar in the Jacobson area that had been nibbled on and some mouse droppings. That was not good. I called our Orkin Manager (Riley) immediately. He said he would be there soon. We noted down that area and then continued farther down finding a little more droppings there. Noted that location as well. We then came to the end of the aisle and they asked how much was Jacobson.

I let them know they store mostly the corrugate pallets and along the bagger and aisle opposite that. We then proceeded to room Three. We found more product spills
And noted them down. They asked if we ever had caught any juvenile mice here. I said yes and that Orkin was on site at that time and took care of the issue



As they did. We then walked in Room 3 found a few more product spills in aisles 3AN, 3LN and 3FA noted them down, towards the end of the tour in room 3 by end of the rack aisle is a drain between aisles LN &KN there the FDA found a couple droppings. During the tour they asked about lizards, Bats and other pest that we may have had here or do have. I said last year we did have Bats outside here and one inside that our pest control took care of. But we have not had any since Kenco has been here. It sounded a little far fetched, that even they thought was.

We then went back to David's office for exit interview I asked Len to join us. We had just started when I was called by Mike that I was needed by OSHA.

The FDA & State said that was fine. So I left them with Len, The OSHA inspector asked me several questions about the building. Asked how long it was and how wide it is. I told him 960 X 528' He then asked more questions, about Lock out tag out. Changing light bulbs, How our Generator power back up works and about

A power issue we had earlier in the year. I answered him about all the questions he had. I asked him the I needed to get back the other inspectors that were

Waiting for me. He said to stay unless you want fines. I said no Sir and sat down. He asked more about the last power failure. Ask if the place went black. I said

Not to my knowledge as I came out for that issue. I then stated that our IT guy Dustin was here during that time when the power went out and Dustin confirmed that we did not loose all of the lights. He then asked him Questions about that evening and about what he did and how the generator works and our UPS station. Dustin answered his questions then he said he was good on that. He then asked about records from who changed the light bulbs and pest control invoices. I gave him record that Girard Electric had changed a light and ballast here recently and a copy of Orkin & River Valley last Invoice. That he wanted.

He also stated if I did not provide this he would go back to work inspecting the building and possible fines along with. I gave the man the three documents.

And he was happy and asked Dustin that he needed to be walked down with Management and himself. By this time it was close to 2:00PM I checked on The state and FDA. Len said they did not ask any questions and left at about 1:20 or so. We then Walked the OSHA inspector out and then he talked with Dustin.

I asked him what he said, just asked if we pressured him at all.

Issues with OSHA are;

1) He is looking at to see if more exits in room 1 are needed. He said the west wall maybe too far with only two exits. He will let us know.

If that is so, Room three will need to be done also, This would be an easy fix. Use one rail door and the center door in room Three, construct exit doorways

From overhead doors. ( He did not look at Room 3 Wall)

2) Confined space he wants a copy of our site SOP that we do not do confined spare or policy we may have that we use.

3) Signage on Injector pump in room 1 labeling confined space.

He will be mailing that out and from the mailing date he said we have 15 days to act. Mike has his info.

I will be on Vacation next week. Mike and David should be able to take care of these issues. Orkin knows I will be gone and will be seeing Mike or David.

I had them install more traps in all these locations where these droppings were found.

If you have questions you could phone me but I may not be available due to traveling out of state.

Regards,

William Schwerin
Facility Maintenance, Quality Engineer
1125 Sycamore St. • Manteno, IL 60950
Office: 815-468-4462 • Mobile: 815-954-8570

CONFIDENTIAL

William.Schwerin@Kencogroup.com

*The information contained in this electronic communication and any accompanying document is confidential and is intended only for the use of the addressee. Unauthorized use, disclosure or copying of this communication, or any part of it, is strictly prohibited and may be unlawful. If you have received this communication in error, please notify the sender immediately by return email, and destroy this communication and all copies of it, including all attachments.*

**Rebekah Funk**

**From:** Coffey, Robert
**Sent:** Saturday, July 12, 2014 12:29 PM
**To:** Moore, Todd; Helveston, Andrew; Pacchioli, Michael; Tumpane Jr., Bill; Maggio, Jennifer; Chick, Matthew
**Cc:** 'David.Jabaley@Kencogroup.com'; Paula Hise (paula.hise@kencogroup.com); Gordon Steele (Gordon.Steele@Jacobsonco.com); 'keith.fron@jacobsonco.com' (keith.fron@jacobsonco.com)
**Subject:** FW: State Healh Dept & FDA & OSHA Visit
**Attachments:** scan.pdf; scan.pdf

**Importance:** High

Team – Earlier this week the site had terminated a disgruntled employee for performance related issues – Friday morning the FDA, OSHA and Health Department paid a visit to the site. The report below is a summary of the investigation and findings.

Due to the harsh winter and adverse conditions, it is common for an increase in rodent activity – as such, Kenco has increased the level of Orkin supervision (and were on site this week on Wednesday). We have seen an increase in pests in the area and have increased the number of traps both inside and outside the building in compliance of Orkin's recommendation.

The official reports are attached and Bill Schwerin the Facility Maintenance Engineers' unfiltered account of the visit is below. No major findings were discovered; however, there is cause for concern around the amount of spilled product and mouse activity in all areas including the Jacobson area where large amounts of product is exposed. The FDA inspector said that he will be back on Monday for a follow up. I will also be on site at that time.

At the end of the shift, the site was on time to have ready and still hovering around 90% full. Kenco and Jacobson are committed to operating the facility safely, efficiently while adhering to Mars quality principles.

**In summary, we are not anticipating any major findings from the inspection and will follow up with any additional questions or concerns.**

Regards,

**Robert Coffey**

**Mars Chocolate, North America**
**Regional Distribution Manager - Midwest**
**Chicago Plant**
**2019 North Oak Park Ave,**
**Chicago, IL 60707**

**M:** 773-892-7735
**E:** robert.coffey@effem.com

**From:** Schwerin, William [mailto:William.Schwerin@Kencogroup.com]
**Sent:** Friday, July 11, 2014 7:04 PM

**To:** Jabaley, David; Hise, Paula; Coffey, Robert
**Cc:** Szplett, Len; Manzello, Mike
**Subject:** State Healh Dept & FDA & OSHA Visit

Hello,

At roughly 9:00AM the Welcome center called me the state inspector was here, shortly after the FDA inspector was here.
We had the Welcome center send them though to meet us. (David Jabaley & myself) They asked questions about Kenco and Mar's
Operation. They said that they were here for a regular inspection and also a complaint.
David answered all of the questions that the FDA asked, the state health had a few more that I took notes that we were unsure of. They asked for last 6
Month Pest Control records and Sanitation records. I was told to find them then catch up with them. At that time I let Keith with Jacobson know that Health & FDA were here for an inspection. He said OK. Dave let me know that he had given Jacobson notice also.

I caught up with them just shortly before the toured the warehouse FDA and the State inspection started well finding only minor things such as some boxes that looked as though they were not taped well and a little damage cases here and there not anything they were noting about except one spill that we had our janitor take care of immediately. Roughly about 10:15 OSHA is at the gate. David had me continue with the FDA & State Health. We just had finished at that point with Room 1 and then continued to Room 2. We walked down aisle A then aisle B found a found a few droppings in 2BN 32 these were noted, continued on about a third of Room two and found a few more product spills, I had noted that and let our Janitor know to clean up as well.

We found some more product spills and they stated that this being a large warehouse this looked to be more of a sanitation issue then a pest issue. The FDA stated that he had done other inspections else where they had real problems with pest in the boxes. I let them know we have had some sightings here and our pest control company did catch some mice here, so they would know when they checked our records they knew were doing our job of cleaning and Pest control.

After about half of Room 2 we came up to the Jacobson area. They noticed the baggers and a few tables with some green plastic bins with opened bags with only a few candies in them. I let them know it was their little QA station, that they check to make sure the product is in conformance. (Good Seals & QA that it is inspected periodically and checked) They said that makes sense. From there they wanted to see more aisles. We continued down the middle aisle in room 2. There were forklifts down most of the aisles till we came to 2PS, then they wanted to see more that way. We were walking down the aisle there, the aisle was not full , giving them opportunity to walk under the rack with their flash lights looking for anything. They found that the Jacobson racks were more dusty and Dirty they stated and asked if we clean these locations. I let them know that Jacobson cleans their own racks and that we do let them know when our Pest control and myself find areas that need cleaning. Just as we were half way the FDA inspector found a Milky way bar in the Jacobson area that had been nibbled on and some mouse droppings. That was not good. I called our Orkin Manager (Riley) immediately. He said he would be there soon. We noted down that area and then continued
farther down finding a little more droppings there. Noted that location as well. We then came to the end of the aisle and they asked how much was Jacobson.

I let them know they store mostly the corrugate pallets and along the bagger and aisle opposite that. We then proceeded to room Three. We found more product spills
And noted them down. They asked if we ever had caught any juvenile mice here. I said yes and that Orkin was on site at that time and took care of the issue