

# UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS 2019 AUG 16 AM 8:58

LEONARD A. SZPLETT, an individual,

PLAINTIFF,

vs.

KENCO LOGISTIC SERVICES, LLC, a
TENNESSEE LIMITED LIABILITY
COMPANY, MARS, INC., The
HARTFORD, DAVID JABALEY,
MARIO LOPEZ, TAMMI FOWLER,
PAULA HISE, TRACE SPIER,
ROBERT COFFEY, TODD MOORE,
JAY ELLIOTT, DAVID CAINES,
MICHAEL MANZELLO, DWIGHT
CRAWLEY, and KELVIN WALSH

DEFENDANTS.

**FILED**

AUG 16 2019

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

1:19-cv-02500
Judge: Gary Feinerman
Magistrate Judge: Young B. Kim

## PLAINTIFF'S RESPONSE TO DEFENDANT'S MARS, INC., ROBERT COFFEY and TODD MOORE'S 12b(6) MOTION TO DISMISS

      **NOW COMES** Plaintiff, Leonard A. Szplett, Pro Se, in response to  Defendants'

Motion(s) to Dismiss in support of his response Plaintiff states the following; **THAT**:

1.     Plaintiff contends that his claims under 42 USC § 1981 and the underlying torts, as well

     as, 18 U.S.C. §1962(c) & (d) were timely filed on April 12, 2019 as this was the third

     (3rd) year, eleventh (11th) month and twenty-nine (29th) day.

2.    *Plaintiff rejects the idea that he failed to state a claim for which relief could be granted under Civil Rule of Procedure 8*

Plaintiff understood that his complaint must provide a "short and plain statement of the claim showing that [he] is entitled to relief." Fed.R.Civ.P. 8(a)(2), to which he provided. [Dkt. ] Plaintiff also understood that "specific facts were not necessary and that the statement need only give the defendant[s] fair notice of what ... the claim is and the grounds upon which it rests." *Erickson v. Pardus,* U.S., 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) (internal quotation marks omitted); *Swierkiewicz,* 534 U.S. at 512, 122 S.Ct. 992.

Plaintiff also understood that at a minimum, he had to plead "enough facts to state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* U.S., 127 S.Ct. 1955, 1974, 167 L.Ed.2d 929 (2007).

A claim has "facial plausibility" when the plaintiff pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." This "plausibility" standard is "not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).*

With that understanding and the understanding that some of his claims required heightened pleading standards, Plaintiff attempted to establish in his complaint that: 1) he was in privity to the Defendants and other employees and agents of Kenco and Mars, as well as, other Plaintiff's and Complainant's in other employment matters before the IDHR, EEOC, District and Seventh Circuit Courts, as well as, other unnamed employees at the Mars Manteno facility; 2) Defendants such as Kenco, Mars, Walsh, Fowler, Lopez, Manzello, Jabaley and others benefited in various judicial forums in using Plaintiff and Plaintiff's position as the HR Manager and; This

benefit allowed Defendants to avoid culpability and liability for the unlawful and impermissible

acts of overt and covert discrimination in their various forms. This benefit was a detriment to the

African American employee's and employees who opposed the discriminatory treatment of

African American employees, such as Plaintiff; 3) Defendants and others planned, assisted,

encouraged, carried out and furthered their schemes through contrivance, deception, malice and

animus; 4) Defendants at the management and executive level(s) created and maintained a

hostile work environment charged with racial animus and that Defendant Kenco and Mars

executive management, other managers and management team(s) engaged in and knowingly

permitted discrimination, racial slurs and epithets, retaliation, wrongful terminations, harassment,

and racially motivated acts of potentially fatal harm to African American employees when "it

knew about the discriminatory conduct and failed to stop it;" or other racially motivated acts that

led to fatalities. It has also been established that racism need not be directed at the complainant

in order to create a hostile environment. 59 Fed.Reg. 11449-50. *See also Patterson v. McLean*

*Credit Union,* 491 U.S. 164, 180, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989); 5) Defendants and

others were negligent per se in violating the civil rights of its protected class employees and

acted with a reckless or callous indifference to these federally protected rights; 6) Defendants

intentionally interfered with and obstructed justice and its administration towards Plaintiff and

other protected class persons; 7) Defendants provided patently false and misleading information

to various governmental and regulatory agencies and judicial forums, such as the district courts

and appellate court of the seventh circuit; 8) Defendants breached their fiduciary obligation

intentionally and furthered their concerted schemes of deceit, malice and reckless indifference

using contrivance with the intent to violate the civil rights of the protected class persons; 9)

Defendants were acting in the scope of their employment with the approval of their employers

Defendants Kenco and Mars and that all of the Defendants are liable- *RESTATEMENT (SECOND) OF AGENCY (1957), quoted in Ellerth, 524 U.S. at 756, and in Faragher, 524 U.S. at 793*; and that a Respondeat Superior relationship existed between Mars, Kenco and their employees and agents; 10) Defendants perfected their plan(s) to knowingly violate persons protected rights by hiring a Jay Elliott, an attorney, and allowing him to make statements and participate in investigatory proceedings without any firsthand knowledge; 11) Plaintiff was promised employment and benefits under certain conditions and he reasonably relied on that promise to his detriment. As a requisite to Plaintiff's employment, Defendants required Plaintiff to sign the offer letter of employment, and various employment policies and an employee handbook or other policy statement that created enforceable contractual rights governed by the traditional requirements for contract formation. Plaintiff also believes that a promissory estoppel was created; 12) Plaintiff had engaged in protected activity, suffered pre and post adverse employment actions, coercion, harassment, and various forms of retaliation and; 13) Defendants expected Plaintiff to act in complicity with their unlawful and contrived schemes to violate the protected rights of African Americans and those who opposed discriminatory treatment of African Americans; 14) Plaintiff's medical leave of absence was a form of constructive discharge due to the creation of a hostile work environment by Defendants that was charged with racial animus 15) no pay was a form of retaliation- *Burlington Northern and Santa Fe Railway Co. v. White, 126 S.Ct. 2405 (2006)-* and; 16) Plaintiff provided enough information through factual occurrences and supporting documentation to make his claims plausible.

Plaintiff also knows that, while there is no 'magic number' of incidents that indicate a hostile work environment, courts have recognized before that an unambiguously racial epithet falls on the 'more severe' end of the spectrum. *Cerros v. Steel Tech., Inc., 288 F.3d 1040, 1047*

*(7th Cir. 2002)* and that even one egregious incident could suffice in creating a hostile work environment. *Cerros v. Steel Technologies, Inc.*, 398 F.3d 944 (7th Cir. 2005) at 950 citing *Hostetler v. Quality Dining, Inc.,* 218 F.3d 798, 808 (7th Cir.2000); see also *Daniels v. Essex Group, Inc.,* 937 F.2d 1264, 1273 (7th Cir.1991).

Additionally, Plaintiff wanted to demonstrate that this was a systemic corporate culture discrimination stemming from the Corporate offices and Executive Level Management. Moreover, the Seventh Circuit has noted and cautioned the lower courts to view "a supervisor's [conduct] in the workplace as much more serious than a co-worker's." *Soucie v. CITY OF BRAIDWOOD*, No. 17-cv-5235 (N.D. Ill. Mar. 18, 2019) citing *Gates,* 916 F.3d at 638.

This management scheme, management at its highest level(s), with the authority to make and execute tangible employment decisions company wide, altered the terms and conditions of Plaintiff's and others employment for unlawful and impermissible reasons that were rooted and grounded in racial bias's and discrimination. This conduct and should be viewed with that much more seriousness; ultimately, as in this case, at every level it was the manager's manager up to and in some cases the President of the division and perhaps the President and CEO of the company that participated in conspiracy that aided and abetted these and other Defendants in avoiding and escaping liability by obstructing justice and its administration.

For example, Defendants such as Walsh the former General Manager, David Jabaley the former Director of Operations, Tammi Fowler the former Senior Manager of Employee Relations and Mike Manzello the former Operations Manager have made racially motivated comments, slurs, innuendos, epithets and stereotypical jokes and remarks in Plaintiff's presence and in the presences of others. These and other persons have used such appalling racist language such as: "Nigger, Nigger Bitch, Black Ass" and other degrading and stereotypical slurs, epithets

and comments.[1] Paula Hise the V.P. of Operations also openly praised Walsh and called him a friend after he was discharged. Todd Moore was also concerned and asked about the morale at the facility after Walsh was involuntarily separated. Plaintiff asserts that Hise and Moore knew that Walsh had been the subject of numerous charges of discrimination filed at the Mars Manteno facility, as Plaintiff personally faxed charges of discrimination to Hise.

Additionally, Paula Hise V.P. of Operations praised and lauded Kelvin Walsh to the employees of the Mars Manteno facility after he was terminated. Hise called him a friend and a good person. Hise was aware of the various charges of discrimination that had been filed against Walsh and the Mars Manteno facility. Walsh was given a severance package even though he was terminated from his position as General Manager. Defendant Kenco and its employees, such as Jay Elliott have an open and admitted history of discriminatory behavior and actions towards protected class persons such as African Americans. (Brown V Kenco-3:10-CV-668). Also, Lopez and Jabaley openly praised and lauded one another on LinkedIn (a social media cite) about how the situations were handled at the Mars Manteno facility.

Mars, Inc. had an onsite manager, Robert Coffey, who daily met with named Defendants such as Walsh, Lopez, Manzello, Jabaley and other persons discussing these and other issues relative to the Mars Manteno facility. Coffey's boss, Todd Moore was also very active in the day to day operations of the Mars Manteno facility. Plaintiff over the years participated in a number of meetings and was privy to the knowledge that every facet of the Mars Manteno facility was discussed and a plan would be devised to address the open items. Furthermore, a

---

[1] In *Soucie v. CITY OF BRAIDWOOD*, No. 17-cv-5235 (N.D. Ill. Mar. 18, 2019) it was cited that the Seventh Circuit characterized the "N-word" and "Black ass" as "appalling racist language." In *Gates v. Bd. of Educ. of the City of Chicago*, 916 F.3d 631 (7th Cir. 2019) at 639; *see also Hrobowski v. Worthington Steel Co.*, 358 F.3d 473, 477 (7th Cir. 2004) ("Given American history, we recognize that the [n-word] can have a highly disturbing impact on the listener.")

change in personnel such as the General Manager, the Facility Manager or even Plaintiff's position would have required at the very least Robert Coffey's approval if not Todd Moore and others' approval. Management from Mars failed to address and remediate these issues and at the very least failed to follow and or enforce the policies in place that address these and other issues. Therefore, this management style is not new, but a deep seeded, open and pervasive systemic corporate culture charged with racial animus. This is even reflected in the Mars and Kenco Company's organizational structure(s).

Recently, the Seventh Circuit stated in *Gates v. Bd. of Educ. of the City of Chicago*, 916 F.3d 631 (7th Cir. 2019) at 638 & 639 citing:

> *Rodgers v. Western-Southern Life Insurance Co.,* 12 F.3d 668 (7th Cir. 1993).
> We affirmed a verdict for an employee where his supervisor used the N-word
> multiple times in his presence and made several other racially offensive
> comments. *Rodgers,* 12 F.3d at 671, 676-78. We explained: "Perhaps no single
> act can more quickly `alter the conditions of employment and create an abusive
> working environment,' than the use of an unambiguously racial epithet such as
> `nigger' by a supervisor in the presence of his subordinates." *Id.* at 675, quoting
> *Meritor,* 477 U.S. at 67, 106 S.Ct. 2399. "[A] supervisor's use of the [N-word]
> impacts the work environment far more severely than use by co-equals." *Id.* at
> 675.

Plaintiff also looks to the courts for their expertise to draw reasonable inference(s) that the defendant(s) is liable for the misconduct(s) alleged. *Twombly, 550 U.S., at 556, 127 S.Ct. 1955*

Plaintiff also asks that leave be granted him to amend his complaint if there are any noted deficiencies by the court.

***3.      Plaintiff rejects the notion that his complaint should be stricken in its entirety
as scandalous because of allegedly having an effect of confusing issues and that its
length and complexity is an undue burden to Defendants.***

Plaintiff asserts and contends that Defendants fiduciary obligation to Plaintiff is made up
of several facets.  The framework of Defendants' fiduciary obligation stems from public policy
which in turn dictates company policy.  For example, the Food Safety Modernization Act herein
after "FSMA" and its governing management scheme[2] is the basis for Defendant Mars and
Kenco's policies, procedures, and protocols.  This management scheme mandates that every
policy, procedure, protocol and form used is to be written/documented, vetted for accuracy by
the head of each department, catalogued/logged, tethered and accessible in one common assigned
place (hard copy and electronically), followed as written, deviations are to be documented:
intentional deviations require approval and unintentional deviations require corrective and
preventative action to ensure that the deviation does not occur again and is audited against these
standards internally and externally for compliance.  Additionally, it is to be managed by a person
meeting the designated criteria under FSMA.

FSMA and its management scheme stem from international law--The Codex
Alimentarius Commission comprised of the Food and Agriculture Organization (herein after
"FAO") and the World Health Organization (herein after "WHO").

The management scheme promotes transparency, accuracy, traceability and
accountability in a documented manner that is audited for compliance[3].  Therefore, all policies,
procedure, protocols, and forms of Defendants are subject to this standard.  Simply it creates an
inextricably linked and irrefutable paper trail to public and company policy.

---

[2] ISO 9001
[3] Mars and Kenco are both audited and certified in accordance with these standards.  Mars is audited by Lloyd's
Register [Dkt. 1 pg. 296] and Kenco by AIB, which conform to FSMA the amended Food Drug and Cosmetic Act-

For example, Defendants policies regarding known and reported incidents mandate that an investigation take place and that a written disposition is made. These incidents include on the job injuries; employee issues such as incidents that precipitate progressive disciplinary actions and firings; complaints, such as: environmental hazards, working conditions, discrimination etc... Such findings are to be a part of Defendants business records and included in employee files.

Defendants also have policies relative to hiring and what the chain of command is relative to hiring various persons at each level of employment, including and up to a Vice Presidency and provides its own associated paper trail. Additionally, each job (position) has an analysis and is mandated to have a job description under FSMA and according to Defendant Kenco and Mars' policies[4]. Therefore, there was no reason that Defendants were unable to produce Plaintiff's signed job description[5] to any requesting government agency and to his physician, as it was mandated a matter of law.

In addition to FSMA, the Bio Terrorism Act requires such vetting and documentation to ensure that the stream of commerce minimize any risks or threat of terror or harm (contamination to our food supply) to our society.

During the relevant time Mars, Inc. was a contributing member to Codex Alimentarius Commission as a board member to the International Life Sciences Institute **(ILSI)**. An industry coalition organization and the organization's Board of Members consists of one representative from each member company, most of which are global firms with a significant footprint in

---

[4] Defendants Control of Documents policy ISO. BP. 4.2.3.001

[5] Plaintiff asserts that the job description was to have been in his personnel file as mandated. Plaintiff was responsible for the personnel files being maintained. Plaintiff asserts that all employees of the Mars Manteno facility had job descriptions in their personnel file that were signed off by the head of each department. Failure to produce the correct job description caused Plaintiff's doctor to evaluate Plaintiff's job performance against inaccurate and misleading information. Additionally, Plaintiff's personnel file should have contained any legitimate performance management assessments that support the contention that Plaintiff was not meeting Defendants legitimate expectations while performing the duties and tasks of the HR Manager at the Mars Manteno Facility.

agrifood, food additive, and food chemical markets like Cargill, Monsanto, Mars, Coca-Cola, Nestle, PepsiCo, and Unilever.[6]

Therefore, it is unreasonable and disingenuous for Defendant Mars and its employees to assert that there is issue confusion, as Mars has a major foot print and is a major player and it has been noted that the ILSI organization not only influences Codex standards through direct cooperation with national and international regulators, but also indirectly through the networks it develops.[7] Consequently, Plaintiff asserts that it is Defendants who seek to once again deceive and confuse the issue(s) and impede and obstruct justice; Ultimately to continue to impose an undue burden upon Plaintiff of denying him his constitutional right to justice.

The additional components that make up Defendants fiduciary obligation(s) to Plaintiff are: to be afforded a work environment that is not charged with racial animus-- fostered and sustained by upper management and Corporate Suite Executives. The final but not the least component were the express and implied covenants outlined by Defendants Kenco, Mars and their management team(s) in its: employee handbook; offer letter to Plaintiff and; policies given to Plaintiff. Additionally as a term and condition of employment, it was required that Plaintiff sign off on the offer letter and portions of the handbook.

Plaintiff also asserts that the codified standards cited were to underscore the bandwidth and depth of Defendants knowledge and scope of their fiduciary obligations created by public policy that dictated their company policy. Furthermore, Defendants failed to point or cite any authority that supports the contention that these codified standards do not create a fiduciary obligation and are not inextricably linked to their policies that governed Plaintiff's employment

---

[6] *Board of Directors,* **INT'L** LIFE SCI. **INST.,** http://www.ilsi.org/Europe/Pages/Board-of-Directors.aspx (last visited May **5,** *2015); Leadership and Supporting Companies,* **INT'L** LIFE SCI. **INST.,** http://www.ilsi.org/Pages/Leadership.aspx (last visited May **5, 2015).**

[7] The Codex Alimentarius Commission, Corporate Influence, and International Trade: A Perspective on FDA's Global Role, 41 Am. J.L. & Med. 406 (2015).

relationship with them. Plaintiff asserts that Defendants are playing possum and are fully aware of its obligations, rules and actions.

Defendants were not able to point to authority within this circuit to support their contention that Plaintiff's complaint placed an undue burden upon the court and Defendant. Plaintiff's ordinary reading and interpretation of the rule(s) led him to believe that he was to provide the facts that were within his purview to support his allegations. Because of Plaintiff's position as the HR manager and his longevity with the Mars Manteno facility, he has an infinite amount of facts. Therefore, Plaintiff attempted to provide the most relevant facts to fulfill his obligations of pleading "enough facts to state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* U.S., 127 S.Ct. 1955, 1974, 167 L.Ed.2d 929 (2007). These facts allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." This "plausibility" standard is "not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).*

Plaintiff also asserts that his complaint was drafted in good faith and not with the intention to be burdensome by volume, but well-grounded in facts, known to him, laid out in a logical fashion with supporting evidence and if the court disagrees with Plaintiff, Plaintiff requests that the court grant him leave to amend any cited deficiencies. However, Plaintiff is prayerful that the court's expertise would allow it to be able to look at the merits of Plaintiff's claims and see the necessary causal connections and inferences that Plaintiff has drawn.

### 4. *Plaintiff rejects the contention that his claims under 42 USC § 1981 are Time-barred by the Four-Year Statute of Limitations.*

Defendants grossly misstate the fact that Plaintiff only alleges claims for retaliation prior to his termination. [Dkt.#33 pg. 12 ¶2]. Plaintiff has repeatedly alleged that his due benefits and pay that he did not receive extended past his termination date and that it was not until after April 14, 2015 that he began to realize that something was going wrong with his employment and his benefits. And that it was not until April 28, 2015 that Plaintiff's claim for not being paid was fully ripe. And it was not until after August 5, 2015 that Plaintiff learned that he had been demoted while he was out on a medical leave of absence and that it was because of all the charges of discrimination that were filed that Lori Varvel was hired [Dkt. 1 pg. 61 ¶317]

Defendants highlight on several occasions that Plaintiff's termination date was a point of trigger for the statute of limitations to begin to run although, Defendants did cite to an authority to support the contention that retaliatory acts post termination are actionable [Dkt. #33 pg. 12 ¶2] (*Robinson v. Shell Oil Co.*, 519 U.S. 337 (1997); *See also Abdullahi v. Prada USA Corp.,* 520 F.3d 710, 712 (7th Cir. 2008). Defendants did not point to any authority to contradict the contention that: 1) cumulative or continuing violation doctrine does not apply to this matter *Turley v. Rednour,* 729 F.3d 645, 654 (7th Cir.2013) (Easterbrook, C.J., concurring) and; that The continuing violation doctrine has the effect of preserving discrimination claims based on incidents that occurred outside of the limitations period if those incidents were part of a larger discriminatory "practice" that continued into the limitations period. *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 379, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982). The doctrine protects victims of discrimination or of other wrongdoing who may not recognize violations as legally actionable until future incidents demonstrate a pattern. *See Dasgupta v. Univ. of Wisconsin Bd. of Regents,* 121 F.3d 1138, 1139 (7th Cir.1997) ("A continuing violation is one that could not

reasonably have been expected to be made the subject of a lawsuit when it first occurred because its character as a violation did not become clear until it was repeated during the limitations period.") or; 2) *"a* series of wrongful acts [does or does not] create a series of claims"- Heard v. Sheahan, 253 *E3d* 316,318 (7th *Cir.* 2001) and/or; 3) that § 1981 does or does not "include the making, performance, modification, and termination of contracts and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). For Szplett's among other things was his inability to enjoy of all his benefits, privileges, terms, and conditions of his contractual relationship.

Moreover, there is "the 'standard rule'" for limitations periods. *Graham County Soil & Water Conservation Dist.* v. *United States ex rel. Wilson*, 545 U. S. 409, 418 (2005). Ordinarily, a "'limitations period commences when the plaintiff has a complete and present cause of action.'" *Ibid.* "[A] cause of action does not become 'complete and present' for limitations purposes until the plaintiff can file suit and obtain relief." *Bay Area Laundry and Dry Cleaning Pension Trust Fund* v. *Ferbar Corp. of Cal.*, 522 U. S. 192, 201 (1997). "And only after he has a complete and present cause of action does a limitations period ordinarily begin to run." Cf. *Mac's Shell Service, Inc.* v. *Shell Oil Products Co.*, 559 U. S. 175, 189– 190 (2010)

Plaintiff maintains that it was not until after April 28, 2015, when Defendants Kenco and Mars failed to pay Plaintiff his March salary[8]; 2) coupled with being made aware on April 14, 2015 that he was denied his disability benefits;[9] 3) Plaintiff also learned several days later that he

[8] Defendant Kenco and Mars had up to thirty (30) days after termination to pay Plaintiff any monies due. Plaintiff asserts that any claim would have been ripe prior to April 28, 2015. Additionally, Plaintiff was not notified until May 8, 2015 that he would not receive his March salary.

[9] Defendants Mars, Kenco and the Hartford were aware that Plaintiff was not released to return to work by his doctor. Also in pre-litigation during the relevant times Kenco and The Hartford have interchangeably been the plan administrator for Plaintiff's disability benefits. Plaintiff stopped receiving Short Term Disability on February 28, 2019 and it was more than a month before he was notified that his benefits were terminated. Plaintiff's doctor had released him to return to work and had several weeks earlier estimated that he would be out six (6) to twelve (12) months.

had been intentionally mischaracterized by Defendant Kenco, as other than the HR Manager of the Mars Manteno facility in the matter of Edith McCurry v. Kenco et al. that Plaintiff realized that something was wrong.

These acts were beyond Plaintiff's termination date of March 29, 2015.   It is "highly doubtful" that Congress intended a time limit on pursuing a claim to expire before the claim arose *Johnson* v. *United States,* 544 U. S. 295, 305 (2005).

After the culmination of these events, it occurred to him that he was being coerced, harassed, and retaliated against for refusing to help Defendants Kenco and Mars continue to violate the constitutionally protected rights of African Americans and other employees of the Mars Manteo facility as a term and condition to receive his severance pay-- a Quid Pro Quo.

This would have effectively made Plaintiff act in complicity with Defendants Mars, Kenco and their employee's and/or their agents race-based stereotypes regarding African Americans. Even to the extent that Plaintiff would have had to perjury himself; conspire, aid and abet these Defendants and others in the continued violation of the protected rights of African American employees and those who opposed the discriminatory treatment of African Americans by avoiding culpability and liability.

Shortly thereafter in May of 2015, Plaintiff filed formal charges with the Illinois Department of Human Rights and the Equal Employment Opportunity Commission[10]. Defendants filed a response to these charges on August 5, 2015 and it was at this time, for the very first time, that Szplett learned that he had been replaced and demoted because of all the charges of discrimination filed against them and that it was due to his failing leadership. Plaintiff then later learned sometime later in July 2018 that Defendants had actively begun looking for his replacement in September of 2014, prior to his medical leave of absence due to

---

[10] Plaintiff's pending claims with the EEOC are currently under review.

hostile work environment [Dkt. 1 pg. 325-353]. This information was concealed from Szplett and it had not discovered until well past Szplett's March 29, 2015 termination date.

As the years and months passed by and Plaintiff became privy to a number of quasi-judicial and judicial matters, Plaintiff had an opportunity to witness these and other named Defendants use Plaintiff, his role and title for their benefit to escape and avoid liability and culpability for the intentional discrimination of African Americans and those who opposed discriminatory treatment of African Americans. These Defendants were upper management to Corporate Suite Executives of Mars and Kenco.

Additionally, these Defendants acted willfully in concert with a reckless abandonment for public and company policies to create and sustain a hostile work environment charged with racial animus. These Defendants and others presented patently false and misleading information and documents to regulatory agencies, such as OSHA, EEOC, the IDHR, Administrative Law Judges, District Courts and the Seventh Circuit Appellate Court as late April 11, 2019. At times Defendants used the information as sword and at other times as a shield; and sometimes used the information as sword and a shield simultaneously to fit their immediate needs.

### 5. *Plaintiff's claims in Counts VI, VII, and XI are not Time-Barred by the Applicable Statute of Limitations prescribed by Illinois Law.*

Under 735 ILCS 5/13-201, "[a]ctions for slander, libel or for publication of matter violating the right of privacy, shall be commenced within one year after the cause of action accrued." However, the statute (735 ILCS 5/13-208) states that "If the defendant (the person who made the statement) was (or is) out of the state for any period of time beginning on the date the statement was made, the time of the defendant's absence won't be counted as part of the one-year filing period."

Defendant Fowler, who was out of state and continues to be out of state, [Dkt. 1 pg. 53 ¶ 261] made defamatory and untrue remarks about Plaintiff during litigation in the matter of McCurry v. Kenco et al 16 –CV-2273.   Consequently, due to Fowler's absence the statute of limitations has not run.  Additionally, Plaintiff did not become aware of these remarks until July of 2018 and would have had no way to learn of these disparaging remarks until such time that he stumbled upon them.  Therefore, based upon when Plaintiff discovered the information, he believes that the time should be tolled under the discovery rule.   And that his April 12, 2019 claim was timely filed.

These remarks damaged plaintiff's professional standing and also caused Plaintiff emotional distress.  Defendant Fowler was aware, just as a number of other Defendants that Plaintiff was susceptible to emotional distress due to his known health issues and conditions that resulted from the hostile work environment at the Mars Manteno facility that was charged with racial animus.

Based upon 735 ILCS 5/13-208, Plaintiff's claims for intentional infliction of emotional distress and negligence under 735 ILCS 5/13-202 would be timely filed as well.

Plaintiff also asserts that his claims of negligence not only related to personal injury, but injury to his personal property (money) under 735 ILCS 5/13-205, which has a five (5) year statute of limitations.  He also asserts that his claims of negligence also waged to help establish the level of liability due the Defendants by demonstrating that the Defendants were grossly negligent with a reckless disregard for: 1) public and company policy and; 2) the constitutional civil rights of the employees at the Mars Manteno facility.

That the Defendants acted in reckless abandonment to their hiring and retention policies of employees; that Defendants failed to investigate claims of discrimination -- let alone bring remediation or correction to the claims of discrimination.

That Defendants, their employees and agents had an open policy of disregarding public and company policies; 2) conspiring to breach and breaching their fiduciary obligations to its employees; 3) hiring employees, i.e. Jay Elliott, Pete Monstwillo, etc..., who fostered, condoned and furthered Defendants open policy of discriminatory actions towards Plaintiff, African Americans, and other protected class persons. 4) Defendants Mars and Kenco, along with other named Defendants were in a position of authority i.e. upper management to Executive Level Management to make adverse employment decisions against persons who complained of or opposed discriminatory treatment. Defendants such as Walsh, Jabaley, Manzello, Fowler, Lopez, Hise and others either made or upheld derogatory, degrading, and or racially motivated comments, epithets, or slurs to Plaintiff and others about African Americans; such as, "Nigger, Nigger Bitch, Black Ass" and other degrading and stereotypes.

In addition, Defendants only raised issues of timeliness as its affirmative defense to Plaintiff's allegations and did not respond to Plaintiffs' allegations in its legal memoranda, and thus Plaintiff asserts that since his claims are not time-barred that Mars, Inc., its agents, and employees that include Kenco and their employees, Todd Moore and Robert Coffey remain Defendants to Plaintiffs' claims and that they have waived any future arguments. *See Steen v. Myers,* 486 F.3d 1017, 1020-21 (7th Cir. 2007) (absence of discussion in brief amounts to abandonment of argument).

Plaintiff also looks to the court for its expertise to draw reasonable inference(s) that the defendant(s) is liable for the misconduct(s) alleged. *Twombly, 550 U.S., at 556, 127 S.Ct. 1955*

Plaintiff also asks that leave be granted him to amend his complaint if there are any noted deficiencies by the court.

**Wherefore,** Plaintiff prays to this Honorable court that Defendants MARS, INC., TODD MOORE, and ROBERT COFFEY'S MOTION TO DISMISS be denied and if there are any noted deficiencies in Plaintiff's case that Plaintiff be granted leave to amend his complaint to correct those deficiencies and it is noted that Defendants have waived any future arguments.

Respectfully Submitted this 13 Day of August 2019 by:

Leonard Szplett
3421 W. 1500 NW RD.
Kankakee, ILL 60901
815-212-3125
Stkbnd2000@aol.com

## CERTIFICATE OF SERVICE

Please take notice that on August 13, 2109 I, Leonard A. Szplett, hereby do,

certify that I did file a RESPONSE TO DEFENDANTS MARS, INC., TODD

MOORE, and ROBERT COFFEY'S 12b(6) MOTION TO DISMISS with the

NORTHERN DISTRICT OF ILLINOIS in the foregoing matter of Case No. 1:19

CV-02500 and have served the persons identified on the docket's service list

through Notice of Electronic Filing generated by the Court's CM/ECF

system through the Clerk's Office.

Respectfully Submitted this 13 Day of August 2019 by:

*Leonard Szplett*

Leonard Szplett
3421 W. 1500 NW RD.
Kankakee, ILL 60901
815-212-3125
Stkbnd2000@aol.com