# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

2019 OCT 17 PM 4: 26

CLERK
U.S. DISTRICT COURT

# FILED

OCT 17 2019

**THOMAS G. BRUTON**
**CLERK, U.S. DISTRICT COURT**

LEONARD A. SZPLETT, an individual,

PLAINTIFF,

VS.

KENCO LOGISTIC SERVICES, LLC, a TENNESSEE LIMITED LIABILITY COMPANY, MARS, INC., The HARTFORD, DAVID JABALEY, MARIO LOPEZ, TAMMI FOWLER, PAULA HISE, TRACE SPIER, ROBERT COFFEY, TODD MOORE, JAY ELLIOTT, DAVID CAINES, MICHAEL MANZELLO, DWIGHT CRAWLEY, and KELVIN WALSH

DEFENDANTS

Case No. 1:19 CV-02500

Judge: Gary Feinerman

Magistrate Judge: Young B. Kim

## PLAINTIFF'S SECOND AMENDED COMPLAINT

There is no other civil action between the parties arising out of the same transaction or occurrence as alleged in this Complaint pending in this Court, nor has any such action been previously filed and dismissed or transferred after having been assigned to a judge, nor do I know of any other civil action, not between the parties, arising out of the same transaction or occurrence as alleged in this Complaint that is either pending or was previously filed and dismissed, transferred, or otherwise disposed of after having been assigned to a Judge in this Court.

NOW COMES Plaintiff, Leonard Szplett, *Pro Se*, and files this Complaint against Defendants, Mars, Incorporated, Kenco Logistics of the Kenco Group, The Hartford, David Caines, Dwight Crawley, Paula Hise, Trace Spier, Jay Elliott, David Jabaley, Todd Moore, Tammi Fowler, Robert Coffey, Kelvin Walsh, Mario Lopez, and Mike Manzello as follows:

1.      Plaintiff, Leonard Szplett (hereinafter "Plaintiff") is a citizen of the United States and resides in the County of Kankakee, State of Illinois.

2.      Plaintiff was an employee of MARS and KENCO within the meaning of the Civil Rights Act of 1866, as amended by the Civil Rights Act of 1991, 42 U.S.C. §1981and applicable case law

3.      Plaintiff SZPLETT was employed with MARS and KENCO and its predecessor, whom at all times acted as agents of Mars, Inc., since 2001 through various 3rd party management companies; beginning with 4T's Management Company in 1999 and then with KENCO in April 2013.

4.      Defendant, Mars, Incorporated (hereinafter "Defendant Mars") is a global food and pet food company that currently maintains several offices in Chicago, Burr Ridge, Joliet and Manteno, Illinois.

5.      Defendant MARS, Inc. employs over 3000+ employees and its primary place of business is in Mclean, Virginia.  Mars is an employer within the meaning of Civil Rights Act of 1866, as amended by the Civil Rights Act of 1991, 42 U.S.C. §1981.

6. Defendant Mars, Inc. employed Kenco Logistics as its 3rd party manager for the Mars Manteno facility.

7. Defendant Kenco Logistics[1] (hereinafter "Defendant Kenco") is a 3rd party logistics provider that manages warehouses.

8. KENCO maintained an office in Manteno, Illinois and currently maintains offices in Bolingbrook, Channahon, Minooka, Joliet and Romeoville Illinois, and conducts business within the State of Illinois and employees over 3000 persons.

9. Defendant KENCO'S primary place of business is in Chattanooga, Tennessee and is an employer within the meaning of Civil Rights Act of 1866, as amended by the Civil Rights Act of 1991, 42 U.S.C. §1981.

10. Defendant Robert Coffey was the onsite Regional Distribution Manager for the Mars Manteno facility in Manteno, IL. At all relevant times Coffey resided in Chicago IL and was an employee of Mars, Inc. during the relevant times.

11. Todd Moore was the Senior Manager of Logistics for the Mars, Inc. Moore managed Robert Coffey, who managed the Mars Manteno facility, among other duties as a Mars, Inc. employee. During the relevant times Moore resided in Tennessee.

12. Paula Hise was the Vice President of Operations for Kenco Logistics and Vice President of Kenco Group Health and Personal Care during the relevant times and resided in Tennessee.

---

[1] Kenco Logistics is a part of the Kenco Group

13.    Trace Spier was the Vice President of Operations for Kenco Logistics and Vice President of Kenco Group Fast Moving Consumer Goods during the relevant times and resided in Tennessee.

14.    Dwight Crawley was the Chief Financial Officer of the Kenco Group during the relevant times and resided in Tennessee.

15.    David Caines was the President of Kenco Logistics who reported to Shelia Crane President of the Kenco Group and the Chief Operating Officer of the Kenco Group during the relevant times and resided in Tennessee.

16.    Tammi Fowler was the Senior Manager of Employee Relations for the Kenco Group during the relevant times and resided in Tennessee.

17.    Jay Elliott, Esq., was the Vice President of Legal for the Kenco Group during the relevant times and resided in Tennessee.

18.    David Jabaley was the Director of Operations for Kenco Logistics and the interim General Manager of the Mars Manteno facility. During the relevant times Jabaley resided in Illinois and Tennessee.

19.    Kelvin Walsh was the General Manager of the Mars Manteno facility during the relevant times and resided in Illinois.

20.    Mike Manzello was the Operations Manager of the Mars Manteno facility during the relevant times and resided in Illinois.

21.    Mario Lopez was the Operations Manager of the Mars Manteno facility during the relevant times and resided in Illinois.

22. The Hartford Life and Accident Company was the 3rd party administrator for Defendant Mars and Kenco's employee life, health and disability benefits. The Hartford is a Hartford, Connecticut company with offices in Chicago, IL.

23. This is a civil action brought pursuant to Federal claims under 42 U.S.C. §1981 for racial discrimination and the underlying torts.

24. Plaintiff also asserts claims against Defendants under 42 U.S.C. §1985.

25. Plaintiff also asserts claims against Defendants under 18 U.S.C. §1001, 1503, 1505, 1512(b), (c), & (f), & (d), &1621.

26. Plaintiff also asserts claims against Defendants under 18 U.S.C. §1962(c) & (d).

27. Plaintiff also cross-reference exhibits from his initial complaint in support of his allegations and he also reserves the right to amend his complaint if the need arises

28. Plaintiff has also filed a Charge of Discrimination with the Illinois Department of Human Rights ("hereinafter IDHR" and the Equal Employment Opportunity Commission ("hereinafter EEOC") for race discrimination, retaliation and other claims. Plaintiff reserves the right to amend his Complaint to assert claims under Title VII once the administrative procedure has been exhausted.

29. This Court has federal question jurisdiction under 28 U.S.C. §1331, 1337, and 1343 and supplemental jurisdiction over Plaintiff's State claims.

## RELEVANT FACTS

30. Plaintiff is Caucasian male who at the relevant time was sixty-seven (67) years old.

31. Plaintiff began his employment as the HR/Accounting Manager with Defendant Mars in 2001, when 4T's was the 3rd party logistics provider.

32. Plaintiff continued performing the HR/Accounting Manager duties with Defendant Mars when Defendant Kenco became the new the 3rd party logistics provider in 2013.

33. Plaintiff was well-qualified for his position as the HR/Accounting Manager and at all times met Defendant Mars and Kenco legitimate expectations.

34. As the HR and Accounting Manager for more than thirteen (13) years, Plaintiff was very familiar with: 1) company and public policies relative to employment, benefits and accounting; 2) the procedures, protocols, best practices, forms, and logs of the Mars Manteno facility; 3) the corporate culture and; the employees, their positions and job duties.

35. Plaintiff and his counterpart were responsible for recruiting, hiring, performance management, employee issues, investigations, termination, benefits, policy dissemination and enforcement, personnel files, among other duties.

36. Plaintiff had a positive employment record. Plaintiff had no disciplinary actions or performance write-ups. Plaintiff had a good reputation, positive

performance reviews, and did not violate any of Defendant Mars or Kenco's policies or procedures.

37. Plaintiff was in privity to all of the Defendants and other employees and agents of Kenco and Mars and other unnamed employees at the Mars Manteno facility, as well as, other Plaintiff's and Complainant's in other employment matters before the IDHR, EEOC, District and Seventh Circuit Courts. For example, Plaintiff has been cited specifically by name, title and position before the IDHR, EEOC, OSHA, Department of Labor, District and Seventh Circuit Appellate Courts by these and other Defendants to which they received a benefit by stating that Plaintiff was the HR/Accounting Manager. *i.e. McCurry v. Kenco et al 16 CV 2273* among others.

38. Mars controlled the daily workflow, including hiring, performance management and other terms and conditions of the Mars Manteno employees.

39. Mars, Inc. had an onsite manager, Robert Coffey, who daily met with named Defendants such as Walsh, Lopez, Manzello, Jabaley and other persons discussing issues relative to the Mars Manteno facility.

40. Coffey's boss, Todd Moore was also very active in the day to day operations of the Mars Manteno facility.

41. Plaintiff over the years participated in a number of meetings and was privy to the knowledge that every facet of the Mars Manteno facility was

discussed and a plan would be devised to address the open items, including legal issues such as this.

42.  At a minimum a Respondeat Superior relationship existed between Mars and Kenco and their employees and agents.

43.  Mars, Inc. paid the wages of the employees and other costs, including legal fees, at the Mars Manteno warehouse on a pass thru basis through its management companies beginning with 4T's then Kenco.

44.  Kenco was paid a set management fee (salary) by Mars to manage the warehouse as outlined in the employment contract between Kenco and Mars.

45.  These practices of passing the cost of labor and other costs thru the management company and paying the management company a fee (salary) dated back to Kenco's predecessor 4T's and was in place when Plaintiff became employed in 2001.

46.  Mars, Inc. employed Kenco as it did all the other employees of the Mars Manteno facility in accordance with the economic realities test.

47.  Defendants such as Kenco, Mars, Coffey, Moore, Walsh, Fowler, Lopez, Manzello, Jabaley and others benefited in various judicial and quasi-judicial tribunals in using Plaintiff and Plaintiff's position as the HR Manager.

48.  These judicial findings allowed these Defendants and others to avoid culpability and liability for the unlawful and impermissible acts of overt and covert discrimination in their various forms. This benefit to these Defendants

and others was a detriment to the African American employee's and employees who opposed the discriminatory treatment of African American employees, such as Plaintiff

49. Defendants such as Kenco, Mars, Coffey, Moore, Hise, Walsh, Fowler, Lopez, Manzello, Jabaley, Crawley, Elliott, Caine, Spier and others planned, assisted, encouraged, carried out and furthered their schemes through contrivance, deception, malice and animus.

50. Defendants at the management including executive level and C Suite employee(s) such as Coffey, Moore, Walsh, Fowler, Lopez, Manzello, Jabaley, Crawley. Elliott, Caines, Hise, Spier and others created and maintained a hostile work environment charged with racial animus.

51. Defendants Coffey, Moore, Walsh, Fowler, Lopez, Manzello, Jabaley, Crawley. Elliott, Caines, Hise, Spier and others, management at its highest level(s), with the authority to make and execute tangible employment decisions company wide, altered the terms and conditions of Plaintiff's and others employment for unlawful and impermissible reasons that were rooted and grounded in racial bias's and discrimination.

52. Defendant Kenco and Mars executive management, such as Moore, Hise, Crawley, Caines, Elliott, Spier, and Jabaley along with other managers and management team(s) such as Coffey, Walsh, Lopez, Manzello, and Fowler engaged in and knowingly permitted discrimination, racial slurs and epithets,

retaliation, wrongful terminations, harassment, and racially motivated acts of potentially fatal harm to African American employees when "it knew about the discriminatory conduct and failed to stop it;" or other racially motivated acts that led to fatalities.

53. Defendant Mars and Kenco had a systemic corporate culture of discrimination stemming from the corporate offices and Executive Level Management. For example, several years prior Defendant Kenco admitted to a pattern and practice of treating African Americans more harshly and severely than non-African Americans in *Brown v. Kenco-3:10-CV-668*. Additionally, Defendant Elliott and Karen Smith of Miller and Martin were the attorneys of record for Defendant Kenco in *Brown v. Kenco-3:10-CV-668*.

54. Defendant Mars and Kenco's employment practices and systems discriminate against African Americans, those who oppose discrimination against African Americans and those who do not act in complicity with Defendants Mars, Kenco, Coffey, Moore, Walsh, Fowler, Lopez, Manzello, Jabaley, and Crawley. Elliott, Caines, Hise, Spier and others race based stereotypes of African Americans, as well as, their unlawful and contrived schemes to violate the protected rights of African Americans. For example, Elliott was Defendant Kenco's outside legal counsel who acknowledged and filed the response in Brown v. Kenco stating that it was a documented fact that African Americans were treated less favorably than non-African-Americans.

55.    SZPLETT also alleges that necessary to the existence of the Mars and Kenco racially discriminatory culture was the expectation that white employees would in complicity work together to marginalize, harass, denigrate, subordinate, punish and exclude black employees.

56.    The discriminatory practices engaged in by Defendants Mars and Kenco and their agents and employees were intentional and systemic in nature; adversely affecting Plaintiff and other protected class persons with respect to hiring, discipline, promotion, job assignment, compensation and other terms and conditions of employment.

57.    Upper level management communicated discriminatory policies and practices in explicit terms to lower level managers who make personnel decisions that affect the terms and conditions of the protected class persons, such as Plaintiff and others who opposed discriminatory treatment.    For example, the then General Manager, Kelvin Walsh, instructed, Thomas White, the then 1st shift supervisor, to treat African American's like assholes.

58.    Upper level management including executive level managers have also made racially and ethnically derogatory and offensive comments and other statements evidencing their animus and bias against African Americans.

59.    Defendants such as Walsh, Jabaley, Manzello, Fowler, Lopez, Hise and others either made or upheld derogatory, degrading, and or racially motivated comments, epithets, or slurs to Plaintiff and others about African Americans;

such as, "Nigger, Nigger Bitch, Black Ass" and other degrading and stereotypes. For example, in July and August of 2013, Kelvin Walsh, the then General Manager referred to the Quality Engineer on several occasions, as "Nigger," "Nigger Bitch," educated "Nigger Bitch" among other degrading and derogatory explicits to Plaintiff. Also, Jabaley, Director of Operations, stated why don't you just pay his "black ass" {Nate Doss} off.

60. Hise, the V.P. of Operations being fully aware of the allegations of discrimination against Walsh, came to the facility in June of 2014 spoke to the employees called Walsh a friend and intimated that she was remorseful for his termination;

61. Hise also praised and lauded Walsh, on the same occasion, to the employees; employees who had been subjugated to Walsh's discriminatory and retaliatory treatment or who had witnessed such. Hise at that time knew of at least three (3) sets of formal charges had been filed against the company and Walsh for discrimination with the IDHR and EEOC, not to mention the internal reports made by employees.

62. Hise was also aware that White, an employee of 15 years, had abruptly resigned in April of 2014 after refusing Walsh's directive to treat employees {African Americans} like "assholes." White had been an employee at the Mars Manteno facility since its inception in 1999 and had a good employment record.

63. Walsh was given a severance package. No other terminated employee was given a severance.

64. Defendant Moore expressed his concern about the morale of the facility after Walsh's termination in an email.

65. Defendants such as Mars, Kenco, Coffey, Moore, Elliot, Caines, Crawley, Spier, Walsh, Jabaley, Manzello, Fowler, Lopez, Hise and others were negligent per se in violating the civil rights of its protected class employees and acted with a reckless or callous indifference to these federally protected rights. For example, while in a meeting with Plaintiff in August of 2014, Jabaley and Spier indicated that the charges of discrimination were frivolous, but needed to still be defended. An additional $100,000.00 was allocated to the budget for this defense.

66. Contrarily, Defendants Mars and Kenco and their employees such as Defendants Coffey, Moore, Elliot, Caines, Crawley, Spier, Walsh, Jabaley, Manzello, Fowler, Lopez, and Hise knew about the discriminatory conduct and failed to stop it. Defendants failed to even follow their own policies with respect to: harassment, violence, discrimination, etc...

67. Defendants Mars and Kenco have a federally mandated system to remediate and obliterate inconsistencies in the workplace. The federal mandate is the amended version of the Food Drug and Cosmetic Act formally known as the Food Safety and Modernization Act ("hereinafter FSMA").

68.     The FSMA mandates that there be a written quality management system that documents the policies, procedures, protocols and forms used. All policies, procedures, protocols and forms are catalogued, appendicized and managed by designated and qualified individual. It also requires that any deviations be documented and the root cause of any deviation of a policy, procedure, protocol or form must be identified, documented and corrected. This scheme is audited periodically internally and externally yearly.

69.     Defendants Mars and Kenco were audited to these federally mandated standards by Lloyd's Register and AIB evidencing that they had a written and documented management system, therefore;

70.     Each policy at the facility accompanied a signature log that was to be retained as proof that an employee had been presented with the corresponding policy.

71.     Defendants Mars and Kenco and their employees and agents failed to follow their own policies and investigate claims of discrimination, but permitted discrimination, racial slurs and epithets, retaliation, wrongful terminations, harassment, and racially motivated acts of potentially fatal harm to African American employees when "it knew about the discriminatory conduct and failed to stop it;" or other racially motivated acts that led to potential fatalities or fatalities.

72. For example, Pete Monstwillo, then a temporary employee, called Vernon Henry a "Nigger" in February of 2014 and that he should look in the mirror.

73. Monstwillo also told Henry that he had friends in management and could get him fired. This was reported to HR and then to the General Manager, Walsh. Walsh told Manzello to handle it and that it could not be reported to corporate because of the other claims of discrimination.

74. Monstwillo was hired as a permanent employee and in October of 2014, Monstwillo tried to kill Henry with a forklift truck and admitted to such.

75. Monstwillo was not punished; however, Henry was terminated while on medical leave for allegedly posting a picture on Facebook. Fowler stated that Monstwillo was just horse-playing.

76. Plaintiff also asserts that Walsh, Fowler, Lopez, Jabaley and others were also negligently retained employees.

77. More than twenty (20) employees filed more than thirty (30) formal complainants of discrimination with the IDHR and EEOC. This was twenty (20%) of the workforce.

78. Also the Hartford assisted the remaining Defendants in retaliating and violating the civil rights of Plaintiff and others when The Hartford, either at its sole direction or that of Defendants Kenco or Mars or both, intentionally subjected Plaintiff and others to unjust, medically and factually unsupported denial of benefits.

79. Plaintiff asserts that The Hartford and or Keno and or Mars and or The Hartford, Mars and Kenco collectively used their unjust, medically and factually unsupported rationale as a pretext for the denial of Plaintiff's and others benefits relative to disability.

80. Plaintiff also asserts that he was not paid the benefit of 60% of his earnings as stated by Defendant Kenco Mars.

81. Defendants individually and collectively intentionally breached their fiduciary obligations to Plaintiff and others by failing to follow the terms and conditions outlined in Plaintiff's offer letter of employment, and various employment policies and an employee handbook or other policy statements that Plaintiff and others were required to sign off on that created enforceable contractual rights governed by the traditional requirements for contract formation.

82. Plaintiff asserts that Defendants Mars and Kenco breached their contractual obligations to Plaintiff. For example, Plaintiff was not compensated in March as other employees who did not associate with African Americans, and or who did not oppose and complain of discrimination and or who did not engage in protected activity and or who acted in complicity with other white employees who discriminated against African Americans.

83. Defendants individually and collectively furthered their concerted schemes of deceit, malice and reckless indifference using contrivance with the

intent to violate the civil rights of the protected class persons. For example, hiring Elliott, a sworn officer of the court, as the VP of legal to be a witness and counsel for Defendants such as Mars, Kenco, Walsh, Manzello and others. The hiring of Elliott according to Defendant Kenco's policy CP.HR. 1002 required a VP or higher recommendation and the approval of the Chief Financial Officer, Dwight Crawley and the David Caines the Division President.

84. Plaintiff also asserts hiring Elliott, a subject matter expert in employment law, was part of a concerted scheme to obstruct justice and its administration.

85. Defendants such as Mars, Kenco, Walsh, Manzello, Lopez, Jabaley, Hise, Fowler, and others were negligent in their hiring and retention of employees who denigrated African-American employees, by displaying openly bigoted and racist conduct toward African American employees.

86. Defendants such as Walsh, Fowler, Lopez, Jabaley, Manzello and others conspired to retaliate against employees who complained of or opposed discriminatory treatment, including Plaintiff.

87. Plaintiff and others were treated disparately or pretextually in the terms and conditions of their employment compared with the way non-African American employees, or employees that had not engaged in protected activity or persons who opposed or complained of discrimination or who acted in

complicity with other white workers to disparately treat African Americans were treated.

88.    Plaintiff engaged in protected activity when he: 1)opposed discrimination to management, such as: Walsh, Lopez, Fowler and others, i.e. the disparate pay of African Americans, uneven and harsher discipline of African Americans to other non-African Americans who had committed more serious or egregious violations of company and public policy; 2) engaged in informal and formal investigations of discrimination; 3) assisted employees in understanding and applying company and public policy equitably in disparate situations and: 4) was a witness in ongoing legal matters amongst other activities.

89.    Retaliation at the Mars Manteno facility took place in: uneven discipline, harsher scrutiny, wrongful termination, unwarranted suspensions, lesser opportunities for overtime, reduction in duties, write-ups, demotions, and economic sanctions (no pay), public humiliation, physiological warfare amongst other tactics.  For example, Plaintiff was demoted from his position as HR/Accounting Manager because he opposed discrimination, his association with African Americans and his failure to act in complicity with the expectation that white employees would in complicity work together to marginalize, harass, denigrate, subordinate, punish and exclude black employees.  Plaintiff also did not receive his March salary under the WARN Act or his disability that was due him and was unable to obtain his unemployment that he was entitled to

because Defendant Mars and Kenco had Plaintiff's termination date as March 29, 2015.

90. Defendants such as Kenco, Mars, Elliott, Jabaley, Fowler, Caines, Crawley, Spier, Hise and others intentionally interfered with and obstructed justice and its administration towards Plaintiff and other protected class persons. For example, Elliott participated in a number of investigations of discrimination before the IDHR & EEOC, including Plaintiff's, making a number of material false statements regarding matters that he had no first-hand knowledge about that would include, but was not limited to: the actual events that occurred and/or the relevant policies and procedures during the time(s) in question(s). Elliott even admitted not even being employed when some matters occurred. Furthermore, Elliott, at all relevant times, was physically located in Chattanooga, TN and had not direct access or first-hand information relative to the matters that transpired at the Mars Manteno facility.

91. Defendants Kenco, Mars, Elliott, Lopez, Walsh, Fowler, Jabaley, Manzello and others such as Dan Dey provided patently false and misleading information to various governmental and regulatory agencies and judicial tribunals, such as the district courts and appellate court of the seventh circuit. For example, personnel files of employees, including Plaintiff, who complained or filed claims of discrimination, were altered. Additionally, policies that were

not relevant to the issues and time in question were used to support the various Defendants contentions to the various governmental and regulatory agencies and tribunals.

92.   Defendants such as Moore, Hise, Crawley, Caines, Elliott, Spier, Jabaley, Coffey, Walsh, Lopez, Manzello, Fowler and The Hartford were acting in the scope of their employment with the approval of their employers.

93.   Defendants perfected their plan(s) to knowingly violate persons protected rights by hiring a Jay Elliott, an attorney, and allowing him to make statements and participate in investigatory proceedings without any firsthand knowledge.  For example, Defendant Elliott in a verified statement stated to the IDHR and EEOC that Plaintiff had never been the HR Manager and that because of all the discrimination charges filed against and his failing leadership led to "them" hiring Lori Varvel as his replacement. Or, Tammi Fowler, stating that Plaintiff was not trained to perform HR functions.

94.   These and other intentionally false and misleading statements made were untrue, defamatory, and damaging to Plaintiff's good reputation.

95.   Plaintiff also contends that it was not until Defendant Elliott's verified statement in August of 2015 that Plaintiff learned that he: 1) had been replaced; 2) had been demoted; 3) had been replaced because of all of the charges of discrimination filed against them; 4) had failing leadership; and 5) had never been the HR Manager.

96.   Plaintiff contends that Defendants Mars, Kenco, Elliott, Hise, Spier, Jabaley, Moore, Fowler, Coffey, Lopez and others concealed the fact(s) that Plaintiff had been subjected to adverse employment actions; such as: being retaliated against by being replaced because of all the charges of discrimination filed against them and being demoted amongst other adverse   actions, including post-employment actions.

97.   Plaintiff was promised employment and benefits under certain conditions and he reasonably relied on that promise to his detriment.

98.   As a requisite to Plaintiff's employment, Defendants required Plaintiff to sign the offer letter of employment, and various employment policies and an employee handbook or other policy statement that created enforceable contractual rights governed by the traditional requirements for contract formation. Plaintiff also believes that a promissory estoppel was created.

99.   Plaintiff's employment contract included his compensation, paid time off, and short-term disability among other benefits, as an employee of Defendant(s) Mars and Kenco.

100. Plaintiff contends that he relied on terms and conditions of his employment contract to his detriment; creating a promissory estoppel.

101. Plaintiff asserts that Defendant Kenco and Defendant the Hartford have identified themselves as both being the Plan Administrator for Defendant Kenco's short-term disability.

102. Plaintiff also asserts that Defendant Kenco stated that Defendant Hartford managed their life and disability plan(s).

103. Defendants Mars and Kenco promised Plaintiff sixty (60%) of his income in the event of a Short-term disability and; The Hartford confirmed such.

104. Plaintiff was not paid the sixty (60%) of his disability as promised to him as a benefit.

105. Plaintiff asserts that Defendants Mars, Kenco and The Hartford were unjustly enriched when they failed to pay Plaintiff his compensation and or benefits.

106. Plaintiff had engaged in protected activity, suffered adverse employment and post-employment actions, coercion, harassment, and various forms of retaliation. For example, Plaintiff was not released to return to work by his physician nor was Plaintiff evaluated by an independent medical examiner, but was denied short term disability based on his improvement.

107. Plaintiff also asserts that his claim for disability was not handled unbiasedly and was retaliatory that Defendant Kenco and the Hartford have acted interchangeably during the relevant time(s).

108. Plaintiff also asserts that his claim for disability was unjustly denied and medically unsupported.

109. Plaintiff asserts that Defendant the Hartford breached its contract and fiduciary obligation to Plaintiff.

110. Plaintiff at all relevant times met the definition of "disabled" according to Defendant Kenco Mars and The Hartford's short term disability policy.

111. Plaintiff's short term disability benefits were stopped at the same time Defendant Kenco issued its severance package in the form of a Quid Pro Quo in late February of 2015.

112. In order for Plaintiff to receive his severance Plaintiff would have to agree to: help Defendant(s) out in litigation of HR matters and waive any claims that Plaintiff may have for his severance pay.

113. No other employee(s) offered severance had not engaged in any protected activity nor had they opposed or complained of discrimination nor had they refused to act in complicity with other whites who would discriminate against African Americans or those who opposed such discrimination. For example, Defendant Walsh or Bill Schwerin.

114. No other employee(s) offered severance had information to assist Defendants in HR matters, as these persons did not have first-hand information regarding HR matters at the Mars Manteno facility.

115. Plaintiff contends that this term and condition of Plaintiff's severance would have effectively aided and abetted Defendants such as Mars, Kenco, Walsh, Fowler, Lopez, Jabaley, Elliott and others in continuing to violate the protected rights of current and former employees of the Mars Manteno facility, including Plaintiff.

116. As the time ended for Plaintiff to either accept or deny the terms and conditions set out to receive his severance in mid-April of 2015, Plaintiff was notified after forty–five (45) days of not receiving his disability payments that his benefits had been retroactively terminated on February 28, 2015.

117. Plaintiff asserts that there were adverse and post adverse employment actions of coercion, harassment, and retaliation for opposing discrimination and failing to assimilate into the racially discriminatory culture of white employees would in complicity work together to marginalize, harass, denigrate, subordinate, punish, exclude and violate the protected rights of African American employees.

118. Defendants expected Plaintiff to act in complicity with their unlawful and contrived schemes to violate the protected rights of African Americans and those who opposed discriminatory treatment of African Americans.

119. Plaintiff did not receive his March salary that he was entitled to receive under the Worker Adjustment and Retraining Notification **Act** of 1988 (hereinafter "WARN Act")

120. All other employees not hired on for continued employment at the Mars Manteno facility was paid their March salary[2].

---

[2] Plaintiff understands that his compensation would either have been his salary or disability payment, but not both.

121. Plaintiff was not informed by Defendant Mars or Kenco or any of its agents or employees on how to continue his employment at the Mars Manteno facility.

122. Defendants had informed other employees that had not engaged in protected activity or who had not opposed or complained of discrimination or who work with other white employees in complicity to discriminate against African Americans.

123. Defendants Mars and or Kenco or both interfered with Plaintiff receiving unemployment.

124. Defendants alleged that Plaintiff's last day of work was March 29, 2015 and mislead the Illinois Department of Employment Security to believe that Plaintiff would be compensated to that date.

125. Plaintiff asserts that he was economically sanctioned for almost sixty (60) days by Defendants Mars and or Kenco or both, when he did not receive any compensation in the form of salary, disability or unemployment.

126. Plaintiff asserts that Defendant(s) Mars and or Kenco or both their behaviours were intentional, reckless and a blatant disregard for Plaintiff's medical condition that led to Plaintiff being on disability.

127. Plaintiff's medical leave of absence was a form of constructive discharge due to the creation and sustainment of a hostile work environment by

Defendants, such as Mars, Kenco, Walsh, Lopez, Manzello, Hise, Spier, Jabaley, Fowler, Coffey and Moore that was charged with racial animus.

128. Defendants such as Mars, Kenco, Walsh, Lopez, Manzello, Hise, Spier, Jabaley, Fowler, Coffey, Moore and The Hartford were aware that Plaintiff was out on disability due to work related stress. For example, Defendants Kenco and Hise reported to Defendant Mars, Coffey and Moore in its Performance Improvement Plan that Plaintiff was out due to work related stress.

129. In the July of 2013, Plaintiff began opposing racial discrimination with the then General Manager Defendant Kelvin Walsh.

130. Plaintiff immediately objected to the racially discriminatory behaviours.

131. Defendant Walsh disregarded Plaintiff's objection. Plaintiff started being ostracized from meetings and his job duties and functions in HR, particularly those functions dealing with informal and formal complaints of discrimination.

132. Defendant Fowler instructed Plaintiff's HR Administrator to forward all complaints to Fowler and she would handle them.

133. Fowler was in Tennessee and was not on site to conduct investigations. Employees were reporting issues and not getting a resolve or employees were being retaliated against for waging complaints.

134. Fowler effectively removed duties from Plaintiff's department.

135. Plaintiff felt harassed, humiliated and discriminated against as a result of this reduction of duties because of Plaintiff and his administrator's

unwillingness to aid and abet the various Defendants in violating the protected rights of African Americans and those that opposed such discrimination.

136. Conversely, when Defendants such as Walsh, Lopez and Jabaley furthered their schemes of retaliation, harassment, uneven discipline, wrongful termination and other acts Defendants would call Plaintiff in as the HR representative in the matter to legitimize and further their contrived schemes that violated company and public policy. For example, in the matter with Vernon Henry's termination and Mary Madison's IDHR, EEOC and Department of Labor matters.

137. Plaintiff was fully expected to be in compliance with the racially discriminatory culture that white employees would in complicity work together to marginalize, harass, denigrate, subordinate, punish and exclude African American employees. For example, Defendants Elliott, Fowler, Hise, Moore and others have stated among other things that it was Plaintiff's failing and or poor leadership that:1) led to all the charges of discrimination being filed and; 2) Plaintiff was replaced because of his failing and or poor leadership.

138. Any reasonable person including Plaintiff could easily infer that Plaintiff's demotion and loss of job was due to his opposition to discrimination, his association with African Americans and his failure to act in complicity with other white employees to marginalize, harass, denigrate, subordinate, punish and exclude African American employees.

139. Additionally, Defendants Hise, Moore, Spier, Coffey and others have spoken individually and collectively several times about this poor or failing leadership.

140. Moore even indicated that there was a "desperate need" for a HR person at the Mars Manteno. Defendants Moore, Coffey, Jabaley, Spier, Elliot, Fowler and others agreed to hire Plaintiff's replacement Lori Varvel. { }

141. Plaintiff had never received any type of disciplinary action or performance write-up since his employment at the Mars Manteno facility began in 2001.

142. Plaintiff asserts that because of his failure to comply to work in complicity with white employees to discriminate African American employees he suffered adverse actions such as: 1) a change in duties and responsibilities; 2) a demotion; 3) ostracized; 4) not being afforded an opportunity to apply for continued employment at the Mars Manteno facility; 5) no pay; 6) medically and factually unsupported denial of short term disability benefits; 7) denial of unemployment benefits; 8) contrivance; 9) termination; 10) reassignment ; 11) constructive discharge; 12) coercion; 13) harassment; 14) retaliation; 15) change in shift-forced to work third (3rd) shift; 16) quid pro quo (coercion); 17 constructive discharge and; defamation of character amongst other adverse actions.

143.   Plaintiff also asserts that it was because of his opposition to discrimination, his association with African Americans and the protected activities he engaged in that he suffered the aforementioned adverse employment actions.

144.   Plaintiff also asserts that he was subjected to reverse discrimination because of his: 1) failure to act in complicity with other white employees to discriminate against African Americans; 2) opposition to discrimination; 3) complaints of discrimination and; 4) association with African Americans.

145.   Plaintiff has suffered damages and irreparable harms as result of the above.

146.   Plaintiff asserts that Defendants Mars, Kenco, Walsh, Fowler, Jabaley, Lopez, Manzello, Hise, Spier, Elliott, Caines, Crawley, Coffey, Moore and others should be estopped.  For example, Defendants have used Plaintiff's name, title and or his position as HR Manager to receive a benefit and prevail in various quasi and judicial tribunals.

147.   Additionally, Defendants in bad faith have presented inconsistent positions and/or theories commensurate to the litigation sometimes as a shield and other times as sword.  For example, Defendants such as Kenco and Elliott have stated that Plaintiff had never been the HR Manager.  Defendants Kenco, Walsh, Fowler, Jabaley, Lopez, and Manzello have stated to the District Court

in Urbana and the Seventh Circuit of Appeals that Plaintiff was the HR manager.

148. Plaintiff asserts that Defendants deliberately changed positions according to the exigencies of the moment.

149. Plaintiff asserts that the Defendants and those in privity to the Defendants should be at a minimum judicially estopped.

## COUNT I - 42 USC §1981 RACE DISCRIMINATION CLAIM AGAINST ALL DEFENDANTS WITH REGARD TO DENIAL OF ENJOYMENT OF ALL BENEFITS, PRIVILEGES, TERMS AND CONDITIONS OF EMPLOYMENT

150. Plaintiff hereby re-alleges and incorporates by reference the above paragraphs.

151. Szplett was treated differently than other employees at the Mars Manteno facility, such as Marci DeRosier or William Scherwin, or Anthony Marquez, or Mike Manzello, or Kelvin Walsh who were not in a protected class.

152. Szplett was treated differently for opposing the disparate treatment and impact by the actions of such malfeasors as: Kelvin Walsh, Mike Manzello, Tammi Fowler, Mario Lopez, David Jabaley, Robert Coffey, Todd Moore and others towards African Americans, and others who opposed such disparate treatment of protected class persons.

153. Szplett also asserts that he was treated differently for his failure to act in complicity with other white employees to discriminate against African Americans because of association with African Americans and or others who opposed such disparate treatment of African Americans.

154. Szplett was ostracized, marginalized, harassed, demoted, defamed, retaliated against, subjected to hostile and racially charged work environment, received a reduction of job duties, denied benefits, defrauded out of compensation, defrauded out of disability benefits, compensated inequitably and deprived of a proper retirement amongst actions.

155. Szplett asserts that at all times Defendants had a fiduciary obligation to him and that the named Defendants controlled the terms and conditions of his employment, including hiring, firing, promotion, benefits and discipline.

156. Defendant intentionally discriminated against African-American employees and employees who opposed discrimination of African American employees and or employees who failed to act in complicity with other white employees who intentionally discriminated against African American employees and or employees who engaged in protected activities relative to African Americans and or employees who associated with African Americans, including Plaintiff, when Defendants Mars and Kenco and their employees, agents and assignors listed above: 1) required that Plaintiff act in complicity to discriminate against African-American employees; 2) Plaintiff opposed

discrimination; 3) Plaintiff engaged in protected activity; and 4) Plaintiff associated with African Americans. Defendant illegally harassed, coerced, and retaliated against Plaintiff throughout and beyond his employment. Defendant also subjected Plaintiff to a pattern of intentional and systemic harassment, discrimination, hostile work environment and a Quid Pro Quo is in violation of the rights of Plaintiff afforded to him by the Civil Rights Act of 1866, 42 U.S.C. § 1981, as amended by the Civil Rights Act of 1991.

157.   Plaintiff also asserts that the unjust enrichment of Defendants Mars, Kenco and the Hartford failure to pay Plaintiff his compensation and disability benefits contributed to the profitability of those enterprises that enabled them to further their contrived schemes to conspire against and intentionally violate Plaintiff's constitutional rights through discriminatory acts rooted and grounded in racial animus.

158.   By the said conduct described above, Defendants racial discrimination related to Plaintiff's employment and the denial of the enjoyment of all of Plaintiff's benefits, privileges, terms and conditions of that employment relationship was because of his association with African Americans, his failure to act in complicity with other white employees to discriminate against African Americans, his opposition to discrimination and his protected activity.

159.   Szplett asserts that there was no other lawful reason for Defendants to make and execute adverse employment decisions towards him except that it

was their deliberate, willful and intentional discrimination against him in retaliation of his protected activities.

160. Accordingly, Plaintiff hereby asserts a 42 U.S.C. 1981 claim against Defendant.

161. That as a direct and proximate result of Defendant's aforesaid violations of Plaintiff's rights, Plaintiff has suffered and sustained reassignment, constructive discharge, demotion, interference with prospective economic advantages (future employment), coercion, compensation benefits, harassment, retaliation, defamation of character, emotional and physical distress and mental anguish, past and future injuries to feelings including extreme embarrassment and humiliation, past and future outrage, damages to reputation, loss of enjoyment of life.

162. In Defendants' discriminatory actions as alleged above, Defendants intentionally breached their fiduciary obligation and acted with malice or reckless indifference to the rights Plaintiff and other African Americans and or those who opposed discrimination and or associated with African Americans and or engaged in protected activity.

## COUNT II - 42 USC §1981 RACE DISCRIMINATION AND RETALIATION CLAIM AGAINST DEFENDANTS MARS, KENCO AND THE HARTFORD WITH REGARD TO BREACH OF CONTRACT

163.  Plaintiff hereby re-alleges and incorporates by reference the above paragraphs.

164.  Plaintiff's employment contract at the Mars Manteno facility was modified in April of 2013 to reflect the management change from 4T's to Kenco.

165.  Plaintiff's 2013 employment contract was between himself and Kenco Mars.

166.  The employment contract included compensation, bonuses, short-term disability benefits among other line items.

167.  Plaintiff opposed and complained of race discrimination by Defendant(s).

168.  Plaintiff refused to act in complicity with white employees to marginalize, harass, denigrate, subordinate, punish and exclude black employees.

169.  Defendants Kenco and The Hartford have acted interchangeably during the relevant times.

170.  Defendants were aware of Plaintiff's opposition, refusal to act in complicity with other white employees and complaint(s) of race discrimination.

171.  Defendants breached the terms and conditions of employment contract between Defendants Kenco Mars and Plaintiff.

172.  Defendants failed to compensate Plaintiff with either his salary or disability benefits during the month of March 2015.

173. When Defendants paid Plaintiff they did not pay Plaintiff the sixty (60%) of his salary as promised.

174. Plaintiff also asserts that the unjust enrichment of Defendants Mars, Kenco and the Hartford failure to pay Plaintiff his compensation and disability benefits contributed to the profitability of those enterprises individually and collectively; enabling them to further their contrived schemes of conspiracy that intentionally violated Plaintiff's constitutional rights through discriminatory acts rooted and grounded in racial animus.

175. Defendants Kenco Mars also interfered with Plaintiff receiving his unemployment benefits during the month of March 2015.

176. By the said conduct described above, Defendants racial discrimination related to Plaintiff's employment and the denial of the enjoyment of all of Plaintiff's benefits, privileges, terms and conditions of that employment relationship was because of his association with African Americans, his failure to act in complicity with other white employees to discriminate against African Americans, his opposition to discrimination and his protected activity.

177. Accordingly, Plaintiff hereby asserts a 42 U.S.C. 1981 claim against Defendant.

178. That as a direct and proximate result of Defendant's aforesaid violations of Plaintiff's rights, Plaintiff has suffered and sustained economic loss, emotional and physical distress and mental anguish, past and future

injuries to feelings including extreme embarrassment and humiliation, past and future outrage, and loss of enjoyment of life.

## COUNT III - 42 USC §1981 RACE DISCRIMINATION AND RETALIATION CLAIM AGAINST DEFENDANTS MARS, KENCO, LOPEZ, FOWLER AND JABALEY WITH REGARD TO FAILURE TO PROVIDE PLAINTIFF WITH AN OPPORTUNITY TO APPLY FOR FUTURE EMPLOYMENT

179. Plaintiff hereby re-alleges and incorporates by reference the above paragraphs.

180. Plaintiff opposed and complained of race discrimination by Defendant(s).

181. Plaintiff refused to act in complicity with white employees to marginalize, harass, denigrate, subordinate, punish and exclude black employees.

182. Defendants were aware of Plaintiff's opposition, refusal to act in complicity and complaint(s) of race discrimination.

183. Defendants did not afford Plaintiff an opportunity to apply for continued work at the Mars Manteno facility in February on 2015 as it had other employees who had not opposed discrimination, associated with African Americans, and or made complaints of discrimination, and or engaged in protected activity.

184. A motivating factor for Plaintiff's denial of employment opportunities was his complaints of race discrimination.

185. A motivating factor for Plaintiff's denial of employment opportunities was his association of African Americans.

186. A motivating factor for Plaintiff's denial of employment opportunities was his protected activity.

187. A motivating factor for Plaintiff's denial of employment opportunities was his failure to act in complicity with white employees to discriminate against African Americans or those who opposed discrimination.

188. A motivating factor for Plaintiff's denial of employment opportunities was because he opposed discrimination.

189. Accordingly, Plaintiff hereby asserts a 42 U.S.C. 1981 claim against Defendant with regard to failure to afford Plaintiff an opportunity to apply for continued employment.

190. As a direct and proximate result of Defendant's aforesaid violations of Plaintiff's rights, Plaintiff has suffered and sustained past and future wage loss, emotional and physical distress and mental anguish, past and future injuries to feelings including extreme embarrassment and humiliation, past and future outrage, damages to reputation, and whatever punitive damages are recoverable herein.

# COUNT IV - 42 USC §1981 RACE DISCRIMINATION AND RETALIATION CLAIMS AGAINST NAMED DEFENDANTS WITH REGARD TO ASSOCIATION WITH AFRICAN AMERICANS AND IN REVERSE DISCRIMINATION FOR OPPOSITION TO DISPARATE TREATMENT AND IMPACT ON PROTECTED CLASS PERSONS

191. Plaintiff hereby re-alleges and incorporates by reference the above paragraphs.

192. In retaliation for Szplett's failure to act in complicity with management's race-based stereotypes regarding African Americans and his unwillingness to work with other Caucasian employees to marginalize, subordinate, minimize, exclude or disparage African American employees he was subject to adverse employment decisions.

193. Specifically, when Plaintiff and other Caucasian employees voiced their opposition to the Mars Manteno racist policies and practices or demonstrate their support of African American employees they were routinely retaliated against and have suffered extreme mental, physical and economic harms.

194. For example, Szplett's was retaliated against when he was forced to work third (3rd) shift allegedly to have a management presence.

195. Other managers such as Marci DeRosier, Mike Manzello, Bill Schwerin and Anthony Marquez, who also only worked first (1st) shift were not required to and did not work third (3rd) shift.

196. The terms and conditions of Plaintiff's employment were altered when Plaintiff had to work third (3rd) shift.

197. In Plaintiff's fourteen years of employment, Plaintiff had never been mandated to work third (3rd) shift.

198. Other examples of retaliation include, hiring Lori Varvel at Fowler's and Lopez's recommendation.

199. Fowler's and Lopez's recommendation, resulted in Defendants September 25, 2014 advertised posting for the HR Manager's position.

200. This adverse employment decision to Plaintiff was a couple of weeks after Plaintiff refused to act with complicity against McCurry (African American) for paying Dana Woods his earned paid time off while on suspension.

201. Woods was suspended for having a discussion and making a comment on a newsworthy incident with another employee that upset a Caucasian woman, Stacey Bushey.

202. Plaintiff asserts that the Woods alleged matter was not investigated by HR as there was no one on site to do an investigation except Szplett and McCurry to which neither of them performed such an investigation.

203. Additionally, there were no investigative notes presented or placed in Woods file.

204. Defendants had a habitual habit of failing to follow its own policies relative investigations, discipline and other matters.

205.   Fowler intimated in the September 2014 meeting, regarding Woods, with Plaintiff, McCurry, Lopez and herself that the best way to get employees to conform was to "hit them in the pocket."

206.   Defendant Elliott and Kenco stated that Varvel was hired because of all of the charges of discrimination filed against them.

207.   Plaintiff also contends that Defendants hired Varvel to further its active, open and unashamed discriminatory culture and further its various schemes of obstruction of justice and to continue to violate the protected rights of African Americans and those who do not conform to the race-based stereotypes or disparaging's of African American employees.

208.   Plaintiff also contends he was retaliated against when he was not given the opportunity or apprised of the process to apply to continue to work at the Mars Manteno facility for Szplett's failure to act in complicity with management's race-based stereotypes regarding African Americans and his unwillingness to work with other Caucasian employees to marginalize, subordinate, minimize, exclude or disparage African American employees.

209.   Plaintiff also asserts that he was not paid in March of 2015 in retaliation and in keeping with their moto of "hitting them in the pocket" for his failure to act with complicity in regards to fostering a work environment white racial dominance, racial animus, hostility and subordination of African Americans.

210.    Plaintiff also asserts that he was discharged through the elaborate contrived retaliatory scheme of not giving Plaintiff the opportunity to apply to continue to work at the Mars Manteno facility.

211.    Plaintiff contends that Defendants also denied his unemployment in retaliation and in keeping with their moto of "hitting them in the pocket" for his failure to act with complicity in regards to fostering a work environment white racial dominance, racial animus, hostility and subordination of African Americans.

212.    Plaintiff also contends that Defendants also cut off and denied plaintiff's disability in retaliation to his protected activity.

213.    A motivating factor for Defendant(s) retaliating against Plaintiff was his complaints of race discrimination.

214.    A motivating factor for Defendant(s) retaliating against Plaintiff was his association of African Americans.

215.    A motivating factor for Defendant(s) retaliating against Plaintiff was his protected activity.

216.    A motivating factor for Defendant(s) retaliating against Plaintiff was his failure to act in complicity with white employees to discriminate against African Americans or those who opposed discrimination.

217.    A motivating factor for Defendant(s) retaliating against Plaintiff was because he opposed discrimination.

218. Accordingly, Plaintiff hereby asserts a 42 U.S.C. 1981 claim against Defendant with regard retaliation.

219. As a direct and proximate result of Defendant's aforesaid violations of Plaintiff's rights, Plaintiff has suffered and sustained past and future wage loss, emotional and physical distress and mental anguish, past and future injuries to feelings including extreme embarrassment and humiliation, past and future outrage, damages to reputation, and whatever punitive damages are recoverable herein.

## COUNT V - 42 USC §1981 RACE DISCRIMINATION AND PRETEXT CLAIMS AGAINST NAMED DEFENDANTS WITH REGARD TO ASSOCIATION WITH AFRICAN AMERICANS AND IN REVERSE DISCRIMINATION FOR OPPOSITION TO DISPARATE TREATMENT AND IMPACT ON PROTECTED CLASS PERSONS

220. Plaintiff hereby re-alleges and incorporates by reference the above paragraphs.

221. Szplett's was harassed and retaliated against when he was forced to work third (3rd) shift allegedly to have a management presence.

222.    Szplett's alleges that this reason was pretextual, as employees working off shifts did not have access to plaintiff's office to even know that plaintiff was working.

223.    Additionally, there was no communication sent to employees informing them Szplett's would be available.

224.    It was common practice for third (3rd) shift employees to address any issues immediately after the end of their shift, when the office was open.

225.    Other managers such as Marci DeRosier, Mike Manzello, Bill Schwerin and Anthony Marquez, who also only worked first (1st) shift were not required to and did not work third (3rd) shift.

226.    Szplett also asserts that the reason Plaintiff was not compensated for March of 2015 and not given his severance was pretextual.

227.    Defendant Kenco asserted that Szplett did not work and was not entitled to his March 2015 compensation.

228.    This was in contradiction to the communication received in the mail by Szplett.

229.    No other person with firsthand knowledge of the HR matters was not given their severance pay or March 2015 compensation or subjected to such terms and conditions.

230.    Szplett also asserts that Defendants rationale and reasons regarding Plaintiff's job duties, title, compensation and performance were pretextual, as

Defendants have stated to various agencies, tribunals and courts that Szplett's was the HR Manager.

231.    Defendants in other instances have stated that Szplett's job duties were not reduced and that the position had not existed previously or that Szplett had never been the HR Manager.

232.    Szplett also asserts that Varvel performed less duties and tasks than Szplett.

233.    Szplett also contends that the reason that Defendants proffered for paying Varvel more that Szplett was pretextual.

234.    Szplett also contends that it is actual job performance and content —not job titles, classifications or descriptions of the work performed that defines what a job entails.

235.    Szplett also asserts that he had more than twice as much experience than Varvel in human resource management and more than four (4) times as much working experience in HR and more than thirty (30) years as a manager.

236.    Szplett further asserts that there were no new duties, tasks and responsibilities derived, added or adduced that had not previously existed and have not previously been performed by Szplett and his counterpart McCurry.

237.    Plaintiff also contends that employee issues had existed since his employment at the Mars Manteno facility.

238.   Additionally, Defendants asserted that it was Szplett's fault and failing leadership that caused all of the discrimination charges to be filed

239.   Defendants have also stated that for performance reasons Szplett was given a negative performance review.

240.   Szplett's vehemently contends that it was not his fault or failing leadership that led to the discrimination charges being filed, but it was his failure to act in complicity with management's race-based stereotypes regarding African Americans and his unwillingness to work with other Caucasian employees to marginalize, subordinate, minimize, exclude or disparage African American employees that he was subject to adverse employment decisions.

241.   Szplett's also asserts that he has never been given a negative performance review.

242.   Specifically Defendants did not produce such a performance review to the IDHR/EEOC nor did Defendant Kenco produce one when Plaintiff requested his personnel file relative to the Illinois Personnel Review Act.

243.   Szplett's asserts that Defendants have intentionally taken inconsistent positions with regards to Szplett's job title and duties.

244.   Plaintiff asserts that an employer's reason for an adverse employment action is without factual basis that is evidence suggestive that an employer might be lying about its true motivation.

245. A motivating factor for Defendant(s) pretextual reasons for Plaintiff's adverse employment decisions was his complaints of race discrimination.

246. A motivating factor for Defendant(s) pretextual reasons for Plaintiff's adverse employment decisions was his association of African Americans.

247. A motivating factor for Defendant(s) pretextual reasons for Plaintiff's adverse employment decisions was his protected activity.

248. A motivating factor for Defendant(s) pretextual reasons for Plaintiff's adverse employment decisions was his failure to act in complicity with white employees to discriminate against African Americans or those who opposed discrimination.

249. A motivating factor for Defendant(s) pretextual reasons for Plaintiff's adverse employment decisions was because he opposed discrimination.

250. Accordingly, Plaintiff hereby asserts a 42 U.S.C. 1981 claim against Defendant with regard pretext.

251. As a direct and proximate result of Defendant's aforesaid violations of Plaintiff's rights, Plaintiff has suffered and sustained past and future wage loss, emotional and physical distress and mental anguish, past and future injuries to feelings including extreme embarrassment and humiliation, past and future outrage, damages to reputation, and whatever punitive damages are recoverable herein.

## COUNT VI - 42 USC §1981 RACE DISCRIMINATION AND HARASSMENT CLAIMS AGAINST NAMED DEFENDANTS WITH REGARD TO ASSOCIATION WITH AFRICAN AMERICANS AND IN REVERSE DISCRIMINATION FOR OPPOSITION TO DISPARATE TREATMENT AND IMPACT ON PROTECTED CLASS PERSONS

252. Plaintiff hereby re-alleges and incorporates by reference the above paragraphs.

253. Szplett's was subjected to more than a "campaign of petty harassment."

254. Szplett was harassed when he was isolated and ostracized from performing his duties as the HR Manager.

255. Additionally, Szplett's was often asked to meetings regarding African American employees, whereby he had no knowledge or input of what was to occur and where management had already contrived illegitimate pretextual reasons for adverse employment decisions to be imposed upon these persons, without investigation and against company policy.

256. Szplett asserts that he was expected to act in complicity with the white racial dominance and subordination of African Americans.

257. Failure to act in white racial dominance and subordination of African American employees resulted in retaliatory actions of harassment and adverse employment decisions.

258.   Szplett was also harassed when he was continually subjected to critical, unwanted and unwarranted remarks, insults and stereotypes about African Americans and other protected class persons.

259.   For example, Kelvin Walsh the then GM referred to the African American Quality Engineer, as an educated "Nigger Bitch" immediately after he insisted that Szplett accompany him to walk her out after terminating her without cause.

260.   The termination was wrongful and was based on a fictitious non-existent policy.

261.   Additionally, there were a number of other racially derogatory statements, slurs, and epithets made that were made by Walsh, Manzello, Fowler, Jabaley and others to repulsive for Plaintiff to pen or repeat.

Other examples are:

262.   Amongst numerous comments made by Mike Manzello who often made racial epithets, jokes, slurs and stereotypical comments about African Americans such as an employee, Nathan Doss.

263.   For example, stereotyping Doss to being associated with and alleged to have gang affiliations and ties with known reputed gang members, such as Larry Hoover.

264.   Manzello also talked about how black men handle their women by calling them derogatory names such as bitches, whores and so on, as well as,

referencing movies, like Anchorman 2, enacting scenes that highlight degrading and derogatory behavior towards black women from men.

265. Also Tammi Fowler, Senior Manager of Employee relations suggested that she knew that Nathan Doss ("Black ass") smoked "weed" every day. Fowler made these and other derogatory comments.

266. Fowler along with the then GM was responsible for Doss being paid disparately.

267. No other employee was subjected to not being paid the prevailing rate upon hiring.

268. In June of 2014, Paula Hise the Vice President of Operations spoke to each shift at the facility regarding Walsh's separation.

269. Hise intimated how good of person Walsh was, that he was a friend, that he would be missed and that she was sure he would land on his feet.

270. Hise in fact had been aware since at least June of 2013 that Walsh had been the ongoing subject and center of a number of internal and external formal complaints of discrimination.

271. Hise in her official capacity of an executive officer of the company openly and unabashedly praised and condoned the malfeasant and unlawful behaviours of Walsh ultimately continuing to foster the already animus and racially charged work environment.

272.    Hise publicly acclaimed her support for Walsh and his beahviours; even to the detriment of those she addressed who had filed various informal and formal complaints.

273.    Robert Coffey, the onsite Regional Distribution Manager for Mars, Inc. was aware that Hise came to the facility and addressed the employees regarding Walsh's.

274.    Additionally, Robert Coffey had been noted saying this how our southern brothers and sisters handle things.

275.    Plaintiff also asserts that this was Robert Coffey's and Mars' position regarding Walsh and his behaviours, as Coffey nor any other Mars' management rebutted or refuted the sentiments proclaimed by Hise.

276.    Nor had Coffey or any other Mars management addressed, mediated or remediated any of the numerous complaints made by employees at the Mars or the racially charged hostile work environment that existed at the Mars Manteno facility.

277.    Szplett asserts that Defendants are liable because of their gross negligence in failing to follow company and public policy in addressing, mediating or remediating any of the numerous complaints made by employees at the Mars Manteno facility or the racially charged hostile work environment that existed at the Mars Manteno facility.

278.   Szplett was harassed in retaliation for his opposition to discrimination and his association with African Americans when he was forced to work third (3rd) shift allegedly to have a management presence.

279.   Other managers such as Marci DeRosier, Mike Manzello, Bill Schwerin and Anthony Marquez, who also only worked first (1st) shift were not required to and did not work third (3rd) shift.

280.   Szplett also asserts that this directive to work third (3rd) shift came after Szplett had raised issues about the pay disparity of the African American Spotters.

281.   Plaintiff also contends that the expectation to act in complicity with management's race-based stereotypes regarding African Americans and to work with other Caucasian employees to marginalize, subordinate, minimize, exclude or disparage African American employees was a form of Quid Pro Quo in order to not be subject to adverse employment decisions, harassment and retaliation.

282.   Szplett's was also subject to another Quid Pro Quo when defendant attempted to extort Plaintiff into obstructing justice and aiding and abetting Defendant into obstructing justice.

283.   More specifically, Defendant required Plaintiff to agree to help Defendant defend itself against lawful cases of discrimination, retaliation, harassment and other causes of actions against Defendants in exchange for his severance pay and compensation for the month of March 2015.

284. Other employees who were not involved in protected activity or who did not have firsthand knowledge relative to the allegations or matters before agencies, tribunals or courts were paid their compensation and severance pay.

285. Plaintiff asserts that he was never informed of the particulars on how to continue his employment at the Mars Manteno facility.

286. Plaintiff also contends that this failure to inform him of how to apply for continued employment was contrived and done to harass and retaliate against plaintiff for his protected activities.

287. Plaintiff also contends that Defendants' failure to inform him of how to apply for continued employment, coupled with the refusal to pay plaintiff his March 2015 wages, the denial of Plaintiff's disability benefits based upon falsified and misleading information submitted to Szplett's doctor, and denying Plaintiff's unemployment along with attempting to extort plaintiff into agreeing to aid and abet Defendants in obstructing justice in order to receive his severance pay was part of a contrived scheme to economically and psychologically harass and punitively punish Plaintiff for his association with African Americans and in opposition to disparate treatment and impact of protected class persons.

288. This economic and psychological tacit and tool of withholding an employee's compensation was often wielded as a two-edged sword used to terrorize and extort protected classes persons into conforming to the "servant –

master relationship" and abandoning any ideas of revolting by not pursuing their rightful claims of discrimination in order to retain their employment.

289. Fowler stated that "hitting them in the pocket" would get their attention.

290. Plaintiff asserts that it was the expectation to act in complicity with management's race-based stereotypes regarding African Americans and his unwillingness to work with other Caucasian employees to marginalize, subordinate, minimize, exclude or disparage African American employees and his failure subjected him to adverse employment decisions.

291. The working environment that was somewhat once manageable had now morphed into an open, active and unashamed animus and racially charged working environment.

292. The harassment, abuse and discrimination were encouraged and expected by various levels of management from the General Manager to the senior and executive level management of Kenco and Mars to act in complicity with the white racial dominance and subordination of African Americans and those who opposed this treatment.

For example, Tom White was written up through contrivance for failing to treat African Americans like "assholes." Tom White opposed such discriminatory treatment and constructively resigned effective immediately.

293. Caucasian employees who do not disparage or minimize African American employees have been and continue to be adversely affected by hostile work

environment at the Mars Manteno facility. For example, in addition to plaintiff, this included Scott Marksteiner, Anastasia Sandness and Don Stanchues.

294.  Resistance and failure to comply with such discrimination resulted in punishment. i.e. harassment, retaliation, demotion, public humiliation, defamation, failure to promote, termination, blackballing, economic and psychological sanctions, differing terms and conditions of employment, uneven discipline and other adverse actions.

295.  A motivating factor for Defendant(s) harassing Plaintiff was his complaints of race discrimination.

296.  A motivating factor for Defendant(s) harassing Plaintiff was his association of African Americans.

297.  A motivating factor for Defendant(s) harassing Plaintiff was his protected activity.

298.  A motivating factor for Defendant(s) harassing Plaintiff was his failure to act in complicity with white employees to discriminate against African Americans or those who opposed discrimination.

299.  A motivating factor for Defendant(s) harassing Plaintiff was because he opposed discrimination.

300.  Accordingly, Plaintiff hereby asserts a 42 U.S.C. 1981 claim against Defendant with regard harassment.

301. As a direct and proximate result of Defendant's aforesaid violations of Plaintiff's rights, Plaintiff has suffered and sustained past and future wage loss, emotional and physical distress and mental anguish, past and future injuries to feelings including extreme embarrassment and humiliation, past and future outrage, damages to reputation, and whatever punitive damages are recoverable herein.

## COUNT VII - 42 USC §1981 RACE DISCRIMINATION AND HOSTILE WORK ENVIRONMENT CLAIMS AGAINST DEFENDANTS MARS, KENCO, WALSH, FOWLER, JABALEY, LOPEZ, HISE, SPIER, MOORE, MANZELLO AND COFFEY WITH REGARD TO ASSOCIATION WITH AFRICAN AMERICANS AND IN REVERSE DISCRIMINATION FOR OPPOSITION TO DISPARATE TREATMENT AND IMPACT ON PROTECTED CLASS PERSONS

302. Plaintiff hereby re-alleges and incorporates by reference the above paragraphs.

303. The Mars Manteno facility was a hostile work environment charged with racial animus fostered and led by top level and executive management.

304. Necessary to the Kenco and Mars Manteno racially discriminatory culture was the expectation that Caucasians will work together to marginalize, subordinate, disparage, and exclude African Americans.

305. For example, this was evidenced when Defendants offered Plaintiff as a witness relative to wrongful termination of an African American Quality Engineer, who brought charges of discrimination and retaliation.

306. Neither defendants' outside counsel nor any of the management at any time questioned or spoke with Plaintiff regarding the matter prior to offering Plaintiff as witness to the IDHR and EEOC or prior to the fact-finding conference that Plaintiff was instructed to attend on the Respondent's part.

307. However, Defendants counsel spoke with Edith McCurry who affirmed that Madison had reported claims of racial discrimination amongst other claims. McCurry also told how she too had been discriminated against.

308. Defendants left McCurry off the witness list and instead named Plaintiff as a witness.

309. Plaintiff asserts that management assumed that Plaintiff would uphold this deep rooted racially discriminate culture through the expectation of complicity of whites working together to marginalize, subordinate, harass, berate and publicly humiliate African Americans with white racial dominance, subordination.

310. Defendants such as Walsh and Manzello would make public spectacles out of African American employees by publicly chastising, disciplining, berating, humiliating, or making some derogatory comment.

311. For example, Nathan Doss was accused of smelling like weed. It was his day off, Manzello and others forced Doss to swipe in or be terminated.

312.    Doss was written up for having a work time accident and sent for a drug test.--Doss did not have a work time accident.

313.    Due to the fact that he was African American Doss was stereotyped to have been a person who smoked "weed."

314.    They were certain that he would fail his test. They halted vacations of other employees in anticipation that he would fail and they would have to cover his shift as a lead.

315.    Doss did not fail the test. Upon him being called back to return to work, Walsh publicly humiliated and berated him in the presences of Plaintiff and others. Walsh continued to retaliate against Doss by canceling the shift he was to lead.

316.    Doss had raised issues of being disparately paid as a lead. Doss was promoted without receiving the prevailing wage for the position.

317.    Walsh and Fowler decided to incrementally pay Doss for performing the job as a lead.

318.    No other employee in the history had been subject to incremental pay.

319.    Additionally, other leads were hired externally immediately preceding and proceeding his promotion.

320.    These persons were non-African Americans (Stephanie Dumas and John Steele) and they were paid at the prevailing wage.

321.    This management scheme intentionally superimposed different terms and conditions upon African Americans and Caucasian employees who did not

conform to race based stereotypes regarding interactions with African American employees or those Caucasian employees who did not disparage or minimize or marginalize or subordinate or exclude African American employees.

322. Other examples: Mario Lopez, the then General Manager told Mardy Ringo in September of 2014 an employee of the Mars Manteno facility , who was a Spotter, that he would fire him he said that he was being racially discriminated against.

323. Ringo and others were tenured Spotter's who were being paid less than newly hired non-white Spotters and even non-white persons who did not meet the employers or the Department of Transportation requirements of holding a commercial driver's license.

324. David Jabaley, Director of Operations, stated "why don't they just write his black ass a check" referring to Nathan Doss.

325. Paula Hise, V.P. of Operations addressed the three (3) shifts of the facility telling the employees that Kelvin Walsh was a good friend and he would be missed.-- All the while knowing, that complaints had been made to corporate and that Walsh had been named in numerous and formal informal charges of racial discrimination.

326. Hise a VP of the company condoned and promoted the hostile work environment charged with racial animus as an acceptable culture of the company.

327. Hise, Jabaley, Fowler, Walsh and others have established through their actions a direct causal link of its corporate culture and the intentional deprivation of statutorily protected rights.

328. Plaintiff asserts that defendant Kenco has an admitted history of disciplining African-Americans more harshly than non-African Americans.

329. Plaintiff also contends that in the matter of *Brown V. Kenco*, Karen Smith and Jay Elliott were the counsel for defendant Kenco.

330. Smith is the attorney who interviewed McCurry relative to the Madison charges in November of 2013.

331. Smith excluded McCurry from the respondent's witness list.

332. Smith included Plaintiff as the HR representative and referenced Szplett's as the HR Manager.

333. Plaintiff also contends that Pete Monstwillo was an employee of the Mars Manteno warehouse and that Monstwillo was subject to the same policies as Plaintiff and others at the Mars Manteno facility.

334. Plaintiff also contends that Monstwillo was not punished or held accountable with regard to public policy or the policies of defendant Kenco or Mars relative to basic employment policies, harassment, violence and safety; nor was Monstwillo punitively or economically sanctioned for making numerous racially motivated threats, his repeated threats and an attempt to kill an African –American employee (Vernon Henry) with a forklift amongst other unlawful actions.

335. Monstwillo was not punished for these racially motivated acts. However, several days later while Henry was off on medical leave from being attacked by Monstwillo, Henry was fired, without an investigation, while on Family Medical Leave Act.

336. Plaintiff personally received Henry's doctors' note that was placed in his personnel file.

337. Management was aware that Henry was out on medical leave when he was terminated for contrived and pretextual reasons.

338. Tammi Fowler alleged along with others that Henry violated its cell phone policy and that Monstwillo was just horse-playing[3]. There was no cell phone policy.

339. Monstwillo's consequences for violating company and public policy, while a temporary employee, was being hired as a fulltime permanent employee of the Mars Manteno facility.

340. Plaintiff asserts that the prohibition on violence is unequivocal and that it was Defendants' duty to refrain from hiring Monstwillo.

341. Defendants were negligent in the hiring and retention[4] of Monstwillo as an employee, as his actions were foreseeable based upon immediate past

---

[3] Monstwillo called repeatedly threatening to kill Henry, after attempting to kill him with the forklift. This was especially unnerving considering there had been a shooting recently at the facility.
[4] Plaintiff asserts this also holds true for Kelvin Walsh, Tammi Fowler, Mike Manzello, David Jabaley and others who were not disciplined for unlawful acts reported.

behaviour that he was and continued to be a contributor of hostile and a racially animus work environment.

342.   Throughout Monstwillo's employment at the Mars Manteno facility he cleaved to the ideology of white racial dominance and subordination of African Americans by often boasting to African American employees that he could get them fired; that he had supremacy over African-Americans (stating that Henry should look in the mirror, as he was "nigger") and that management was his friend amongst other rants.

343.   Monstwillo's friends in management were a part of the same management scheme that subjected Szplett to being ostracized from meetings, denial of proper administrative support by increasing workloads and adding additional duties outside of HR and accounting to Szplett's counterpart McCurry along with whimsical and ever changing and shorter deadlines that created chaos and stress within the daily workflow of both Szplett's and his counterpart McCurry.

344.   Additionally, certain white employees repeatedly told racially derogatory jokes and slurs, as well as, making racially motivated epithets and stereotypical terms such as; "niggers," "nigger bitches," "educated nigger," "black asses."

345.   This would include Kelvin Walsh, Mike Manzello, David Jabaley, Tammi Fowler and others.

346.   Not only would Walsh make such remarks he even encouraged other Caucasian management to do the same and treat the employees like "assholes."

347. When Walsh was met with resistance to his ideology he punished the resistors.

348. Specifically, Walsh contrived performance issues relative to Tom White and presented them to him in the form of a write-up. White further resisted and immediately resigned.

349. White referenced in his written exit interview that the workplace was discriminatory and management pressured lower management and other whites to act in complicity with white racial dominance.

350. In Defendants' discriminatory actions as alleged above, Defendants intentionally breached their fiduciary obligation to Plaintiff when it: created, fostered and sustained a hostile work environment that was charged with racial animus. Defendants acted with malice or reckless indifference to the rights Plaintiff and others.

351. Defendants intentionally violated company and public policy.

**COUNT VIII - 42 USC §1981 RACE DISCRIMINATION AND ADVERSE ACTIONS CLAIMS AGAINST NAMED DEFENDANTS WITH REGARD TO ASSOCIATION WITH AFRICAN AMERICANS AND IN REVERSE DISCRIMINATION FOR OPPOSITION TO DISPARATE TREATMENT AND IMPACT ON PROTECTED CLASS PERSONS**

352.   Plaintiff hereby re-alleges and incorporates by reference the above paragraphs.

353.   Plaintiff contends that he had been working for Defendants at the Mars Manteno facility for fourteen (14) years without incident, Defendants' abrupt, unjustifiable and cryptic adverse employment decision supports the drawing of an inference that Defendants were motivated by some impermissible reason.

354.   Plaintiff asserts that he was subjected to a reduction of duties.

355.   Plaintiff asserts that he was subjected to a demotion.

356.   Plaintiff asserts that he was subjected to a title change.

357.   Plaintiff asserts that he was subjected to extortion.

358.   Plaintiff asserts that he was subjected to being defrauded out of his benefits. i.e. unemployment and disability.

359.   Plaintiff asserts that he was subjected to the equivalent of wage theft, as he was not compensated as other employees were at the Mars Manteno facility who had not engaged in protective activity.

360.   Plaintiff asserts that he was subjected to being depraved of an opportunity to apply for and continue work at the Mars Manteno facility.

361.   Plaintiff asserts that he was subjected to being evicted from his office and reassigned to a cubicle in the back of the office away from co-workers and management.

362.    Plaintiff asserts that he was subjected to harassment, retaliation, disparate treatment, different terms and conditions of employment, and a hostile work environment amongst other things.

363.    Plaintiff asserts that he was subjected to damage to his professional standing and defamation of his character.

364.    Plaintiff asserts that he was subjected to a temporary constructive discharge, when he was forced to take medical leave of absence due to the intolerable and hostile working conditions at the Mars Manteno facility.

365.    Plaintiff asserts that he was not equally paid as Varvel for performing the job duties and tasks of the HR Manager.

366.    Plaintiff also asserts that Varvel was only an HR Generalist.

367.    Plaintiff also asserts that he had more job duties and tasks than Varvel consisting of accounting and other ancillary tasks.

368.    A motivating factor for Defendant(s) adverse actions towards Plaintiff was his complaints of race discrimination.

369.    A motivating factor for Defendant(s) adverse actions towards Plaintiff was his association of African Americans.

370.    A motivating factor for Defendant(s) adverse actions towards Plaintiff was his protected activity.

371. A motivating factor for Defendant(s) adverse actions towards Plaintiff was his failure to act in complicity with white employees to discriminate against African Americans or those who opposed discrimination.

372. A motivating factor for Defendant(s) adverse actions towards was because he opposed discrimination.

373. Accordingly, Plaintiff hereby asserts a 42 U.S.C. 1981 claim against Defendant with regard adverse actions.

374. As a direct and proximate result of Defendant's aforesaid violations of Plaintiff's rights, Plaintiff has suffered and sustained past and future wage loss, emotional and physical distress and mental anguish, past and future injuries to feelings including extreme embarrassment and humiliation, past and future outrage, damages to reputation, and whatever punitive damages are recoverable herein.

## COUNT IX - 42 USC §1981 RACE DISCRIMINATION AND QUID PRO QUO CLAIMS AGAINST NAMED DEFENDANTS WITH REGARD TO ASSOCIATION WITH AFRICAN AMERICANS AND IN REVERSE DISCRIMINATION FOR OPPOSITION TO DISPARATE TREATMENT AND IMPACT ON PROTECTED CLASS PERSONS

375. Plaintiff hereby re-alleges and incorporates by reference the above paragraphs.

376. Plaintiff incorporates by reference all the preceding paragraphs of this Complaint as if fully set forth herein.

377. Necessary to the Kenco and Mars intentionally racially discriminatory culture was the expectation that Caucasians will work together to marginalize, subordinate, disparage, and exclude African Americans.

378. Failure of Caucasians to adhere to working together to marginalize, subordinate, disparage, and exclude African Americans would result in adverse employment actions such as: write-ups, constructive discharge(s), disciplinary actions of suspension and or demotion.

379. For example, Plaintiff was ostracized from meetings and a number of various routine job duties and tasks that he had regularly performed as the HR and Accounting Manager along with reducing his administrative support.

380. Plaintiff was also mandated to work 3rd shift and eventually demoted from the HR Manager's position for failing to meet the unlawful illegitimate expectations that Caucasians will work in complicity to marginalize, subordinate, disparage, and exclude African Americans.

381. Plaintiff asserts that failure to act in complicity with Caucasians to marginalize, subordinate, disparage, and exclude African Americans altered the terms and conditions of his and other employees at the Mars Manteno facility.

382. Additionally, Szplett's was subject to another form of Quid Pro Quo from Defendant when it required plaintiff to agree to help Defendant defend lawful

charges of discrimination, retaliation, harassment and whistleblowing and its lawsuits against Defendants in exchange for his severance pay and compensation for the month of March 2015.

383.   Plaintiff asserts that he was never informed of the particulars on how to continue his employment at the Mars Manteno facility.

384.   Plaintiff also contends that this failure to inform him of how to apply for continued employment was contrived to coerce Plaintiff into being placed in a situation where it would be easy to extort Plaintiff into aiding and abetting Defendants into obstructing justice for Plaintiff and others by economically depriving him of monies and benefits due him.

385.   More specifically, Defendants scheme entailed not paying Szplett since February of 2015. Szplett had been not been paid in over a month, when Defendants attempted to extort Plaintiff into obstructing justice and; under this contrived scheme it would be more than a month before Szplett could receive his unemployment.

386.   Plaintiff asserts that this was done to extort Plaintiff into obstructing justice by aiding and abetting Defendants in violating the constitutional rights of protected class persons.

387.   Plaintiff asserts that this was done to coerce and ultimately extort Plaintiff into obstructing justice by aiding and abetting Defendants in the obstruction of justice and its administration to avoid liability and culpability.

388.    Plaintiff asserts that this was done to harass and retaliate against plaintiff for his association with African Americans and his protected activities that opposed discrimination in the work place.

389.    Plaintiffs allege that this was done for the purpose to interfere with plaintiffs' ability to pursue a remedy against defendants

390.    Other examples of known Quid Pro Quo's: Tom White, a first (1st) shift supervisor of fifteen (15) years, was written up through contrivance for failing to treat African Americans like "assholes." Tom White opposed such discriminatory treatment and constructively resigned effective immediately.

391.    White indicated that the working environment was discriminatory.

392.    Scot Marksteiner was demoted, suspended and eventually terminated for his failure to act in complicity with other Caucasians to work together to marginalize, subordinate, disparage, and exclude African Americans.

393.    A motivating factor for Defendant(s) Quid Pro Quo harassment of Plaintiff was his complaints of race discrimination.

394.    A motivating factor for Defendant(s) Quid Pro Quo harassment of Plaintiff was his association of African Americans.

395.    A motivating factor for Defendant(s) Quid Pro Quo harassment of Plaintiff was his protected activity.

396.   A motivating factor for Defendant(s) Quid Pro Quo harassment of Plaintiff was his failure to act in complicity with white employees to discriminate against African Americans or those who opposed discrimination.

397.   A motivating factor for Defendant(s) Quid Pro Quo harassment of Plaintiff was because he opposed discrimination.

398.   Accordingly, Plaintiff hereby asserts a 42 U.S.C. 1981 claim against Defendant with regard Quid Pro Quo harassment.

399.   As a direct and proximate result of Defendant's aforesaid violations of Plaintiff's rights, Plaintiff has suffered and sustained past and future wage loss, emotional and physical distress and mental anguish, past and future injuries to feelings including extreme embarrassment and humiliation, past and future outrage, damages to reputation, and whatever punitive damages are recoverable herein.

## COUNT X - 18 USC §1001 FALSE STATEMENT(S)  AND 18 USC §1621 PERJURY CLAIMS AGAINST NAMED DEFENDANTS WITH REGARD TO PLAINTIFF'S ASSOCIATION WITH AFRICAN AMERICANS AND IN REVERSE DISCRIMINATION FOR OPPOSITION TO DISPARATE TREATMENT AND IMPACT ON PROTECTED CLASS PERSONS

400.   Plaintiff hereby re-alleges and incorporates by reference the above paragraphs.

401. Szplett's alleges that the reason given to the IDHR and EEOC by Defendant Kenco by Defendant Elliott in its verified statement was pretextual with regards to Plaintiff having to work third (3rd) shift.

402. There was no communication sent to employees informing them Szplett's would be available on the third (3rd) shift.

403. It was common practice for third (3rd) shift employees to address any issues immediately after the end of their shift, when the office was open.

404. Other managers such as Marci DeRosier, Mike Manzello, Bill Schwerin and Anthony Marquez, who also only worked first (1st) shift were not required to and did not work third (3rd) shift.

405. Szplett also asserts that the reason provided to the IDHR, EEOC, The Illinois Department of Labor and the Illinois Department of Unemployment Security why Plaintiff was not compensated for March of 2015 and not given his severance was pretextual.

406. Defendant Kenco and Defendant Jay Elliott asserted that Szplett did not work and was not entitled to his March 2015 compensation.

407. This was in contradiction to the communication received in the mail by Szplett.

408. Plaintiff was entitled to compensation under The **WARN Act**.

409.   No other employee that was not retained as an employee at the Mars Manteno warehouse worked and they were given March's compensation under the WARN Act.

410.   No other person eligible to receive their severance pay or March compensation was not given their severance pay or March 2015 compensation and or subjected to such terms and conditions.

411.   Szplett also asserts that Defendants rationale and reasons regarding Plaintiff's job duties, title, compensation and performance were pretextual, as Defendants have stated to various agencies, tribunals and courts under oath and the penalty of perjury that Szplett's was the HR Manager.

412.   Defendants such as Kenco and Elliott have in other instances, once again under oath or the penalty of perjury, stated that Szplett's job duties were not reduced and that the position had not existed previously or that Szplett had never been the HR Manager.

413.   Szplett also contends that the reason given to the IDHR and EEOC by Defendants for paying Varvel more that Szplett was pretextual.

414.   Szplett also asserts that Varvel performed less duties and tasks than Szplett.

415.   Szplett also contends that it is actual job performance and content —not job titles, classifications or descriptions of the work performed that defines what a job entails.

416. Szplett also asserts that he had more than twice as much experience than Varvel in human resource management and more than four (4) times as much working experience in HR and had been a manager for more than thirty (30) years.

417. Szplett further asserts that there were no new duties, tasks and responsibilities derived, added or adduced that had not previously existed and have not previously been performed by Szplett and his counterpart McCurry.

418. Plaintiff also asserts that Varvel did not have any special certification(s) or qualifications to perform the job.

419. Plaintiff asserts that Varvel was classified by Defendant Kenco Mars as a HR Generalist and not a manager.

420. Defendant Elliott stated that it was Plaintiff's failing leadership that caused all of the discrimination charges.

421. Plaintiff also contends that employee issues had existed since his employment at the Mars Manteno facility.

422. Defendants have also stated that for performance reasons Szplett was given a negative performance review.

423. Szplett's vehemently contends that it was not his fault or failing leadership that led to the discrimination charges being filed, but it was his failure to act in complicity with management's race-based stereotypes regarding African Americans and his unwillingness to work with other Caucasian

employees to marginalize, subordinate, minimize, exclude or disparage African American employees that he was subject to adverse employment decisions.

424.   Szplett's also asserts that he has never been given a negative performance review.

425.   Defendants did not produce such a performance review to the IDHR/EEOC nor did Defendant Kenco produce one when Plaintiff requested his personnel file relative to the Illinois Personnel Review Act.

426.   Defendant Kenco alleges that it was the Hartford's decision to terminate Plaintiff's benefits.

427.   Defendant Kenco is self-insured and alleges that the Hartford just manages the plan.

428.   Defendant Hartford now alleges that Kenco is the Plan Administrator.

429.   Defendants Kenco and The Hartford have acted interchangeably as the Plan Administrator during the relevant.

430.   The reasons given for Plaintiff's termination of benefits to various governmental agencies was pretextual.

431.   Additionally, in support  of these false statements and others:

432.   Plaintiff asserts that Defendants have intentionally taken inconsistent positions relative to avoiding liability and culpability relative to claims of discrimination and other actionable causes of action.

433.    Plaintiff asserts that Defendants actions were deliberate and an obstruction to justice and its administration.

434.    Plaintiff asserts that these intentional inconsistencies were carried out by mail, email, and phone to further the contrived schemes of Defendants such as Mars, Kenco, Elliott, Fowler, Jabaley, Lopez, Walsh, Moore, Coffey, Spier, Hise, and others to violate the protected rights of Plaintiff and others and obstruct justice and its administration.

435.    Plaintiff asserts that because several matters had a final judgment on the merits and; the identity of the cause of action in both the earlier and later suit shares the common nucleus of operative facts asserted and; that SZPLETT was in privity in the matters that Defendants such as Mars, Kenco, Fowler, Walsh, Manzello, Lopez, Jabaley, Coffey, Moore and others received a benefit(s) Defendants such as Mars, Kenco, Fowler, Walsh, Manzello, Lopez, Coffey, Moore, Caines, Crawley, Spier, Hise, Elliott, Jabaley and others in privity to them should be estopped from receiving another benefit based upon inconsistent position according to the doctrine(s) of Judicial Estoppel, Collateral Estoppel and Res Judicata.

436.    For example, Plaintiff asserts that in the matter of McCurry v Kenco et al... (16-cv 2273 ) that Defendants Mars, Kenco, Moore, Coffey, Lopez, Walsh, Fowler, Jabaley and others benefited from stating that Plaintiff was the HR

Manager. The matter was decided in July of 2018. Defendants made the same representation to the Seventh Circuit of Appeals on April 11, 2019 upon appeal.

437. Plaintiff also asserts in the matter of Madison v. Kenco et al. 2016-FDA-04. Defendants contended to the Department of Labor's administrative law judge on two separate occasions in its motions for summary decision that Szplett was the HR Manager. The matter was decided on November 22, 2017.

438. Plaintiff also asserts that Defendants had also made this same contention in its position statement in Madison's IDHR charge no. 2014CF0475 cross-filed with the EEOC and to OSHA in 2013.

439. Conversely, in Szplett's matter before the IDHR, EEOC and IDOL through verified statements Defendant Kenco, Elliott and others have alleged that:1) Plaintiff was not the HR Manager; 2) Plaintiff had never been the HR Manager; 3) there was never a HR Manager's position previously and; 3) Plaintiff had no reduction in duties.

440. These statements were disseminated by U.S. Mail and email.

441. A motivating factor for Defendant(s) making false and perjurious statements against and about Plaintiff was his complaints of race discrimination.

442. A motivating factor for Defendant(s) making false and perjurious statements against and about Plaintiff was his association of African Americans.

443. A motivating factor for Defendant(s) making false statements and perjurious against and about Plaintiff was his protected activity.

444. A motivating factor for Defendant(s) making false statements and perjurious against and about Plaintiff was his failure to act in complicity with white employees to discriminate against African Americans or those who opposed discrimination.

445. A motivating factor for Defendant(s) making false and perjurious statements against and about Plaintiff was because he opposed discrimination.

446. A motivating factor for Defendant(s) making false and perjurious statements against and about Plaintiff was to avoid and escape liability and culpability.

447. A motivating factor for Defendant(s) making false and perjurious statements against and about Plaintiff was to evade justice.

448. A motivating factor for Defendant(s) making false and perjurious statements against and about Plaintiff was to obstruct, hinder and impede justice and its administration.

449. Accordingly, Plaintiff hereby asserts a 18 U.S.C. § 1001 & 18 U.S.C. 1621 claim against Defendant with regard to perjurious and false statements.

450. As a direct and proximate result of Defendant's aforesaid violations of Plaintiff's rights, Plaintiff has suffered and sustained past and future wage loss, emotional and physical distress and mental anguish, past and future injuries to

feelings including extreme embarrassment and humiliation, past and future outrage, damages to reputation, and whatever punitive damages are recoverable herein.

## COUNT- XI OBSTRUCTION OF JUSTICE IN VIOLATION of 18 USC 1503, 1505& 1512(b), (c) & (f), 1621 CLAIMS AGAINST DEFENDANTS MARS, KENCO, WALSH, FOWLER, JABALEY, LOPEZ, HISE, SPIER, MOORE, MANZELLO, COFFEY, CRAWLEY, CAINES, AND ELLIOTT WITH REGARD TO ASSOCIATION WITH AFRICAN AMERICANS AND IN REVERSE DISCRIMINATION FOR OPPOSITION TO DISPARATE TREATMENT AND IMPACT ON PROTECTED CLASS PERSONS

451. Plaintiff hereby re-alleges and incorporates by reference the above paragraphs.

452. Defendants have intentionally taken inconsistent positions at various tribunals to avoid liability and culpability relative to claims of discrimination.

453. Defendants actions were deliberate and an obstruction to justice and its administration.

454. Defendants have provided half-truths, misleading and patently false evidence regarding Plaintiff to various governmental agencies.

455.    Plaintiff also asserts that conflicting accounts about employment actions "constitutes further evidence as to the honesty of Defendants' belief in imposing an adverse employment decision"-Pretext.

456.    Defendants utilized the mail to further its schemes violating protected class employees civil and constitutional rights, deceit, fraud, extortion and obstruction of justice.

457.    Plaintiff asserts that Defendant Kenco's hiring Jay Elliott as the VP of legal was a conspiracy to corruptly impede and obstruct the administration of justice.

458.    The hiring of Elliott in this case required approval of the VP or higher, the CFO and the COO according to Defendants hiring policy referenced in the matter of Henry V. Kenco et al. 1:15-cv-10961.

459.    Additionally, by sheer definition the hiring of an individual requires a consensus and a common goal in exchange for consideration; essentially a conspiracy.

460.    Specifically, an outlined agreement of mutual understood expectations to be fulfilled on the parts of perspective employee and employer for a sum of money as consideration for the fulfillment of these mutually agreed objectives, goals and tasks.

461.    Jay Elliott being the counsel of record participated in Plaintiff's fact finding conference as a witness-providing misleading and patently false information and written documentation.

462.    Varvel also participated in plaintiff's fact finding conference and she too did not have any firsthand information and she too could not affirmatively attest to anything that occurred relative to Plaintiff's allegations, as a vast number of these instances occurred prior to Varvel's hiring.

463.    Pointedly, a number of these things occurred prior to both Elliott and Varvel's hiring.

464.    Plaintiff asserts and concurs with Elliott when Elliott stated to the IDHR/EEOC investigator that instances that occurred prior to the hiring of Varvel that he had as much knowledge as Varvel would have.

465.    Plaintiff asserts that neither Varvel nor Elliott had any legitimate firsthand admissible knowledge to provide.

466.    Plaintiff asserts that it can be easily inferred that Defendant Elliott intentionally acted with malice, a blatant and reckless disregard and with premeditation to obstruct and impede justice and its administration.

467.    Plaintiff has not only witnessed Elliott on behalf of Defendants corruptly influence, obstruct, and impede the administration justice in Plaintiff's matters, but Plaintiff has also witnessed Elliott and Varvel on behalf of Defendants

further their schemes to influence, obstruct, or impede, the due administration of justice of other litigants such as Vernon Henry, Edith McCurry, and others.

468. Szplett's also contends that Elliott had sufficient enough business relationships with his client that generated a "financial motive" for him to conspire with the defendant to intentionally obstruct, impede, delay and thwart the administration of justice relative to Plaintiff and other litigants. In re: Henry v Kenco et al., McCurry s Kenco et al., Doss v. Kenco et al., and others.

469. This is evidenced by Defendants contrived schemes of intentionally taking inconsistent positions with agencies, tribunals and courts relative in avoiding liability and culpability relative to claims of discrimination, retaliation, harassment and other unlawful violations of public policy.

470. A motivating factor for Defendants' obstruction of justice was to continue to violate the protected rights of Plaintiff and others.

471. A motivating factor for Defendants' obstruction of justice was to continue its intentional and deliberate systemic corporate culture of racism and discrimination.

472. A motivating factor for Defendants' obstruction of justice was to harass and interfere with plaintiffs' ability to pursue a remedy against defendants

473. A motivating factor for Defendants' obstruction of justice was to avoid and escape liability and culpability.

474.   A motivating factor for Defendants' obstruction of justice was to evade justice.

475.   A motivating factor for Defendants' obstruction of justice was to hinder and impede justice and its administration.

476.   Accordingly, Plaintiff hereby asserts claims of 18 USC 1503, 1505 & 1512(b), (c) & (f), 1621 against Defendant with regard to obstruction of justice through perjurious and false statements made by US Mail, email or phone.

477.   As a direct and proximate result of Defendant's aforesaid violations of Plaintiff's rights, Plaintiff has suffered and sustained past and future wage loss, emotional and physical distress and mental anguish, past and future injuries to feelings including extreme embarrassment and humiliation, past and future outrage, damages to reputation, and whatever punitive damages are recoverable herein.

## COUNT XII – 42 USC §1981 RACE DISCRIMINATION CLAIM AND 42 USC §1985 CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS  CLAIMS AGAINST NAMED DEFENDANTS WITH REGARD TO DENIAL OF ENJOYMENT OF ALL  BENEFITS, PRIVILEGES, TERMS AND CONDITIONS OF  EMPLOYMENT AND TO PLAINTIFF'S ASSOCIATION WITH AFRICAN

## AMERICANS AND IN REVERSE DISCRIMINATION FOR OPPOSITION TO

## DISPARATE TREATMENT AND IMPACT ON PROTECTED CLASS PERSONS

478. Plaintiff hereby re-alleges and incorporates by reference the above paragraphs.

479. Defendants engaged in a number of civil conspiracies to violate Plaintiff's protected rights.

480. Defendants such as Mars, Kenco, Fowler, Jabaley, Lopez, Walsh, Spier, Coffey, Moore, Hise, Caines, Crawley, Elliott, and others in an effort to conceal the truth about the racially charged hostile work environment, the pervasive and rampant discrimination, the adverse employment decisions toward Plaintiff and others engaged in numerous civil conspiracies.

    a.    For example Defendants: 1) hired Jay Elliott as in house legal counsel; 2) manipulated, contrived and applied policies that either did not exist or that were created to accommodate the current issue(s) at hand; 3) provided patently false and misleading information and or documentation to agencies, tribunals and courts that blatantly went against their own policies; 4) breached their duty of care by failing to uphold their fiduciary obligation to follow company and public policy; 5) aided and abetted malfeasors that fostered and condoned such disparaging acts against African Americans and other protected class persons; 6) intentionally failed to investigate claims of discrimination, collusion, disparity of pay, uneven

discipline, retaliation, amongst other issues raised and; 7) provided misleading and patently false information and documentation that supported whatever non-discriminatory reason that was asserted to avoid culpability, liability and obstruct justice.

b.　　Hired Lori Varvel as the HR Manager to further its schemes of contrivance and intentional discrimination.

481.　Plaintiff also asserts that he was subjected to a conspiracy to extort him out of his protected rights, his wages, benefits and compensation.

482.　Plaintiff also asserts the conspiracy to extort Plaintiff would also defraud other litigants out of their civil and constitutional rights by either having Plaintiff perjure himself by either telling half-truths or making materially false statements or committing fraud by omission to help Defendants defend or overcome lawful litigation unlawfully.

483.　Essentially Plaintiff would be obstructing and impeding justice and unlawfully assisting Defendants.

484.　Plaintiff also contends that Defendants Kenco, Mars and those in privity to them attempted to extort him into aiding and abetting Defendants in obstructing justice and its administration.

485.　Plaintiff contends that this obstruction would continue to violate Plaintiff's and the other protected class person's civil and constitutional rights.

486.    Defendants Kenco, Mars and those in privity to them in furtherance of its scheme contrived a plan to place Plaintiff in a precarious economic situation to coerce him to obstruct justice in order to receive his severance pay.

487.    Defendants Kenco, Mars and those in privity to them gave Plaintiff's physician a contrived and inaccurate job description for Plaintiff's physician to make an evaluation.

488.    Predicated on those duties and the responses, the Hartford, the administrator for Defendant Kenco's self-insured disability plan deduced that Plaintiff was able to return to work.

489.    On or about February 26, 2015, Plaintiff received certified mail from Defendant Kenco indicating that the contract had been terminated sooner than the expected date of March 29, 2015.

490.    Additionally, it stated that since Szplett had not applied to continue to work at the Mars Manteno facility that he was entitled to receive severance by signing the release within forty five (45) days of the date of receipt.

491.    The most notable of the terms and conditions were that Plaintiff had to waive any claims that he may have had against Defendant and that he had to help Defendants defend itself against HR matters in order to receive his severance pay.

492.    Szplett's applied for unemployment a benefit due him.

493.   Szplett was denied because Defendant Kenco or Mars or those in privity to them asserted that Szplett was still an employee until March 29, 2015 and was not entitled to his unemployment benefits.

494.   Plaintiff asserts that Defendant Kenco or Mars or those in privity to them intentional schemes of conspiracy: 1) defrauded him out of his disability benefits; 2) intentionally failed to inform him of how to apply to continue his employment and; 3) refused to pay Szplett as it had the other employees who were not continuing their employment at the Mars Manteno facility.

495.   Plaintiff asserts that Defendant Kenco or Mars or those in privity to them contrived a perfect scenario to deprive Plaintiff out of his benefits, wages and compensation to coerce Plaintiff into being extorted into waiving his rights and defrauding others out of their rights by aiding and abetting Defendants such as Mars, Kenco, Fowler, Lopez, Walsh, Manzello, Jabaley, Elliott, Spier, Hise, Crawley, Caines and others in obstructing justice and violating other protected class person's civil and constitutional rights.

496.   The scheme was to get Szplett into helping Defendants Mars and Kenco and their employees or agents or those in privity to them defend HR matters in exchange for his severance pay and other benefits.

497.   Szplett was never paid his March compensation or his disability benefits.

498.   Plaintiff contends this was a deprivation and adverse employment action that gives rise to liability.

499.  Additionally, Szplett asserts that Defendants Mars and or Kenco or both have kept Szplett's wages unjustly and for their undue enrichment and to further its enterprise and schemes.

500.  Plaintiff also asserts that in punishment for Szplett failure to act in complicity with management's race-based stereotypes regarding African Americans and his unwillingness to work with other Caucasian employees to marginalize, subordinate, minimize, exclude or disparage African American employees that his compensation was kept.

501.  Plaintiff also asserts that Defendants Kenco, Mars, Fowler, Elliott, Jabaley, Lopez, Spier, Hise, Caines, Crawley, Coffey, Moore and others that are in privity to them have violated 18 USC 1962 in regards to 18 USC 1503, 18 U.S.C. 1505 and 18 U.S.C. 1985.

502.  Defendants such as Hise, Spier, Moore, Jabaley, Fowler, Elliott, Coffey, Caines, Crawley and others have crossed state lines and used the mail, email and phone to further its conspired schemes to impede and obstruct the administration of justice and to extort plaintiff out of his protected rights, his wages, his due processes, compensation and benefits, as well as, to defraud other protected class persons out of their civil and constitutional rights.

503.  Defendants' unlawful actions as alleged above were intentional and willful. Defendants acted corruptly with malice or reckless indifference to the rights Plaintiff and others.

504. By the said conduct described above, Defendants contrived schemes and intentional racial discrimination related to Plaintiff's employment and the denial of the enjoyment of all of Plaintiff's benefits, privileges, terms and conditions of that employment relationship was to harass and interfere with plaintiffs' ability to pursue a remedy against Defendants and;

505. Because of his association with African Americans, his failure to act in complicity with other white employees to discriminate against African Americans, his opposition to discrimination and his protected activity.

506. Szplett asserts that there was no other lawful reason for Defendants to make and execute such elaborate contrived schemes that adversely affected his employment and violated his protected rights except that it was Defendants' systemic, deliberate, willful and intentional discriminatory practices at work.

507. Accordingly, Plaintiff hereby asserts a 42 U.S.C. 1981 and 1985 claim against Defendant.

508. That as a direct and proximate result of Defendant's aforesaid violations of Plaintiff's rights, Plaintiff has suffered and sustained reassignment, constructive discharge, demotion, interference with prospective economic advantages (future employment), coercion, compensation benefits, harassment, retaliation, defamation of character, emotional and physical distress and mental anguish, past and future injuries

to feelings including extreme embarrassment and humiliation, past and future outrage, damages to reputation, loss of enjoyment of life.

509.  In Defendants' discriminatory actions as alleged above, Defendants intentionally conspired to breach their fiduciary obligation and violate Plaintiff's constitutional rights.  Defendants acted with malice and or reckless indifference or both to the rights Plaintiff and other African Americans and or those who opposed discrimination and or associated with African Americans and or engaged in protected activity.

## COUNT XIII-735 ILCS 5/13-208 DEFAMATION TO PLAINTIFF BY DEFENDANTS KENCO, MARS, TAMMI FOWLER AND JAY ELLIOTT

510.  Plaintiff hereby re-alleges and incorporates by reference the above paragraphs

511.  Defendant Fowler stated that Plaintiff was not trained to handle HR matters.

512.   Plaintiff had been the HR Manager since 2001.

513.  Defendants Elliott and Kenco reported false and misleading information to the IDHR/EEOC regarding Plaintiff's performance that was damaging to plaintiff's professional standing and career.

514.   Specifically, Defendants stated that it was Szplett's failing leadership that led to all the charges of discrimination filed against them.

515. Defendants Elliott and Kenco have also stated that for performance reasons Szplett was given a negative performance review.

516. Szplett's had been employed at the Mars Manteno facility since 2001 and had not ever received a negative performance rating or disciplinary action.

517. At all times Szplett's met respondents legitimate employment expectations.

518. Defendants have never produced the alleged negative performance review to support this contention.

519. A motivating factor for Defendant(s) making defamatory statements against and about Plaintiff was his complaints of race discrimination.

520. A motivating factor for Defendant(s) making defamatory statements against and about Plaintiff was his association of African Americans.

521. A motivating factor for Defendant(s) making defamatory statements against and about Plaintiff was his protected activity.

522. A motivating factor for Defendant(s) making defamatory statements against and about Plaintiff was his failure to act in complicity with white employees to discriminate against African Americans or those who opposed discrimination.

523. A motivating factor for Defendant(s) making defamatory statements against and about Plaintiff was because he opposed discrimination.

524. A motivating factor for Defendant(s) making defamatory statements against and about Plaintiff was to avoid and escape liability and culpability.

525. A motivating factor for Defendant(s) making defamatory statements against and about Plaintiff was to evade justice.

526. A motivating factor for Defendant(s) making defamatory statements against and about Plaintiff was to obstruct, hinder and impede justice and its administration.

527. Accordingly, Plaintiff hereby asserts a 735 ILCS 5/13-208 claim against Defendant with regard to defamation.

528. As a direct and proximate result of Defendant's aforesaid violations of Plaintiff's rights, Plaintiff has suffered and sustained past and future wage loss, emotional and physical distress and mental anguish, past and future injuries to feelings including extreme embarrassment and humiliation, past and future outrage, damages to reputation, and whatever punitive damages are recoverable herein.

## COUNT XIV-735 ILCS 5/13-202 & 735 ILCS 5/13-205 NEGLIGENT TO PLAINTIFF

## BY ALL NAMED DEFENDANTS

529. Plaintiff hereby re-alleges and incorporates by reference the above paragraphs.

530.    Defendants such as Kenco and Mars and their employees, agents, assignors and or those in privity to them are negligent per se for failing to comply with public policies such as the Food Drug and Cosmetic Act as amended by the Food Safety and Modernization Act, Presidential Directives and the Bioterrorism Act of 2002, Title VII, The Civil Rights Act of 1964 as amended in 1991, OSH Act and other statutes and codified standards.

531.    Defendants such as Kenco and Mars and their employees, agents, assignors and or those in privity to them are also intentionally negligent for failing to comply with company policies relative to harassment, violence, discrimination, investigations, and its quality management systems (which is equivalent to the FDA's Qsit-21CFR 8.20)

532.    Defendants such as Kenco and Mars and their employees, agents, assignors and or those in privity to them are also grossly negligent for failing to adhere to the terms and conditions of Plaintiff's employment relative to the ENJOYMENT OF ALL BENEFITS, PRIVILEGES, TERMS AND CONDITIONS OF EMPLOYMENT including but not limited to Plaintiff's continued employment, compensation, short term disability, severance and unemployment benefits.

533.    Plaintiff considers his compensation and monetized disability payments as property.

534. Defendants such as Kenco and Mars and their employees, agents, assignors and or those in privity to them established a duty of care and fiduciary obligation when it extended a written offer of employment to Plaintiff outlining numerous benefits that Plaintiff was required to sign and return to accept Defendants Kenco and Mars.

535. Defendants such as Kenco and Mars and their employees, agents, assignors and or those in privity to them were willfully and grossly negligent in their intentional and willful discrimination of Plaintiff and other Caucasians that refused to act complicitly individually and collectively to disparage, marginalize, subordinate, minimize and exclude African Americans.

536. Defendants such as Kenco and Mars and their employees, agents, assignors and or those in privity to them were willfully and grossly negligent in their intentional and willful discrimination of African Americans.

537. Defendants such as Kenco and Mars and their employees, agents, assignors and or those in privity to them were willfully and grossly negligent in their hiring and retention of employees who also fostered the hostile work environment and aided and abetted Defendants in their malfeasance.

538. This would include Kelvin Walsh, Mike Manzello, Tammi Fowler, David Jabaley, Jay Elliott, Mario Lopez, Karl Meyers, Trace Spier, Paula Hise and Pete Monstwillo amongst others.

539.   A motivating factor for Defendant(s) willfully and grossly negligence was Defendants systemic culture of intentional racism and discrimination.

540.   Accordingly, Plaintiff hereby asserts a 735 ILCS 5/13-202 & 735 ILCS 5/13205 claim against Defendant with regard to negligence.

541.   In Defendants' discriminatory actions as alleged above, Defendants intentionally breached their fiduciary obligation, through contrived schemes that were furthered through the U.S. Mail, email and phone.  Defendants acted with gross negligence and malice or reckless indifference to the rights Plaintiff and other African Americans and or those who opposed discrimination and or associated with African Americans and or engaged in protected activity

## COUNT XV-735 ILCS 5/163-250 BREACH OF FIDUCIARY DUTY TO PLAINTIFF

## BY ALL NAMED DEFENDANTS

542.   Plaintiff hereby re-alleges and incorporates by reference the above paragraphs.

543.   Defendants such as Kenco and Mars and their employees, agents, assignors and or those in privity to them had a duty of care to Plaintiff and other protected class persons to which they breached and failed to adhere.

544.   Plaintiff asserts that Defendants Kenco and Mars created a fiduciary duty to Plaintiff and other employees when it required its employees to sign its

offer letter according to Defendants policy CP.HR. 1002 as a term and condition of employment.

545.    In addition, public policies such as the Food Drug and Cosmetic Act as amended by the Food Safety and Modernization Act, Presidential Directives and the Bioterrorism Act of 2002, Title VII, The Civil Rights Act of 1964 as amended in 1991 and other statutes and codified standards also created this duty of care.

546.    For example, Defendants such as Kenco and Mars and their employees, agents, assignors and or those in privity to them did not follow company and or public policy, with regard to: 1) the fulfillment of their contractual obligations to Plaintiff created by the offer and acceptance of employment at the Mars Manteno facility in April of 2013 e.g. Plaintiff's compensation and due benefits such as short term disability, severance and unemployment;  2) affording Plaintiff an opportunity to continue his employment at the Mars Manteno facility;  3) affording Plaintiff the due process required to demote Plaintiff from his position of HR Manager; 4) their failure to follow and enforce company policies, with regard to such policies as harassment, violence, discrimination, investigations, and its quality management systems (which is equivalent to the FDA's Qsit-21CFR 8.20); 5) Plaintiff and others being free from a racially hostile work environment among other obligations.

547.    Example, while Pete Monstwillo was still a temporary employee he began engaging in racially motivated threats, white racial dominance and subordination of African Americans.

548.    Despite Walsh and Manzello, the senior management, at the facility being aware of Monstwillo's very open, active and unashamed discriminatory proclivity he was hired as a full time employee, given premium shifts, greater access to overtime and better fringe benefits than African Americans such as Vernon Henry.

549.    Pete Monstwillo made a number of racially motivated threats, his repeated threats culminated in an attempt to kill an African –American employee (Vernon Henry) with a forklift. Even after he attempted to kill him with the forklift, he continued to call the facility and threaten Henry. The authorities were not called.

550.    Within a day or so of this incident, Henry was discharged on a contrived cell phone policy violation that did not exist.

551.    In furtherance of its scheme on or about October 8, 2014, Lopez, Jabaley, Fowler and others terminated the persons in the photo that Henry allegedly took to legitimize Henry being terminated. Henry was not in the picture nor did they have any evidence linking Henry to having taken this picture.

552.    Defendant Lopez indicated to Plaintiff that these persons were collateral damage.

553.   Henry was unevenly and more harshly disciplined than Monstwillo even though Monstwillo's known actions were far more egregious than Henry's contrived allegations.

554.   Lopez and Jabaley involved Plaintiff in this contrived scheme to retaliate against Henry because they needed an HR presence; Henry had complained of racially motivated verbal and physical threats.

555.   Plaintiff affirmed for corporate, specifically Dan Dey, that there was not a cell phone policy for the facility.

556.   Defendant Kenco admitted to OSHA that it did not have a cell phone policy or proof of such policy in the matter of Kenco Logistics OSHA No. 985037.

557.   Each policy at the facility accompanied a signature as proof that an employee had been presented with the corresponding policy.

558.   There was no policy log for Henry or any other employee regarding cell phone use.

559.   Tammi Fowler stated that Monstwillo was just horse playing.

560.   Plaintiff asserts that the prohibition on violence is unequivocal and that it was Defendants' fiduciary duty to refrain from hiring and retaining Monstwillo.

## COUNT XVI-735 ILCS 5/163-250 CONSPIRACY TO COMMIT BREACH OF

### FIDUCIARY DUTY BY NAMED DEFENDANTS

561.   Plaintiff hereby re-alleges and incorporates by reference the above paragraphs.

562.   Defendants in an effort to conceal the truth conspired to obstruct justice and avoid culpability and liability about: 1) the racially charged hostile work environment; 2) the pervasive and rampant discrimination; 3) the adverse employment decisions toward Plaintiff and others and; 4) the blatant breach in their duty of care by: intentionally failing to uphold their fiduciary obligation of a) compensating Plaintiff; b) administering Plaintiff's short term and unemployment benefits; c) affording Plaintiff an opportunity to apply for continued employment; d) affording Plaintiff his due process prior to being demoted from his position of HR Manager; e)  notifying Plaintiff that he had been demoted; f) failing to investigate claims of discrimination, collusion, disparity of pay, uneven discipline, and retaliation amongst other issues raised.

563.   For example, Defendant Fowler recommended hiring a HR Manager to replace Plaintiff.

564.   Defendant Fowler's recommendation was not made for legitimate lawful reasons.

565.   Defendants Kenco, Mars Lopez, Coffey, Moore, Jabaley, Spier and others conferred individually and collectively and agreed with Fowler's recommendation.

566.   Defendants Kenco, Mars Lopez, Coffey, Moore, Jabaley, Spier and others were acting for the benefit of the corporation and themselves.

567.   There were a number of emails suggesting that poor leadership was the root cause of the issues at the Mars Manteno facility.

568.   Defendant Elliott on behalf of Kenco and others stated to the IDHR and EEOC in August of 2015 that it was Plaintiff's failing (poor) leadership that caused of the charges of discrimination to be filed against them.

569.   Plaintiff had never received a poor performance rating, write-up or disciplinary action nor was Plaintiff afforded a due process in being demoted or informed of his demotion until August of 2015.

570.   Plaintiff reported to Defendant Fowler with a dotted line to the General Manager of the facility.

571.   All of the discrimination claims were deemed frivolous by David Jabaley Director of Operations, and Trace Spier the then VP of Operations in our budget meeting in August of 2014.

572.   Spier added a $100,000.00 to the budget to defend these frivolous claims of discrimination.

573.    After the $100,000.00 increase in the budget to defend these claims, Defendant Kenco hired Jay Elliott[5] as its in house counsel.

574.    Elliott's hiring was a contrived scheme to further Defendants schemes to breach Defendants' fiduciary obligations to comply with public and company policy with regard to Plaintiff and others.

575.    Defendant(s) Mars, Kenco, Spier, Elliott, Crawley, Caines and others were acting for the benefit of the corporation and themselves.

576.    Defendant(s) Mars, Kenco, Spier, Elliott, Crawley, Caines and others were authorized to perform these acts with the primary intent to benefit the corporation.

577.    Additionally, Defendants Mars, Kenco, Spier, Elliott, Crawley, Caines and others intentionally interfered and obstructed the administration of justice through strategically hiring Elliott as an employee, to act within the scope of his employment, when he participate in the administrative processes of claims of discrimination.

578.    The administrative process at the IDHR and EEOC is a requisite of Title VII claims.

579.    Defendants, specifically Elliott, on behalf of others such as Kenco, Fowler, Walsh, Lopez, Manzello, Jabaley and others provided inaccurate, prejudicial and misleading accounts of information, false statements (testimony and

---

[5] The hiring of Jay Elliott according to Defendant Kenco's policy required the recommendation of the VP or higher and the approval of the CFO and President of the company.

documentation)[6] to undermine the integrity of the process of incidents that occurred, even prior to his employment.

580. Plaintiff alleges that these statements were made for the sole purpose to harass and interfere with plaintiffs' ability to pursue a remedy against Defendants.

581. Plaintiff asserts that this was an intentional breach of fiduciary obligation not only to Plaintiff, but to the judicial system and its administration of justice for two reasons: Defendant Elliott is an officer of the court and it is improper to "knowingly and willfully . . . make[] any materially false, fictitious, or fraudulent statement or representation" in the course of "any matter within the jurisdiction of the executive, legislative, or judicial branch" of the federal government.

582. For example, Defendant Elliott indicated that he lacked access to employees.

583. Reasonably, it can be easily inferred and asserted that Elliott was not able to conduct an investigation regarding these matters, as he lacked access to employees.

584. It can also easily be inferred that any information that Elliott provided or submitted to various agencies, tribunals and courts relative to Plaintiff and other litigants was contrived, capricious and inaccurate.

---

[6]False statements were made by way of U.S. mail, email and phone through verified statements and other correspondences.

585.   It can also be reasonably asserted from this and other conduct that the fiduciary obligation(s) due Plaintiff and others were intentionally breached through the concerted efforts of various persons.

586.   David Caines, David Crawley, Trace Spier, Paula Hise, Tammi Fowler, David Jabaley and others participated in these conspiracies that retaliated against and harassed Plaintiff for his: 1) association with African Americans; 2) opposition to discriminatory treatment and; 3) non-complicity to white racial dominance and black subordination.

587.   Plaintiff also asserts that these person's conspiratory actions also obstructed justice and its administration.

588.   Plaintiff also asserts that these conspiratory actions were in violation of U.S.S. 1985.

589.   Elliott became Defendants' proxy during the requisite investigation stage to influence, prejudice and obstruct justice.

590.   Additionally, it can be asserted that Defendants, including Elliott, Spier, Hise, Crawley, Caines, Fowler, Jabaley, Lopez, Kenco and others had financial motives because of their respective financial interests in the company to protect the interest of the company (Kenco) and its client Mars.

591.   Defendants Mars and Kenco awarded employees performance bonuses.

## COUNT XVII-735 ILCS 5/13-205 TORTIOUS INTERFERENCE WITH

## PROSPECTIVE ECONOMIC ADVANTAGE BY DEFENDANTS MARS, KENCO,

## LOPEZ, JABALEY, HISE, MOORE, COFFEY, AND FOWLER

592.   Plaintiff hereby re-alleges and incorporates by reference the above paragraphs.

593.   Plaintiff contends that he was not given the opportunity or apprised of the process to apply to continue to work at the Mars Manteno facility with the new management company.

594.   Defendants Mars, Kenco and Lopez indicated that information would be provided to Plaintiff for Plaintiff to apply for continued employment.

595.   Defendants Mars, Kenco, Fowler nor Lopez or anyone in privity to these Defendants provided that information to Plaintiff as promised.

596.   Szplett contends this interference was in retaliation of Szplett's: 1) failure to act in complicity with management's race-based stereotypes regarding African Americans and his unwillingness to work with other Caucasian employees to marginalize, subordinate, minimize, exclude or disparage African American employees; 2) opposition to discrimination and; 3) association with African Americans.

597.   Plaintiff also asserts that his discharge was also a result of this interference executed through the elaborate contrived retaliatory scheme to not

give Plaintiff the opportunity to apply to continue to work at the Mars Manteno facility.

598. Plaintiff also contends that Defendants Mars, Kenco, The Hartford and others in privity to them interfered with Plaintiff's ability to receive Plaintiff's short term disability benefits when: Defendants Mars and or Kenco or their employees or those in privity to them provided patently false and misleading to the Plaintiff's physician regarding Plaintiff's job and duties.

599. Defendants Mars, Kenco, The Hartford and others in privity to them provided a job posting from another facility that was not Plaintiff's.

600. Plaintiff asserts that this was intentional as each facility is mandated by FSMA to have its own quality management system that has job descriptions for each employee.

601. Plaintiff's physician made an evaluation based upon the specific information in the job posting provided.

602. Defendants Mars, Kenco, The Hartford and others in privity to them made the decision to terminate Plaintiff's benefits in part because of this evaluation and in part because Defendants Mars, Kenco, The Hartford and others in privity to them deemed him improved to return to work.

603. Plaintiff had not been released to return to work at that time.

604. Plaintiff also contends that Defendants Mars, Kenco and others in privity to them interfered with Plaintiff's ability to obtain unemployment benefits as

Defendants Mars, Kenco and others in privity to them held Plaintiff out to be
employed until March 29, 2015, effectively disqualifying Plaintiff to receive
unemployment.

605.    Plaintiff contends that Defendants Mars, Kenco, The Hartford and others
in privity to them intentionally breached their fiduciary obligation and acted
with malice or reckless indifference to the rights Plaintiff and other when it
interfered with Plaintiff's ability to engage in the various forms of economic
advantages due him.

## COUNT XVIII- 735 ILCS 5/13-202 INTENTIONAL INFLICTION OF
## EMOTIONAL DISTRESS OF PLAINTIFF BY DEFENDANTS

606.    Plaintiff hereby re-alleges and incorporates by reference the above
paragraphs.

607.    Defendants were aware that Plaintiff was out on disability due to
work related stress.

608.    Defendants intentionally inflicted emotional distress upon Plaintiff and
Plaintiff's family, when it intentionally failed to compensate Szplett as it had
other employees for the month of March in 2015.

609.    Defendants intentionally inflicted emotional distress upon plaintiff and
Plaintiff's family, when it intentionally denied Plaintiff disability and

unemployment benefits beginning in February of 2015, while Plaintiff was out on disability due to the work related stress of the hostile work environment.

610.    Defendants intentionally inflicted emotional distress upon Plaintiff and Plaintiff's family, when it intentionally did not apprise plaintiff on how to continue his employment at the Mars Manteno facility as it had other employees.

611.    Defendants intentionally inflicted emotional distress upon Plaintiff and Plaintiff's family, when Defendants orchestrated a Quid Pro Quo to extort Plaintiff into obstructing justice by aiding and abetting Defendants in defending against the HR claims in litigation in exchange for Plaintiff's severance pay.

612.    Defendants intentionally inflicted emotional distress upon Plaintiff and Plaintiff's family, when it intentionally demoted Plaintiff.

613.    This demotion occurred less than three weeks after plaintiff was on disability for work related stress.

614.    Defendants had been conspiring and furthering its schemes to retaliate against Plaintiff prior to the hiring of Lori Varvel and Szplett's actual demotion in November 2014.

615.    Plaintiff was not aware that he had been demoted until August of 2015.

616.    Defendants' conduct as outlined above was intentional.

617.    Defendants' conduct as outlined above was extreme, outrageous, and of such character as not to be tolerated by a civilized society.

618. Defendants' conduct as outlined above was for an ulterior motive or purpose.

619. Defendants' were aware of Plaintiff's medical condition as he was out on work related stress.

620. Defendant The Hartford conveyed to at a minimum Defendant Kenco that Plaintiff was out do to work related stress.

621. Plaintiff only corresponded with The Hartford regarding his medical condition(s).

622. Plaintiff did not authorize The Hartford to discuss his medical condition with his employer.

623. Defendant Kenco at a minimum conveyed to Defendants Mars, Hise, Fowler, Jabaley, Lopez, Moore, Coffey, Elliott and others that Plaintiff was on leave due to work related stress.

624. Defendants' conduct resulted in severe and serious emotional distress.

625. As a direct and proximate result of Defendant's conduct, Plaintiff has been damaged in the manner outlined above.


## COUNT XIX 735 ILCS 5/13-215 FRAUDULENT CONCEALMENT OF ADVERSE EMPLOYMENT ACTIONS BY DEFENDANTS MARS, KENCO, LOPEZ, FOWLER, JABALEY, ELLIOTT, SPIER, HISE, MOORE, AND COFFEY

626. Plaintiff hereby re-alleges and incorporates by reference the above paragraphs.

627. Additionally, Szplett asserts that Defendants Mars, Kenco, Fowler, Jabaley, Spier, Moore, Coffey, Hise, Elliott and others in privity conspired to fraudulently conceal from Plaintiff that Defendants had harmed Plaintiff by demoting Plaintiff from the HR Manager's position unbeknownst to him.

628. At no time did Defendants tell Plaintiff that Plaintiff would be replaced.

629. At no time did Defendants tell Plaintiff that he had been replaced while he was on sick leave.

630. Plaintiff also asserts that Defendants had not made him aware of any performance issues that would dictate or necessitate such a change.

631. Plaintiff was replaced within three (3) weeks of being on disability.

632. Szplett contends that Defendants had been furthering its scheme by conspiring to replace Szplett's, as Defendants had made a plan and had been actively looking and recruiting for his replacement since September of 2014.

633. Plaintiff also asserts that the first time he became aware of an issue with his performance was in August of 2015. Defendants indicated to the IDHR and EEOC that it was his failing leadership that led to Defendants deciding to hire Varvel as the HR Manager.

634. Szplett's also contends that numerous Defendants such as Fowler, Walsh, Lopez, Jabaley, Spier, Hise and other malfeasors wanted Szplett to actively

assist with the expected complicity to the white racial dominance and subornation of African Americans.

635. Szplett's asserts that his failure to conform to this overt racism prompted the change in the Manteno HR department.

636. In mid-April of 2015 Plaintiff learned that Defendants mischaracterized him before the IDHR and EEOC as other than the HR/Accounting Manager in the matter of Edith McCurry.

637. Defendants' unlawful actions as alleged above were intentional and willful. Defendants acted corruptly with malice or reckless indifference to the rights Plaintiff and others.

# COUNT XX- 735 ILCS 5/13-214.3 AIDING AND ABETTING BY ALL OF THE NAMED DEFENDANTS

638. Plaintiff hereby re-alleges and incorporates by reference the above paragraphs.

639. Mars, Inc., Kenco, Robert Coffey, Todd Moore, Paula Hise, Trace Spier, David Caines, Dwight Crawley and others aided and abetted malfeasors such as Kelvin Walsh, Mike Manzello, David Jabaley, Mario Lopez, Tammi Fowler, Jay Elliott, Lori Varvel and others in obstructing justice and its administration.

640. Mars, Inc., Robert Coffey, Todd Moore and others aided and abetted malfeasors such as Kenco, Kelvin Walsh, Mike Manzello, David Jabaley, Mario

Lopez, Tammi Fowler, Pete Monstwillo and others to intentionally discriminate against protected class person, including Plaintiff, to include African Americans and those that either associated with African Americans or who opposed disparaging or refused to disparage African Americans.

641. Furthermore, Mars, Inc., Robert Coffey, Todd Moore and others aided and abetted malfeasors, such as Defendants Kenco, Kelvin Walsh, Mike Manzello, David Jabaley, Mario Lopez, Tammi Fowler, along with Pete Monstwillo and others, in their gross negligence to intentionally discriminate against and terrorize protected class person, including Plaintiff, to include African Americans and those that either associated with African Americans or who opposed disparaging or refused to disparage African Americans.

642. Specifically, Mars, Inc., Robert Coffey, Todd Moore and others refused to stop the gross negligence and intentional discrimination of protected class persons, including Plaintiff and others such as African Americans and those that either associated with African Americans or who opposed discrimination or refused to disparage African Americans.

643. More specifically, Robert Coffey was on site and should have known or been aware of the intentional discrimination, the uneven discipline of protected class persons and the hostile work environment.

644. Coffey reported to Moore, who also had input and control over the Mars Manteno facility and in turn Moore reported to others such as Steve Sheldon.

645.    Additionally, Plaintiff asserts that it is an employee's right to have a safe working environment free from racial animus and hostility and that Mars, Inc. Robert Coffey, Todd Moore and others did nothing to stop this intentional, pervasive and systematic discrimination.

646.    Mars, Inc., Kenco, Robert Coffey, Todd Moore and others aided and abetted malfeasors such as Kelvin Walsh, Mike Manzello, David Jabaley, Mario Lopez, Tammi Fowler, Pete Monstwillo and others in violating the constitutionally protected rights of protected class persons, including Plaintiff, as well as, African Americans and those that either associated with African Americans or who opposed disparaging or refused to disparage African Americans.

647.    More specifically, Mars, Inc., Robert Coffey, Todd Moore and others furthered the malfeasors conspired and intentional schemes of discrimination by giving approval and funding to execute the hiring of Lori Varvel to cover-up the intentional discrimination along with weighing in on various schemes that would defraud employees out their various protected rights.

648.    Specifically, Mars, Inc., Robert Coffey, Todd Moore and others, in violation of company and public policy, did not conduct any investigation to unearth the issues or to address them. Nor did they follow their policies or public policy relative to employment discrimination.

649.    Mars, Inc., Kenco, Robert Coffey, Todd Moore and others aided and abetted malfeasors, such as Kelvin Walsh, Mike Manzello, David Jabaley, Mario Lopez, Tammi Fowler, Pete Monstwillo and others, to intentionally obstruct and imped justice and its administration relative to protected class person, including Plaintiff, to include African Americans and those that either associated with African Americans or who opposed disparaging or refused to disparage African Americans.

650.    More specifically, Mars, Inc., Robert Coffey, Todd Moore and others corruptly furthered the malfeasors conspired and intentional schemes of discrimination and obstruction by giving approval and funding necessary to execute the hiring of Lori Varvel. Varvel's hiring would further the scheme too cover-up the intentional discrimination along with being able to strategically further the various other contrived schemes that would obstruct and impede the administration of justice of the protected rights of Plaintiff and others.

651.    Mars, Inc., Robert Coffey, Todd Moore and others aided and abetted malfeasors such as Defendants Kenco, Kelvin Walsh, Mike Manzello, David Jabaley, Mario Lopez, Tammi Fowler, Jay Elliott and others to intentionally make materially false misrepresentations in violation of 18 U.S.C. § 1001 to governmental agencies and tribunals in an effort to further obstruct and imped justice and its administration relative to Plaintiff and other protected class persons.

652.     These aforementioned Defendants either acquiesced, made patently false or misleading statements, half-truths or omissions and acted corruptly.

653.     Mars, Inc., Robert Coffey, Todd Moore and others aided and abetted and conspired with malfeasors such as Kenco, Kelvin Walsh, Mike Manzello, David Jabaley, Mario Lopez, Tammi Fowler, Jay Elliott, Pete Monstwillo and others in breaching its duty of care owed to the employees of the Mars Manteno facility.

### COUNT XXI-RICO

### (Federal Civil RICO, 18 U.S.C. §1962(c) & (d))

**Defendants Kenco Logistics, The Kenco Group, Trace Spier, Paula Hise, Mars Inc., David Jabaley, Eddy Register, Tammi Fowler, Dwight Crawley, David Caines, Todd Moore, Robert Coffey, Steve Sheldon and Other Unknown Persons**

654.     Plaintiff incorporates by reference all the preceding paragraphs of this Complaint as if fully set forth herein.

655.     Defendants violated RICO and Plaintiff was injured as a result.

656.     Each Defendant is a "person" capable of holding legal or beneficial interest in property within the meaning of 18 U.S.C. § 1961(3).

657.     Each Defendant violated 18 U.S.C. § 1962(c) & (d) by the acts described in the prior paragraphs, and as further described below.

658.    The Enterprise, Defendants Kenco Logistics, Mars, Inc., Jabaley,

Tammi Fowler, Mario Lopez,......, together with (1) the Kenco Group, (2)

one or more former officers and former directors of Kenco, (3) employees,

officers and directors of the Kenco Group-controlled companies (including

David Caines, Sandra Kennedy, Trace Spier, Paula Hise, Eddy Register,

David Jabaley, David Crawley), and (4) Mars, Inc., together with (1) one

or more former officers and former directors of Mars, Inc. (3) employees,

officers and directors of the Mars, Inc. including Robert Coffey, Todd

Moore, Steve Sheldon and others form an association-in-fact for the

common and continuing purpose described herein and constitute an

enterprise within the meaning of 18 U.S.C. § 1961(4) engaged in the

conduct of their affairs through a continuing pattern of racketeering

activity.

659.    The members of the enterprise functioned as a continuing unit with

an ascertainable structure separate and distinct from that of the conduct

of the pattern of racketeering activity. There may also be other members

of the enterprise who are unknown at this time.

660.    Alternatively, the Kenco Group companies each constitute a separate

enterprise within the meaning of 18 U.S.C. § 1961(4).

661.    Alternatively, the Kenco Group-controlled companies together

constitute an enterprise within the meaning of 18 U.S.C. § 1961(4).

662.    Alternatively, the Mars, Inc. companies each constitute a separate enterprise within the meaning of 18 U.S.C. § 1961(4).

663.    Alternatively, the Mars, Inc.-controlled companies together constitute an enterprise within the meaning of 18 U.S.C. § 1961(4)

664.    Each enterprise has engaged in, and their activities have affected, interstate commerce.

665.    Pattern of Racketeering Activity. Defendants, each of whom are persons associated with, or employed by, the enterprise, did knowingly, willfully and unlawfully conduct or participate, directly or indirectly, in the affairs of the enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(1), 1961(5), and 1962(c).

666.    The racketeering activity was made possible by Defendants' regular and repeated use of the facilities and services of the enterprise. Defendants had the specific intent to engage in the substantive RICO violation alleged herein.

667.    Predicate acts of racketeering activity are acts which violate the provisions of the U.S. Code enumerated in 18 U.S.C. § 1961(1)(A) & (B), as more specifically alleged below. Defendants each committed at least two such acts or else aided and abetted such acts.

668.    The acts of racketeering were not isolated, but rather the acts of Defendants were related in that they had the same or similar purpose and

result, participants, victim(s) and method of commission. Further, the acts of racketeering by Defendants have been continuous.

669.    There was repeated conduct during a period of time beginning in approximately 2013 and continuing to the present, and there is a continued threat of repetition of such conduct.

670.    The association-in-fact enterprise and the alternative enterprises, as alleged herein, were not limited to the predicate acts and extended beyond the racketeering activity. Rather, they existed separate and apart from the pattern of racketeering activity for the legitimate business purpose Defendants.

671.    Plaintiff asserts that Defendants have had and do have legitimate business plans outside of the pattern of racketeering activity.

672.    Plaintiff specifically alleges that Defendants participated in the operation and management of the association-in-fact enterprise and the alternative enterprises by overseeing and coordinating the commission of multiple acts of racketeering as described below.

673.    Predicate Act: Use of Mails and Wires to Defraud Plaintiff through extortion in Violation of 18 U.S.C. §§ 1341 and 1343. Defendants committed acts constituting violations under 18 U.S.C. §§ 1341 and 1343 in that they conspired to devise and devised a scheme or artifice to defraud money

through extortion from Plaintiff in a quid pro quo scheme by means of false or fraudulent pretenses, representations, and promises.

674.    For the purpose of executing their scheme or artifice, Defendants caused delivery of various documents and things by the U.S. mails or by private or commercial interstate carriers, or received such there from.

675.    Defendants also transmitted or caused to be transmitted by means of wire communications in various writings, signs and signals that furthered Defendants schemes.

676.    The acts of Defendants set forth above were done with knowledge that the use of the mails or wires would follow in the ordinary course of business, or that such use could have been foreseen, even if not actually intended.

677.    These acts were done with an intentional reckless disregard for Plaintiff and others.

678.    Defendants knew that its specific intent was to advance Defendants' scheme or artifice to obstruct justice to avoid culpability and liability for the violation of Plaintiff and others federally protected rights under Title VII, USC 1981 and other federally protected rights.

679.    Defendants carried out their scheme in different states and could not have done so unless they used the U.S. mails or private or commercial interstate carriers or interstate wires.

680.    In furtherance of their scheme alleged herein, Defendants Kenco,

The Kenco Group, Spier, Hise, Jabaley, Lopez, Register, CFO, COO, CEO,

President of Kenco Group, Mars, Inc., Coffey, Moore, Sheldon and others

communicated among themselves and with Plaintiff in furtherance of the

scheme to defraud and extort Plaintiff, as well as, obstruct justice and its

administration to avoid culpability and liability in the violation of

Plaintiff and others federally protected rights..

681.    These communications were typically transmitted by wire (i.e.,

electronically) and/or through the United States mails or private or

commercial carriers. Defendants also transmitted or caused an undated

letter regarding Plaintiff's severance, compensation and unemployment

benefits received by Plaintiff during the week of February 26, 2015

through the U.S. mail.

682.    Furthermore, Plaintiff asserts that communications took place with

Defendants and unknown officers and directors of Kenco and Mars during

the course of the termination of Kenco Logistics as the 3rd party manager

for MARS, Inc. in 2015 to carry out this transition.

683.    Specifically, Defendants used wire and/or U.S. mail or private or

commercial carriers to coerce and extort Plaintiff out of his compensation,

severance and unemployment benefit for the purpose of continuing their

fraudulent scheme to obstruct justice to avoid liability and culpability for

engaging in the violation of employees federally protected rights under Title VII, USC 1981 and other federally protected rights.

684.    More specifically, Defendant Mars, Inc., its officers, directors and employees caused the January 2015 termination letter to be disseminated by U.S. mail or private or commercial carriers.

685.    Correspondence took place between Mars and Kenco regarding the transition.

686.    Specifically, Judy Craig discussed notifying the employees of transition by email with Mars.

687.    Specifically, in early February Plaintiff was notified by mail by Mario Lopez that Kenco had lost its contract.

688.    Specifically, in February of 2015, Plaintiff was notified by Eddy Register that he had failed to apply for continued employment.  Plaintiff was told that he was entitled to his salary for March, his severance and unemployment after March's compensation was exhausted; {in exchange} if he agreed to waive his rights to pursue claims against Defendant(s). Plaintiff was also to help Defendants defend against HR related matters and litigation.

689.    Essentially, Defendants conspired to coerce Plaintiff into being extorted out of his protected rights and to obstruct justice and its administration for Plaintiff and other former and then current employees

of the Mars Manteno facility in a quid pro quo for his salary, his severance and his unemployment through the U.S. Mail.

690. Plaintiff was given forty-five (45) days after receiving this offer through the U.S. Mail to accept this offer.

691. Within those forty-five (45) days, on or about April 15, 2015 Plaintiff became aware that Defendants were attempting to obstruct justice and its administration, when Plaintiff began being mischaracterized as other than the HR manager to avoid culpability and liability in the matter of Edith McCurry IDHR and EEOC charge no. 2015CA1804/21BA50670.

692. More specifically, on April 1, 2015, the IDHR and EEOC received a communication from Defendant Kenco in charge no. 2015CA1804/21BA50670 indicating that Szplett was not the HR Manager.

693. It was at this point that Plaintiff had a suspicion that Defendants were engaging in some impermissible or unlawful acts.

694. Plaintiff realized that once again Defendants expected Plaintiff to act in complicity to expectation that Caucasians would work together to purport white racial dominance and the subornation of African Americans through disparagement, marginalization, minimization and exclusion.

695. Plaintiff's then and current legal counsel contacted Defendant Kenco regarding Plaintiff's March compensation.

696.   Defendant Kenco stated by email that Szplett was not entitled to the March compensation because he did not work.

697.   No other employee who received March's compensation worked.

698.   Shortly thereafter in May of 2015, Plaintiff filed charges at the IDHR, EEOC and the Illinois Department of Labor herein after "IDOL."

699.   In late August of 2015, Plaintiff learned from Defendants position statement that according to Defendant Kenco, Szplett was the reason for all of the discrimination charges being filed.

700.   Szplett also learned in the same position statement that Defendants hired Lori Varvel because of all of the charges of discrimination that were being filed.

701.   This statement was sent to the IDHR and EEOC by Defendants through the U.S. Mail.

702.   This was the first time that Defendants had communicated to Szplett's that he had been relieved of his job duties and tasks as the HR Manager, as Szplett had been out on a constructive medical discharge due to the hostile work environment.

703.   Defendants were aware that Plaintiff was out on medical leave due to work related stress.

704.   Plaintiff asserts that at a minimum Defendants communicated this information amongst themselves by email and phone.

705. Plaintiff asserts that Defendants used wire and/or U.S. Mail or private or commercial carrier to submit its position and verified statements and supporting documentation and evidence in charge no. 2015CA1804/21BA50670 in furtherance of their scheme to obstruct justice and its administration.

706. Plaintiff also asserts that Defendants obstruction of justice and its administration was to avoid liability and culpability through providing misleading and fraudulent half-truths that would continue to violate Plaintiff's and others federally protected rights.

707. Defendants' quid pro quo scheme to extort Plaintiff also caused Plaintiff to be defrauded out of his benefits and thousands of dollars.

708. Defendants shared objective was to avoid culpability and liability of Title VII, §1981 and other federally protected claims by obstructing justice and its administration through contrivance.

709. Defendants committed acts constituting violations under 18 U.S.C. §1952 in having devised or intended to devise a scheme or artifice to obstruct justice and its administration.

710. Defendants committed acts constituting violations under 18 U.S.C. §1952 in that having devised or intended to devise a scheme or artifice to defraud and extort plaintiff out of his benefits, compensation, severance

and protected rights in a quid pro quo exchange to force Plaintiff to aid and abet Defendants in obstructing justice and its administration.

711. Specifically, in September of 2014 Trace Spier and Todd Moore agreed to meet.

712. Both individuals traveled to Illinois to meet offsite regarding the Mars Manteno site and its leadership.

713. From the meeting between Spier and Moore a plan was devised on how to address the issues at the Mars Manteno facility.

714. Plaintiff asserts that the plan included hiring a replacement for Plaintiff to perform his HR duties and functions.

715. Plaintiff asserts that in furtherance of this scheme Defendants used electronic mail, telephone and internet to comprise and finalize its plans to hire a HR Manager.

716. Plaintiff contends that defendants used the internet to advance its scheme when it advertised the position of HR Manager in September of 2014.

717. Plaintiff contends that when Defendants advertised the position of HR Manager, Szplett was holding the position of HR Manager.

718. Plaintiff also contends that by email Todd Moore and Robert Coffey of Mars, Inc. approved the cost of hiring the HR Manager.

719.    Plaintiff asserts that Todd Moore was located in Chattanooga, TN and Robert Coffey was located in Manteno, IL.

720.    Plaintiff also asserts that Defendants scheme could not have been furthered without U.S. mails or private or commercial interstate carriers or interstate wires.

721.    These acts were done intentionally and knowingly with the specific intent to advance Defendants' scheme or artifice to obstruct justice and its administration to avoid culpability and liability for the violation(s) of the federally protected rights of the former and then current employees of the Mars Manteno facility.

722.    Specifically, Defendants obstructed justice to deprive former and then current employees, including Plaintiff, out of their constitutional right of due process. Defendants acted corruptly and with malice.

723.    Tammi Fowler recommended hiring a HR Manager.

724.    Fowler traveled from Chattanooga, TN to Illinois to interview candidates in furtherance of Defendants scheme or artifice to obstruct justice. Fowler acted corruptly and with malice.

725.    This was not the only instance that Fowler had traveled to Illinois from Tennessee in order to promote, manage and facilitate the continuation of Defendants schemes.

726. Plaintiff also contends that others such as David Jabaley, Paula Hise, Trace Spier, Todd Moore and others have traveled to Illinois in furtherance of Defendants contrived schemes or artifices to obstruct justice.

727. Mario Lopez, the then General Manager and Tammi Fowler decided to hire Lori Varvel, as Plaintiff later learned because of all the charges of discrimination that were filed against them.

728. Lori Varvel was hired, according to Defendants, as the HR Manager because of Szplett's failing leadership and because of all the charges of discrimination filed against them.

729. Plaintiff also asserts that Jay Elliott was also hired as the VP of Legal in furtherance of Defendants scheme and artifice to obstruct justice.

730. Elliott had been Defendant Kenco's outside legal counsel from the firm of Miller & Martin in Chattanooga, TN.

731. Plaintiff asserts that Trace Spier stated in August of 2014 that an additional $100,000.00 would be added to the budget to defend the claims of discrimination.

732. Jabaley stated that the claims of discrimination were frivolous, but still needed to be defended.

733. Budgets were approved by Mars, Inc.

In previous years, Mars previously paid the legal bills incurred at the Mars Manteno facility.

734. Todd Moore, Robert Coffey and others approved the budget for the Mars Manteno facility.

735. Mars ultimately paid the line items on the approved budget, after it was passed through the management company.

736. Plaintiff asserts that this included legal fees.

737. Plaintiff asserts that Elliott's hiring was a result of the budgeted monies to defend the alleged "frivolous" claims of discrimination.

738. According to Defendant Kenco's policy CP.HR.01002 the hiring of a VP required the authorization of the CFO and President of the Group.

739. Elliott was hired in November of 2014.

740. These acts were done intentionally and knowingly with the specific intent to advance Defendants' scheme or artifice.

741. Varvel and Elliott participated in Fact Finding Conferences held on behalf of the IDHR and EEOC for Plaintiff and other former and then current employees at the Mars Manteno facility.

742. Kenco and Elliott were made aware that an attorney could not participate in the Fact Finding Conference by the IDHR and EEOC.

743. Nonetheless, Elliott participated in Plaintiff's Fact Finding conference by phone, as he had with other employees, without having any firsthand knowledge.

744. Specifically, Elliott admitted in an email to the IDHR and EEOC investigator that he did not have access to employees at the Mars Manteno facility, as they had lost the contract.

745. Specifically, Elliott admitted in email(s) in March and October of 2014 that Varvel did not know any more than he did, as she was hired after the incidents that occurred in this matter of Vernon Henry in October of 2014, to which Plaintiff witnessed and participated in.

746. Plaintiff asserts that Elliott's participation violated the IDHR and EEOC rules regarding attorney participation.

747. Plaintiff also asserts that the statements made by Elliott were not made with firsthand knowledge nor made upon a reasonable investigation.

748. Plaintiff also asserts that because Elliott did not have access to the employees as he stated he could not have conducted an investigation.

749. Furthermore, Defendants failed to adhere to their policies to conduct investigations as required by company and public policy.

750. Plaintiff contends that Elliott was the attorney of record for Defendants in the IDHR and EEOC proceedings.

751. Szplett also contends that Elliott was an officer of the court at the relevant time.

752. Plaintiff also contends that since Elliott had no firsthand knowledge, no access to employees, and no investigations had taken place the statements made by Elliott were patently false and misleading.

753. Szplett also contends that Elliott's participation was contrived to impede, thwart and obstruct justice and its administration in Plaintiff's and others matters.

754. Szplett also contends that Elliott's participation was also in furtherance of Defendants' scheme or artifice.

755. Plaintiff also contends that he acted corruptly and as a sworn officer of the court he had a fiduciary obligation to not even give the mere appearance of acting corruptly.

756. Szplett also contends that Varvel had no firsthand knowledge and that any statements made were patently false and misleading.

757. Szplett also contends that Varvel's hiring was contrived and that Defendants used Varvel to further its schemes and artifices of obstruction of justice and its administration, when Varvel participated in Plaintiff's and others proceedings at the IDHR and EEOC.

758. These acts were done corruptly with the specific intent to advance Defendants' Mars, Kenco and others scheme or artifice.

759.   Defendants' shared objective was to violate Plaintiff's constitutional rights.

760.   Defendants' shared objective was to obstruct justice and its administration.

761.   Defendants' shared objective was to avoid culpability and liability.

762.   Szplett also contends that the directors, executive officers and other employees of the Mars Manteno facility, Mars, Inc., Kenco Logistics and The Kenco Group conspired to and obstructed justice and its administration when hired Elliott and Varvel.

763.   Plaintiff contends that these immediate aforementioned persons shared objective was to: 1) avoid liability and culpability; 2) evade justice; 3) obstruct and impede the administration of justice; 4) continue to violate Plaintiff's and other rights; 5) defraud Plaintiff and others out of their due process of law; 6) defraud Plaintiff and others out being made whole and; 7) undue enrichment from monies retained from Plaintiff and others.

764.   Szplett also contends that these persons included: Lori Varvel, Mario Lopez, Robert Coffey, Todd Moore, Steve Sheldon, Paula Hise, Trace Spier, Dwight Crawley, David Caines, CEO, President, David Jabaley, Eddy Register, Tammi Fowler and other unknown persons at this time.

765.  Szplett also contends that Kelvin Walsh and Mike Manzello also conspired to obstruct justice and its administration with one or more of the aforementioned persons.

766.  For example, Fowler, Spier, Jabaley, Moore, Coffey, Spier and others conspired to and hired Lori Varvel because of all the charges of discrimination according to Elliott in August of 2015.

767.  Another example is Caines, Crawley and Spier corruptly conspired to and hired Elliott as the VP of Legal.  Elliott, a sworn officer of the court, corruptly obstructed and impeded justice and its administration, when he: 1) made patently false statements to the IDHR, EEOC and IDOL by phone; 2) submitted false and misleading verified position statements that contained patently false and misleading information to the IDHR, EEOC and IDOL through the US Mail and email and; 3) participated in investigatory proceedings before the IDHR, EEOC and IDOL as a witness and legal counsel.

768.  Elliott also emailed the IDHR and EEOC stating that he did not have access to employees and that he and Varvel started after these incidents had occurred.

769.  Every citizen has a constitutional right to the due process of law.

770.  Plaintiff asserts that Defendants intentionally conspired to obstructed justice in violation of 18.U.S.C. §1962(d).

771.    Plaintiff also asserts that Defendants intentionally conspired to obstructed justice in violation of 18.U.S.C. §1962(d) in violation of Plaintiff's and others right to the due process of law.

772.    Plaintiff asserts that Defendants intentionally conspired to obstructed justice in violation of 18.U.S.C. §1962(d) to avoid culpability and liability for violating protected rights of Plaintiff's and others rights through extortion, false representations, fraud, deceit, and other improper and unlawful means.

773.    Defendants' violations of state and federal law as set forth herein, each of which directly and proximately injured Plaintiff and other employees, constituted a continuous course of conduct spanning a period from approximately 2013 to present, which was intended to obstruct justice and its administration through extortion, false representations, fraud, deceit, and other improper and unlawful means. Therefore, said violations were a part of a pattern of racketeering activity under 18 U.S.C. §§ 1961(1) and (5).

774.    Defendants, each of whom are persons associated with, or employed by Mars, Inc., Kenco Logistics, The Kenco Group or the Kenco Mars facility and did knowingly, willfully and unlawfully conduct or participate, directly or indirectly, in its affairs through a pattern of racketeering activity with the meaning of 18 U.S.C. § 1961(1), 1961(5),

and 1962(c). The racketeering activity was made possible by Defendants' regular and repeated use of Mars, Inc., Kenco Logistics, The Kenco Group or the Kenco Mars facility personnel, facilities and services. Defendants had the specific intent to engage in the substantive RICO violation alleged herein.

775.   Plaintiff asserts that Defendants have conducted and/or participated, directly and/or indirectly, in the conduct of the affairs of the alleged enterprises through a pattern of racketeering activity as defined herein in violation of 18 U.S.C. § 1962(c) & (d).

776.   Predicate acts of racketeering activity are acts which are in violation of the U.S. Code enumerated in 18 U.S.C. § 1961(1)(A) & (B), as more specifically alleged below. Defendants each committed at least two such acts or else aided and abetted such acts.

777.   The acts of racketeering were not isolated, but rather the acts of Defendants were related in that they had the same or similar purpose and result, participants, victims and method of commission. Further, the acts of racketeering by Defendants have been continuous. There was repeated conduct during a period of time beginning in approximately 2013 and continuing to present, and there is a continued threat of repetition of such conduct.

778.   Plaintiff specifically alleges that Defendants participated in the operation and management of Mars, Inc., Kenco Logistics, The Kenco Group or the Kenco Mars facility by overseeing and coordinating the commission of multiple acts of racketeering as described below.

779.   The Predicate acts in violation of 18 U.S.C.§1962 are:

   a.   Extortion in violation of 18 U.S.C §1951,

   b.   Obstruction of Justice in Violation of U.S.C. 18 U.S.C. 1503

   c.   Travel in Furtherance of Scheme to Obstruct Justice in violation of 18 U.S.C. §1952

   d.   Use of Mails and Wires to Extort and Obstruct in Violation of U.S.C. 1341 and 1343

780.   The unlawful actions of Defendants, and each of them, have directly, illegally, and proximately caused and continue to cause injuries to Plaintiff and Plaintiff's protected rights.

781.   Even if some of the Defendants did not agree to harm Plaintiff specifically, the purpose of the acts they engaged in was to advance the overall object of the conspiracy, and the harm to Plaintiff was a reasonably foreseeable consequence of Defendants' actions.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court would:

A.      Grant Szplett a declaratory judgment against the named Defendants that violated Szplett's right to be free from discrimination in the workplace pursuant to the Civil Rights Act of 1866, as amended by the Civil Rights Act of 1991, 42 U.S.C. §1981; 42 U.S.C. §1981A;

B.      Grant Szplett a declaratory judgment against the named Defendants for claims asserted against Defendants under 42 U.S.C. §1985;

C.      Grant Szplett a declaratory judgment against the named Defendants for claims asserted against Defendants under 18 U.S.C. §1001;

D.      Grant Szplett a declaratory judgment against the named Defendants for claims asserted against Defendants under 18 U.S.C. § 1503;

E.      Grant Szplett a declaratory judgment against the named Defendants for claims asserted against Defendants under 18 U.S.C. § 1505;

F.      Grant Szplett a declaratory judgment against the named Defendants for claims asserted against Defendants under 18 U.S.C. § 1512(b), (c), & (f), & (d);

G.      Grant Szplett a declaratory judgment against the named Defendants for claims asserted against Defendants under 18 U.S.C. § &1621;

H.      Grant Szplett a declaratory judgment against the named Defendants for claims asserted against Defendants under 18 U.S.C. § 1962(c) & (d) and;

I. Grant Szplett a declaratory judgment against the named Defendants for Plaintiff's state law claims asserted against Defendants and;

J. Grant a permanent injunction enjoining Defendant, its officers, successors, assigns, agents, servants, employees, attorneys, and all persons in active concert or participation with it, from engaging in any employment practice which discriminates on the basis of a race, or association with African Americans or the failure to act in complicity with white employees who fail to act in complicity and discriminate against African Americans or those who oppose discrimination and;

K. Order Defendant Mars and Kenco to institute and carry out policies, practices, and programs which provide equal employment opportunities for African Americans and which eradicate the effects of its past and present unlawful employment practices and;

L. Order Defendant to implement non-discriminatory objectives, written policies and practices regarding the terms and conditions of employment and sign and conspicuously post, for a designated period of time, a notice to all employees that sets forth the remedial action required by the Court and informs all employees that Defendant will not discriminate against African Americans or those who oppose discrimination of African Americans or those who refuse to act in complicity with white employees to discriminate against African Americans and those who oppose such discrimination any employee because of their race, including that it will comply with all aspects of the 42 USC 1981 and Title VII and;

M. The entry of an injunction ordering each Defendant MARS, Inc., KENCO LOGISTIC SERVICES, LLC and The HARTFORD to make Szplett whole with full back pay, benefits (lost and future) and front pay and; .

N. An injunction ordering that the remaining Defendants individually make Szplett whole to the fullest extent of the law commensurate to the claims that the court has held them liable to and;

O. An award to Szplett for actual damages, including medical, penalties, infliction of emotional distress-compensatory damages in an amount to be shown at trial for past and future economic and non-economic losses, including extreme emotional distress and mental anguish, impairment of the quality of life; and consequential loses and;

P. An award to Szplett for exemplary and/or punitive damages, such as treble damages, in an amount shown at trial and;

Q. An award to Szplett of reasonable attorneys' fees and costs, including but not limited to: court costs, expert witness fees, and other miscellaneous cost: postage, paper, ink, office supplies as provided and;

R. An award of interests on any pre- and post-judgment awards at the highest rate allowed by law; and;

S. Removing false or damaging information from Szplett's personnel file, exonerating Szplett's for all misconduct that he was illegally and wrongly accused of having engaged, and allowing Szplett to provide statements in rebuttal to any remaining documents within his personnel files and;

T.    Such other and further relief that is due Plaintiff and as this Court deems just and appropriate to be determined by a jury;

## PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL COUNTS

Respectfully Submitted this 17 Day of October 2019 by:

Leonard Szplett
3421 W. 1500 NW RD.
Kankakee, ILL 60901
815-212-3125
Stkbnd2000@aol.com

CERTIFICATE OF SERVICE

Please take notice that on October 17, 2019 I, Leonard A. Szplett, hereby do,

certify that I did file A SECOND AMENDED COMPLAINT AS ORDER BY THE

COURT with the NORTHERN DISTRICT OF ILLINOIS in the foregoing matter

of Case No. 1:19 CV-02500 and have served the persons identified on the

docket's service list through Notice of Electronic Filing generated by the

Court's CM/ECF system through the Clerk's Office.


Respectfully Submitted this 17 Day of October 2019 by:


*Leonard Szplett*

Leonard Szplett
3421 W. 1500 NW RD.
Kankakee, ILL 60901
815-212-3125
Stkbnd2000@aol.com